**HIGHLY CONFIDENTIAL**

**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| STEVES AND SONS, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> JELD-WEN, INC., ) <br> ) <br> Defendant. ) <br> ) | Civil Action No. 3:20-cv-000098 |

### JELD-WEN'S SECOND SUPPLEMENTAL BRIEF IN OPPOSITION TO STEVES' MOTION FOR PRELIMINARY INJUNCTION

At the request of the Court, this brief addresses how the coronavirus pandemic should influence the Court's ruling on Steves' pending motion for a preliminary injunction. As explained below, recent events have weakened Steves' claim in two significant ways.

*First*, the balance of harms now tips even more in JELD-WEN's favor. Just this week, JELD-WEN experienced a temporary work stoppage at its Towanda plant, ▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ The requested injunction would only compound this injury by allowing Steves to take a larger slice of what is, unavoidably, a shrinking pie. By contrast, Steves reports that it has avoided any negative impact from the current crisis, and that its business is still booming.

*Second*, recent events render an injunction even more inconsistent with the public interest. At a time when production is already limited, Steves should not receive preference over JELD-WEN's other contract customers and JELD-WEN itself. And given the rapidly changing nature of this crisis, an injunction would "impose[] a continuing duty of supervision on the issuing

1

court." *Original Great Am. Chocolate Chip Cookie Co. v. River Valley Cookies*, 970 F.2d 273, 277 (7th Cir. 1992). When future disruptions inevitably occur, this Court would have to sort out how these disruptions should impact JELD-WEN's obligations under the requested injunction. This inevitable supervision would be a "drain on scarce judicial resources," which is a "factor weighing against the grant of equitable relief in this case." *Id.* Additionally, because JELD-WEN is a publicly traded company, the Court should consider how an injunction would "impact[] the value of the public's investment in the company." *Intergroup Corp. v. Equinox Bus. Credit Corp.*, No. 04 CV 4591, 2005 WL 3274110, at *14 n.2 (D.N.J. July 14, 2005). Since the beginning of the coronavirus epidemic, all industries and companies have been greatly affected, as can be seen in the drop in stock prices across the board. ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

## FACTUAL BACKGROUND

The coronavirus pandemic has impacted JELD-WEN in several significant ways.

In response to the crisis, the Governor of Pennsylvania issued an executive order on Thursday, March 19, 2020, requiring the closure of all businesses that are not considered "life sustaining." Ex. 1 at 1. Enforcement of the Order began the next evening and is to continue "until further notice." *Id.* JELD-WEN immediately and vigorously sought a waiver from the Governor's order, working around the clock with local counsel, in-state advocates, and industry partners to persuade the Governor's office to reclassify JELD-WEN's operations as "life sustaining." In the interim, JELD-WEN suspended doorskin production at its Towanda, Pennsylvania plant— ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

██████████████████████████████████████████████. Finally, after days of urging by JELD-WEN and its partners, the Governor issued an updated list of "life sustaining" businesses on Tuesday, March 24, and JELD-WEN resumed doorskin production in the early hours of Wednesday, March 25.[1] During this time, JELD-WEN provided updates to Steves on JELD-WEN's efforts towards a waiver or clarification from Pennsylvania authorities.

The Towanda shutdown, ████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████ ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████

JELD-WEN's other three doorskin plants are in states—Oregon, West Virginia, and Louisiana—that have also issued stay-at-home orders. Right now, JELD-WEN's facilities in these states are still operating, ████████████████████████████████████████

████████████████████ In addition, JELD-WEN is closely monitoring the health of its factory employees. ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████

The pandemic has also had a stark impact on the enterprise value of companies across America, ████████████████████████████████. ████████████████████████

---

[1] ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████

[2] *See, e.g.*, "Anthony Fauci: Coronavirus shutdown in Louisiana likely needed to come 'a bit sooner,'" Mar. 25, 2020, https://www.nola.com/news/coronavirus/article_230eefc6-6f17-11ea-a321-f3f445345a48.html.

