**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| STEVES AND SONS, INC.,           ) | |
|                                   ) | |
|            Plaintiff,       ) | |
|                                     ) | Civil Action No. 3:20-cv-00098 |
|      v.                        ) | |
|                                     ) | |
| JELD-WEN, INC.,              ) | |
|                                     ) | |
|           Defendant.     ) | |

**JELD-WEN, INC.'S MEMORANDUM IN SUPPORT OF ITS**
**MOTION TO DISMISS COUNTS ONE AND TWO OF STEVES AND SONS, INC.'S**
**COMPLAINT FOR FAILURE TO STATE A CLAIM**

## TABLE OF CONTENTS

INTRODUCTION..............................................................................................................1

FACTUAL BACKGROUND ...........................................................................................2

ARGUMENT ....................................................................................................................5

I.      Steves' Antitrust Claim Fails as a Matter of Law...............................................5

      A.      Steves Does Not Allege Facts Plausibly Showing Its Purported Injuries
            Were Caused by the 2012 Acquisition...................................................7

      B.      Steves Cannot Plausibly Allege Facts Showing That Its Purported Injury
            Constitutes Antitrust Injury.................................................................. 10

II.     Steves' Tortious Interference Claim Fails as a Matter of Law................................... 13

      A.      Steves Cannot Bootstrap Its Contract Claim Into a Tort Claim........................... 13

      B.      Steves Failed to State a Tortious-Interference Claim Recognized by
            Delaware Law. ...................................................................................... 15

            1.      Steves Has Not Stated a Tortious-Interference Claim for Tortious
                  Interference with Contract. ........................................................ 15

            2.      Steves Has Not Alleged a Claim for Tortious Interference with
                  Prospective Contractual Relations. ........................................... 19

      CONCLUSION ................................................................................................ 21

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*,
   369 F.3d 732 (3d Cir. 2004)................................................................................11

*Abex Corp. v. Md. Cas. Co.*,
   790 F.2d 119 (D.C. Cir. 1986) ..........................................................................17

*Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*,
   910 F.2d 139 (4th Cir. 1990) ...........................................................................5, 7

*Agilent Techs., Inc. v. Kirkland*,
   No. 3512-VCS, 2009 WL 119865 (Del. Ch. Jan. 20, 2009)...............................20

*Allen Family Foods, Inc. v. Capitol Carbonic Corp.*,
   No. N10C-10-313, 2011 WL 1205138 (Del. Super. Ct. Mar. 31, 2011) ...............19

*Allen v. Washington Hosp.*,
   34 F. Supp. 2d 958 (W.D. Pa. 1999)..................................................................18

*Anderson v. Wachovia Mortg. Corp.*,
   621 F.3d 261 (3d Cir. 2010).......................................................16, 17, 18, 19

*Anesthesia Servs., P.A. v. Anesthesia Advantage, P.C.*,
   No. N11C-03-005, 2013 WL 3352672 (Del. Super. Ct. June 27, 2013) ...............21

*Austin v. Blue Cross & Blue Shield of Ala.*,
   903 F.2d 1385 (11th Cir. 1990) ................................................................6, 10, 12

*Bank of Am., N.A. v. New England Quality Serv., Inc.*,
   No. 5:16-cv-83, 2017 WL 57793 (D. Vt. Jan. 4, 2017)........................................18

*Beard Research, Inc. v. Kates*,
   8 A.3d 573 (Del. Ch. 2010)...........................................................................15, 16

*Boulden v. Albiorix, Inc.*,
   No. 7051-VCN, 2013 WL 396254 (Del. Ch. Jan. 31, 2013) ...............................14

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
   429 U.S. 477 (1977)......................................................................................6, 10

*Chapter 7 Tr. Constantino Flores v. Strauss Water Ltd.*,
   No. 11141-VCS, 2016 WL 5243950 (Del. Ch. Sept. 22, 2016) ......................15, 19

*Charter Oil Co. v. Am. Emp'rs' Ins. Co.*,
   69 F.3d 1160 (D.C. Cir. 1995) ...................................................................19

*City of Pittsburgh v. W. Penn Power Co.*,
   147 F.3d 256 (3d Cir. 1998)......................................................................7, 8

*CMI, Inc. v. Intoximeters, Inc.*,
   918 F. Supp. 1068 (W.D. Ky. 1995) ........................................................18

*Concord Boat Corp. v. Brunswick Corp.*,
   207 F.3d 1039 (8th Cir. 2000) ..............................................................5, 7

*Cornell Glasgow, LLC v. La Grange Props., LLC*,
   No. N11C-05-016 JRS CCLD, 2012 WL 2106945 (Del. Super. Ct. June 6,
   2012) ...........................................................................................................15

*Corning Inc. v. SRU Biosystems, LLC*,
   292 F. Supp. 2d 583 (D. Del. 2003) .........................................................21

*D'Andrea v. Rafla-Demetrious*,
   146 F.3d 63 (2d Cir. 1998) .......................................................................18

*Data Mgmt. Internationalé, Inc. v. Saraga*,
   No. 05C-05-108, 2007 WL 2142848 (Del. Super. Ct. July 25, 2007) ..............13, 14

*Del. State Univ. Student Hous. Found. v. Ambling Mgmt. Co.*,
   556 F. Supp. 2d 367 (D. Del. 2008)................................................13, 14, 15, 19

*Expressions Hair Design v. Schneiderman*,
   137 S. Ct. 1144 (2017)..............................................................................17

*Global Fitness Holdings, LLC v. Fed. Recovery Acceptance, Inc.*,
   No. 2:13-cv-00204-DN, 2015 WL 12600167 (D. Utah Aug. 31, 2015)..................18

*GWO Litig. Tr. v. Sprint Sols., Inc.*,
   No. N17C-06-356, 2018 WL 5309477 (Del. Super. Ct. Oct. 25, 2018)...................20

*KMS Rest. Corp. v. Wendy's Int'l, Inc.*,
   361 F.3d 1321 (11th Cir. 2004) ...............................................................18

*Kuroda v. SPJS Holdings, L.L.C.*,
   971 A.2d 872 (Del. Ch. 2009)...................................................................14

*Newman v. Universal Pictures*,
   813 F.2d 1519 (9th Cir. 1987) ..................................................................11

