IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | | |
|---|---|---|
| STEVES AND SONS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 3:20-cv-00098 REP |
| v. | ) | |
| | ) | |
| JELD-WEN, INC., | ) | Jury Trial Demanded |
| | ) | |
| Defendant. | ) | **PUBLIC VERSION** |
| | ) | |
| | ) | |

## JELD-WEN'S ANSWER AND AFFIRMATIVE DEFENSES TO STEVES' COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, DAMAGES, AND SPECIFIC PERFORMANCE

Defendant JELD-WEN, Inc. ("JELD-WEN") provides the following answers and affirmative defenses to the Complaint filed by Steves and Sons, Inc. ("Steves"). JELD-WEN denies all allegations in the Complaint not specifically admitted below. In responding to the Complaint, JELD-WEN uses the headings employed by Steves. JELD-WEN answers as follows:

**Steves' Introductory Paragraphs**

**This is a case about illegal, predatory conduct designed to eliminate fair competition.**

**Defendant JELD-WEN, Inc. ("JELD-WEN") already has been found liable for violating the Clayton Antitrust Act, been found to have breached its contract with Plaintiff Steves and Sons, Inc. ("Steves"), been assessed tens of millions of dollars in treble damages, been ordered to divest the doorskin manufacturing plant it acquired in its unlawful anti-**

1

competitive acquisition of its competitor Craftmaster Inc. ("CMI"),[1] and been ordered to pay even more damages to Steves because of its refusal to conform its conduct to be consistent with these multiple adverse judicial determinations.[2] Yet, JELD-WEN continues in its efforts to "kill off" Steves before the remedies already awarded to Steves can be implemented to restore competition in the marketplace.[3]

Most recently, JELD-WEN has begun to choke off Steves' timely access to interior molded doorskins, an essential input in Steves' business of making residential doors. Instead of delivering to Steves the doorskins it orders from JELD-WEN within 30 days of receipt of Steves' purchase orders – as JELD-WEN is required to do by the Supply Agreement between the parties – JELD-WEN either has been refusing to supply doorskins ordered altogether, shipping them weeks late, or – its newest tactic – drastically limiting the number of each style of doorskin that Steves can purchase. As a result, Steves has been unable to meet its customers' demands for doorskins, and will not be able to meet those demands so long as JELD-WEN's actions continue. Indeed, by drastically limiting the number and style of doorskins available to Steves – yet apparently not similarly limiting itself – JELD-WEN has found its most effective method yet of damaging Steves' business.

JELD-WEN's anti-competitive conduct violates the antitrust laws. Its actions also have tortiously interfered with Steves' contracts with, and business expectancy regarding, a substantial number of Steves' current and potential door customers. Additionally, JELD-

---

[1] *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, ECF No. 1852, March 13, 2019 (E.D. Va.).

[2] *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, ECF No. 1981, November 19, 2019 (E.D. Va.).

[3] As this Court previously found, JELD-WEN "regard[s] Steves, a significant player in the interior door market, to be an independent to be killed off." *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, ECF No. 1784, October 5, 2018 at 74 (E.D. Va.).

**WEN's acts and omissions are in breach of JELD-WEN's ongoing contractual obligations to Steves under the parties' doorskin Supply Agreement.**

**Accordingly, Steves seeks preliminary and permanent injunctive relief, declaratory relief, and an order of specific performance requiring JELD-WEN to sell Steves the doorskins it orders and to perform as the parties' contract requires. Steves also seeks an award of substantial compensatory and punitive damages for the harm inflicted on it by JELD-WEN in this latest plot to kill Steves off.**

Steves' introductory paragraphs set forth conclusions of law to which no response is required.  To the extent further response is required, JELD-WEN denies the allegations in Steves' introductory paragraphs, except that it admits that JELD-WEN has been found liable in previous proceedings in this Court, which rulings are currently on appeal.  In addition, JELD-WEN specifically denies that it is attempting to "kill off" Steves or "choke off" Steves' access to interior molded doorskins, denies that it has breached the Supply Agreement, and JELD-WEN denies that Steves is entitled to any relief.

### THE PARTIES, JURISDICTION, VENUE, AND INTERSTATE COMMERCE

1.     **Steves is a Texas corporation headquartered in Texas. For purposes of 28 U.S.C. § 1332(a), Steves is a citizen of Texas.**

JELD-WEN admits the first sentence in paragraph 1.  The second sentence of paragraph 1 sets forth conclusions of law to which no response is required.

2.     **Steves owns a door manufacturing plant in Henrico County, Virginia, for which Steves purchases doorskins and other inputs in interstate commerce from several states other than Virginia and ships doors in interstate commerce throughout the East Coast.**

JELD-WEN admits that Steves owns a door manufacturing plant in Henrico County, Virginia.  JELD-WEN is without knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 2, and therefore denies them.

3.     **Steves also owns door manufacturing plants in San Antonio, Texas and Lebanon, Tennessee, for both of which Steves purchases doorskins and other inputs in interstate commerce and ships doors in interstate commerce across the United States, except in certain areas of the West Coast.**

JELD-WEN admits that Steves owns door manufacturing plants in San Antonio, Texas and Lebanon, Tennessee.  JELD-WEN is without knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 3, and therefore denies them.

4.     **JELD-WEN is a Delaware corporation with its principal place of business in either Oregon or North Carolina. For purposes of 28 U.S. C. § 1332(a), JELD-WEN is a citizen of Delaware and either Oregon or North Carolina.**

JELD-WEN admits the first sentence in paragraph 4.  The second sentence of paragraph 4 sets forth conclusions of law to which no response is required.

5.     **JELD-WEN sells doorskins, doors, and other products in interstate commerce across the United States, including in Virginia. JELD-WEN has regularly shipped doorskins to Steves' plant in Henrico County, as well as to the other two Steves plants. JELD-WEN regularly does business with other customers throughout this District and Division.**

JELD-WEN admits the allegations in paragraph 5.

6.     **JELD-WEN and Steves are engaged in interstate commerce and in activities substantially affecting interstate commerce, and the conduct alleged herein substantially affects interstate commerce.**

JELD-WEN admits that it is engaged in activities involving interstate commerce.  JELD-WEN is without knowledge sufficient to form a belief as to the truth of the remaining allegations in paragraph 6, and therefore denies them.  Additionally, the remaining allegations in paragraph 6 set forth conclusions of law to which no response is required.

7.     **This Court has subject matter jurisdiction over the antitrust claims in this action pursuant to 15 U.S.C. §§ 15 and 26; 28 U.S.C. § 1331; and/or 28 U.S.C. § 1337(a).**

Paragraph 7 sets forth conclusions of law to which no response is required.

8.     **This Court has subject matter jurisdiction over the tortious interference, breach of contract, declaratory judgment, and specific performance claims in this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy on those claims exceeds $75,000.00, exclusive of interest and costs, and the parties are citizens of different states.**

Paragraph 8 sets forth conclusions of law to which no response is required.

9.     **This Court has personal jurisdiction over JELD-WEN under: (a) Virginia Code § 8.01-328.1.A.1 and 2 because the causes of action asserted in this Complaint arise from JELD-WEN's transacting business in Virginia and contracting to supply doorskins to Steves in Virginia; (b) Va. Code § 8.01-328.1.A.3 because JELD-WEN caused tortious injury by an act or omission in Virginia; and (c) 15 U.S.C. § 22 because JELD-WEN may be found and transacts business in this District.**

Paragraph 9 sets forth conclusions of law to which no response is required.

10. **Under § 1 of the Supply Agreement (attached hereto as Ex. 1), JELD-WEN agreed to sell to Steves, and Steves agrees to purchase from JELD-WEN, the full range of molded doorskin products manufactured by JELD-WEN, according to the terms and provisions of the Supply Agreement. As of the effective date of the Supply Agreement, Steves had, and still today has, a facility in Henrico County, Virginia for manufacturing doors from doorskins and other inputs. For this facility, Steves purchases doorskins and other inputs in interstate commerce and ships doors in interstate commerce across the United States.**

In response to the first sentence of paragraph 10, JELD-WEN asserts that the Supply Agreement speaks for itself, and denies any allegation inconsistent with the Supply Agreement and the Uniform Commercial Code.  In response to the second sentence of paragraph 10, JELD-WEN admits that Steves has had, since at least 2012, a facility in Henrico County, Virginia for manufacturing doors from doorskins and other inputs.  JELD-WEN is without knowledge sufficient to form a belief as to the truth of the allegations in the third sentence of paragraph 10, and therefore denies them.

