IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

STEVES AND SONS, INC.,  )
                        )
            Plaintiff,  )
                        )        Civil Action No. 3:20-cv-000098
v.                      )
                        )
JELD-WEN, INC.,         )        Jury Trial Demanded
                        )
            Defendant.  )        **REDACTED**
                        )
                        )
                        )

## FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, DAMAGES, AND SPECIFIC PERFORMANCE

This is a case about illegal, predatory conduct designed to eliminate fair competition.

Defendant JELD-WEN, Inc. ("JELD-WEN") already has been found liable for violating the Clayton Antitrust Act, been found to have breached its contract with Plaintiff Steves and Sons, Inc. ("Steves"), been assessed tens of millions of dollars in treble damages, been ordered to divest the doorskin manufacturing plant it acquired in its unlawful anti-competitive acquisition of its competitor Craftmaster Inc. ("CMI"),[1] and been ordered to pay even more damages to Steves because of its refusal to conform its conduct to be consistent with these multiple adverse judicial

---

[1] *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, ECF No. 1852, March 13, 2019 (E.D. Va.).

determinations.[2] Yet, JELD-WEN continues in its efforts to "kill off" Steves before the remedies already awarded to Steves can be implemented to restore competition in the marketplace.[3]

Most recently, JELD-WEN has begun to choke off Steves' timely access to interior molded doorskins, an essential input in Steves' business of making residential doors. Instead of delivering to Steves the doorskins it orders from JELD-WEN within 30 days of receipt of Steves' purchase orders – as JELD-WEN is required to do by the Supply Agreement between the parties – JELD-WEN either has been refusing to supply doorskins ordered altogether, shipping them weeks late, or – its newest tactic – drastically limiting the number of each style of doorskin that Steves can purchase. As a result, Steves has been unable to meet its customers' demands for doorskins, and will not be able to meet those demands so long as JELD-WEN's actions continue. Indeed, by drastically limiting the number and style of doorskins available to Steves – yet apparently not similarly limiting itself – JELD-WEN has found its most effective method yet of damaging Steves' business. With JELD-WEN limiting Steves' supply of doorskins, some customers have entered into, or are being encouraged to enter into, long-term exclusive supply agreements or rebate agreements with JELD-WEN or Masonite, thereby perpetuating the damage to Steves' business even if it regains a reliable and adequate supply of doorskins.

JELD-WEN's anti-competitive conduct violates the antitrust laws. Its actions also have tortiously interfered with Steves' contracts with, and business expectancy regarding, a substantial number of Steves' current and potential door customers. Additionally, JELD-WEN's acts and

---

[2] *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, ECF No. 1981, November 19, 2019 (E.D. Va.).

[3] As this Court previously found, JELD-WEN "regard[s] Steves, a significant player in the interior door market, to be an independent to be killed off." *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, ECF No. 1784, October 5, 2018 at 74 (E.D. Va.).

omissions are in breach of JELD-WEN's ongoing contractual obligations to Steves under the parties' doorskin Supply Agreement.

Accordingly, Steves seeks preliminary and permanent injunctive relief, declaratory relief, and an order of specific performance requiring JELD-WEN to sell Steves the doorskins it orders and to perform as the parties' contract requires. Steves also seeks an award of substantial compensatory and punitive damages for the harm inflicted on it by JELD-WEN in this latest plot to kill Steves off.

## THE PARTIES, JURISDICTION, VENUE, AND INTERSTATE COMMERCE

1.      Steves is a Texas corporation headquartered in Texas. For purposes of 28 U.S.C. § 1332(a), Steves is a citizen of Texas.

2.      Steves owns a door manufacturing plant in Henrico County, Virginia, for which Steves purchases doorskins and other inputs in interstate commerce from several states other than Virginia and ships doors in interstate commerce throughout the East Coast.

3.      Steves also owns door manufacturing plants in San Antonio, Texas and Lebanon, Tennessee, for both of which Steves purchases doorskins and other inputs in interstate commerce and ships doors in interstate commerce across the United States, except in certain areas of the West Coast.

4.      JELD-WEN is a Delaware corporation with its principal place of business in either Oregon or North Carolina. For purposes of 28 U. S. C. § 1332(a), JELD-WEN is a citizen of Delaware and either Oregon or North Carolina.

5.      JELD-WEN sells doorskins, doors, and other products in interstate commerce across the United States, including in Virginia. JELD-WEN has regularly shipped doorskins to Steves' plant in Henrico County, as well as to the other two Steves plants. JELD-WEN regularly does business with other customers throughout this District and Division.

6.      JELD-WEN and Steves are engaged in interstate commerce and in activities substantially affecting interstate commerce, and the conduct alleged herein substantially affects interstate commerce.

7.      This Court has subject matter jurisdiction over the antitrust claims in this action pursuant to 15 U.S.C. §§ 15 and 26; 28 U.S.C. § 1331; and/or 28 U.S.C. § 1337(a).

8.      This Court has subject matter jurisdiction over the tortious interference, breach of contract, declaratory judgment, and specific performance claims in this action pursuant to 28 U.S.C. § 1332(a) because the amount in controversy on those claims exceeds $75,000.00, exclusive of interest and costs, and the parties are citizens of different states.

9.      This Court has personal jurisdiction over JELD-WEN under: (a) Virginia Code § 8.01-328.1.A.1 and 2 because the causes of action asserted in this Complaint arise from JELD-WEN's transacting business in Virginia and contracting to supply doorskins to Steves in Virginia; (b) Va. Code § 8.01-328.1.A.3 because JELD-WEN caused tortious injury by an act or omission in Virginia; and (c) 15 U.S.C. § 22 because JELD-WEN may be found and transacts business in this District.