3

██████████████████████████████████████████████████

██████ ████████████████████████████████████ ██████

████████████████████████████████████████████████

███████

## ARGUMENT

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 346 (4th Cir. 2009). The "clear showing" standard applies to each of the four preliminary injunction requirements. *Id.* Thus, a plaintiff "must make a clear showing that the balance of equities tips in [its] favor" and a "clear showing that an injunction is in the public interest." *Sierra Club & S.C. Wildlife Fed'n v. Kolnitz*, No. 2:16-cv-03815, 2017 WL 3480777, at *7–8 (D.S.C. Aug. 14, 2017). This is not a theoretical inquiry. Rather, "[t]he Court must weigh the real-world effect of granting the requested injunction." *APEG Energy II, LP v. Veltri*, No. 19-cv-0801, 2019 WL 3841243, at *8 (D. Colo. Apr. 23, 2019).

### A. Steves' Burden

The events of the past week highlight why the requested injunction is mandatory in nature. Because of the shutdown at Towanda, ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████ Absent an injunction, JELD-WEN will address this unfortunate situation by allocating the available doorskins in an equitable manner based on JELD-WEN's and its external customers' prior-year orders. As the following table shows, this approach ensures that JELD-WEN and its customers each receive a portion of the available production:

4

| Allocation of ▮▮ Carrara Doorskins | | |
|---|---|---|
| Customer | Allocation Percentage | Quantity Shipped |
| Woodgrain | ▮▮ | ▮ |
| Haley | ▮▮ | ▮▮ |
| Excel | ▮▮ | ▮▮ |
| Lynden | ▮▮ | ▮▮ |
| Steves | ▮▮ | ▮▮ |
| JELD-WEN | ▮▮ | ▮▮ |
| **Total** | **100%** | ▮▮ |

Under an injunction, however, this scenario would play out very differently. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ And even if the Court were to order that Steves' extra doorskins should come only from JELD-WEN's allotment, this would still harm JELD-WEN's other doorskin customers. In that scenario, the other door manufacturers would receive fewer doorskins due to allocation, but Steves would receive substantially more. This would provide Steves with an unfair advantage over its door competitors at a time of scarce doorskin supply.

---

3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

As this real-world example makes clear, "[t]he relief requested by [Steves] is a mandatory injunction—requiring [JELD-WEN] to *do* something." *Wells. Am. Corp. v. Ziff-Davis Publ. Co.*, 900 F.2d 258, 1990 WL 33532, at *2 (4th Cir. 1990). That "something" is ordering JELD-WEN to take doorskins that it would otherwise allocate to itself and other contract customers on a reasonable and equitable basis, and instead deliver all of those doorskins to Steves. Because this relief is mandatory in nature, Steves must show an "indisputably clear" right to the injunction. *Sun Microsystems, Inc. v. Microsoft Corp.*, 333 F.3d 517, 525 (4th Cir. 2003).

### B. The Balance of Equities

In balancing equities, a court must "consider the potential injury that plaintiff will suffer in the absence of an injunction and the potential injury of the defendant in the presence of the injunction." *Revzip, LLC v. McDonnell*, 2019 WL 6701835, at *8 (W.D. Pa. Dec. 9, 2019).

The coronavirus pandemic has already had ▮▮▮▮▮ impact on JELD-WEN's doorskin production. JELD-WEN hopes that these disruptions will not continue, but as the Chief Judge of this Court has recognized in several General Orders issued over the past two weeks, there are "thousands of new COVID-19 cases being identified each day in the United States, with the available evidence revealing that the spread of COVID-19 is rapidly accelerating in . . . the United States, and "[h]ealth officials have consistently warned that the next several weeks pose the greatest risk of increased community transmission of COVID-19." E.D. Va. Gen. Order 2020-07 (Mar. 24, 2020). As a result, every indication is that conditions are likely to get worse before they get better, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The requested injunction will only exacerbate this damaging and unpredictable situation.