*Novell, Inc. v. Microsoft Corp.*,
   505 F.3d 302 (4th Cir. 2007) ...........................................................6, 10, 12

*O.K. Sand & Gravel, Inc. v. Martin Marietta Techs., Inc.*,
   36 F.3d 565 (7th Cir. 1994) ........................................................................7

*Oksanen v. Page Mem'l Hosp.*,
   945 F.2d 696 (4th Cir. 1991) ...........................................................6, 10, 11

*Organovo Holdings, Inc. v. Dimitrov*,
   162 A.3d 102 (Del. Ch. 2017).....................................................................20

*Orion Pictures Distribution Corp. v. Syufy Enters.*,
   829 F.2d 946 (9th Cir. 1987) .......................................................................11

*OverDrive, Inc. v. Baker & Taylor, Inc.*,
   No. 5835-CC, 2011 WL 2448209 (Del. Ch. June 17, 2011) ......................16

*Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*,
   507 F.3d 117 (2d Cir. 2007)...................................................................7, 8, 9

*Price v. Sorrell*,
   784 P.2d 614 (Wyo. 1989) ...........................................................................18

*Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*,
   296 F.3d 308 (4th Cir. 2002) .......................................................................17

*Procaps S.A. v. Patheon, Inc.*,
   845 F.3d 1072 (11th Cir. 2016) ...................................................................11

*Rhodes v. E.I. du Pont de Nemours & Co.*,
   636 F.3d 88 (4th Cir. 2011) .........................................................................17

*St. Louis Convention & Visitors Comm'n v. NFL*,
   154 F.3d 851 (8th Cir. 1998) .......................................................................18

*Triple Canopy, Inc. v. Moore*,
   No. 04 C 3265, 2005 WL 1629768 (N.D. Ill. July 1, 2005) .......................18

*Turner v. Va. Dep't of Med. Assistance Servs.*,
   230 F. Supp. 3d 498 (W.D. Va. 2017) ...........................................................7

*Valley Prods. Co. v. Landmark*,
   128 F.3d 398 (6th Cir. 1997) .......................................................................11

*White v. Ransmeier & Spellman*,
   950 F. Supp. 39 (D.N.H. 1996)....................................................................18

*Worthington v. Palmer*,
   No. 3:15cv410, 2015 WL 7571822 (E.D. Va. Nov. 24, 2015) ....................21

**Other Authorities**

1 Louis Altman & Malla Pollack, *Callmann on Unfair Competition, Trademarks and Monopolies* § 4:48 (4th ed. 2019) ....................................................................11

Dan D. Dobbs et al., *The Law of Torts* § 634 (2d ed. 2019) ...........................................19

Restatement (Second) of Torts § 766...........................................................................16

Restatement (Second) of Torts § 766A.......................................................16, 17, 18, 19

**INTRODUCTION**

For nearly four years, Steves and JELD-WEN have litigated a wide-ranging dispute that has generated multiple jury verdicts, numerous final decisions by this Court, and several related appeals to the Fourth Circuit (which remain pending).  This is not that case.  Here, Steves alleges an entirely distinct breach of contract based on an unrelated "allocation" provision of the parties' Supply Agreement that played no role in the prior litigation, and its claim involves a new dispute that began just a few months ago—well after the parties' original dispute was fully briefed and awaiting argument before the Fourth Circuit and more than seven years after JELD-WEN's acquisition of Craftmaster Manufacturing, Inc. ("CMI").

Despite the manifest differences between this case and the parties' prior dispute, Steves seeks to run the exact same playbook here.  According to Steves, *any* purported breach of the Supply Agreement by JELD-WEN automatically equates to an antitrust injury traceable back to the 2012 CMI acquisition—and hence entitles Steves to treble its breach-of-contract damages— no matter how distantly removed in time or how remote in causal nexus from the acquisition.  As a matter of law, Steves does not and cannot plausibly allege an antitrust claim on these facts, because it has not plausibly alleged the essential elements of antitrust impact, injury, and causation that are required to state a claim under the Clayton Act.

Steves also has sought to pad its Complaint with a meritless claim for tortious interference, on the theory that the alleged breaches of contract prevented Steves from serving its own customers or acquiring new ones.  But Delaware law clearly forbids that approach, rejecting efforts to bootstrap run-of-the-mill breach-of-contract claims into independent torts.  And even if Steves' claim were theoretically viable, it has failed to allege the basic facts that Delaware law requires for a tortious-interference claim, including identifying any actual contracts or expected

contractual relationships with which JELD-WEN purportedly interfered.  As such, its tortious-interference claim likewise fails as a matter of law.

Put simply, this case is a breach-of-contract case and nothing more.  The Court should dismiss Steves' antitrust and tortious-interference claims with prejudice.

## FACTUAL BACKGROUND

This Court presided over a prior breach-of-contract, antitrust, and trade secrets dispute between Steves and JELD-WEN, and it is intimately familiar with the facts and issues of that case.  The judgment entered in that case is currently the subject of multiple appeals before the Fourth Circuit.  *See Steves & Sons, Inc. v. JELD-WEN, Inc.*, No. 3:16-cv-00545 (E.D. Va.) ("*Steves I*"); *Steves & Sons, Inc. v. JELD-WEN, Inc.*, Nos. 19-1397, 19-2466 (4th Cir.).  As this Court has already recognized, despite Steves' efforts to tie this case to the previous one, *see, e.g.*, Compl. at 1-2, the claims raised in the present dispute are distinct from those raised in *Steves I*.  *See Steves I*, Order Denying Pl.'s Expedited Mot. for Inj. in Supp. of Am. Final J. (Feb. 14, 2020), ECF No. 2036.  This case primarily involves a different provision of the Supply Agreement—the Supply Agreement's "allocation" provision, *see* Supply Agreement (ECF No. 1-1) § 20—that was not at issue in *Steves I*, and it is premised on conduct that occurred more than six months after the amended final judgment in *Steves I* was entered and more than seven years after the CMI transaction closed.

In its Complaint, Steves alleges that beginning in October 2019, JELD-WEN breached the parties' Supply Agreement by "fail[ing] and refus[ing] to deliver to Steves all doorskins ordered within 30 days of receipt of Steves' purchase orders."  Compl. ¶ 37.  As JELD-WEN has explained to Steves, that failure was caused by "an increased demand for doorskins that JELD-WEN could not meet," which was in turn caused by an unexpected price increase for

interior molded doors imposed by Masonite (which JELD-WEN followed for its own doors) that was announced in October 2019 to take effect in February 2020. *Id.* ¶¶ 47-48.