11. **As of the effective date of the Supply Agreement, JELD-WEN had, and still today has, actual knowledge that Steves operates its door manufacturing facility in Henrico County. As of the effective date of the Supply Agreement, JELD-WEN had, and still today has, actual knowledge that Steves receives and uses JELD-WEN's doorskins at its Henrico County facility.**

JELD-WEN admits that Steves operates a door manufacturing facility in Henrico County and that Steves purchases doorskins from JELD-WEN for use in that plant.  JELD-WEN denies any remaining allegations in paragraph 11.

12.     **Since the Supply Agreement took effect, JELD-WEN has sold to Steves and delivered to Steves at its Henrico County facility millions of doorskins in performance of the Supply Agreement; employees and representatives of JELD-WEN have visited Steves' Henrico County facility in furtherance of JELD-WEN's performance of its Supply Agreement obligations; and employees and representatives of JELD-WEN have initiated and transmitted electronic communications, including phone calls and emails, to employees of Steves at its Henrico County facility in furtherance of JELD-WEN's performance of its Supply Agreement obligations.**

JELD-WEN admits that it has sold doorskins to Steves for use in Steves' Henrico County facility, that representatives of JELD-WEN have visited Steves' Henrico County facility, and that JELD-WEN has communicated with Steves' employees at Steves' Henrico County facility. JELD-WEN denies any remaining allegations in paragraph 12.

13.     **In addition to its business relationship with Steves, JELD-WEN also sells doors to, and has a business relationship with, customers in Virginia.**

JELD-WEN admits that it has sold products to, and has business relationships with, customers in Virginia.

14.     **By delivering doorskins to Henrico County, having its employees and representatives visit Henrico County, having its employees and representatives communicate with Steves' employees in Henrico County, and selling doors to customers in Virginia, JELD-WEN transacts business in Virginia.**

JELD-WEN admits that it transacts business in Virginia.

15.     **Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391(b) and (c), because JELD-WEN regularly**

transacts business in this District, including by shipping doorskins to Steves' plant in Henrico County, Virginia; JELD-WEN contracted to supply services or things to Steves in Virginia; and a substantial part of the events or omissions giving rise to Steves' claims, including JELD-WEN's failure to ship doorskins to Steves' Virginia plant and Steves' resulting loss of customers in Virginia, occurred in this District.

Paragraph 15 sets forth conclusions of law to which no response is required.

## FACTUAL BACKGROUND

A.   **The Previous Litigation**

1.   **Interior Molded Doorskins**

16.   **Steves makes and sells interior molded residential doors. These doors are the most popular type of interior doors in North America; the vast majority of interior doors sold in North America are molded doors, and that share has consistently grown over time. Interior molded doors simulate the aesthetics of solid wood doors, but at lower prices.**

JELD-WEN admits the allegations in paragraph 16.

17.   **Doorskins are a key component of interior molded doors. Doorskins comprise the front and back of interior molded doors. Interior molded doors are made by sandwiching wood frames and a hollow or solid core between two doorskins.**

JELD-WEN admits the allegations in paragraph 17.

18.   **Doorskins account for more than 70% of the material input cost of molded interior doors.**

JELD-WEN admits the allegations in paragraph 18.

2.   **Competition in the Doorskin Market**

19.   **Before 2012, there were three suppliers of interior molded doorskins in the United States: JELD-WEN, Masonite and CMI. Those suppliers, and their approximate**

**national shares of total United States sales of interior molded doorskins, were as follows: Masonite 46%, JELD-WEN 38%, and CMI 16%. "[C]ompetition among those three suppliers was vigorous and effective."** *Steves and Sons, Inc. v. JELD-WEN, Inc.***, 3:16-cv-545, ECF No. 1784, October 5, 2018 at 6 (E.D. Va.).**

In response to the first sentence in paragraph 19, JELD-WEN admits that before 2012, JELD-WEN, Masonite, and CMI, among others, supplied interior molded doorskins in the United States. JELD-WEN denies the remaining allegations in the first and second sentences of paragraph 19. In response to the third sentence of paragraph 19, JELD-WEN admits that Steves has accurately quoted from the cited opinion, but notes that the judgment in that case is currently on appeal.

20. **In October 2012, JELD-WEN acquired CMI through merger, leaving only two suppliers of interior doorskins in the United States. Soon after JELD-WEN's acquisition of CMI, though, Masonite stopped selling doorskins at competitive prices and terms to independent door companies like Steves that were wholly dependent on JELD-WEN and Masonite for this essential input, leaving JELD-WEN as the only practical source of doorskin supply.**

In response to the first sentence of paragraph 21, JELD-WEN admits that it acquired CMI through a merger in October 2012, and that following the merger, JELD-WEN and Masonite sold interior molded doorskins. In response to the second sentence of paragraph 21, JELD-WEN admits that at some point after the merger, Masonite announced that it would no longer sell doorskins to "competition." JELD-WEN denies the remaining allegations in paragraph 20.

21. **At the time JELD-WEN acquired CMI, the market for interior doorskins was already highly concentrated; accordingly, the merger was presumptively anti-**

**competitive. The doorskin market became an effective monopoly when Masonite elected to no longer sell doorskins to others at realistically competitive prices or terms.**

The assertion in paragraph 21 that the sale of doorskins constitutes a "market" is a legal conclusion as to which no response is required. However, to the extent that a response is required, JELD-WEN denies that doorskins constitute a relevant market for antitrust purposes. JELD-WEN further denies that the merger was presumptively anti-competitive. JELD-WEN is without information sufficient to form a belief as to the truth of the remaining allegations in paragraph 21, and on that basis, denies them.

22.     **"The merger substantially lessened competition in the doorskin market."** *Steves and Sons, Inc. v. JELD-WEN, Inc.*, **3:16-cv-545, ECF No. 1784, October 5, 2018 at 6 (E.D. Va.).**

JELD-WEN admits that Steves has accurately quoted from the cited opinion, but notes that the judgment in that case is currently on appeal.

### 3.     The Supply Agreement

23.     **In May 2012, JELD-WEN and Steves entered into a supply agreement ("the Supply Agreement") under which Steves agreed to purchase at least 80% of its doorskin requirements from JELD-WEN and JELD-WEN agreed to supply doorskins to Steves.**

JELD-WEN admits that JELD-WEN and Steves entered into a Supply Agreement. JELD-WEN further asserts that the Supply Agreement speaks for itself, and denies any allegation inconsistent with the Supply Agreement and the Uniform Commercial Code.

24.     **Since entering into the Supply Agreement, Steves has purchased nearly all of its doorskin requirements from JELD-WEN.**

JELD-WEN is without information sufficient to form a belief as to the truth of the allegations in paragraph 24, and on that basis, denies them.

10

25.     **Since entering into the Supply Agreement, Steves has issued purchase orders to JELD-WEN on a weekly basis. JELD-WEN has provided Steves with "confirmations" of the orders within 2-3 business days, sometimes making relatively minor variations to the purchase orders, typically to change the production location, or slightly modify the quantities so that delivery trucks will be balanced. JELD-WEN then has provided Steves with "shipping notices" setting forth shipping dates. Give or take a few days, JELD-WEN typically delivered the doorskins ordered by Steves within 30 days of receiving Steves' purchase orders, as required by the Supply Agreement.**

In response to the first sentence of paragraph 25, JELD-WEN admits that Steves has issued purchase orders to JELD-WEN on a weekly basis. In response to the second sentence of paragraph 25, JELD-WEN admits that before doorskin demand exceeded JELD-WEN's production capacity, and before Steves started placing unreasonably disproportionate orders, JELD-WEN issued confirmations to Steves within 2-3 business days. In further response to the second sentence of paragraph 25, JELD-WEN denies that changes to the purchase orders were "minor." In response to the third sentence of paragraph 25, JELD-WEN admits that it has provided Steves with "shipping notices" setting forth shipping dates for those orders that JELD-WEN confirmed. In response to the fourth sentence of paragraph 25, JELD-WEN admits that before doorskin demand exceeded JELD-WEN's production capacity, and before Steves started placing unreasonably disproportionate orders, JELD-WEN typically delivered the doorskins ordered by Steves within 30 days of receiving Steves' purchase orders. In further response to the fourth sentence of paragraph 25, JELD-WEN asserts that the Supply Agreement speaks for itself, and denies any allegation inconsistent with the Supply Agreement and the Uniform Commercial Code. JELD-WEN denies the remaining allegations in paragraph 25.