10.     Under § 1 of the Supply Agreement (attached hereto as Ex. 1), JELD-WEN agreed to sell to Steves, and Steves agrees to purchase from JELD-WEN, the full range of molded doorskin products manufactured by JELD-WEN, according to the terms and provisions of the Supply Agreement. As of the effective date of the Supply Agreement, Steves had, and still today has, a facility in Henrico County, Virginia for manufacturing doors from doorskins and other inputs. For this facility, Steves purchases doorskins and other inputs in interstate commerce and ships doors in interstate commerce across the United States.

11.     As of the effective date of the Supply Agreement, JELD-WEN had, and still today has, actual knowledge that Steves operates its door manufacturing facility in Henrico County.

As of the effective date of the Supply Agreement, JELD-WEN had, and still today has, actual knowledge that Steves receives and uses JELD-WEN's doorskins at its Henrico County facility.

12.     Since the Supply Agreement took effect, JELD-WEN has sold to Steves and delivered to Steves at its Henrico County facility millions of doorskins in performance of the Supply Agreement; employees and representatives of JELD-WEN have visited Steves' Henrico County facility in furtherance of JELD-WEN's performance of its Supply Agreement obligations; and employees and representatives of JELD-WEN have initiated and transmitted electronic communications, including phone calls and emails, to employees of Steves at its Henrico County facility in furtherance of JELD-WEN's performance of its Supply Agreement obligations.

13.     In addition to its business relationship with Steves, JELD-WEN also sells doors to, and has a business relationship with, customers in Virginia.

14.     By delivering doorskins to Henrico County, having its employees and representatives visit Henrico County, having its employees and representatives communicate with Steves' employees in Henrico County, and selling doors to customers in Virginia, JELD-WEN transacts business in Virginia.

15.     Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391(b) and (c), because JELD-WEN regularly transacts business in this District, including by shipping doorskins to Steves' plant in Henrico County, Virginia; JELD-WEN contracted to supply services or things to Steves in Virginia; and a substantial part of the events or omissions giving rise to Steves' claims, including JELD-WEN's failure to ship doorskins to Steves' Virginia plant and Steves' resulting loss of customers in Virginia, occurred in this District.

## FACTUAL BACKGROUND

**A.      The Previous Litigation**

### 1.      Interior Molded Doorskins

16.      Steves makes and sells interior molded residential doors. These doors are the most popular type of interior doors in North America; the vast majority of interior doors sold in North America are molded doors, and that share has consistently grown over time. Interior molded doors simulate the aesthetics of solid wood doors, but at lower prices.

17.      Doorskins are a key component of interior molded doors. Doorskins comprise the front and back of interior molded doors. Interior molded doors are made by sandwiching wood frames and a hollow or solid core between two doorskins.

18.      Doorskins account for more than 70% of the material input cost of molded interior doors.

### 2.      Competition in the Doorskin Market

19.      Before 2012, there were three suppliers of interior molded doorskins in the United States: JELD-WEN, Masonite and CMI. Those suppliers, and their approximate national shares of total United States sales of interior molded doorskins, were as follows: Masonite 46%, JELD-WEN 38%, and CMI 16%. "[C]ompetition among those three suppliers was vigorous and effective." *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, ECF No. 1784, October 5, 2018 at 6 (E.D. Va.).

20.      In October 2012, JELD-WEN acquired CMI through merger, leaving only two suppliers of interior doorskins in the United States. Soon after JELD-WEN's acquisition of CMI, though, Masonite stopped selling doorskins at competitive prices and terms to independent door companies like Steves that were wholly dependent on JELD-WEN and Masonite for this essential input, leaving JELD-WEN as the only practical source of doorskin supply.

21.     At the time JELD-WEN acquired CMI, the market for interior doorskins was already highly concentrated; accordingly, the merger was presumptively anti-competitive. The doorskin market became an effective monopoly when Masonite elected to no longer sell doorskins to others at realistically competitive prices or terms.

22.     "The merger substantially lessened competition in the doorskin market." *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, ECF No. 1784, October 5, 2018 at 6 (E.D. Va.).

### 3.     The Supply Agreement

23.     In May 2012, JELD-WEN and Steves entered into a supply agreement ("the Supply Agreement") under which Steves agreed to purchase at least 80% of its doorskin requirements from JELD-WEN and JELD-WEN agreed to supply doorskins to Steves.

24.     Since entering into the Supply Agreement, Steves has purchased nearly all of its doorskin requirements from JELD-WEN.

25.     Since entering into the Supply Agreement, Steves has issued purchase orders to JELD-WEN on a weekly basis. JELD-WEN has provided Steves with "confirmations" of the orders within 2-3 business days, sometimes making relatively minor variations to the purchase orders, typically to change the production location, or slightly modify the quantities so that delivery trucks will be balanced. JELD-WEN then has provided Steves with "shipping notices" setting forth shipping dates. Give or take a few days, JELD-WEN typically delivered the doorskins ordered by Steves within 30 days of receiving Steves' purchase orders, as required by the Supply Agreement.

### 4. JELD-WEN's Liability for Antitrust Violations and Breach of Contract Has Been Conclusively Established

26.     In June 2016, Steves sued JELD-WEN in this Court, alleging that JELD-WEN violated the Clayton Act and breached the Supply Agreement. The lawsuit was based on JELD-WEN's acquisition of CMI and anti-competitive conduct following the acquisition.