Given the current crisis, therefore, JELD-WEN will be harmed whether the injunction is

6

granted or not. Absent an injunction, JELD-WEN will try to minimize the impact of any production shortfalls by allocating a portion of whatever production is available to every customer (as illustrated in the table above). If an injunction issues, however, JELD-WEN will have to privilege Steves' demands, even if that means there are no doorskins remaining for other customers or JELD-WEN's internal use. In that scenario, the injunction would simply make a bad situation much worse: not only will JELD-WEN have to cope with reduced production, but it will have to dedicate a larger share of that reduced production to Steves.

By contrast, the injury Steves will suffer in the absence of an injunction pales in comparison. The Court has a reliable sense of how Steves will hold up without an injunction because that is how the parties have been operating for nearly four months. And Steves reports that, notwithstanding the global pandemic, its business is still booming. Since this crisis struck, Steves has repeatedly represented both to JELD-WEN and this Court that it has seen no slowdown in its customers' orders. *See* Email from E. Steves to G. Michel (Mar. 23, 2020) (Ex. 2) at 2 ("Notwithstanding the impact of this virus on the national economy, our door customers are continuing to ask for doors on a normal basis."); Conf. Call Tr. (Mar. 18, 2020) (Ex. 3) at 5 ("The business realities for Steves is essentially unchanged . . . there not yet having been any material impact on Steves' ability to make and sell doors from the coronavirus."). Indeed, Steves has even indicated that its orders have increased since the crisis began. Conf. Call Tr. (Mar. 24, 2020) (Ex. 4) at 4 ("[A]ll of Steves' door plants remain open and in operation, and Steves actually has had an uptick in orders from some clients, some customers including Home Depot.").

For context, before the outbreak Steves was on pace to sell 10.4 million doors in 2020. S. Steves Depo. Tr. (Ex. 5) at 18. This would represent a more than 50% increase over its 2019 sales.

That Steves remains on pace for a record year despite a global health crisis shows that it cannot satisfy the demanding standard for a mandatory injunction.[4]

In evaluating the harm that Steves will suffer in the absence of an injunction, the Court should also consider the fact that Steves' dire predictions have invariably proven at odds with reality. Six weeks ago, Steves represented to this Court that JELD-WEN had "tarnished" Steves' reputation and "imperiled Steves' ability to continue operating at all." Steves Mot. [ECF No. 2] at 1. Both representations proved to be greatly exaggerated. And during the preliminary injunction hearing, Steves' counsel claimed that "Steves would be so weakened by May that the company here in May would not be same company here today." Hr'g Tr. (Mar. 5, 2020) (Ex. 6) at 17. Yet three weeks later—in the midst of a global pandemic threatening the American economy—Steves reports that it is continuing to sell doors at a record pace with no dropoff in sight. Ex. 5 at 18.

To secure an injunction, Steves must establish an injury that is "certain, great, actual and not theoretical." *Luczak v. Coakley*, No. 5:16CV189, 2018 WL 4305810, at *6 (N.D. W. Va. Sept. 10, 2018). "Bare allegations of what is likely to occur are of no value," particularly when such allegations have turned out to be wildly inaccurate in the past. *Wis. Gas Co. v. F.E.R.C.*, 758 F.2d 669, 674 (D.D.C. 1985). The evidence here shows that JELD-WEN has already been harmed by the coronavirus pandemic, and that an injunction would continue to compound this harm. The evidence also shows that, not only has Steves not been harmed by the crisis, but it continues to sell doors at a substantial pace. Steves has not made a clear showing that the balance of equities tips in its favor, so the injunction must be denied.

---

[4] JELD-WEN does not know what impact the coronavirus and resulting economic downturn will have on market demand for interior molded doors, nor when that impact will be felt. But it is possible that demand for interior molded doors may fall soon and that JELD-WEN will be able to end allocation.

### C. The Public Interest

Finally, the coronavirus pandemic highlights three reasons why an injunction would conflict with the public interest.