In December 2019, realizing that it was physically incapable of producing enough doorskins to meet that increased demand (notwithstanding JELD-WEN's around-the-clock doorskin production), JELD-WEN invoked the allocation provision of the parties' Supply Agreement for the first time in the parties' nearly 8-year contractual relationship. *Id.* ¶ 44. Under that provision, when JELD-WEN "recognizes an actual or anticipated shortage in production capacity over the current or anticipated demand," it must provide Steves with a notice of allocation stating its "current production capacity in North America indicating a shortage in production capacity, which will then result in the need for an allocation period." *Id.* ¶ 42 (quoting Supply Agreement § 20). The allocation period will then begin "effective the first day of the month following the notice of allocation." *Id.* In accordance with that provision, JELD-WEN sent Steves a notice of allocation on December 19, 2019, and the resulting allocation period began on January 1, 2020. *Id.* ¶ 44.

In this case, Steves alleges that in invoking and applying allocation, JELD-WEN has violated its contractual obligations under the Supply Agreement in various ways. In particular, Steves alleges that JELD-WEN has violated the Supply Agreement because, according to Steves:

(i)   JELD-WEN had no right to invoke allocation, because (Steves claims) JELD-WEN's production capacity is actually higher than the capacity stated in the notice of allocation (which was based on JELD-WEN's historical production), *see id.* ¶¶ 44-46;

(ii)  the increased demand was caused in part by JELD-WEN's own decision to follow Masonite's price increase, *see id.* ¶¶ 47-48, 50;

(iii) JELD-WEN must fulfill Steves' orders in full before responding to increased demand from other customers, *id.* ¶ 49;

(iv)  in Steves' view, "allocation should have ended in the first week of February 2020," *id.* ¶ 51;

3

(v)     the Supply Agreement requires JELD-WEN to sell Steves any doorskins Steves orders up to its total allocation amount, and does not allow JELD-WEN to ration particular styles of doorskins in accordance with internal and external demand, *id.* ¶¶ 52-55;

(vi)    JELD-WEN wrongly based Steves' allocation percentage on the wrong year's shipments and production, *id.* ¶¶ 56-58; and

(vii)   JELD-WEN is required to base its allocation percentage on the number of doorskins that Steves ordered in the previous year, not (as the Supply Agreement specifies) the number of doorskins that JELD-WEN shipped to Steves, *id.* ¶ 59.

None of Steves' breach-of-contract theories has any merit, and JELD-WEN is fully prepared to litigate them at the proper time.  This motion, however, focuses on the two other claims that Steves asserts in its Complaint: its claim under the Clayton Act in Count One of the Complaint, *see id.* ¶¶ 83-87, and its tortious interference claim in Count Two of the Complaint, *see id.* ¶¶ 88-97.

For its antitrust claim, Steves reaches back more than seven years to JELD-WEN's 2012 acquisition of CMI, asserting once again that this acquisition should have been prohibited under the Clayton Act because it reduced competition in the doorskin market.  *See, e.g.*, *id.* ¶¶ 19-22, 26, 29, 67-69, 72-73.  Despite occasional conclusory allegations that its purported injuries occurred "as a result of the illegal merger," *id.* ¶ 74, Steves does not allege that the 2012 acquisition itself caused the sudden increase in demand for doorskins in October 2019, or JELD-WEN's inability to fill that demand, or JELD-WEN's resulting decision to invoke the allocation provision of a contract which pre-dates the acquisition.  Instead, Steves alleges that if the acquisition had not occurred, "Steves could turn to the competitive market" to acquire all the doorskins it wants at its preferred prices.  *Id.* ¶ 76; *see also id.* ¶ 80.  Steves provides no further factual allegations to support that assertion.  In particular, it provides no factual allegations whatsoever to describe what the doorskin market would look like today if the 2012 acquisition

had never occurred, or to show that CMI would have been willing and able (absent the acquisition) to sell Steves doorskins today at the prices, quantities, and preferred designs/SKUs that Steves demands.

For its tortious interference claim, Steves alleges that JELD-WEN's purported breaches of the Supply Agreement have "rendered Steves unable to fulfill many of its existing contracts" and made it "more expensive and burdensome" for Steves to do so. *Id.* ¶ 93. It also claims that those same purported breaches have made Steves "unable to acquire, continue, and form new contracts." *Id.* Steves does not allege that JELD-WEN has caused any third party to breach any contract with Steves; nor does it identify any contract with any third party that JELD-WEN has caused Steves itself to actually breach, or any future contract that Steves claims JELD-WEN actually knew about and caused Steves to lose.

## ARGUMENT

### I. Steves' Antitrust Claim Fails as a Matter of Law.

To state an antitrust claim under the Clayton Act, a private plaintiff must allege facts plausibly showing both *antitrust impact* and *antitrust injury*, each of which requires a clear causal link between the challenged conduct and the plaintiff's alleged harm. To show antitrust *impact*, a plaintiff must "construct a hypothetical market, a 'but for' market, free of the restraints and conduct alleged to be anticompetitive," and allege facts plausibly showing that the challenged anticompetitive conduct has made it worse off than it would be in that but-for world—in other words, it must show that the challenged conduct is a but-for cause of its injury. *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055 (8th Cir. 2000) (citation omitted); *see, e.g.*, *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 149 (4th Cir. 1990) (plaintiff must show a "reasonably probable causal link" between the challenged conduct and its injury). To show antitrust *injury*, a plaintiff must demonstrate an "'injury of the type the

antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful.'"  *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 311 (4th Cir. 2007) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  Under that element, the plaintiff must show not only a causal connection between the challenged conduct and its injury, but that the *anticompetitive* aspects of that conduct were what caused its injury, such that its own injury "coincides with the public detriment tending to result from the alleged violation." *Austin v. Blue Cross & Blue Shield of Ala.*, 903 F.2d 1385, 1389-90 (11th Cir. 1990); *see Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 709 (4th Cir. 1991) (en banc) (plaintiff must show harm not just to itself "as an individual competitor," but to "competition as a whole").