      **4.**      **JELD-WEN's Liability for Antitrust Violations and Breach of Contract Has Been Conclusively Established**

26.      **In June 2016, Steves sued JELD-WEN in this Court, alleging that JELD-WEN violated the Clayton Act and breached the Supply Agreement. The lawsuit was based on JELD-WEN's acquisition of CMI and anti-competitive conduct following the acquisition.**

JELD-WEN admits the first sentence of paragraph 26.  In response to the second sentence of paragraph 26, JELD-WEN admits that Steves' 2016 lawsuit was based on JELD-WEN's acquisition of CMI and JELD-WEN's alleged conduct following the acquisition, but JELD-WEN denies any liability related to the acquisition of CMI and its conduct following the acquisition, and notes that the judgment from Steves' 2016 lawsuit is currently on appeal.

27.      **For example, soon after Masonite announced that it would stop selling doorskins to independents like Steves, JELD-WEN began to refuse to honor the Supply Agreement's terms and conditions for setting doorskin prices, began charging higher prices than the Supply Agreement authorized, refused to sell certain doorskin models to Steves altogether, and began providing Steves with lower-quality doorskins. This behavior continued unabated despite Steves' complaints, leading Steves to file the June 2016 lawsuit.**

JELD-WEN denies the allegations in paragraph 27.

28.      **Steves' complaint was tried before a jury from January 29 through February 15, 2018. At conclusion of the trial, the jury found JELD-WEN guilty of violating the antitrust laws and breaching the Supply Agreement.**

JELD-WEN admits that Steves' 2016 complaint was tried before a jury.  JELD-WEN denies its liability under that verdict.  JELD-WEN further notes that the judgment following the

12

jury's verdict is currently on appeal.  JELD-WEN denies the remaining allegations in paragraph 28.

29.     **Specifically, the jury found that JELD-WEN's acquisition of CMI violated Section 7 of the Clayton Act; that JELD-WEN's Section 7 violation caused an injury to Steves  that was of the type that the antitrust laws were intended to prevent; that Steves was entitled to damages for antitrust injuries as a result of JELD-WEN's overcharging Steves for doorskins, shipping defective doorskins to Steves and failing to reimburse Steves for those doorskins, and refusing to reimburse Steves for the cost of doors that incorporated defective doorskins. The jury also found that JELD-WEN breached the Supply Agreement. The jury also necessarily reached a variety of subsidiary conclusions.**

JELD-WEN denies its liability under the jury verdict.  JELD-WEN further notes that the judgment following the jury's verdict is currently on appeal.  JELD-WEN denies the remaining allegations in paragraph 29.

30.     **The jury awarded Steves trebled damages of $36,455,619 for past harm suffered by Steves from JELD-WEN's antitrust violations. It also awarded Steves trebled damages of $139,441,743 for lost future profits that would start accruing in 2021.**

JELD-WEN asserts that the jury's verdict speaks for itself, and denies anything inconsistent with that verdict, except that JELD-WEN denies its liability under that verdict. JELD-WEN further notes that the judgment following the jury's verdict is currently on appeal.

31.     **Following a three-day bench trial, this Court further ordered that JELD-WEN divest the doorskin manufacturing plant in Towanda, Pennsylvania that JELD-WEN acquired in its unlawful acquisition of CMI.**

JELD-WEN admits that the Court entered a divesture remedy in the prior case.  JELD-WEN asserts that the Court's orders and opinions speak for themselves, and denies anything inconsistent with those orders and opinions.  JELD-WEN further denies liability under Steves' 2016 complaint, and notes that the judgment in that case is currently on appeal.

32.     **In an Amended Final Judgment entered on March 13, 2019, this Court gave Steves a choice between the future lost profits awarded by the jury or the divestiture ordered by the Court. *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, ECF No. 1852, March 13, 2019 (E.D. Va.). Steves chose the latter option while preserving the right to recover the awarded damages should divestiture not occur. The Court also awarded Steves declaratory relief.**

JELD-WEN admits that the Court entered an Amended Final Judgment on March 13, 2019.  In response to the first and third sentences in paragraph 32, JELD-WEN asserts that the Court's Amended Final Judgment speaks for itself, and denies anything inconsistent with that Amended Final Judgment.  JELD-WEN further denies liability under Steves' 2016 complaint, and notes that the Amended Final Judgment in that case is currently on appeal.  In response to the second sentence of paragraph 32, JELD-WEN admits that Steves chose the latter option while preserving the right to recover the awarded damages should divestiture not occur, but denies that Steves is entitled to any relief in that matter.

### 5.     JELD-WEN's Continuing Misconduct

33.     **Despite the jury verdict finding that JELD-WEN had been overcharging Steves for doorskins under the Supply Agreement's pricing formula and a declaratory judgment establishing that the Supply Agreement's pricing formula requires JELD-WEN to decrease doorskin prices in years in which its Key Input Costs decrease, JELD-WEN**

continued to overcharge Steves in the exact same manner as it had before the verdict and declaratory judgment.

JELD-WEN denies the allegations in paragraph 33.

34. **As a result, Steves moved for, and obtained, further relief from the Court for JELD-WEN's continuing conduct under 28 U.S.C. § 2202.**

JELD-WEN admits that Steves moved for, and obtained, further relief from the Court under 28 U.S.C. § 2202, but denies that Steves was entitled to any further relief, and notes that the Court's decision is currently on appeal.

35. **In November 2019, the Court awarded Steves an additional $7,083,013 for JELD-WEN's continuing overcharges.**

JELD-WEN admits that the Court awarded Steves an additional $7,083,013, but denies that Steves was entitled to such relief, and notes that the Court's decision is currently on appeal.

B. **JELD-WEN's Newest Misconduct**

1. **JELD-WEN's Failure to Timely Deliver Doorskins to Steves**

36. **As noted above, the Supply Agreement requires JELD-WEN to supply Steves with its doorskin requirements. Specifically, under § 4 of the Supply Agreement, Steves must purchase from JELD-WEN at least 80% of its doorskin requirements and JELD-WEN must fill Steves' orders. JELD-WEN "agrees that it will deliver to STEVES all molded doorskin products ordered within thirty (30) days of receipt of STEVES' purchase order[s]." Section 4 further states that, "[a]lthough STEVES has the right to . . . purchase from other sources, it is the intent and spirit of this Agreement that, . . . STEVES will purchase the maximum volume possible under this Agreement from JELD-WEN."**

JELD-WEN admits that Steves has accurately quoted certain portions of the Supply Agreement.  In response to paragraph 36, JELD-WEN asserts that the Supply Agreement speaks

for itself, and denies any allegation inconsistent with the Supply Agreement and the Uniform Commercial Code.

37.     **Beginning with purchase orders issued by Steves on October 28, 2019, and continuing with purchase orders issued by Steves through at least December 31, 2019 (and, as set forth below, continuing since then), JELD-WEN failed and refused to deliver to Steves all doorskins ordered within 30 days of receipt of Steves' purchase orders.**

JELD-WEN denies the allegations in paragraph 37, and specifically asserts that Steves did not issue purchase orders on October 28, 2019, but issued purchase orders on November 1, 2019.

38.     **Through December 31, 2019, JELD-WEN delivered 243,130 doorskins to Steves more than 30 days after receipt of Steves' purchase orders. These doorskins were delivered 17-45 days late.**

In response to the first sentence of paragraph 38, JELD-WEN is without information sufficient to form a belief as to the truth of the allegations, and on that basis, denies them.  JELD-WEN denies the allegations in the second sentence of paragraph 38.