27.     For example, soon after Masonite announced that it would stop selling doorskins to independents like Steves, JELD-WEN began to refuse to honor the Supply Agreement's terms and conditions for setting doorskin prices, began charging higher prices than the Supply Agreement authorized, refused to sell certain doorskin models to Steves altogether, and began providing Steves with lower-quality doorskins. This behavior continued unabated despite Steves' complaints, leading Steves to file the June 2016 lawsuit.

28.     Steves' complaint was tried before a jury from January 29 through February 15, 2018. At conclusion of the trial, the jury found JELD-WEN guilty of violating the antitrust laws and breaching the Supply Agreement.

29.     Specifically, the jury found that JELD-WEN's acquisition of CMI violated Section 7 of the Clayton Act; that JELD-WEN's Section 7 violation caused an injury to Steves that was of the type that the antitrust laws were intended to prevent; that Steves was entitled to damages for antitrust injuries as a result of JELD-WEN's overcharging Steves for doorskins, shipping defective doorskins to Steves and failing to reimburse Steves for those doorskins, and refusing to reimburse Steves for the cost of doors that incorporated defective doorskins. The jury also found that JELD-WEN breached the Supply Agreement. The jury also necessarily reached a variety of subsidiary conclusions.

30.     The jury awarded Steves trebled damages of $36,455,619 for past harm suffered by Steves from JELD-WEN's antitrust violations. It also awarded Steves trebled damages of $139,441,743 for lost future profits that would start accruing in 2021.

31.     Following a three-day bench trial, this Court further ordered that JELD-WEN divest the doorskin manufacturing plant in Towanda, Pennsylvania that JELD-WEN acquired in its unlawful acquisition of CMI.

32.     In an Amended Final Judgment entered on March 13, 2019, this Court gave Steves a choice between the future lost profits awarded by the jury or the divestiture ordered by the Court. *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, ECF No. 1852, March 13, 2019 (E.D. Va.). Steves chose the latter option while preserving the right to recover the awarded damages should divestiture not occur. The Court also awarded Steves declaratory relief.

### 5.     JELD-WEN's Continuing Misconduct

33.     Despite the jury verdict finding that JELD-WEN had been overcharging Steves for doorskins under the Supply Agreement's pricing formula and a declaratory judgment establishing that the Supply Agreement's pricing formula requires JELD-WEN to decrease doorskin prices in years in which its Key Input Costs decrease, JELD-WEN continued to overcharge Steves in the exact same manner as it had before the verdict and declaratory judgment.

34.     As a result, Steves moved for, and obtained, further relief from the Court for JELD-WEN's continuing conduct under 28 U.S.C. § 2202.

35.     In November 2019, the Court awarded Steves an additional $7,083,013 for JELD-WEN's continuing overcharges.

**B.      JELD-WEN's Newest Misconduct**

      **1.      JELD-WEN's Failure to Timely Deliver Doorskins to Steves**

36.      As noted above, the Supply Agreement requires JELD-WEN to supply Steves with its doorskin requirements. Specifically, under § 4 of the Supply Agreement, Steves must purchase from JELD-WEN at least 80% of its doorskin requirements and JELD-WEN must fill Steves' orders. JELD-WEN "agrees that it will deliver to STEVES all molded doorskin products ordered within thirty (30) days of receipt of STEVES' purchase order[s]." Section 4 further states that, "[a]lthough STEVES has the right to . . . purchase from other sources, it is the intent and spirit of this Agreement that, . . . STEVES will purchase the maximum volume possible under this Agreement from JELD-WEN."

37.      Beginning with purchase orders issued by Steves on October 28, 2019, and continuing with purchase orders issued by Steves through at least December 31, 2019 (and, as set forth below, continuing since then), JELD-WEN failed and refused to deliver to Steves all doorskins ordered within 30 days of receipt of Steves' purchase orders.

38.      Through December 31, 2019, JELD-WEN delivered 243,130 doorskins to Steves more than 30 days after receipt of Steves' purchase orders. These doorskins were delivered 17-45 days late.

39.      Moreover, as of the filing of this First Amended Complaint, JELD-WEN still had not delivered 98,925 doorskins ordered by Steves in 2019, despite the passage of significantly more than 30 days.

40.      JELD-WEN also has not timely delivered doorskins in response to purchase orders issued by Steves in 2020.

41.      Steves has issued doorskin purchase orders to JELD-WEN since December 31, 2019. As of the filing of this First Amended Complaint, JELD-WEN has not delivered more than

1 million doorskins ordered in 2020, despite the passage of more than 30 days since JELD-WEN received Steves' purchase orders.

### 2.   JELD-WEN's Improper Notice of Allocation and Application of Allocation

42.   Under § 20 of the Supply Agreement, JELD-WEN may declare allocation if it "recognizes an actual or anticipated shortage in production capacity over the current or anticipated demand." If JELD-WEN intends to declare allocation, it must "immediately notify Steves of JELD-WEN's current production capacity in North America indicating a shortage in production capacity, which will then result in the need for an allocation period ('notice of allocation')." Section 20 further provides that an "allocation period will start effective the first day of the month following the notice of allocation."

43.   During a period of allocation, Steves is entitled to receive from JELD-WEN a percentage of JELD-WEN's production volume. Per § 20 of the Supply Agreement, the percentage is "calculated by dividing the total number of skins shipped to STEVES the preceding year by the total number of skins manufactured in North America by JELD-WEN the preceding year." JELD-WEN is required to advise Steves of its "percentage number" by January 30 of each year. During allocation, "Steves will be allowed to purchase up to the percentage number" that has been calculated for Steves for "the preceding year."