First, this element requires a court to "consider the effects of preliminary injunctive relief on any nonparties who may possess significant interest in the outcome." *Hughes Network Sys. v. InterDigital Commc'ns Corp.*, 17 F.3d 691, 696 (4th Cir. 1994). As the example above shows, JELD-WEN's other contract customers have a significant interest in the injunction being denied. If the injunction is granted, Steves will receive priority over every other customer, and the effect will sometimes be that there are no doorskins left for these customers. The harm to JELD-WEN's contract customers will increase as the pandemic worsens and JELD-WEN's doorskin production comes under greater stress. The more coronavirus disrupts JELD-WEN's production capacity, the more damage will result from giving Steves preferential treatment.

Second, the public interest opposes any "injunction that would require ongoing judicial supervision to assure the nonmovant is abiding by the injunction." *Rodriguez v. Wiley*, No. 08-cv-02505, 2009 WL 6325780, at *4 (D. Colo. Aug. 14, 2009). The need for judicial supervision is unavoidable, however, where "application of the injunction is highly uncertain." *Id.* Given the trajectory of recent events, there is a high degree of uncertainty hanging over JELD-WEN's operations and the U.S. market for interior molded doors. As a result, JELD-WEN's ability to meet customer demand may fluctuate on a weekly basis. If the injunction is granted, the parties will have to repair to the Court whenever there is a dispute over how a particular disruption impacts JELD-WEN's obligations under the injunction. This potential "drain on scarce judicial resources . . . weigh[s] against the grant of equitable relief in this case." *Am. Chocolate Chip Cookie Co.*, 970 F.2d at 277.

**HIGHLY CONFIDENTIAL**



## **CONCLUSION**

For all of the above reasons, Steves' motion for a preliminary injunction should be denied.

Dated: March 26, 2020  Respectfully submitted,

JELD-WEN, Inc.

By counsel

<u>/s/ *Brian C. Riopelle*</u>
Brian C. Riopelle (VSB #36454)
Gregory J. DuBoff (VSB # 82062)
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
(804) 775-1084 – Tel.
(804) 698-2150 – Fax
briopelle@mcguirewoods.com
gduboff@mcguirewoods.com

*Attorneys for Defendant*

11

CERTIFICATE OF SERVICE

I hereby certify that on the 26th day of March 2020, the following counsel of record have been served using the CM/ECF system, which will then send a notification of such filing (NEF) to the registered participants as identified on the NEF to receive electronic service, including:

Lewis F. Powell III
John S. Martin
Alexandra L. Klein
Maya M. Eckstein
Douglas M. Garron
R. Dennis Fairbanks, Jr.
Michael Shebelskie
William H. Wright, Jr.
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
(804) 788-8200 – Tel.
(804) 788-8218 – Fax
lpowell@huntonAK.com
martinj@huntonAK.com
aklein@huntonAK.com
meckstein@huntonAK.com
dgarrou@huntonAK.com
dfairbanks@huntonAK.com
mshebelskie@huntonAK.com
cwright@huntonAK.com

Ted Dane
Glenn Pomerantz
Gregory Sergi
Munger, Tolles & Olson LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9288 – Tel.
(213) 683-4088 – Fax
ted.dane@mto.com
glenn.pomerantz@mto.com
gregory.sergi@mto.com

Kyle Mach
Emily C. Curran-Huberty

Munger, Tolles & Olson LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
(415) 512-4000 – Tel.
(415) 512-4077 – Fax
kyle.mach@mto.com
emily.curran-huberty@mto.com

*Attorneys for Plaintiff*

Marvin G. Pipkin
Kortney Kloppe-Orton
Pipkin Law
10001 Reunion Place, Suite 6400
San Antonio, TX 78216
(210) 731-6495 – Tel.
(210) 293-2139 – Fax

*Of Counsel*

/s/ *Brian C. Riopelle*
Brian C. Riopelle (VSB #36454)
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
(804) 775-1084 – Tel.
(804) 698-2150 – Fax
briopelle@mcguirewoods.com

*Attorney for Defendant*