Steves cannot meet either of those essential requirements here.  The conduct that Steves claims was anticompetitive in its Clayton Act claim is JELD-WEN's 2012 acquisition of CMI, a transaction that closed more than seven years before the declared allocation.  *See* Compl. ¶ 84. While JELD-WEN acknowledges this Court has already found that acquisition anticompetitive, that alone is not enough to allow Steves' newest claim to go forward, for Steves cannot plausibly allege that any harm it has suffered from the failure to completely fill its doorskin orders— conduct that Steves alleges began at most a few months ago—is causally related to that long-ago acquisition.  *Post hoc ergo propter hoc* is a logical fallacy, not a viable theory of causation.  In fact, the conduct at issue in this case is so attenuated from the 2012 acquisition that Steves makes only a cursory effort to connect the two.  Steves makes no attempt to allege facts in its Complaint plausibly showing what the doorskin market would have looked like today absent the 2012 acquisition, let alone that CMI (a company that has not existed for more than seven years) would be willing and able today to provide Steves with all the doorskins that it wants at the prices, quantities, and types that Steves demands.  Just as fatal to its claim, Steves makes no attempt to

allege facts showing that the purported injuries it has suffered from the alleged contractual breaches coincide with any broader harm to the market at large.  Because Steves has failed to put forward any facts plausibly showing the "reasonably probable causal link" necessary for either antitrust impact or antitrust injury, its Clayton Act claim must be dismissed.  *Adv. Health-Care Servs.*, 910 F.2d at 149.

### A.      Steves Does Not Allege Facts Plausibly Showing Its Purported Injuries Were Caused by the 2012 Acquisition.

To plead antitrust impact, a plaintiff must allege facts plausibly showing that its injury was the "but-for result of [a defendant's] anticompetitive conduct."  *Turner v. Va. Dep't of Med. Assistance Servs.*, 230 F. Supp. 3d 498, 507 (W.D. Va. 2017); *see, e.g.*, *O.K. Sand & Gravel, Inc. v. Martin Marietta Techs., Inc.*, 36 F.3d 565, 573 (7th Cir. 1994) (antitrust plaintiff must show that "the violation was the cause-in-fact of the injury: that 'but for' the violation, the injury would not have occurred" (citation omitted)).  To assess causation, courts must "look back from the vantagepoint of the injury to test the nature of the cause, rather than to presume antitrust injury wherever there is an agreement or merger that results in harm."  *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 266 (3d Cir. 1998).  The burden is on the plaintiff to "construct a hypothetical market, a 'but for' market, free of the restraints and conduct alleged to be anticompetitive," and plausibly show that the alleged anticompetitive conduct has caused it an injury that it would not have suffered in that but-for world.  *Concord Boat*, 207 F.3d at 1055-57. If a plaintiff fails to allege facts plausibly showing the requisite causal link between the alleged anticompetitive conduct and its alleged injury, its antitrust claim must be dismissed.

The Second Circuit's decision in *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117 (2d Cir. 2007), is illustrative.  In that case, the defendant was a crushed-stone manufacturer that bought its only significant competitor, acquiring a monopoly in the market.

*Id.* at 119.  It subsequently terminated its distribution agreement with the plaintiff, depriving the plaintiff of its supply of crushed stone and driving it out of the market.  The Second Circuit held that the plaintiff failed to state an antitrust claim because its alleged injury—the termination of its distribution agreement—"was not caused by an exercise of the defendant's newly acquired [market] power."  *Id.* at 123.  Instead, the claimed injury arose from the defendant's *contractual* power to terminate the agreement, which was something it "could have just as well done without having monopoly power."  *Id.*  In short, the plaintiff's alleged harm was an "incidental matter which the merger … certainly did not cause," so the plaintiff could not show the antitrust impact required for a claim challenging the merger under the Clayton Act.  *Id.*

The Third Circuit's decision in *City of Pittsburgh v. West Penn Power Co.* reinforces the same point.  There, the Third Circuit held that the City of Pittsburgh failed to state an antitrust claim because the harm it alleged—the payment of higher rates for electric utility service— would likely have existed whether or not the challenged merger was consummated, so the injury did not flow from the transaction at issue.  147 F.3d at 266.  Because the plaintiff could not show "a direct link between the alleged antitrust violation and [its] purported injury," insofar as it would have suffered the same harm even in a but-for world without the challenged anticompetitive conduct, its antitrust claim could not go forward.  *Id.* at 268.

Steves' antitrust claim suffers from the same problem.  As the Complaint makes clear, Steves premises that claim on the recent injuries it claims it is suffering as a result of JELD-WEN's purported breaches of the Supply Agreement in the past few months—not on any injuries directly traceable to the long-ago 2012 acquisition.  *See, e.g.*, Compl. ¶¶ 74-75 (alleging that JELD-WEN "failed to timely deliver, or deliver at all, hundreds of thousands of doorskins," "declared allocation on the basis of an artificial production capacity," "limited Steves to an

8

artificial percentage of its doorskin production," and "improperly limited Steves to a mix of doorskins"). And unlike its previous case before this Court, where Steves argued that the 2012 acquisition actually *caused* JELD-WEN to decide to breach the Supply Agreement by charging higher prices, Steves cannot plausibly allege here that the 2012 acquisition somehow caused JELD-WEN's decision to invoke allocation. Setting aside Steves' conclusory allegations that all its injuries have occurred "as a result of the illegal merger," *id.* ¶ 74, it is clear from Steves' own allegations that those purported contractual breaches "could have just as well [occurred] without" the acquisition. *Port Dock*, 507 F.3d at 123. Because the acquisition "certainly did not cause" those purported breaches, *id.*, Steves cannot use that years-old acquisition to transform its breach-of-contract claims into an antitrust case.

Nor can Steves save its antitrust claim with the generic allegation that "[w]ere it not for JELD-WEN's illegal merger, Steves could turn to the competitive market to prevent JELD-WEN from imposing these anticompetitive terms and restricting Steves' volumes." Compl. ¶ 76; *see also* Compl. ¶ 80. To begin with, Steves makes no attempt to plead facts actually showing what the doorskin market would look like today if the 2012 acquisition had never occurred, let alone that Steves would have been able to acquire (from CMI or elsewhere) all the various doorskins it wants at the prices it demands in that but-for world. In any event, even if Steves could allege facts plausibly showing that it could have obtained doorskins elsewhere absent the 2012 acquisition, that still would not make that years-old acquisition the *cause* of Steves' purported injury; it would at best just show that Steves might have ameliorated the *effects* of that breach-of-contract injury had the acquisition never occurred. Put simply, on the facts that Steves itself alleges, the cause of its purported injury is the alleged breach of contract, not an acquisition that

took place more than seven years earlier. That makes it impossible for Steves to show antitrust impact, which is fatal to its antitrust claim.