39.     **Moreover, as of the filing of this Complaint, JELD-WEN still had not delivered 238,750 doorskins ordered by Steves in 2019, despite the passage of more than 30 days.**

JELD-WEN denies the allegations in paragraph 39, and specifically denies that it had any obligation to deliver doorskins pursuant to purchase orders it did not confirm.

40.     **JELD-WEN also has not timely delivered doorskins in response to purchase orders issued by Steves in 2020.**

JELD-WEN denies the allegations in paragraph 40, and specifically denies that it had any obligation to deliver doorskins pursuant to purchase orders it did not confirm.

41.     **Steves has issued purchase orders to JELD-WEN for 1,615,875 doorskins since December 31, 2019. As of the filing of this Complaint, JELD-WEN has not delivered 748,125 doorskins ordered in 2020, despite the passage of more than 30 days since JELD-WEN received Steves' purchase orders.**

JELD-WEN denies the allegations in paragraph 41, and specifically denies that it had any obligation to deliver doorskins pursuant to purchase orders it did not confirm.

### 2.     JELD-WEN's Improper Notice of Allocation and Application of Allocation

42.     **Under § 20 of the Supply Agreement, JELD-WEN may declare allocation if it "recognizes an actual or anticipated shortage in production capacity over the current or anticipated demand." If JELD-WEN intends to declare allocation, it must "immediately notify Steves of JELD-WEN's current production capacity in North America indicating a shortage in production capacity, which will then result in the need for an allocation period ('notice of allocation')." Section 20 further provides that an "allocation period will start effective the first day of the month following the notice of allocation."**

In response to paragraph 42, JELD-WEN admits that Steves has accurately quoted certain portions of the Supply Agreement, asserts that the Supply Agreement speaks for itself, and denies any allegation inconsistent with the Supply Agreement and the Uniform Commercial Code.

43.     **During a period of allocation, Steves is entitled to receive from JELD-WEN a percentage of JELD-WEN's production volume. Per § 20 of the Supply Agreement, the per-centage is "calculated by dividing the total number of skins shipped to STEVES the**

17

**preceding year by the total number of skins manufactured in North America by JELD-WEN the preceding year." JELD-WEN is required to advise Steves of its "percentage number" by January 30 of each year. During allocation, "Steves will be allowed to purchase up to the percentage number" that has been calculated for Steves for "the preceding year."**

In response to paragraph 43, JELD-WEN asserts that the Supply Agreement speaks for itself, and denies any allegation inconsistent with the Supply Agreement and the Uniform Commercial Code.   The Supply Agreement does not specify how allocation should be administered at the design or SKU level.   Thus, JELD-WEN allocated doorskin production by design family.   Under this methodology, each doorskin purchaser—including JELD-WEN itself—is allotted a percentage of weekly production by design family.   This allotment is equal to the percentage of each design's production that a purchaser bought in the preceding year.

44.      **JELD-WEN issued a notice of allocation to Steves on December 19, 2019, meaning that it could not take effect before January 1, 2020. The notice of allocation did not explain why JELD-WEN had "recognize[d] an actual or anticipated shortage in production capacity over the current or anticipated demand." The notice represented only that JELD-WEN's North American production capacity was approximately** ███████ **doorskins per year.**

JELD-WEN admits that it issued a notice of allocation to Steves on December 19, 2019. JELD-WEN further asserts that the notice of allocation speaks for itself, and denies any allegation inconsistent with the notice of allocation, the Supply Agreement, and the Uniform Commercial Code.  JELD-WEN denies the remaining allegations in paragraph 44.

45.     **JELD-WEN, though, has a demonstrated ability to produce at least █ █ doorskins per year in North America. A JELD-WEN employee testified under oath in the prior antitrust case that JELD-WEN's North American production capacity was more than █ doorskins per year in 2017.**

JELD-WEN denies the allegations in the first sentence of paragraph 45.  In response to the second sentence of paragraph 45, JELD-WEN denies that its plants' actual demonstrated production capacity is currently █ doorskins per year.

46.     **Nothing in the Supply Agreement authorizes JELD-WEN to instigate an allocation period by holding its production output below its demonstrated production capacity so as to unnecessarily and artificially produce "an actual or anticipated shortage in production capacity over current or anticipated demand."**

JELD-WEN denies that is has artificially produced any shortages in production capacity. In response to paragraph 46, JELD-WEN further asserts that the Supply Agreement speaks for itself, and denies any allegation inconsistent with the Supply Agreement and the Uniform Commercial Code.  JELD-WEN denies the remaining allegations in paragraph 46.

47.     **Moreover, JELD-WEN has conceded the real facts that led it to declare allocation, which have nothing to do with capacity shortages. Specifically, in a filing in this Court, JELD-WEN stated that a price increase it announced for its interior molded doors caused a "spike" in demand from customers seeking to purchase doors before the price increase became effective. This increase in demand resulted, according to JELD-WEN, in an increased demand for doorskins that JELD-WEN could not meet.**

JELD-WEN admits that a larger-than-normal price increase on interior molded doors by Masonite, and then JELD-WEN, caused a spike in the demand for interior molded doors and doorskins.  JELD-WEN denies the remaining allegations in paragraph 47.

48.    **In October of 2019 and then again in November of 2019, JELD-WEN announced two price increases for its doors, the last and larger of which was to take effect on February 7, 2020. In total, the two price increases represented a 22-27% increase in JELD-WEN's door prices. Door manufacturer Masonite announced a similar price increase on October 30, 2019, to take effect February 3, 2020.**

JELD-WEN admits that it announced price increases in October and November 2019, and that Masonite announced a price increase on October 30, 2019.  JELD-WEN denies the remaining allegations in paragraph 48.

49.    **Even if one assumes arguendo that JELD-WEN's explanation for its purported doorskin shortage is true, it does not justify refusing to fill Steves' orders or placing Steves on allocation. In the letters announcing its price increases to door customers, JELD-WEN specifically reserved the right to reject door orders that deviated from door customers' historical weekly order size averages. The Supply Agreement contains no parallel provision that would allow JELD-WEN to do the same to Steves. Absent allocation, JELD-WEN must "deliver to STEVES all molded doorskin products ordered within thirty (30) days of receipt of STEVES' purchase order[s]."  JELD-WEN's desire to voluntarily fulfill inflated orders from its door customers does not justify shorting Steves.  Nor does it justify allocation.**

JELD-WEN asserts that its price increase announcement letters speak for themselves, and denies any allegation inconsistent with those letters.  In response to the third sentence of

paragraph 49, JELD-WEN asserts that the Supply Agreement speaks for itself, and denies any allegation inconsistent with the Supply Agreement and the Uniform Commercial Code. JELD-WEN denies the remaining allegations in paragraph 49.

50. **Moreover, if JELD-WEN's explanation for allocation is true, JELD-WEN's inability to meet demand is caused by JELD-WEN's own decision to raise its door prices. Nothing in the Supply Agreement gives JELD-WEN the right to instigate an allocation period by itself creating the conditions that result in an actual or anticipated shortage in production capacity over current or anticipated demand.**

JELD-WEN denies the allegations in paragraph 50.

51. **Further still, assuming JELD-WEN's explanation for allocation is true, allocation should have ended in the first week of February 2020. JELD-WEN's second price increase took effect February 7, 2020. Thus, by JELD-WEN's own account, door demand should have stabilized as door customers can no longer purchase doors at the lower, pre-increase prices.**

JELD-WEN denies the allegations in paragraph 51.

52. **Possibly more egregious than JELD-WEN declaring a manufactured allocation is JELD-WEN's imposition of an ordering methodology during allocation that limits the quantity and mix of doorskins that Steves can receive from JELD-WEN, and which finds no support in the Supply Agreement.**

JELD-WEN admits that it is using an ordering methodology during allocation that applies to all of its customers and to JELD-WEN itself. JELD-WEN denies the remaining allegations in paragraph 52.

53. **Under the "mix methodology" JELD-WEN imposed on Steves during the allocation period, JELD-WEN determined the percentage of JELD-WEN's production of each style of doorskin that Steves purchased in 2019. JELD-WEN advised Steves that its 2020 purchases would be limited to those percentages as to each style, regardless of Steves' actual needs or customer demands.**

JELD-WEN admits that it determined the percentage of JELD-WEN's production of each style of doorskin that Steves purchased in 2019, and that JELD-WEN advised Steves that its purchases during allocation would be limited to those percentages as to each style. JELD-WEN denies the remaining allegations in paragraph 53.