44.   JELD-WEN issued a notice of allocation to Steves on December 19, 2019, meaning that it could not take effect before January 1, 2020. The notice of allocation did not explain why JELD-WEN had "recognize[d] an actual or anticipated shortage in production capacity over the current or anticipated demand." The notice represented only that JELD-WEN's North American production capacity was approximately 50 million doorskins per year.

45.     JELD-WEN, though, has a demonstrated ability to produce at least 56 million doorskins per year in North America. A JELD-WEN employee testified under oath in the prior antitrust case that JELD-WEN's North American production capacity was more than 56 million doorskins per year in 2017.

46.     Nothing in the Supply Agreement authorizes JELD-WEN to instigate an allocation period by holding its production output below its demonstrated production capacity so as to unnecessarily and artificially produce "an actual or anticipated shortage in production capacity over current or anticipated demand."

47.     Moreover, JELD-WEN has conceded the real facts that led it to declare allocation, which have nothing to do with capacity shortages. Specifically, in a filing in this Court, JELD-WEN stated that a price increase it announced for its interior molded doors caused a "spike" in demand from customers seeking to purchase doors before the price increase became effective. This increase in demand resulted, according to JELD-WEN, in an increased demand for doorskins that JELD-WEN could not meet.

48.     In October of 2019 and then again in November of 2019, JELD-WEN announced two price increases for its doors, the last and larger of which was to take effect on February 7, 2020. In total, the two price increases represented a 22-27% increase in JELD-WEN's door prices. Door manufacturer Masonite announced a similar price increase on October 30, 2019, to take effect February 3, 2020.

49.     Even if one assumes arguendo that JELD-WEN's explanation for its purported doorskin shortage is true, it does not justify refusing to fill Steves' orders or placing Steves on allocation. In the letters announcing its price increases to door customers, JELD-WEN specifically reserved the right to reject door orders that deviated from door customers' historical weekly order size averages. The Supply Agreement contains no parallel provision that would allow JELD-WEN

to do the same to Steves. Absent allocation, JELD-WEN must "deliver to STEVES all molded doorskin products ordered within thirty (30) days of receipt of STEVES' purchase order[s]." JELD-WEN's desire to voluntarily fulfill inflated orders from its door customers does not justify shorting Steves.  Nor does it justify allocation.

50.     Moreover, if JELD-WEN's explanation for allocation is true, JELD-WEN's inability to meet demand is caused by JELD-WEN's own decision to raise its door prices. Nothing in the Supply Agreement gives JELD-WEN the right to instigate an allocation period by itself creating the conditions that result in an actual or anticipated shortage in production capacity over current or anticipated demand.

51.     In addition, JELD-WEN is improperly considering its own doorskin needs in determining whether it has "recognize[d] an actual or anticipated shortage in production capacity over the current or anticipated demand." The Supply Agreement does not permit JELD-WEN to do so, as Paragraph 20 makes no mention of JELD-WEN's own doorskin needs with respect to allocation.

52.     Instead, Paragraph 20 explicitly states that "volumes purchased by customers to which JELD-WEN has no commitment to sell under a supply agreement cannot limit JELD-WEN's provision of volume requested by STEVES during allocation."

53.     JELD-WEN's Fiber division, which manufactures doorskins, does not have a "commitment to sell under a supply agreement" to JELD-WEN's Door division, which manufactures doors.

54.     Thus, JELD-WEN cannot use its own need for doorskins as a basis to declare allocation.

55.     Further still, assuming JELD-WEN's explanation for allocation is true, allocation should have ended in the first week of February 2020. JELD-WEN's second price increase took

effect February 7, 2020. Thus, by JELD-WEN's own account, door demand should have stabilized as door customers can no longer purchase doors at the lower, pre-increase prices.

56.     Possibly more egregious than JELD-WEN declaring a manufactured allocation is JELD-WEN's imposition of an ordering methodology during allocation that limits the quantity and mix of doorskins that Steves can receive from JELD-WEN, and which finds no support in the Supply Agreement.

57.     Under the "mix methodology" JELD-WEN imposed on Steves during the allocation period, JELD-WEN determined the percentage of JELD-WEN's production of each style of doorskin that Steves purchased in 2019. JELD-WEN advised Steves that its 2020 purchases would be limited to those percentages as to each style, regardless of Steves' actual needs or customer demands.

58.     Demand for doorskin styles change over time. For example, as a result of its customers' demands, Steves ordered more of certain doorskin styles from JELD-WEN in early 2019 than it did in late 2019, and vice versa. JELD-WEN's mix methodology, though, is static and based on Steves' overall 2019 percentage of doorskin style purchases.

59.     In other words, limited by JELD-WEN's mix methodology, Steves is unable to meet customer demands. JELD-WEN, though, is not limited by any artificial mix methodology and is therefore free to meet customer demands.

60.     Moreover, as noted above, Steves is entitled to receive during allocation a percentage of JELD-WEN's production volume that is equal to the percentage of JELD-WEN's production volume shipped to Steves "the preceding year."

61.     The allocation period JELD-WEN sought to initiate by its December 19, 2019 notice took effect (assuming *arguendo* that it was valid) on January 1, 2020. The year preceding

2020 is 2019. Thus, the percentage number that should be applied to the allocation period (assuming *arguendo* that it is valid) is Steves' 2019 percentage number.