### B.   Steves Cannot Plausibly Allege Facts Showing That Its Purported Injury Constitutes Antitrust Injury.

Even if Steves had plausibly alleged facts showing that it suffered some kind of harm because of the 2012 acquisition—that is, facts showing that Steves would not have suffered the injury it claims here in a hypothetical world where that acquisition never happened—its Clayton Act claim would still fail for lack of antitrust injury, because Steves cannot show an "injury of the type the antitrust laws were intended to prevent." *Novell*, 505 F.3d at 311. Because the antitrust laws exist for "the protection of *competition*, not *competitors*," *Brunswick*, 429 U.S. at 488 (emphasis added), a plaintiff seeking to bring an antitrust claim must show that whatever injury it suffered "as an individual competitor" coincides with the injury to "competition as a whole" caused by the allegedly anticompetitive practices, *Oksanen*, 945 F.2d at 709. As the allegations in the Complaint illustrate, Steves cannot make that showing here.

Steves' breach-of-contract and antitrust claims in this matter—which are distinct from the claims asserted in the prior matter—rest on precisely the same asserted injury: that JELD-WEN failed to deliver Steves all of the doorskins Steves has ordered, and that JELD-WEN instituted allocation and limited the number of doorskins Steves would receive contrary to the provisions of the Supply Agreement. But those allegations at best assert that JELD-WEN failed to live up to its *contractual* duties under the Supply Agreement—not that JELD-WEN failed to comply with the broader duty imposed by the antitrust laws to refrain from anticompetitive conduct. Conversely, Steves' allegations that JELD-WEN deprived Steves of the benefits that Steves expected under the Supply Agreement show at most a private *contractual* injury, not one that "coincides with" any "public detriment tending to result from the alleged violation." *Austin*, 903

F.2d at 1389-90.  Whatever harm Steves may have suffered from JELD-WEN's alleged failure to satisfy its obligations under the Supply Agreement, it is only a harm to Steves "as an individual competitor," not to "competition as a whole."  *Oksanen*, 945 F.2d at 709.  That is not an *antitrust injury*.

Courts in analogous cases have regularly rejected plaintiffs' efforts to assert antitrust injury by pointing to a breach of contract.  *See, e.g.*, *Newman v. Universal Pictures*, 813 F.2d 1519, 1522-23 (9th Cir. 1987); *Orion Pictures Distribution Corp. v. Syufy Enters.*, 829 F.2d 946, 948-49 (9th Cir. 1987); *Valley Prods. Co. v. Landmark*, 128 F.3d 398, 403-04 (6th Cir. 1997); *2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732, 738-39 (3d Cir. 2004); 1 Louis Altman & Malla Pollack, *Callmann on Unfair Competition, Trademarks and Monopolies* § 4:48 (4th ed. 2019).  In *Orion*, for instance, the Ninth Circuit rejected the plaintiff's Sherman Act allegation that the defendant theater owner's monopolization of the regional theaters market enabled its later breach of the parties' contract to display plaintiff's film.  829 F.2d at 949.  The court held that the defendant's duties "were fixed by its [pre-existing] contractual commitment," so the plaintiff's contractual losses "d[id] not constitute antitrust injury."  *Id.*  Instead, the plaintiff suffered only "a breach of contract, not an antitrust injury," even if it was the defendant's later monopolization of the region's theaters that enabled it to breach the parties' contract.  *Id.*  Steves' claim fails for the same reason:  It asserts injury under the parties' pre-existing contract, not under antitrust law.  There is no legal basis for Steves to convert its contractual injury into treble antitrust damages by "dress[ing] up in antitrust garb what is, at best, a … contract violation.'"  *Procaps S.A. v. Patheon, Inc*., 845 F.3d 1072, 1087 (11th Cir. 2016).

On the contrary, Steves' own allegations show that it impermissibly seeks to use the antitrust laws as a sword—to protect its position as a competitor relative to others in the

11

market—rather than as a shield to protect competition.  Steves' claim in this case is not that JELD-WEN should be forced to take some action that would increase supply or lower prices for the market as a whole.  Instead, Steves' avowed goal in this suit is to obtain an edge over its competitors (including JELD-WEN) by taking advantage of what it believes are the more favorable terms in its own Supply Agreement, to obtain more than its allocated share of its preferred doorskin styles.  *See, e.g.*, Compl. ¶¶ 52-55.  Even if Steves' reading of the Supply Agreement were correct—and it is not—Steves' inability to disadvantage its competitors by acquiring a greater share of JELD-WEN's limited doorskin production, based on its alleged individual contractual rights, is not an "injury of the type the antitrust laws were intended to prevent." *Novell*, 505 F.3d at 311.  Indeed, it is very nearly the opposite.

Steves' other allegations throughout the Complaint underscore its lack of antitrust injury. For instance, Steves alleges that the current shortage "does not justify refusing to fill Steves' orders or placing Steves on allocation" *under the Supply Agreement*.  Compl. ¶ 49.  Steves thus compares the Supply Agreement to JELD-WEN's "letters announcing its price increases to door customers," in which "JELD-WEN specifically reserved the right to reject door orders that deviated from door customers' historical weekly order size averages," and argues that "[t]he Supply Agreement contains no parallel provision that would allow JELD-WEN to do the same to Steves." *Id.*  Again, however, that argument rests not on any claim that Steves is sharing in some general public injury caused by anticompetitive conduct, but rather on the theory that Steves has suffered a distinct contractual harm all its own.  Steves cannot allege an antitrust injury that "coincides with the public detriment," *Austin*, 903 F.2d at 1389-90, based on purportedly unique contractual protections that it claims give it an edge over its competitors.