54. **Demand for doorskin styles change over time. For example, as a result of its customers' demands, Steves ordered more of certain doorskin styles from JELD-WEN in early 2019 than it did in late 2019, and vice versa. JELD-WEN's mix methodology, though, is static and based on Steves' overall 2019 percentage of doorskin style purchases.**

In response to the first sentence of paragraph 54, JELD-WEN admits that demand for doorskin styles change over time. In response to the second sentence of paragraph 54, JELD-WEN is without information sufficient to form a belief as to the truth of the allegations, and on that basis, denies them. JELD-WEN admits that its "mix methodology" is based on customers' 2019 percentages, and further asserts that JELD-WEN is utilizing this mix methodology because it is fair and equitable to all of JELD-WEN's doorskin customers, including JELD-WEN's own door plants. JELD-WEN denies the remaining allegations in paragraph 54.

55. **In other words, limited by JELD-WEN's mix methodology, Steves is unable to meet customer demands. JELD-WEN, though, is not limited by any artificial mix methodology and is therefore free to meet customer demands.**

JELD-WEN denies the allegations in paragraph 55.

56.     **Moreover, as noted above, Steves is entitled to receive during allocation a percentage of JELD-WEN's production volume that is equal to the percentage of JELD-WEN's production volume shipped to Steves "the preceding year."**

JELD-WEN asserts that the Supply Agreement speaks for itself, and denies any allegation inconsistent with the Supply Agreement and the Uniform Commercial Code.

57.     **The allocation period JELD-WEN sought to initiate by its December 19, 2019 notice took effect (assuming *arguendo* that it was valid) on January 1, 2020. The year preceding 2020 is 2019. Thus, the percentage number that should be applied to the allocation period (assuming *arguendo* that it is valid) is Steves' 2019 percentage number.**

In response to the first sentence in paragraph 57, JELD-WEN admits that the allocation period took effect on January 1, 2020.  JELD-WEN admits the allegations in the second sentence of paragraph 57.  In response to the third sentence of paragraph 57, JELD-WEN asserts that it is applying Steves' 2019 percentage to Steves' overall purchases of doorskins during allocation.

58.     **Yet, JELD-WEN's December 19 notice of allocation and subsequent communications with Steves stated that JELD-WEN would apply Steves' 2018 percentage number to the allocation period –** ███**% of JELD-WEN's 2020 production during allocation. In other words, JELD-WEN intends to ship Steves no more than** ███**% of its 2020 production of doorskins.**

In response to the first sentence of paragraph 58, JELD-WEN asserts that the December 19 notice of allocation speaks for itself, and denies anything inconsistent with that document. JELD-WEN denies the allegations in the second sentence of paragraph 58.

59.   **Steves' 2019 percentage number is ▓▓%, though JELD-WEN advised Steves that it was only ▓▓%. The percentage provided by JELD-WEN is artificially deflated by JELD-WEN's failure to deliver to Steves thousands of doorskins ordered by Steves in 2019.**

JELD-WEN admits that Steves' 2019 percentage is ▓▓%.   JELD-WEN denies the remaining allegations in paragraph 59.

60.   **If applied to JELD-WEN's claimed production capacity of approximately 50 million, JELD-WEN intends to provide Steves with only ▓▓▓▓ doorskins in 2020 using JELD-WEN's claimed 2018 percentage number of ▓▓%. JELD-WEN should be providing Steves with more than approximately ▓▓▓▓ doorskins using either JELD-WEN's claimed percentage number of ▓▓% or Steves' percentage number of ▓▓%. In this scenario, JELD-WEN's incorrect percentage number would deprive Steves of more than ▓▓▓▓ doorskins.**

JELD-WEN denies the allegations in paragraph 60, and asserts that it is applying ▓▓% to Steves' overall doorskin purchases.

61.   **If applied to a production capacity of at least ▓▓▓▓, JELD-WEN should be providing Steves with more than approximately ▓▓▓▓▓ doorskins based on either of the 2019 percentage numbers. In this scenario, JELD-WEN's incorrect percentage number would deprive Steves of more than ▓▓▓▓ doorskins.**

JELD-WEN denies the allegations in paragraph 61.

**C.     The 2012 Merger and Its Anticompetitive Effects**

**1.     Relevant Market**

62.   **The sale of interior molded doorskins in the United States is a line of commerce and relevant market within the meaning of Section 7 of the Clayton Act. This**

Court previously and correctly found that "interior molded doorskins are a properly defined relevant antitrust market." *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, ECF No. 1847, March 13, 2019 at 17 (E.D. Va.). That correct conclusion is binding on JELD-WEN.

Paragraph 62 asserts legal conclusions that do not require a response. To the extent that a response is required, JELD-WEN denies the allegations contained in paragraph 62.

63.     **The relevant product market is "interior molded doorskins."**

Paragraph 63 asserts legal conclusions that do not require a response. To the extent that a response is required, JELD-WEN denies the allegations contained in paragraph 63.

64.     **For the production of interior molded doors, there are no close substitutes for interior molded doorskins. A small but significant increase in the price of interior molded doorskins for use in manufacturing interior molded doors would not cause a significant number of purchasers of interior molded doorskins to substitute other doorskins.**

JELD-WEN denies the allegations in paragraph 64.

65.     **The relevant geographic market within the meaning of the Clayton Act for interior molded doorskins is the United States. The vast majority of interior molded doorskins purchased by U.S. door manufacturers are produced in the United States.**

JELD-WEN admits that many interior molded doorskins that are purchased by U.S. manufacturers are produced in the United States. The remainder of paragraph 65 asserts legal conclusions that do not require a response. To the extent that a response is required, JELD-WEN denies the allegations contained in paragraph 65.

66.     **Steves has searched across the globe for an alternate source of doorskins, but has not identified any global supplier that can provide sufficient doorskins to meet Steves' needs. This Court previously and correctly found that "foreign suppliers do not provide viable alternative supplies of doorskins in the quantity and quality required by Steves."** *Steves and Sons, Inc. v. JELD-WEN, Inc.*, **3:16-cv-545, ECF No. 1784, October 5, 2018 at 78 (E.D. Va.). That correct conclusion is binding on JELD-WEN.**

In response to the first sentence of paragraph 66, JELD-WEN is without information sufficient to form a belief as to the truth of the allegations, and on that basis, denies them.   In response to the second sentence in paragraph 66, JELD-WEN asserts that the Court's opinion speaks for itself, and denies anything inconsistent with that Amended Final Judgment.   JELD-WEN further denies liability under Steves' 2016 complaint, and notes that the Amended Final Judgment in that case is currently on appeal.   JELD-WEN denies the remaining allegations in paragraph 66.

### 2.     Market Structure

67.     **Before the 2012 Merger, there were three suppliers of interior molded doorskins in the United States.** *Steves and Sons, Inc. v. JELD-WEN, Inc.*, **3:16-cv-545, ECF No. 1784, October 5, 2018 at 11 (E.D. Va.). Those suppliers, and their national shares of total United States sales of interior molded doorskins, were as follows: Masonite with 46%, JELD-WEN with 38%, and CMI with 16%.**

JELD-WEN admits that before 2012, Masonite, JELD-WEN, and CMI, among others, supplied interior molded doorskins in the United States.   JELD-WEN denies the remaining allegations in paragraph 67.

68.     **In October 2012, JELD-WEN acquired CMI through merger, leaving only two suppliers of interior doorskins in the United States.** *Steves and Sons, Inc. v. JELD-*

**WEN, Inc., 3:16-cv-545, ECF No. 1784, October 5, 2018 at 18-19 (E.D. Va.). Soon after JELD-WEN's acquisition of CMI, though, Masonite stopped selling doorskins at competitive prices and terms to companies like Steves that were wholly dependent on JELD-WEN and Masonite for this essential input, leaving JELD-WEN as the only practical source of doorskin supply. *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, ECF No. 1784, October 5, 2018 at 30 (E.D. Va.).**

JELD-WEN admits that following the 2012 merger, JELD-WEN and Masonite both sold interior molded doorskins, and that at some point, Masonite announced that it would no longer sell interior molded doorskins to "competition." JELD-WEN denies the remaining allegations of paragraph 68.