62.     Yet, JELD-WEN's December 19 notice of allocation and subsequent communications with Steves stated that JELD-WEN would apply Steves' 2018 percentage number to the allocation period – 22.43% of JELD-WEN's 2020 production during allocation. In other words, JELD-WEN advised Steves that it intended to ship Steves no more than 22.43% of its 2020 production of doorskins.

63.     JELD-WEN later conceded that it would provide Steves during allocation with doorskins equaling Steves' 2019 percentage number of 27.29%.

64.     If applied to JELD-WEN's claimed production capacity of approximately 50 million, JELD-WEN intends to provide Steves with only 13.5 million doorskins using JELD-WEN's claimed percentage number of 27.29%. That is approximately 1.4M fewer doorskins than Steves forecast it needed to receive from JELD-WEN in 2020.

65.     If applied to a production capacity of at least 56 million, and assuming allocation is valid, JELD-WEN should be providing Steves with more than approximately 15,250,000 million doorskins based on the 2019 percentage number.

## C.     The 2012 Merger and Its Anticompetitive Effects

### 1.     Relevant Market

66.     The sale of interior molded doorskins in the United States is a line of commerce and relevant market within the meaning of Section 7 of the Clayton Act. This Court previously and correctly found that "interior molded doorskins are a properly defined relevant antitrust market." *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, ECF No. 1847, March 13, 2019 at 17 (E.D. Va.). That correct conclusion is binding on JELD-WEN.

67.     The relevant product market is "interior molded doorskins."

68. For the production of interior molded doors, there are no close substitutes for interior molded doorskins. A small but significant increase in the price of interior molded doorskins for use in manufacturing interior molded doors would not cause a significant number of purchasers of interior molded doorskins to substitute other doorskins.

69. The relevant geographic market within the meaning of the Clayton Act for interior molded doorskins is the United States. The vast majority of interior molded doorskins purchased by U.S. door manufacturers are produced in the United States.

70. Steves has searched across the globe for an alternate source of doorskins, but has not identified any global supplier that can provide sufficient doorskins to meet Steves' needs. This Court previously and correctly found that "foreign suppliers do not provide viable alternative supplies of doorskins in the quantity and quality required by Steves." *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, ECF No. 1784, October 5, 2018 at 78 (E.D. Va.). That correct conclusion is binding on JELD-WEN.

### 2. Market Structure

71. Before the 2012 Merger, there were three suppliers of interior molded doorskins in the United States. *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, ECF No. 1784, October 5, 2018 at 11 (E.D. Va.). Those suppliers, and their national shares of total United States sales of interior molded doorskins, were as follows: Masonite with 46%, JELD-WEN with 38%, and CMI with 16%.

72. In October 2012, JELD-WEN acquired CMI through merger, leaving only two suppliers of interior doorskins in the United States. *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, ECF No. 1784, October 5, 2018 at 18-19 (E.D. Va.). Soon after JELD-WEN's acquisition of CMI, though, Masonite stopped selling doorskins at competitive prices and terms to companies like Steves that were wholly dependent on JELD-WEN and Masonite for this essential input,

leaving JELD-WEN as the only practical source of doorskin supply. *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, ECF No. 1784, October 5, 2018 at 30 (E.D. Va.).

73.     At the time JELD-WEN acquired CMI, the market for interior doorskins was already highly concentrated. It became an effective monopoly when Masonite effectively elected to no longer sell doorskins to others.

74.     Although Masonite has occasionally claimed that it remains willing to sell interior molded doorskins to independent customers like Steves (despite the company's direct statements to the contrary in speaking with investors), Masonite has offered terms for the sale of such doorskins that demonstrate that it does not intend to sell materially significant volumes of such skins to Steves or anyone else. *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, ECF No. 1784, October 5, 2018 at 34 (E.D. Va.).

75.     Although foreign manufacturers of interior molded doorskins exist, they do not sell interior molded doorskins in the United States in quantities or varieties sufficient to provide Steves' needs for doorskins. *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 3:16-cv-545, ECF No. 1784, October 5, 2018 at 35 (E.D. Va.). Such manufacturers are not material competitive constraints on JELD-WEN and Masonite.

### 3.     Anticompetitive Effects

76.     The effect of the 2012 Merger has been and will continue to be substantially to lessen competition, or to tend to create a monopoly, in the market for interior molded doorskins in the United States. The merger has had anticompetitive effects as described below.

77.     The results of the prior proceedings already have demonstrated conclusively that the merger was illegal and caused antitrust injuries to Steves. The merger has caused additional antitrust injuries to Steves since the prior verdicts were reached and which are not remedied by the prior verdicts. The merger also threatens additional likely future anticompetitive effects.

a.     **Unilateral Effects**

78.     JELD-WEN has increased prices and restricted output of its interior molded doorskins sold to Steves as a result of the illegal merger. As described above, and in addition to the conduct previously adjudged to be an anticompetitive effect of the illegal merger, JELD-WEN failed to timely deliver, or deliver at all, hundreds of thousands of doorskins to Steves since October 28, 2019.

79.     As described above, and in addition to the conduct previously adjudged to be an anticompetitive effect of the illegal merger, JELD-WEN declared allocation on the basis of an artificial production capacity. It also limited Steves to an artificial percentage of its doorskin production, and improperly limited Steves to a mix of doorskins that prevent Steves from responding to market demand.