The bottom line for Steves' theory of antitrust injury is simple:  As far as Steves is concerned, any time JELD-WEN breaches the Supply Agreement in any way, Steves can sue not only for breach of contract but also for treble antitrust damages, on the theory that *any* harm it suffers is somehow the fault of the acquisition.  That extraordinary theory is foreclosed by settled law, as it effectively denies the antitrust injury and impact requirements altogether.  Because Steves has not alleged and cannot allege facts in this case plausibly showing that the 2012 acquisition caused any injury it has suffered from the current doorskin shortage, and because its assertion that JELD-WEN has failed to live up to the Supply Agreement shows at most contractual injury, its antitrust claim in Count One should be dismissed with prejudice.

## II.  Steves' Tortious Interference Claim Fails as a Matter of Law.

Steves' allegation that JELD-WEN "tortiously interfered with Steves' contracts … and business expectanc[ies]," Compl. at 2, also fails as a matter of law.  To begin, Delaware law prohibits a plaintiff from "bootstrapping" a tortious-interference claim onto a breach-of-contract claim, which is precisely what Steves is attempting to do here.  *See, e.g.*, *Del. State Univ. Student Hous. Found. v. Ambling Mgmt. Co.*, 556 F. Supp. 2d 367, 377-78 (D. Del. 2008).  And in any event, the Complaint does not adequately allege either of the only two tortious-interference claims recognized by Delaware law:  (1) "tortious interference with contract" or (2) "tortious interference with prospective contractual relations."  *Id.* at 376.  For both reasons, this Court should dismiss Count Two as a matter of law.

### A.  Steves Cannot Bootstrap Its Contract Claim Into a Tort Claim.

Delaware law forbids the "gratuitous 'bootstrapping' of contract claims into tort claims" because "a breach of contract will not generally constitute a tort."  *Data Mgmt. Internationalé, Inc. v. Saraga*, No. 05C-05-108, 2007 WL 2142848, at *3 (Del. Super. Ct. July 25, 2007).  As a result, "a plaintiff bringing a claim based entirely upon a breach of the terms of a contract

generally must sue in contract, and not in tort." *Id.*  This principle holds even if a plaintiff alleges "an intentional, knowing, wanton, or malicious action by the defendant." *Id.*  The key question is whether the plaintiff alleges "wrongful conduct beyond the breach of contract itself"; if not, then any tort claims must be dismissed under the bootstrapping doctrine. *Id.*; *see also, e.g.*, *Boulden v. Albiorix, Inc.*, No. 7051-VCN, 2013 WL 396254, at *15-16 (Del. Ch. Jan. 31, 2013); *Del. State*, 556 F. Supp. 2d at 377 (dismissing tortious-interference claim and rejecting argument that defendant management company had "damage[d] the Foundation's reputation with [the university's] students" because the tort claim "arose solely" from the parties' contract).

Steves' tortious-interference claim is precisely the type of claim that Delaware's bootstrapping doctrine bars.  The Complaint makes clear that Steves' purported injuries stem from a common source:  JELD-WEN's alleged breach of contract.  *See* Compl. at 2 (characterizing JELD-WEN's misconduct as failing to "deliver[] to Steves the doorskins it orders … as JELD-WEN is required to do by the Supply Agreement").  The Complaint does not allege any facts showing that JELD-WEN has harmed Steves by "violat[ing] an independent legal duty[] apart from the duty imposed by contract," *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 889 (Del. Ch. 2009); despite a few conclusory allegations that JELD-WEN committed various "misrepresentations," "acts of deceit," and other violations, *see* Compl. ¶ 94, the only conduct that is alleged to have harmed Steves is JELD-WEN's purported violation of the Supply Agreement by failing to deliver doorskins Steves believes should have been delivered under the contract and/or by declaring an allocation in alleged contravention of the terms of the Agreement.  That is presumably why the only injunctive relief Steves requests—under Counts One and Three—is to "requir[e] JELD-WEN to sell Steves the doorskins it orders and to perform as [Steves believes] the parties' contract requires."  Compl. at 2-3; *see id.* at 26.

14

In short, Steves' tortious interference claim amounts only to an allegation that JELD-WEN's failure to fill Steves' doorskin orders under the contract had the effect of damaging Steves' relationships with current and prospective customers. *See id.* ¶¶ 93, 95. Merely "intoning the *prima facie* elements" of tortious interference while doing no more than "telling the story of the defendant's failure to perform under the contract" is forbidden under Delaware law. *Cornell Glasgow, LLC v. La Grange Props., LLC*, No. N11C-05-016 JRS CCLD, 2012 WL 2106945, at \*8 (Del. Super. Ct. June 6, 2012). Count Two must therefore be dismissed independent of the reasons described further below.

### B. Steves Failed to State a Tortious-Interference Claim Recognized by Delaware Law.

Even if Steves' tortious-interference claim could survive under Delaware's bootstrapping doctrine, it would still fail as a matter of law, because the Complaint does not adequately allege either of the two tortious-interference claims recognized by Delaware law: (1) "tortious interference with contract" or (2) "tortious interference with prospective contractual relations." *Del. State*, 556 F. Supp. 2d at 376.

#### 1. Steves Has Not Stated a Tortious-Interference Claim for Tortious Interference with Contract.

Steves has failed to allege an essential element of a tortious-interference-with-contract claim under Delaware law: "an actual breach of a valid and enforceable contract." *Beard Research, Inc. v. Kates*, 8 A.3d 573, 605-07 (Del. Ch. 2010). Steves cannot salvage this pleading deficiency by relying on a *different* cause of action—that JELD-WEN has made it more difficult for Steves to perform its own contracts—that the Delaware Supreme Court has never recognized.

Under Delaware law, a claim for tortious interference with contract arises "when the defendant wrongfully prevents a third party from performing a contract." *Chapter 7 Tr. Constantino Flores v. Strauss Water Ltd.*, No. 11141-VCS, 2016 WL 5243950, at \*10 (Del. Ch.

Sept. 22, 2016); *see also* Restatement (Second) of Torts § 766 (premising liability on a defendant "inducing or otherwise causing the third person not to perform the contract"). As such, "to succeed under [a tortious interference with contract] theory," a plaintiff must allege that the defendant caused a third party to commit "an actual breach of a valid and enforceable contract." *Beard Research*, 8 A.3d at 607. But Steves does not allege that JELD-WEN caused any third party to breach any contract with Steves, *see* Compl. ¶¶ 88-97, so its claim for tortious interference with contract fails as a matter of law. *See OverDrive, Inc. v. Baker & Taylor, Inc.*, No. 5835-CC, 2011 WL 2448209, at *9 (Del. Ch. June 17, 2011) (dismissing tortious-interference claim because "plaintiff fail[ed] to allege any breach of a third-party contract"). And even if (contrary to fact) Delaware law permitted Steves to sue for tortious interference on the theory that JELD-WEN caused Steves to break one of *its own* contracts, Steves does not allege facts identifying any "actual breach of a valid and enforceable contract" by Steves itself either. *Beard Research*, 8 A.3d at 607; *cf.* Compl. ¶ 93 (alleging that Steves has been "unable to fulfill many of its existing contracts," without identifying any actual breach).