69.    **At the time JELD-WEN acquired CMI, the market for interior doorskins was already highly concentrated. It became an effective monopoly when Masonite effectively elected to no longer sell doorskins to others.**

The allegations in paragraph 69 are legal conclusions as to which no response is required. However, to the extent that a response is required, JELD-WEN denies that doorskins constitute a relevant market for antitrust purposes and that there was an "effective monopoly." JELD-WEN is without information sufficient to form a belief as to the truth of the remaining allegations contained in paragraph 69 and, on that basis, denies them.

70.    **Although Masonite has occasionally claimed that it remains willing to sell interior molded doorskins to independent customers like Steves (despite the company's direct statements to the contrary in speaking with investors), Masonite has offered terms for the sale of such doorskins that demonstrate that it does not intend to sell materially**

**significant volumes of such skins to Steves or anyone else.** *Steves and Sons, Inc. v. JELD-WEN, Inc.*, **3:16-cv-545, ECF No. 1784, October 5, 2018 at 34 (E.D. Va.).**

JELD-WEN is without information sufficient to form a belief as to the truth of the allegations contained in paragraph 70 and, on that basis, denies them.

71.    **Although foreign manufacturers of interior molded doorskins exist, they do not sell interior molded doorskins in the United States in quantities or varieties sufficient to provide Steves' needs for doorskins.** *Steves and Sons, Inc. v. JELD-WEN, Inc.*, **3:16-cv-545, ECF No. 1784, October 5, 2018 at 35 (E.D. Va.). Such manufacturers are not material competitive constraints on JELD-WEN and Masonite.**

JELD-WEN is without information sufficient to form a belief as to the truth of the allegations contained in paragraph 71 and, on that basis, denies them.

### 3.    Anticompetitive Effects

72.    **The effect of the 2012 Merger has been and will continue to be substantially to lessen competition, or to tend to create a monopoly, in the market for interior molded doorskins in the United States. The merger has had anticompetitive effects as described below.**

JELD-WEN denies the allegations in paragraph 72.

73.    **The results of the prior proceedings already have demonstrated conclusively that the merger was illegal and caused antitrust injuries to Steves. The merger has caused additional antitrust injuries to Steves since the prior verdicts were reached and which are not remedied by the prior verdicts. The merger also threatens additional likely future anticompetitive effects.**

JELD-WEN denies the allegations in paragraph 73.

a.    **Unilateral Effects**

74.    **JELD-WEN has increased prices and restricted output of its interior molded doorskins sold to Steves as a result of the illegal merger. As described above, and in addition to the conduct previously adjudged to be an anticompetitive effect of the illegal merger, JELD-WEN failed to timely deliver, or deliver at all, hundreds of thousands of doorskins to Steves since October 28, 2019.**

JELD-WEN denies the allegations in paragraph 74.

75.    **As described above, and in addition to the conduct previously adjudged to be an anticompetitive effect of the illegal merger, JELD-WEN declared allocation on the basis of an artificial production capacity. It also limited Steves to an artificial percentage of its doorskin production, and improperly limited Steves to a mix of doorskins that prevent Steves from responding to market demand.**

JELD-WEN denies the allegations in paragraph 75.

76.    **These effects are the direct result of JELD-WEN's illegal acquisition of CMI and the resulting loss of competition. Were it not for JELD-WEN's illegal merger, Steves could turn to the competitive market to prevent JELD-WEN from imposing these anticompetitive terms and restricting Steves' volumes. By breaching its contract with Steves, JELD-WEN is effectively capitalizing on its increased market power to foreclose Steves' access to sufficient quantities of various styles of doorskins. JELD-WEN would not enjoy this market power but for the 2012 Merger. The effect is to limit Steves' ability to compete against JELD-WEN for the sale of interior molded doors, and to cause Steves a wide variety of harms discussed elsewhere herein.**

JELD-WEN denies the allegations in paragraph 76.

29

**b.      Coordinated Effects**

77.      **The merger has resulted, and is likely to further result, in coordinated effects adverse to Steves and other doorskin customers. Most notably, by eliminating CMI as an independent competitor for doorskin sales, the merger has made it possible for JELD-WEN and Masonite to raise prices and restrict output of interior molded doorskins sold to independent door customers like Steves, knowing that JELD-WEN and Masonite will likely recoup the profits on any lost doorskin sales by gaining interior molded door sales that would otherwise be made by Steves or another independent competitor. Such coordination is much less likely to occur in a competitive market, such as where a third doorskin manufacture like CMI would make such a strategy less profitable to each doorskin manufacturer.**

JELD-WEN denies the allegations in paragraph 77.

**4.      Barriers to Entry**

78.      **The barriers to entry in the doorskin manufacturing business are formidable. As was explained in the June 25, 2014 Masonite investor presentation, the interior doorskins business "is not easy to replicate" and takes approximately four years and a $100 to $150 million capital investment.**

JELD-WEN admits that paragraph 78 purports to quote from a Masonite investor presentation, the contents of which speak for themselves.  To the extent paragraph 78 contradicts or characterizes the contents of statements made in the presentation, JELD-WEN denies those allegations.  JELD-WEN denies the remaining allegations in paragraph 78.

79.      **Steves' own independent analysis is consistent with the existence of very substantial barriers to entry. Steves itself has been trying—without success—to find an alternative source of interior molded doorskins in the United States for many years since**

the loss of CMI. Despite these significant efforts, Steves has no alternative to JELD-WEN for the vast majority of its doorskin purchases and does not appear likely to have any such alternative absent the divestiture remedy the Court has already awarded, but which has not yet been completed. It is clear that entry into the market has not been and will not be timely, likely, or sufficient to counteract the substantial anticompetitive effects of the merger that have already occurred and which are likely to continue to occur absent an additional remedy.

JELD-WEN is without information sufficient to form a belief as to the truth of the allegations contained in the first and second sentences of paragraph 79 and, on that basis, denies them.  JELD-WEN denies the allegations in the third sentence of paragraph 79.

80. **JELD-WEN's illegal merger has caused injuries that are of the type that the antitrust laws are intended to prevent. Among other things, JELD-WEN's increases in prices and restrictions in output have harmed Steves precisely because the merger has eliminated Steves' ability to procure interior molded doorskins from other suppliers at competitive prices and at competitive terms. Thus, it is the loss of competition caused by the merger that makes JELD-WEN's conduct possible and which makes possible the majority of the resulting harms to Steves.  JELD-WEN's illegal merger is a material cause of these antitrust injuries.**

JELD-WEN denies the allegations in paragraph 80.

D.     **Alternative Dispute Resolution**

81. **Section 10 of the Supply Agreement governs "disputes which may arise hereunder." It requires the parties to hold at least one "internal conference" involving their "senior executives," and then to engage in mediation, before the "Complaining Party" may file suit. Section 10 applies to JELD-WEN's breaches of contract.**

JELD-WEN asserts that the Supply Agreement speaks for itself, and denies any allegation inconsistent with the Supply Agreement and the Uniform Commercial Code.

82. **The parties have held several discussions regarding the contract disputes identified above, but the disputes were not resolved. Steves is prepared to engage in the internal conference and mediation contemplated by the Supply Agreement, but is filing this Complaint and a motion for temporary restraining order and preliminary injunction so as to maintain the status quo to prevent further harm to Steves pending resolution of these disputes.**

JELD-WEN admits that JELD-WEN participated in good faith in a discussion among senior executives, followed by a mediation session before the Honorable David Novak, but denies that Steves participated in those sessions and mediation in good faith. JELD-WEN denies the remaining allegations in paragraph 82.

## COUNT ONE

(Clayton Act, Section 7, 15 U.S.C. § 18)

83. **The foregoing allegations are incorporated as though re-alleged herein.**

JELD-WEN reasserts and incorporates by reference its foregoing responses.