80.     These effects are the direct result of JELD-WEN's illegal acquisition of CMI and the resulting loss of competition. Were it not for JELD-WEN's illegal merger, Steves could turn to the competitive market to prevent JELD-WEN from imposing these anticompetitive terms and restricting Steves' volumes. By breaching its contract with Steves, JELD-WEN is effectively capitalizing on its increased market power to foreclose Steves' access to sufficient quantities of various styles of doorskins. JELD-WEN would not enjoy this market power but for the 2012 Merger. The effect is to limit Steves' ability to compete against JELD-WEN for the sale of interior molded doors, and to cause Steves a wide variety of harms discussed elsewhere herein.

81.     The merger also has limited the quantity of each doorskin design Steves can obtain. While under JELD-WEN's control, the Towanda factory devotes its output primarily to the doorskins that JELD-WEN's door plants demand. Absent the illegal acquisition, the operator of the Towanda factory would instead produce greater quantities of doorskins demanded by other customers, including Steves. JELD-WEN also either would have been unable to impose its rigid

quotas by design (the "mix methodology"), or those quotas would have had substantially less of an effect on Steves' and other independents' supply of doorskins, because independents would have had the option to purchase more of highly demanded designs from the operator of the Towanda factory.

82.     In addition, the merger greatly disincentivizes JELD-WEN from increasing its actual production of, and capacity to produce, doorskins. On information and belief, absent the illegal merger, JELD-WEN would have met any purported shortage of doorskins by reopening its mothballed factory in Marion, North Carolina or increasing capacity at other plants.

### b.     Coordinated Effects

83.     The merger has resulted, and is likely to further result, in coordinated effects adverse to Steves and other doorskin customers. Most notably, by eliminating CMI as an independent competitor for doorskin sales, the merger has made it possible for JELD-WEN and Masonite to raise prices and restrict output of interior molded doorskins sold to independent door customers like Steves, knowing that JELD-WEN and Masonite will likely recoup the profits on any lost doorskin sales by gaining interior molded door sales that would otherwise be made by Steves or another independent competitor. Such coordination is much less likely to occur in a competitive market, such as where a third doorskin manufacture like CMI would make such a strategy less profitable to each doorskin manufacturer.

### 4.     Barriers to Entry

84.     The barriers to entry in the doorskin manufacturing business are formidable. As was explained in the June 25, 2014 Masonite investor presentation, the interior doorskins business "is not easy to replicate" and takes approximately four years and a $100 to $150 million capital investment.

85.     Steves' own independent analysis is consistent with the existence of very substantial barriers to entry. Steves itself has been trying—without success—to find an alternative source of interior molded doorskins in the United States for many years since the loss of CMI. Despite these significant efforts, Steves has no alternative to JELD-WEN for the vast majority of its doorskin purchases and does not appear likely to have any such alternative absent the divestiture remedy the Court has already awarded, but which has not yet been completed. It is clear that entry into the market has not been and will not be timely, likely, or sufficient to counteract the substantial anticompetitive effects of the merger that have already occurred and which are likely to continue to occur absent an additional remedy.

86.     JELD-WEN's illegal merger has caused injuries that are of the type that the antitrust laws are intended to prevent. Among other things, JELD-WEN's increases in prices and restrictions in output have harmed Steves precisely because the merger has eliminated Steves' ability to procure interior molded doorskins from other suppliers at competitive prices and at competitive terms. Thus, it is the loss of competition caused by the merger that makes JELD-WEN's conduct possible and which makes possible the majority of the resulting harms to Steves. JELD-WEN's illegal merger is a material cause of these antitrust injuries.

**D.     Alternative Dispute Resolution**

87.     Section 10 of the Supply Agreement governs "disputes which may arise hereunder." It requires the parties to hold at least one "internal conference" involving their "senior executives," and then to engage in mediation, before the "Complaining Party" may file suit. Section 10 applies to JELD-WEN's breaches of contract.

88.     The parties have held the "internal conference" and have engaged in mediation, but the disputes were not resolved..

**COUNT ONE**

(Clayton Act, Section 7, 15 U.S.C. § 18)

89.     The foregoing allegations are incorporated as though re-alleged herein.

90.     JELD-WEN has violated Section 7 of the Clayton Act, as was found conclusively in prior binding proceedings. The effect of the 2012 Merger has been, and continues to be, substantially to lessen competition or to tend to create a monopoly in the market for interior molded doorskins in the United States in violation of Section 7 of the Clayton Act.

91.     These violations have caused injuries to Steves. Within the meaning of Section 4 of the Clayton Act, 15 U.S.C. § 15, Steves has been injured in its business or property by reason of the lessening of competition described above, including, without limitation JELD-WEN's refusal to supply to Steves an essential input for its door manufacturing business except on anticompetitive terms and conditions. Steves is entitled to recover treble damages for such injuries, in an amount to be proved at trial.

92.     Steves has suffered and is continuing to suffer irreparable harm that cannot be cured by money damages. Accordingly, Steves is entitled to preliminary injunctive relief to prevent further irreparable harm.

93.     Steves is threatened with further loss or damage by reason of the actual or likely lessening of competition described above and is entitled to permanent injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, sufficient to restore competition to the doorskins and doors markets comparable to that which existed before the illegal 2012 Merger.

**COUNT TWO**

(Tortious Interference)

94.     The foregoing allegations are incorporated as though re-alleged herein.

95.     Steves has or had contracts with certain molded interior residential door customers, including, among others, ███████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████████. These agreements are supply agreements under which the customers agree to purchase a percentage of their interior molded door requirements from Steves and/or agree to receive rebates based on purchase volumes.

96.     Steves also has or had continuing and ongoing business relationships with molded interior residential door customers that, because of the length of the relationship and the goodwill developed between Steves and the customers, Steves expected and believed would continue and result in sales of molded interior residential doors. For example, Steves has or had long-term relationships with ████████████████████████████████████████████████████ ███████████████████████████████████████████.