Instead, Steves appears to advance a wholly different theory: that JELD-WEN should be held liable for making it "more expensive and burdensome" for Steves to perform its own contracts, a theory that Steves draws not from existing Delaware law but from § 766A of the Restatement (Second) of Torts. Compl. ¶93; *see* Pl.'s Suppl. Br. in Supp. of Mot. for Prelim. Inj. (ECF No. 46) at 22. But neither the Delaware Supreme Court nor any other Delaware court has ever accepted that theory, and the Third Circuit has predicted that the Delaware Supreme Court would reject it. *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 281 (3d Cir. 2010) ("We are aware of no cases in which the Delaware courts have adopted § 766A ...."). This Court should do the same.

When a state supreme court "has spoken neither directly nor indirectly on the particular issue," a federal court must "predict how that court would rule if presented with the issue." *Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002). A federal court should "act conservatively when asked to predict how a state court would proceed on a novel issue of state law," recognizing that it is not the proper body to create new state common law. *Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88, 97-98 (4th Cir. 2011). In addition, once a federal circuit court has expressed its "view of the law of a state in its jurisdiction," other federal courts will generally "defer to the local circuit's view." *Abex Corp. v. Md. Cas. Co.*, 790 F.2d 119, 125 (D.C. Cir. 1986); *see also Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144, 1149-50 (2017) ("We generally accord great deference to the interpretation and application of state law by the courts of appeals."). This deference stems from a recognition that circuit courts "are better schooled in and more able to interpret the laws of their respective States" than other, unfamiliar courts. *Expressions Hair Design*, 137 S. Ct. at 1150.

Applying those principles, this Court should reject Steves' request that this Court create a new claim for tortious interference under Delaware law whenever one party has made another's performance under a contract more expensive or burdensome. As noted, no Delaware court—much less the Delaware Supreme Court—has ever upheld such a claim. This Court should be especially reluctant to expand Delaware tort law under those circumstances. On top of that, this Court should defer to the Third Circuit's conclusion in *Anderson* that the Delaware Supreme Court would reject such a claim. 621 F.3d at 281. As the Third Circuit explained, the key distinction between a claim under the Restatement (Second) of Torts § 766A on one hand and a tortious interference claim under existing Delaware law on the other is that "a § 766A plaintiff is

not required to show that the defendant caused the *breach* of the plaintiff's contract," but only that "plaintiff's performance was caused to be more expensive or burdensome." *Id.* (alteration omitted).  Without the bright line that the requirement of an actual breach creates, the Third Circuit explained, evidence in support of a § 766A claim would inevitably be "too speculative and subject to abuse to provide a meaningful basis for a cause of action." *Id.*; *see also CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1079-80 (W.D. Ky. 1995) (criticizing § 766A as "all encompassing," "vague," and "necessarily involv[ing] highly speculative damages").  As such, the Third Circuit had little difficulty concluding that the Delaware Supreme Court would refuse to adopt the problematic theory Steves advances here.

Several other states and federal courts have rejected that theory too.  Some states, like Wyoming, have rejected causes of action under § 766A outright.  *See, e.g.*, *Price v. Sorrell*, 784 P.2d 614, 616 (Wyo. 1989).  And in other federal jurisdictions, courts have consistently refused to recognize § 766A claims absent express state authority.  *See, e.g.*, *KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1323 (11th Cir. 2004) (Florida); *Triple Canopy, Inc. v. Moore*, No. 04 C 3265, 2005 WL 1629768, at *7 (N.D. Ill. July 1, 2005) (Illinois); *Global Fitness Holdings, LLC v. Fed. Recovery Acceptance, Inc.*, No. 2:13-cv-00204-DN, 2015 WL 12600167, at *11-12 (D. Utah Aug. 31, 2015) (Kentucky); *St. Louis Convention & Visitors Comm'n v. NFL*, 154 F.3d 851, 865 (8th Cir. 1998) (Missouri); *White v. Ransmeier & Spellman*, 950 F. Supp. 39, 41 n.2 (D.N.H. 1996) (New Hampshire); *D'Andrea v. Rafla-Demetrious*, 146 F.3d 63, 66 (2d Cir. 1998) (New York); *Allen v. Washington Hosp.*, 34 F. Supp. 2d 958, 964-65 (W.D. Pa. 1999) (Pennsylvania); *Bank of Am., N.A. v. New England Quality Serv., Inc.*, No. 5:16-cv-83, 2017 WL 57793, at *9-10 (D. Vt. Jan. 4, 2017) (Vermont).  Commentary on § 766A likewise cautions that "the rule in § 766A may be broader than many courts will accept," as

"thousands of acts" could subject a party to liability under that capacious rule.  Dan D. Dobbs et al., *The Law of Torts* § 634 (2d ed. 2019).  This Court should follow that persuasive authority and likewise refuse to accept § 766A as a viable basis for pleading tortious interference under Delaware law.

None of the dicta in the Delaware Superior Court's—not the Delaware Supreme Court's—unpublished decision in *Allen Family Foods, Inc. v. Capitol Carbonic Corp.*, No. N10C-10-313, 2011 WL 1205138 (Del. Super. Ct. Mar. 31, 2011), should persuade this Court otherwise.  Though some language in that decision, when taken out of context, might suggest theoretical support for § 766A, the *Allen Family Foods* court ultimately did not reach the issue because the plaintiff there had "failed to plead a viable claim … under Section 766A or otherwise." *Id.* at *1.  As later Delaware cases have clarified, *Allen Family Foods* should *not* be read "for the proposition that Delaware has formally adopted Section 766A as a cause of action," as § 766A "has never formally been recognized by Delaware courts." *Flores*, 2016 WL 5243950, at *10 & n.53.  The Delaware Superior Court's musings in *Allen Family Foods* are far from the requisite "clear signal[]" to this and other out-of-circuit federal courts that the Third Circuit "'clearly misread' [Delaware state] law" that would be necessary for this Court to disregard *Anderson*. *Charter Oil Co. v. Am. Emp'rs' Ins. Co.*, 69 F.3d 1160, 1164 (D.C. Cir. 1995).  This Court should follow the Third Circuit and the clear weight of state and federal authority, and refuse to recognize a novel tort claim that no Delaware court has ever adopted.