84. **JELD-WEN has violated Section 7 of the Clayton Act, as was found conclusively in prior binding proceedings. The effect of the 2012 Merger has been, and continues to be, substantially to lessen competition or to tend to create a monopoly in the market for interior molded doorskins in the United States in violation of Section 7 of the Clayton Act.**

JELD-WEN denies the allegations in paragraph 84.

85. **These violations have caused injuries to Steves. Within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15, Steves has been injured in its business or**

property by reason of the lessening of competition described above, including, without limitation JELD-WEN's refusal to supply to Steves an essential input for its door manufacturing business except on anticompetitive terms and conditions. Steves is entitled to recover treble damages for such injuries, in an amount to be proved at trial.

JELD-WEN denies the allegations in paragraph 85.

86.     **Steves has suffered and is continuing to suffer irreparable harm that cannot be cured by money damages. Accordingly, Steves is entitled to preliminary injunctive relief to prevent further irreparable harm.**

JELD-WEN denies the allegations in paragraph 86.

87.     **Steves is threatened with further loss or damage by reason of the actual or likely lessening of competition described above and is entitled to permanent injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, sufficient to restore competition to the doorskins and doors markets comparable to that which existed before the illegal 2012 Merger.**

JELD-WEN denies the allegations in paragraph 87.

## COUNT TWO

### (Tortious Interference)

88.     **The foregoing allegations are incorporated as though re-alleged herein.**

JELD-WEN reasserts and incorporates by reference its foregoing responses.

89.     **Steves has contracts with certain of its molded interior residential door customers.**

JELD-WEN is without information sufficient to form a belief as to the truth of the allegations contained in the first and second sentences of paragraph 89 and, on that basis, denies them.

90.    **Steves also has continuing and ongoing business relationships with molded interior residential door customers that, because of the length of the relationship and the goodwill developed between Steves and the customers, Steves expected and believed would continue and result in sales of molded interior residential doors.**

JELD-WEN is without information sufficient to form a belief as to the truth of the allegations contained in the first and second sentences of paragraph 90 and, on that basis, denies them.

91.    **Steves also has developed business relationships with molded interior residential doors customers that either recently have purchased molded interiors residential doors or expressed a firm intent to buy such doors from Steves.**

JELD-WEN is without information sufficient to form a belief as to the truth of the allegations contained in the first and second sentences of paragraph 91 and, on that basis, denies them.

92.    **As a seller of molded interior residential doors and a direct competitor of Steves for the sale of molded interior residential doors, JELD-WEN is aware of Steves' existing contracts, its continuing business relationships with doors customers, and its relationship with other doors customers expected to result in sales of doors, some of which had been customers of JELD-WEN's.**

JELD-WEN denies the allegations in paragraph 92.

93.    **JELD-WEN has intentionally and improperly interfered with Steves' existing contracts, with Steves' continuing business relationships with molded interior residential doors customers, and with Steves' reasonable expectation of forming new contracts with molded interior residential doors customers in Virginia and elsewhere. This interference**

**has rendered Steves unable to fulfill many of its existing contracts and unable to acquire, continue, and form new contracts, and making it more expensive and burdensome for Steves to fulfill, acquire, continue, and form existing and new contracts.**

JELD-WEN denies the allegations in paragraph 93.

94.     **JELD-WEN's improper means include, but are not limited to, misrepresentations about the reasons for JELD-WEN's failure and refusal to confirm or deliver Steves' orders for doorskins, misrepresentations about JELD-WEN's reasons for instigating allocation, breaches of the Supply Agreement committed in bad faith, violations of the antitrust laws, and other violations of statutes or recognized common-law rules, acts of deceit, restraints of trade, and unfair competition.**

JELD-WEN denies the allegations in paragraph 94.

95.     **Because JELD-WEN competes with Steves for the sale of molded interior residential doors, JELD-WEN has been and will continue to be motivated by its improper purpose of eliminating Steves as a competitor and obtaining Steves' molded interior residential doors customers for itself to interfere, and to act for the purpose of interfering, with Steves' existing contracts, continuing relationships, and reasonable expectation of forming new contracts.**

JELD-WEN admits that JELD-WEN competes with Steves for the sale of molded interior residential doors.  JELD-WEN denies the remaining allegations in paragraph 95.

96.     **JELD-WEN's acts were willful and wanton and were motivated by, or were the product of, actual malice towards Steves.**

JELD-WEN denies the allegations in paragraph 96.

97.     **As a result of JELD-WEN's tortious interference, Steves has lost substantial sales and opportunities for future sales, and Steves has suffered a loss of good will.**

JELD-WEN denies the allegations in paragraph 97.

## COUNT THREE

(Breach of Contract)

98.     **The foregoing allegations are incorporated as though re-alleged herein.**

JELD-WEN reasserts and incorporates by reference its foregoing responses.

99.     **The Supply Agreement is a valid and enforceable contract under which JELD-WEN agreed to sell and deliver doorskins to Steves, and Steves agreed to purchase doorskins, all in accordance with the terms and conditions of the Supply Agreement.**

JELD-WEN admits that the Supply Agreement is a valid and enforceable contract. JELD-WEN asserts that the Supply Agreement speaks for itself, and denies any allegation inconsistent with the Supply Agreement and the Uniform Commercial Code.

100.    **As described in this Complaint, JELD-WEN has breached and is continuing to breach the Supply Agreement in numerous ways, including without limitation by failing and refusing to deliver doorskins ordered when JELD-WEN had not issued a notice of allocation; by issuing an unjustified notice of allocation that was caused and made necessary, if at all, by JELD-WEN's own conduct in restricting its production output and/or creating a spike in demand for doors through its price increases, which notice therefore is ineffective; and by failing to properly implement and administer the allocation period even if JELD-WEN had been authorized to initiate the allocation period.**

JELD-WEN denies the allegations in paragraph 100.

101.   **As a result of JELD-WEN's breaches of the Supply Agreement, many of which are ongoing, Steves has suffered damages substantially in excess of $75,000 in an amount to be shown at trial; including without limitation damages for the following:**

● **JELD-WEN's failure and refusal to deliver at all, much less within 30 days, doorskins ordered before December 31, 2019. The direct and foreseeable consequence of JELD-WEN's failure and refusal to deliver doorskins ordered by Steves within 30 days or at all is that Steves was required to turn away new customers for its doors and drop existing customers.**

● **JELD-WEN's unjustified and improper declaration of allocation, and improper application of allocation to Steves. The direct and foreseeable consequence of JELD-WEN's void and ineffective initiation of an allocation period and improper application of allocation is that Steves has been prevented from ordering doorskins it would have ordered if JELD-WEN had not initiated an allocation period and, thus, has had to turn away new customers for its doors and drop existing customers.**

JELD-WEN denies the allegations in paragraph 101.

102.   **Additionally, Steves is entitled to specific performance under the Supply Agreement by having its orders filled in whole, without regard to the mix of doorskin models that may be included in those orders, as if JELD-WEN had not initiated an allocation period.**

JELD-WEN denies the allegations in paragraph 102.

## COUNT FOUR

(Declaratory Judgment)

103.   **The foregoing allegations are incorporated as though re-alleged herein.**

JELD-WEN reasserts and incorporates by reference its foregoing responses.

104.    **An actual controversy has arisen and now exists between Steves and JELD-WEN concerning whether, among other things, JELD-WEN's initiation of an allocation period is valid and effective and whether the manner in which JELD-WEN is administering the allocation period is consistent with the terms and conditions of the Supply Agreement.**

JELD-WEN admits that Steves has raised a purported controversy.  JELD-WEN denies that Steves is entitled to any relief and denies the remaining allegations in paragraph 104.

105.    **Steves contends that JELD-WEN's initiation of an allocation period is void and ineffective because JELD-WEN's initiation of an allocation period is based on a production capacity significantly below the production capacity JELD-WEN previously claimed under oath to have, because JELD-WEN has not adequately justified the need for allocation, and because JELD-WEN itself caused the conditions, if any, that led to the supposed increase in demand on which JELD-WEN is basing its initiation of an allocation period. JELD-WEN takes contrary positions.**

JELD-WEN admits that Steves has raised several contentions.  JELD-WEN denies that Steves is entitled to any relief and denies the remaining allegations in paragraph 105.