97.     Steves also had plans to significantly grow its molded interior residential doors business with certain customers in 2020. These include, but are not limited to, ███████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████.

98.     On information and belief, as a seller of molded interior residential doors and a direct competitor of Steves for the sale of molded interior residential doors, JELD-WEN had knowledge of Steves' existing contracts, its continuing business relationships with doors customers, and its relationship with other doors customers expected to result in sales of doors, some of which had been customers of JELD-WEN's.

99.    For example, JELD-WEN was aware that Steves had long-term agreements with customers such as ██████████████████████████████████████████████████ ████████, with Steves being awarded the business.

100.    Similarly, JELD-WEN was aware that Steves had an ongoing relationships with businesses like ████, based on information and belief, because JELD-WEN has attempted to entice businesses like ████ into ordering significantly more doors from JELD-WEN by offering rebates for 2020, despite imposing allocation on Steves.

101.    JELD-WEN also was aware that Steves was acquiring new business from entities like ██████████████. JELD-WEN had knowledge of Steves' relationship with ████████ ████, and, based on information and belief, JELD-WEN was aware of Steves' relationships with ████ and other customers through the activities of JELD-WEN's sales personnel, including but not limited to attendance at customer events and trade shows.

102.    Additionally, by selling doorskins to Steves, JELD-WEN knows that Steves has substantially grown its door business over the past couple of years, forecasting the purchase of 11 million doorskin orders in 2018, 12 million doorskin orders in 2019, and 14.9 million doorskin orders for 2020.  JELD-WEN further knows that, in 2019, because Steves' market share for doors was expanding more than Steves initially forecast, Steves ultimately ordered 14.2 million doorskins in 2019.

103.    Despite having a common-law duty not to wrongfully interfere with Steves' contracts, existing business relationships, and prospective business relationships, and a federal statutory duty not to violate the antitrust laws, JELD-WEN has intentionally and improperly interfered with Steves' existing contracts, with Steves' continuing business relationships with molded interior residential doors customers, and with Steves' reasonable expectation of forming new contracts with molded interior residential doors customers in Virginia and elsewhere.

104.    JELD-WEN's improper means include, but are not limited to, its ongoing violations of the antitrust laws, misrepresentations about the reasons for JELD-WEN's failure and refusal to confirm or deliver Steves' orders for doorskins, misrepresentations about JELD-WEN's reasons for instigating allocation, the use of the mix methodology, breaches of the Supply Agreement committed in bad faith, and other violations of statutes or recognized common-law rules, acts of deceit, restraints of trade, and unfair competition.

105.    This interference has caused Steves to be unable to fill all or some of the door orders placed by ███████████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████████████ █████████████████████████████████.

106.    JELD-WEN's interference also has resulted in ██████████████████████ ████████████████████, with whom Steves had continuing and ongoing business relationships for the purchase of interior molded doors, to no longer purchase interior molded doors from Steves.

107.    JELD-WEN's interference also has resulted in ██████████████████████ █████████████████████████████████, with whom Steves had business relationships for the purchase of interior molded doors, to reduce their interior molded door orders with Steves.

108.    JELD-WEN's interference also has resulted in Steves losing business opportunities, including the opportunity to significantly expand its interior molded door business with ████████ ███████████████████.

109.    Because JELD-WEN competes with Steves for the sale of molded interior residential doors, JELD-WEN has been and will continue to be motivated by its improper purpose

of crippling or eliminating Steves as a competitor and obtaining Steves' molded interior residential doors customers for itself, and to interfere, and to act for the purpose of interfering, with Steves' existing contracts, continuing relationships, and reasonable expectation of forming new contracts.

110.    JELD-WEN's acts were willful and wanton and were motivated by, or were the product of, actual malice towards Steves.

111.    As a result of JELD-WEN's tortious interference, Steves has lost substantial sales and opportunities for future sales, and Steves has suffered a loss of good will.

## COUNT THREE

(Breach of Contract)

112.    The foregoing allegations are incorporated as though re-alleged herein.

113.    The Supply Agreement is a valid and enforceable contract under which JELD-WEN agreed to sell and deliver doorskins to Steves, and Steves agreed to purchase doorskins, all in accordance with the terms and conditions of the Supply Agreement.

114.    As described in this Complaint, JELD-WEN has breached and is continuing to breach the Supply Agreement in numerous ways, including without limitation by failing and refusing to deliver doorskins ordered when JELD-WEN had not issued a notice of allocation; by issuing an unjustified notice of allocation that was caused and made necessary, if at all, by JELD-WEN's own conduct in restricting its production output and/or creating a spike in demand for doors through its price increases, which notice therefore is ineffective; and by failing to properly implement and administer the allocation period even if JELD-WEN had been authorized to initiate the allocation period.

115.    As a result of JELD-WEN's breaches of the Supply Agreement, many of which are ongoing, Steves has suffered damages substantially in excess of $75,000 in an amount to be shown at trial; including without limitation damages for the following:

- JELD-WEN's failure and refusal to deliver at all, much less within 30 days, doorskins ordered before December 31, 2019. The direct and foreseeable consequence of JELD-WEN's failure and refusal to deliver doorskins ordered by Steves within 30 days or at all is that Steves was required to turn away new customers for its doors and drop existing customers or substantially under-deliver doors to them.