2.   Steves Has Not Alleged a Claim for Tortious Interference with Prospective Contractual Relations.

Steves has likewise failed to adequately allege the only other tortious-interference claim actually recognized by Delaware law:  "tortious interference with prospective contractual relations." *Del. State*, 556 F. Supp. 2d at 376.  Here, too, Steves' claim falls short because the

Complaint both fails to identify a specific party with whom Steves had a business expectancy and fails to allege that JELD-WEN had actual knowledge of any such prospective business relation.

Under Delaware law, to state a claim for tortious interference with prospective contractual relations, a plaintiff "must identify a specific party who was prepared to enter into a business relationship but was dissuaded from doing so by the defendant." *Agilent Techs., Inc. v. Kirkland*, No. 3512-VCS, 2009 WL 119865, at *6-7 (Del. Ch. Jan. 20, 2009) (alteration omitted).   A complaint may not simply rely on "vague statements about unknown customers." *Id.* at *7.   That, however, is precisely what Steves has attempted to do here.   The Complaint broadly and vaguely asserts that JELD-WEN has "interfered with Steves' … reasonable expectation of forming new contracts with molded interior residential door customers," without actually identifying any such customers.   Compl. ¶ 93.   That is insufficient to plead a business expectancy under Delaware law.   *See GWO Litig. Tr. v. Sprint Sols., Inc.*, No. N17C-06-356, 2018 WL 5309477, at *13 (Del. Super. Ct. Oct. 25, 2018) (dismissing a tortious interference claim that alleged "nothing more than generalized allegations of harm based on ostensible interference with speculative business relations").   Because the Complaint does nothing more than "alleg[e] a nebulous, unascertainable class of business relationships," Steves' claim fails. *Organovo Holdings, Inc. v. Dimitrov*, 162 A.3d 102, 122-23 (Del. Ch. 2017) (quotation marks omitted).

Steves' claim also fails for the independent reason that Steves does not allege any facts showing that JELD-WEN had any knowledge of Steves' purported business expectancies.   To plead a claim for tortious interference with prospective contractual relations, Steves must allege enough facts to show that JELD-WEN had "knowledge of" the relevant "relationship or

expectancy." *Corning Inc. v. SRU Biosystems, LLC*, 292 F. Supp. 2d 583, 585 (D. Del. 2003). That knowledge must be "either actual or imputed"; mere allegations of "constructive knowledge" are not sufficient. *Anesthesia Servs., P.A. v. Anesthesia Advantage, P.C.*, No. N11C-03-005, 2013 WL 3352672, at *4 & n.54 (Del. Super. Ct. June 27, 2013); *see id.* at *6 ("Tortious interference with prospective contractual relations cannot exist without knowledge to support intent."). Here, the Complaint alleges only that because JELD-WEN is "a seller of molded interior residential doors," it is "aware of Steves' ... relationship [sic] with other doors customers expected to result in sales." Compl. ¶ 92. That conclusory language falls well short of alleging that JELD-WEN had actual knowledge of any particular business expectancy. *See Worthington v. Palmer*, No. 3:15cv410, 2015 WL 7571822, at *3 (E.D. Va. Nov. 24, 2015) (Payne, J.) ("[T]he basic pleading standards set by [*Bell*] and [*Iqbal*] … foreclose conclusory, factually unsupported claims …."). Under established Delaware law, Steves' failure to allege that JELD-WEN had actual knowledge of any particular Steves' purported business expectancy is fatal to its attempted claim for tortious interference with prospective contractual relations.

## CONCLUSION

For the foregoing reasons, JELD-WEN respectfully requests that the Court dismiss Counts One and Two of Steves' Complaint in their entirety and with prejudice.

Dated: March 27, 2020

Respectfully submitted,


JELD-WEN, Inc.

By counsel

/s/ *Brian C. Riopelle*
Brian C. Riopelle (VSB #36454)
Gregory J. DuBoff
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
(804) 775-1084 – Tel.
(804) 698-2150 – Fax
briopelle@mcguirewoods.com

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of March 2020, the following counsel of record have

been served using the CM/ECF system, which will then send a notification of such filing (NEF)

to the registered participants as identified on the NEF to receive electronic service, including:

Lewis F. Powell III
John S. Martin
Alexandra L. Klein
Maya M. Eckstein
Douglas M. Garron
R. Dennis Fairbanks, Jr.
Michael Shebelskie
William H. Wright, Jr.
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
(804) 788-8200 – Tel.
(804) 788-8218 – Fax
lpowell@huntonAK.com
martinj@huntonAK.com
aklein@huntonAK.com
meckstein@huntonAK.com
dgarrou@huntonAK.com
dfairbanks@huntonAK.com
mshebelskie@huntonAK.com
cwright@huntonAK.com

Ted Dane
Glenn Pomerantz
Gregory Sergi
Munger, Tolles & Olson LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9288 – Tel.
(213) 683-4088 – Fax
ted.dane@mto.com
glenn.pomerantz@mto.com
gregory.sergi@mto.com

Kyle Mach
Emily C. Curran-Huberty
Munger, Tolles & Olson LLP

560 Mission Street, 27th Floor
San Francisco, CA 94105
(415) 512-4000 – Tel.
(415) 512-4077 – Fax
kyle.mach@mto.com
emily.curran-huberty@mto.com

*Attorneys for Plaintiff*

Marvin G. Pipkin
Kortney Kloppe-Orton
Pipkin Law
10001 Reunion Place, Suite 6400
San Antonio, TX 78216
(210) 731-6495 – Tel.
(210) 293-2139 – Fax

*Of Counsel*

/s/ *Brian C. Riopelle*
Brian C. Riopelle (VSB #36454)
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
(804) 775-1084 – Tel.
(804) 698-2150 – Fax
briopelle@mcguirewoods.com

*Attorney for Defendant*