106.    **Steves further contends that in administering an allocation period, JELD-WEN must use Steves' 2019 percentage number, which must include doorskins ordered after October 28, 2019 that should have been delivered before December 31, 2019, but were not; must apply Steves' 2019 percentage number to JELD-WEN's true North American production capacity; and must permit Steves to order the mix of doorskin models that reflects the current demands of Steves' customers rather than Steves' past orders.  JELD-WEN takes contrary positions.**

38

JELD-WEN admits that Steves has raised several contentions.  JELD-WEN denies that Steves is entitled to any relief and denies the remaining allegations in paragraph 106.

107.    **Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, Steves is entitled to a declaration that:**

● **JELD-WEN's notice of allocation is void and ineffective;**

● **If JELD-WEN's notice of allocation is not void and ineffective, JELD-WEN must use Steves' 2019 percentage number, properly calculated, to allocate doorskins to Steves;**

● **If JELD-WEN's notice of allocation is not void and ineffective, JELD-WEN must include in calculating Steves' 2019 percentage number the doorskins ordered before December 31, 2019, that JELD-WEN should have delivered before that date but did not;**

● **If JELD-WEN's notice of allocation is not void and ineffective, JELD-WEN must apply Steves' 2019 percentage number, correctly calculated, to JELD-WEN's true production capacity rather than its claimed production capacity; and**

● **If JELD-WEN's notice of allocation is not void and ineffective, JELD-WEN must permit Steves to order the mix of doorskin models that reflects the current demands of Steves' customers rather than Steves' past orders.**

JELD-WEN denies the allegations in paragraph 107.

## PRAYER FOR RELIEF

**Wherefore, Plaintiff, Steves and Sons, Inc., requests that the Court grant it the following relief:**

1.      Under Count One, appropriate injunctive relief against JELD-WEN, including without limitation an order that it fill Steves' doorskin orders in whole, without regard to the mix of doorskin models that may be included in those orders, as if JELD-WEN had not initiated an allocation period.

2.      Under Count One, an award of three times the damages sustained by Steves because of JELD-WEN's violation of the antitrust laws, in an amount to be proven at trial;

3.      Under Count Two, an award of compensatory and punitive damages, in amounts to be proven at trial,

4.      Under Count Three, the damages sustained by Steves because of JELD-WEN's breaches of the Supply Agreement, in an amount to be proven at trial, and an order requiring specific performance of the Supply Agreement;

5.      Under Count Four, appropriate declaratory relief as set forth therein;

6.      An award of Steves' reasonable attorneys' fees and costs in this action pursuant to Sections 4 and 16 of the Clayton Act and § 12 of the Supply Agreement;

7.      Pre-judgment and post-judgment interest; and

8.      Such other relief as this Court deems just and proper.

JELD-WEN denies that Steves is entitled to any relief set forth in its Prayer for Relief.

## AFFIRMATIVE DEFENSES

Subject to its responses above, and upon information and belief, JELD-WEN alleges and asserts the following defenses in response to the allegations in the Complaint.  Regardless of how such defenses are listed herein, JELD-WEN undertakes the burden of proof only as to those defenses that are deemed affirmative defenses as a matter of law.  In addition to the affirmative defenses described below, JELD-WEN reserves the right to amend or raise additional affirmative

40

defenses pursuant to any docket control order or as additional information becomes available through further investigation and discovery.

### FIRST DEFENSE
### (Failure to State a Claim)

The Complaint filed by Steves fails to state a claim upon which relief can be granted.

### SECOND DEFENSE
### (Unclean Hands)

Steves' claims are barred in whole or in part because of Steves' conduct and unclean hands.

### THIRD DEFENSE
### (Terms of Contract and UCC)

Steves' claims are barred in whole or in part because the conduct alleged adheres to the terms of the parties' contract and the Uniform Commercial Code.

### FOURTH DEFENSE
### (Lawful Conduct)

Steves' claims are barred in whole or in part because the claims are based on lawful conduct.

### FIFTH DEFENSE
### (Good Faith)

Steves' claims are barred in whole or in part because the claims are based on conduct undertaken in good faith.

### SIXTH DEFENSE
### (No Causation)

Steves' claims against JELD-WEN are barred because Steves' damages, if any, were not caused by JELD-WEN.

### SEVENTH DEFENSE
### (Equitable Defenses)

Steves' claims are barred in whole or in part by the doctrines of waiver, implied waiver, estoppel, good faith, laches, and/or other equitable remedies.

### EIGHTH DEFENSE
### (Mitigation of Risk)

Steves' claims are barred in whole or in part by Steves' failure to take adequate measures to mitigate damages.

### NINTH DEFENSE
### (Course of Performance, Course of Dealing, Usage of Trade)

Steves' claims are barred in whole or in part by the doctrines of course of performance, course of dealing, and usage of trade.

### TENTH DEFENSE
### (Unreasonably Disproportionate Orders)

Steves' claims are barred in whole or in part by Steves' unreasonably disproportionate orders in violation of 6 Del. C. § 2-306(1).

### ELEVENTH DEFENSE
### (Failure to Conduct Alternative Dispute Resolution)

Steves' claims are barred in whole or in part by Steves' failure to conduct the alternative dispute resolution procedures set forth in the Supply Agreement before filing the Complaint.

### TWELFTH DEFENSE
### (Double Recovery)

Steves is barred from obtaining damages in this case because the requested damages are duplicative of the damages it was awarded in *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545.

## JURY DEMAND

JELD-WEN demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, JELD-WEN prays that the Court enter judgment in its favor and against Steves as follows:

A.   Dismissing, with prejudice, Steves' claims against JELD-WEN and denying each and every prayer for relief contained in the Complaint, and entering judgment in favor of JELD-WEN on each and every claim;

B.   Ruling in favor of all of JELD-WEN's affirmative defenses;

C.   Awarding JELD-WEN its expenses and costs in accordance with Rule 54(d) of the Federal Rules of Civil Procedure;

D.   Awarding JELD-WEN its reasonable attorney's fees pursuant to Supply Agreement Section 12; and,

E.   Awarding JELD-WEN any other relief the Court may deem just and proper.

Dated: March 27, 2020                    Respectfully submitted,

JELD-WEN, Inc.

By counsel

/s/ *Brian C. Riopelle*
Brian C. Riopelle (VSB #36454)
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
(804) 775-1084 – Tel.
(804) 698-2150 – Fax
briopelle@mcguirewoods.com

*Attorney for Defendant*

43

CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of March 2020, the following counsel of record have been served using the CM/ECF system, which will then send a notification of such filing (NEF) to the registered participants as identified on the NEF to receive electronic service, including:

Lewis F. Powell III
John S. Martin
Alexandra L. Klein
Maya M. Eckstein
Douglas M. Garron
R. Dennis Fairbanks, Jr.
Michael Shebelskie
William H. Wright, Jr.
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
(804) 788-8200 – Tel.
(804) 788-8218 – Fax
lpowell@huntonAK.com
martinj@huntonAK.com
aklein@huntonAK.com
meckstein@huntonAK.com
dgarrou@huntonAK.com
dfairbanks@huntonAK.com
mshebelskie@huntonAK.com
cwright@huntonAK.com

Ted Dane
Glenn Pomerantz
Gregory Sergi
Munger, Tolles & Olson LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9288 – Tel.
(213) 683-4088 – Fax
ted.dane@mto.com
glenn.pomerantz@mto.com
gregory.sergi@mto.com

Kyle Mach
Emily C. Curran-Huberty
Munger, Tolles & Olson LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
(415) 512-4000 – Tel.

(415) 512-4077 – Fax
kyle.mach@mto.com
emily.curran-huberty@mto.com

*Attorneys for Plaintiff*

Marvin G. Pipkin
Kortney Kloppe-Orton
Pipkin Law
10001 Reunion Place, Suite 6400
San Antonio, TX 78216
(210) 731-6495 – Tel.
(210) 293-2139 – Fax

*Of Counsel*

/s/ *Brian C. Riopelle*
Brian C. Riopelle (VSB #36454)
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
(804) 775-1084 – Tel.
(804) 698-2150 – Fax
briopelle@mcguirewoods.com

*Attorney for Defendant*