- JELD-WEN's unjustified and improper declaration of allocation, and improper application of allocation to Steves. The direct and foreseeable consequence of JELD-WEN's unjustified and ineffective initiation of an allocation period and improper application of allocation is that Steves has been prevented from ordering doorskins it would have ordered if JELD-WEN had not initiated an allocation period and, thus, has had to turn away new customers for its doors and drop existing customers or substantially under-deliver doors to them.

116.    Additionally, Steves is entitled to specific performance under the Supply Agreement by having its orders filled in whole, without regard to the mix of doorskin models that may be included in those orders, as if JELD-WEN had not initiated an allocation period.

## COUNT FOUR

### (Declaratory Judgment)

117.    The foregoing allegations are incorporated as though re-alleged herein.

118.    An actual controversy has arisen and now exists between Steves and JELD-WEN concerning whether, among other things, JELD-WEN's initiation of an allocation period is valid and effective and whether the manner in which JELD-WEN is administering the allocation period is consistent with the terms and conditions of the Supply Agreement.

119.    Steves contends that JELD-WEN's initiation of an allocation period is void and ineffective because JELD-WEN's initiation of an allocation period is based on a production

26

capacity significantly below the production capacity JELD-WEN previously claimed under oath to have, because JELD-WEN has not adequately justified the need for allocation, and because JELD-WEN itself caused the conditions, if any, that led to the supposed increase in demand on which JELD-WEN is basing its initiation of an allocation period. JELD-WEN takes contrary positions.

120.   Steves further contends that in administering an allocation period, JELD-WEN must use Steves' 2019 percentage number, which must include doorskins ordered after October 28, 2019 that should have been delivered before December 31, 2019, but were not; must apply Steves' 2019 percentage number to JELD-WEN's true North American production capacity; and must permit Steves to order the mix of doorskin models that reflects the current demands of Steves' customers rather than Steves' past orders.  JELD-WEN takes contrary positions.

121.   Pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, Steves is entitled to a declaration that:

- JELD-WEN's notice of allocation is void and ineffective;

- If JELD-WEN's notice of allocation is not void and ineffective, JELD-WEN must use Steves' 2019 percentage number, properly calculated, to allocate doorskins to Steves;

- If JELD-WEN's notice of allocation is not void and ineffective, JELD-WEN must apply Steves' 2019 percentage number, correctly calculated, to JELD-WEN's true production capacity rather than its claimed production capacity;

- If JELD-WEN's notice of allocation is not void and ineffective, JELD-WEN must permit Steves to order the mix of doorskin models that reflects the current demands of Steves' customers rather than Steves' past orders, thus voiding JELD-WEN's "mix methodology"; and

●   If either JELD-WEN's notice of allocation or its "mix methodology" is deemed void and ineffective, Steves' percentage number for 2020 shall be calculated by the number of doorskins Steves would have ordered and JELD-WEN would have shipped had JELD-WEN complied with the Supply Agreement.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff, Steves and Sons, Inc., requests that the Court grant it the following relief:

1.      Under Count One and Two, appropriate injunctive relief against JELD-WEN, including without limitation an order that it fill Steves' doorskin orders in whole, without regard to the mix of doorskin models that may be included in those orders, as if JELD-WEN had not initiated an allocation period and an order enjoining JELD-WEN from enforcing exclusive supply agreements wrongfully obtained through JELD-WEN's violations of the antitrust laws and otherwise tortious conduct.

2.      Under Count One, an award of three times the damages sustained by Steves because of JELD-WEN's violation of the antitrust laws, in an amount to be proven at trial;

3.      Under Count Two, an award of compensatory and punitive damages, in amounts to be proven at trial,

4.      Under Count Three, the damages sustained by Steves because of JELD-WEN's breaches of the Supply Agreement, in an amount to be proven at trial, and an order requiring specific performance of the Supply Agreement;

5.      Under Count Four, appropriate declaratory relief as set forth therein;

6.     An award of Steves' reasonable attorneys' fees and costs in this action pursuant to Sections 4 and 16 of the Clayton Act and § 12 of the Supply Agreement;

7.     Pre-judgment and post-judgment interest; and

8.     Such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Steves demands a trial by jury for all issues triable by a jury.

Dated:  April 3, 2020

Respectfully submitted,

STEVES AND SONS, INC.

By:     /s/Lewis F. Powell III
Lewis F. Powell III (VSB No. 18266)
Michael Shebelskie (VSB No. 27459)
Maya M. Eckstein VSB No. 41413)
HUNTON ANDREWS KURTH LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
Telephone:  (804) 788-8200
Facsimile:   (804) 788-8218
lpowell@hunton.com
mshebelskie@hunton.com
meckstein@hunton.com

*Attorneys for Plaintiff*

Glenn D. Pomerantz (pro hac vice)
Kyle W. Mach (pro hac vice)
Emily Curran-Huberty (pro hac vice)
MUNGER, TOLLES & OLSON LLP
350 S. Grand Avenue, 50th Floor
Los Angeles, CA 90071
Telephone:  (213) 683-9132
Facsimile:  (213) 683-5161

Marvin G.  Pipkin (pro hac vice)
Kortney Kloppe-Orton (pro hac vice)

PIPKIN LAW
10001 Reunion Place, Suite 6400
San Antonio, TX  78216
Telephone:     (210) 731-6495
Facsimile:     (210) 293-2139

*Of Counsel*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 3, 2020, I caused a copy of the foregoing to be electronically filed using the CM/ECF system, which will send notification to counsel of record of such filing by operation of the Court's electronic system.  Parties may access this filing via the Court's electronic system.

By  /s/Lewis F. Powell III
Lewis F. Powell III