STEVES AND SONS, INC.,

    Plaintiff,

v.                          Civil Action No. 3:20-cv-98
                                 **Public Version**

JELD-WEN, INC.,

    Defendant.

## MEMORANDUM OPINION

This matter is before the Court on Steves and Sons, Inc.'s ("Steves") MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION (ECF No. 2) (the "Preliminary Injunction Motion"). For the reasons set forth below, the Preliminary Injunction Motion will be granted.

### I. PROCEDURAL HISTORY

On February 14, 2020, Steves filed its COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, DAMAGES, AND SPECIFIC PERFORMANCE (ECF No. 1; ECF No. 6) against JELD-WEN, Inc. ("JELD-WEN"). The Complaint presents three counts, each of which, in whole or in part, implicates or arises out of a long-term requirements contract in which JELD-WEN, a manufacturer of molded interior doorskins and molded interior doors, agreed to supply Steves, a manufacturer of molded interior doors, with eighty

percent (80%) of Steves' requirements for doorskins (the "Supply Agreement"). Steves presents four claims in the Complaint.

COUNT ONE alleges a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18. This count is largely based on a judgment that Steves obtained against JELD-WEN in Steves I[1] for violating Section 7 of the Clayton Act when JELD-WEN acquired CraftMaster Inc. ("CMI"), thereby substantially lessening competition in the market for doorskins. In COUNT ONE, Steves alleges that JELD-WEN is using the illegal market power that resulted from that illegal acquisition by refusing "to supply to Steves an essential input for its door manufacturing business except on anticompetitive terms and conditions." (ECF No.6 ¶ 85.)

In COUNT TWO, Steves alleges that "JELD-WEN has intentionally and improperly interfered with Steves' existing contracts [for the sale of doors], with Steves continuing business relationships with [Steves' door customers], and with Steves' reasonable expectation of forming new contracts [for new door sales]." (Id. ¶ 93.) In COUNT TWO, it is alleged that JELD-WEN is using an artificially-created need for allocation of sales to its doorskin customers (which limits the number of doors Steves and JELD-WEN's other

---

[1]     Steves & Sons, Inc. v. JELD-WEN, Inc., No. 3:16-cv-545, is the full style of the case now referred to as Steves I. The FINAL JUDGMENT ORDER was entered on December 2, 2018, (Steves I, ECF No. 1815), and an AMENDED FINAL JUDGMENT ORDER was entered on March 13, 2019, (Steves I, ECF No. 1852).

doorskin customers can make) to take business that Steves had with existing door customers and that it reasonably expected to have with potential door customers.

In COUNT THREE, Steves alleges that JELD-WEN has breached and is continuing to breach the Supply Agreement. In particular, Steves alleges that JELD-WEN breached the Supply Agreement: (1) "by failing and refusing to deliver doorskins ordered when JELD-WEN had not issued a notice of allocation"; (2) "by issuing an unjustified notice of allocation" [under § 20 of the Supply Agreement]; and (3) "by failing to properly implement and administer the allocation period even if JELD-WEN had been authorized to initiate the allocation period." (Id. ¶ 100.)

COUNT FOUR seeks a declaratory judgment. In particular, Steves seeks declarations that:

- JELD-WEN's notice of allocation is void and ineffective;

- If JELD-WEN's notice of allocation is not void and ineffective, JELD-WEN must use Steves' 2019 percentage number, properly calculated, to allocate doorskins to Steves;

- If JELD-WEN's notice of allocation is not void and ineffective, JELD-WEN must include in calculating Steves' 2019 percentage number the doorskins ordered before December 31, 2019, that JELD-WEN should have delivered before that date but did not;

- If JELD-WEN's notice of allocation is not void and ineffective, JELD-WEN must apply Steves' 2019 percentage number, correctly calculated, to JELD-WEN's true production capacity rather than its claimed production capacity; and

3

- If JELD-WEN's notice of allocation is not void and ineffective, JELD-WEN must permit Steves to order the mix of doorskin models that reflects the current demands of Steves' customers rather than Steves' past orders.

(Id. ¶ 107.)

Steves contends that it has been, and continues to be, irreparably injured by the conduct alleged in COUNTS ONE through THREE. As a result, Steves seeks a preliminary injunction and an expedited trial on the merits. The merits trial has now been set for June 1, 2020.[2]

In the interim, if the Court decides that the allocation was not properly declared, Steves requests a preliminary injunction ordering JELD-WEN to:

(1) Terminate allocation, effective retroactively to January 1, 2020;

(2) Terminate the ordering, confirmation, and delivery process JELD-WEN instituted as part of allocation;

(3) Revert to the parties' previous ordering, confirmation, and delivery process; and

(4) Deliver to Steves all doorskins Steves ordered from JELD-WEN from November 25, 2019.

(ECF No. 47 at 2.) In the alternative, if the Court determines that allocation was appropriately declared, Steves requests that the Court order JELD-WEN to:

---

[2] The Governor of Virginia has issued a Temporary Stay at Home Order, effective until June 10, 2020, in response to the COVID-19 virus. Consequently, the trial may have to be delayed until the order expires.

(1)   Supply Steves with ███████ of JELD-WEN's North American production of molded doorskins;

(2)   Refrain from restricting Steves' purchases by molded doorskin design and size;

(3)   Revert to the parties' previous ordering, confirmation, and delivery process;

(4)   Deliver to Steves all doorskins Steves ordered from JELD-WEN from November 25, 2019 onward; and

(5)   Provide biweekly reports to Steves explaining JELD-WEN's production of molded doorskins and the number of doorskins ordered by and shipped to JELD-WEN's contracted molded doorskin customers and JELD-WEN's North American door manufacturing operations during the preceding two-week period.

(Id. at 2-3.)[3]

Steves argues that it is entitled to preliminary injunctive relief under all four counts of its Complaint. However, the record is such that it is possible only to assess whether preliminary injunction relief is available as to COUNT THREE, the breach of contract claim.[4]   Indeed, it was to the breach of contract claim

---

[3]   Steves previously filed a similar motion in Steves I, asking the Court to grant similar relief.   Immediately after that motion was denied for lack of jurisdiction, (Steves I, ECF No. 2036), Steves filed the Complaint in this case.

[4]   It is true that the Clayton Act violation that is the basis of COUNT ONE was proved in Steves I and, thus, that part of COUNT ONE can be considered as established by the judgment in Steves I. However, the record here is scant as to whether that antitrust violation caused the damages alleged in this case, and there is a dispute as to whether the Complaint alleges antitrust impact or antitrust injury.   Thus, COUNT ONE is not an appropriate basis for preliminary injunctive relief.   Nor is COUNT TWO an appropriate basis because there is a substantial issue as to whether the Complaint adequately alleges the tortious interference claims therein presented.

that the parties directed the evidence, the briefing, and the argument. The requested declaration in COUNT FOUR tracks the allegations of COUNT THREE. If Steves proves a substantial likelihood of success on COUNT THREE, there is also a substantial likelihood of success on COUNT FOUR.

To begin, it is necessary to recount the contract provisions at issue and then to determine the facts as presented by the testimony and exhibits. The parties agreed that the direct examination of the witnesses would be presented by affidavit/declaration. Thus, at the evidentiary hearing, the witnesses were subject to cross-examination and re-direct examination. Almost all exhibits were admitted without objection.[5]

## II. CONTRACT PROVISIONS

Several provisions of the Supply Agreement are the focus of the issues in the case, the testimony, and the exhibits. Thus, the contractual provisions are essential to understand the issues and the evidence and to resolve the Preliminary Injunction Motion.

Section 1 is entitled "**Purchase and Sale.**" It provides:

> JELD-WEN hereby agrees to sell to STEVES, and
> STEVES hereby agrees to purchase from JELD-
> WEN, molded doorskin products according to the
> terms and provisions of this Agreement. The
> products subject to this Agreement shall be

---

[5] JELD-WEN objected to the admission of the allocation provisions with its other doorskin customers. For the reasons explained in Section V(A)(3)(c)(i) below, the objection was overruled.

the full range of JELD-WEN molded doorskin
products (the "Product").

(ECF No. 1-1 § 1 ("Ex. 1").) Under this provision, JELD-WEN agrees

to sell, and Steves agrees to buy, from the "full range of JELD-

WEN molded doorskin products." Then, in Section 4, entitled

**"Quantity,"** the Supply Agreement provides that:

> STEVES <u>agrees</u> to purchase from JELD-WEN <u>not</u>
> <u>less than eighty percent (80%) of its molded</u>
> <u>doorskin products requirements from such</u>
> <u>products that are manufactured and offered by</u>
> <u>JELD-WEN</u> ("purchase commitment"). JELD-WEN
> agrees that it will <u>deliver</u> to STEVES <u>all</u>
> <u>molded doorskin products ordered within thirty</u>
> <u>(30) days of receipt of STEVES' purchase</u>
> <u>order</u>. Doorskin products not manufactured by
> JELD-WEN are not considered when calculating
> the above purchase commitment. In addition,
> STEVES may purchase outside of the 80%
> purchase commitment from another source if
> STEVES['] purchase price for the same or
> similar product from another source is at
> least 3% less than the then[-]current JELD-
> WEN delivered purchase price for the product
> but only after JELD-WEN has had a reasonable
> opportunity to match such lower purchase
> price. Although STEVES has the right to so
> purchase from other sources, it is the intent
> and spirit of this Agreement that, subject to
> acceptable terms as set forth above, STEVES
> will purchase the maximum volume possible
> under this Agreement from JELD-WEN.

(<u>Id.</u> § 4 (emphasis added).) Thus, the Supply Agreement is what is

commonly known as a "requirements contract" pursuant to which JELD-

WEN agrees to supply at least eighty percent (80%) of Steves'

requirements for molded interior doorskins. And, JELD-WEN agrees

to deliver the ordered products within thirty (30) days of receipt of the purchase order.[6]

Section 20 is at the heart of this case. It is entitled **"Allocation."** Section 20 requires Steves to submit, by November 30 of each year, forecasts of its doorskin requirements for the coming year. Steves also is obligated to submit quarterly requirement forecasts. The purpose of the forecasts is "to assist JELD-WEN in managing its production levels to meet STEVES' anticipated requirements for Product," (id. § 20), which is defined in Section 1 as "the full range of JELD-WEN molded doorskin products," (id. § 1). The record is clear that both the annual and quarterly forecasts are made by stating the number of doorskins Steves expects to buy from JELD-WEN for the period covered by the forecast.

In Section 20, the parties addressed possible shortages in JELD-WEN's production capacity and established an allocation provision that would apply if such a shortage in production capacity occurred or was anticipated. On that score, Section 20 provides:

> By January 30 of each year, JELD-WEN shall provide STEVES with a percentage number

---

[6]    Under certain conditions, Steves is permitted to buy more than eighty percent (80%) of its requirements from JELD-WEN. But although Steves has a limited right to buy from other sources, "it is the intent and spirit of [the Supply] Agreement that . . . Steves will purchase the maximum volume possible . . . from JELD-WEN." (Ex. 1 § 4.)

regarding its Product, which number is to be calculated by dividing the total number of skins shipped to STEVES the preceding year by the total number of skins manufactured in North America by JELD-WEN the preceding year. If, during the term of this Agreement, JELD-WEN recognizes an actual or anticipated shortage in production capacity over the current or anticipated demand, JELD-WEN shall immediately notify STEVES of JELD-WEN'[s] current production capacity in North America indicating a shortage in production capacity, which will then result in the need for an allocation period ("notice of allocation") . . . During the allocation period, STEVES will be allowed to purchase up to the percentage number of JELD-WEN production volume during allocation provided by JELD-WEN in the January 30 notification referenced above, provided that volumes purchased by customers to which JELD-WEN has no commitment to sell under a supply agreement cannot limit JELD-WEN's provision of volume requested by STEVES during allocation.

(Id. § 20.)

There is also an integration clause in Section 18. It provides that:

This Agreement constitutes the entire Agreement between the Parties and may not be modified or amended except in writing signed by each of the Parties or authorized agents of the Parties. There are no understandings, agreements or representations, express or implied, not specified in this Agreement.

(Id. § 18.)

### III. FINDINGS OF FACT

The testimony and exhibits establish the basic facts about: (1) the dealings between the parties under the foregoing provisions of the Supply Agreement; and (2) the disputes that precipitated

9

Steves' request for a preliminary injunction. Other facts are found in the analysis sections of this Memorandum Opinion. In determining the facts to the extent necessary to determine the Preliminary Injunction Motion, the Court has assessed the credibility of the witnesses and the meaning of the exhibits.

Steves manufactures molded interior doors and sells them to building supply companies, some large, some small. A molded interior door is made by affixing a molded interior doorskin to a door frame. The doorskin is the visible front and back of the door. Steves buys, largely from JELD-WEN, the doorskins that it uses to make the doors that it sells to its customers.

JELD-WEN makes both molded interior doors and molded interior doorskins. Within JELD-WEN, the door manufacturing operation ("JW Door") is separate from the doorskin manufacturing operation ("JW Fiber" or the "fiber operation"). JW Door and JW Fiber are not separate formal divisions, but they operate separately. JW Fiber provides its product (doorskins) to JW Door pursuant to intracompany orders. JW Fiber considers, and refers to, JW Door as a "customer," but, there are no intracompany contracts between JW Door and JW Fiber.

It is not disputed that, since the acquisition of CMI in 2012, there are only two manufacturers of interior molded doorskins in the United States: JELD-WEN and Masonite Corp. ("Masonite"). Nor does it appear to be disputed that foreign manufacturers of

doorskins play no significant role in the United States doorskin market.

## A. The Ordering and Fulfilling of Requirements

Since entering into the Supply Agreement in May 2012, Steves, as the Supply Agreement requires, has provided JELD-WEN with annual and quarterly estimates of what Steves expects its doorskin requirements to be. The annual and quarterly estimates are now, and have always been, stated in the number of doorskins required for the period (year or quarter). During the year and the various quarters, the demand from Steves' customers varies with respect to the style of doors (or SKUs). Therefore, it has been, and is, the practice that Steves places purchase orders with JELD-WEN on a weekly basis, and that the purchase orders list the amounts, by SKU,[7] of doorskins that Steves requires, thereby enabling Steves to tailor its doorskin purchases to the demands of its door customers. (ECF No. 46-1 ¶ 15.) JELD-WEN typically has provided written confirmation of the purchase orders within two to three business days of receiving them. These confirmations normally have confirmed Steves' purchase orders as submitted. However, JELD-WEN occasionally has made changes to optimize truck freight or to change from which JELD-WEN plant it would ship the doorskins to Steves. (Id.)

---

[7]    "SKU" means Stock Keeping Unit, and each SKU is a separate design.

## B.    The Masonite and JELD-WEN Price Increases

In October and November of 2019, JELD-WEN and Masonite made price increase announcements, which sparked the events at the root of this case.  First, on October 16, 2019, JW Door announced that it would increase prices for its interior molded doors by approximately 5-7%, effective December 16, 2019.  (ECF No. 3-1 at 66.) Second, on October 30, 2019, Masonite announced that it would increase its prices for its interior molded doors by approximately 25%, effective February 3, 2020.  (Id. at 61.)  Masonite's increase appears to have been the largest-ever price increase in the market. (See, e.g., ECF No. 45-1 at 105:8-22[8] (Sam Steves Dep.).)  Finally, to keep pace with Masonite, JW Door announced three weeks later, on November 21, 2019, that it would increase its prices for its doors by an additional 17-20%, effective February 7, 2020.  (ECF No. 3-1 at 63.)

Thus, by the end of October 2019, the purchasers were aware that their costs would significantly increase in early February

---

8



12

2020 when the Masonite and JELD-WEN price increases took effect. The parties seem to agree that the door manufacturers then began to significantly increase their orders for doorskins to acquire their doorskin needs before the price increases took effect in February. In other words, the demand for doorskins began to increase significantly beginning in November 2019.

As required by the Supply Agreement, Steves, at the end of 2018, forecast that it would require twelve million doorskins from JELD-WEN during 2019. (ECF No. 46-1 ¶¶ 30-31.) Also, as the Supply Agreement required, Steves submitted quarterly forecasts in the second, third, and fourth quarters of 2019. (Id.) Specifically, Steves forecast that it would order 3,750,000 doorskins in the second quarter of 2019, 3,575,000 doorskins in the third quarter, and 3,700,000 doorskins in the fourth quarter. (Id. ¶ 31.)

Steves' actual orders were 3,868,251 in the first quarter, 3,289,760 in the second quarter, 3,150,430 in the third quarter, and 3,963,090 in the fourth quarter. (Id.) For the year (2019), Steves actually ordered 14,271,531 doorskins, approximately 18.93% (or 2,271,531 doorskins) above its annual forecast. (See id.)

The record shows that, before the fourth quarter of 2019 and for a few weeks in the fourth quarter, JELD-WEN, depending on the week, fulfilled between 97.6% and 100.1% of Steves' orders and delivered the doorskins within a maximum of thirty-two days. (See

ECF No. 59 at 101 (Bolan testimony); ECF No. 46-1 at 50-51 (chart detailing purchase order fill rate and average delivery time).) However, in the fourth quarter of 2019, JELD-WEN stopped its long-standing practice of promptly confirming Steves' orders and delivering almost all of the doorskins that Steves ordered within the time called for by the Supply Agreement. (ECF No. 7-1 ¶¶ 9-13; see also ECF No. 46-1 at 50-51.) For instance, in the week of November 18, 2019, JELD-WEN filled 100.0% of Steves' orders within thirty-one days; in the week of November 25, 2019, JELD-WEN's fill rate decreased to 97.6% delivered within an average of forty-five days and, by the week of December 23, 2019, JELD-WEN's fill rate had dropped to 83.1% delivered within an average of forty-eight days. (ECF No. 46-1 at 51.) As Steves explains:

> Yet, of all of the doorskins ordered by Steves from JELD-WEN in 2019 in Weeks 44-52 (2,748,030 total doorskins), 2,072,425 skins were delivered more than 30 days after JELD-WEN's receipt of Steves' [purchase orders] (or 75.4% of Week 44-52 orders); 929,740 skins were delivered more than 40 days after JELD-WEN's receipt of Steves' [purchase orders] (or 33.8% of Week 44-52 orders); 398,008 skins were delivered more than 50 days after JELD-WEN's receipt of Steves' [purchase orders] (or 14.5% of Week 44-52); and 131,475 skins were delivered more than 60 days or more after JELD-WEN's receipt of Steves' [purchase orders] (or 4.8% of Week 44-52 orders).

(Id. ¶ 22.)

When Steves objected, JELD-WEN stated that Steves' orders were "significantly disproportionate to both Steves' most recent

forecast and [its] historical ordering patterns," an obvious reference to Uniform Commercial Code ("UCC") § 2-306(1). JELD-WEN also said that it was "unable to accommodate this unreasonably disproportionate demand at this time and therefore cannot accept the orders as is." (ECF No. 3-1 at 69.) JELD-WEN refused to meet Steves' orders and, instead, shipped only 95.8% of orders for the week of December 2, 2019, 94.8% for the week of December 9, 2019, 93.3% for the week of December 16, 2019, and 83.1% for the week of December 23, 2019. (ECF No. 46-1 at 51.) The doorskins JELD-WEN did ship were shipped late. (Id. (chart showing average delivery times were between forty and forty-eight days for these weeks).) As of April 3, 2020—the date Steves filed its FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, DAMAGES, AND SPECIFIC PERFORMANCE (ECF No. 105)—JELD-WEN had not delivered 98,925 doorskins that Steves ordered in 2019. (Id. ¶ 39.) These facts comprise the essence of what is referred to in the briefs and argument as the pre-allocation breach.

Then, because of allegedly excessive demand, JELD-WEN verbally informed Steves on December 18, 2019 that it would declare allocation under Section 20 of the Supply Agreement. (ECF No. 7-1 ¶ 21.) JELD-WEN formally declared allocation on December 19, 2019. The allocation period would begin on January 1, 2020. (ECF No. 3-1 at 28.) Under Section 20 of the Supply Agreement, Steves is entitled to ███████ of JELD-WEN's total North American doorskin

production during the period of allocation. (See ECF No. 60 at 143.)[9]

However, that was not to be because, on January 17, 2020, JW Fiber informed Steves that allocation would be made pursuant to a so-called "mix methodology." Under this methodology, unlike the applicable provision of Section 20, orders of specific doorskin styles were capped at a percentage "based on [the customers'] historical mix" from the preceding year—2019. (ECF No. 3-1 at 30; ECF No. 59 at 90-91 (Bolan testimony).) JW Fiber "transition[ed]

_____

[9]    This percentage is by virtue of the second and fourth sentences of Section 20. The second sentence reads:

By January 30 of each year, JELD-WEN shall provide STEVES with a percentage number regarding its Product, which number is to be calculated by dividing the total number of skins shipped to STEVES the preceding year by the total number of skins manufactured in North America by JELD-WEN the preceding year. If, during the term of this Agreement, JELD-WEN recognizes an actual or anticipated shortage in production capacity over the current or anticipated demand, JELD-WEN shall immediately notify STEVES of JELD-WEN'[s] current production capacity in North America indicating a shortage in production capacity, which will then result in the need for an allocation period ('notice of allocation').

The fourth sentence reads:

During the allocation period, STEVES will be allowed to purchase up to the percentage number of JELD-WEN production volume during allocation provided by JELD-WEN in the January 30 notification referenced above, provided that volumes purchased by customers to which JELD-WEN has no commitment to sell under a supply agreement cannot limit JELD-WEN's provision of volume requested by STEVES during allocation.

to [its mix methodology] on January 28, 2020 for shipments beginning on February 28, 2020." (ECF No. 3-1 at 30.) As of the March 5-6, 2020 evidentiary hearing, it was not known when allocation would end. (ECF No. 59 at 114 (Bolan testimony).)

The record shows that, because of the pre-allocation breach, the imposition of allocation, and the use of the mix methodology, Steves has had to inform ████████████████████████████████████ ████████████████████████████████████ that Steves will be unable to fill their current and future orders. (ECF No. 46-1 ¶ 81.) Some of these customers subsequently entered into supply agreements, or other long-term agreements, with Masonite or JELD-WEN. (Id. ¶ 86.) Additionally, Steves has shown that it has lost opportunities to acquire new business and that its reputation has suffered. (ECF No. 7-1 ¶¶ 37-41.)

C.    **Testimony at the March 5-6, 2020 Evidentiary Hearing**

On March 5-6, 2020, the Court held an evidentiary hearing on Steves' Preliminary Injunction Motion. In reality, the evidence was directed exclusively to whether injunctive relief was available under COUNT THREE (Breach of Contract).[10]  Peggie Bolan ("Bolan"), Bruce Fedio ("Fedio"), and Daniel Castillo ("Castillo")

---

[10]    Conceptually, some of the evidence related to COUNTS ONE and TWO, but, from the evidence offered, the briefs, and the argument, it is clear that COUNT THREE is the basis for injunctive relief. Additionally, COUNT FOUR asks for declaratory relief that, for the most part, is tied to COUNT THREE.

testified on JELD-WEN's behalf.  Sam Steves II ("Sam Steves") and Doug Gartner ("Gartner") testified on behalf of Steves.  The direct testimony of all witnesses was submitted by declaration.  With the exception of Sam Steves and Gartner, all witnesses gave live testimony on cross-examination and redirect examination.

Bolan is the Vice-President and General Manager of Building Products at JELD-WEN.  (ECF No. 45-4 ¶ 2.)  Since February 2019, she has taken on the "additional responsibility of managing JELD-WEN's external doorskin customers."  (Id.)  Fedio has been the Vice-President of Fiber Operations in North America for JELD-WEN since 2012 and is thus "responsible for the operational aspects of JELD-WEN's North America doorskin production, including safety, quality, delivery, cost, and inventory."  (ECF No. 45-13 ¶ 2.) Castillo has been the President for North America Doors at JELD-WEN since February 2018.  (ECF No. 45-14 ¶ 2.)

### (1)  Demand

JELD-WEN makes many styles of doorskins.  Two of JELD-WEN's available doorskin styles are the Rockport and Carrara doorskins. The demand for Rockport and Carrara doorskins significantly increased after JW Door and Masonite's price increase announcements.  (ECF No. 59 at 77-78 (Bolan testimony).)  Indeed,

the record is clear that Rockport and Carrara doorskins are the only styles of doorskins that are, or ever were, in short supply.

Nonetheless, citing as its reason a shortage in its North American production capacity, JELD-WEN declared allocation as to all of its doorskin styles. (ECF No. 3-1 at 28 ("JELD-WEN has recognized an actual and anticipated on-going shortage in production capacity over the current and anticipated demand for molded doorskin products which necessitates an allocation period.").) A given reason was the terse, unexplained comment that "you can't be partially on allocation." (ECF No. 59 at 202 (Fedio testimony).) JELD-WEN has offered no explanation for that view. And, because of the mix methodology system of allocation, JELD-WEN is limiting customers' ability to order not only Rockport and Carrara doorskins, but also all other doorskin styles, such as Santa Fe doorskins. (ECF No. 60 at 35-36 (Castillo testimony).)

In sum, the record shows that there was a shortage in JELD-WEN's production capacity over the then-current and -anticipated demand for the Rockport and Carrara styles. However, the record also shows that the production capacity shortfall was confined to those styles. Thus, whatever may be the reason for limiting customer orders for other styles, it is not an actual or anticipated shortage of JELD-WEN's production capacity.

## (2) Allocation Method: Mix Methodology

Under the mix methodology, customers may only receive up to a certain percentage of each doorskin style. (ECF No. 59 at 90–91 (Bolan testimony).) This percentage was based on the percentage of JW Fiber's production of that particular doorskin style that the customer ordered in 2019. (Id. (Bolan testimony).) For instance, if a customer in 2019 purchased 25% of JELD-WEN's production of Atherton doorskins, under the mix methodology, the customer would be allowed to purchase only up to 25% of JELD-WEN's 2020 Atherton production. (Id. at 91 (Bolan testimony).) Although Bolan conceded that demand for certain doorskin styles changed from year-to-year, she insisted that the year-to-year change was not dramatic and that the purpose of the mix methodology was to "be able to satisfy everyone fairly." (Id. at 93 (Bolan testimony).)

However, because the needs of JW Door dictate whether JW Fiber will increase or decrease production of a given doorskin style, the number of doorskins available to outside customers under the mix methodology varies based on JW Fiber's doorskin production as tailored to the needs of JW Door. (Id. at 91–92 (Bolan testimony).) In other words, if JELD-WEN increases its production of Atherton doorskins, the customer who is entitled to 25% of JELD-WEN's Atherton doorskins could order more Atherton doorskins in 2020 than it ordered in 2019 simply because JELD-WEN increased

20

production. When deciding how much of each doorskin style to produce, JW Fiber is not constrained by the demand of its independent doorskin customers, such as Steves. (Id. (Bolan testimony).) Consequently, if JW Door has an increased demand for a certain style in 2020 than it did in 2019, JW Fiber increases production of that doorskin style and vice versa for decreased demand. (Id. at 92 (Bolan testimony).) Stated differently, because most of the demand for doorskins JW Fiber produces comes from JW Door, JW Door's demand drives the production of doorskins. (ECF No. 60 at 49-54 (Castillo testimony).) For instance, because JW Door is the largest doorskin consumer, if JW Door's demand for Atherton doorskins goes up by 10% and Steves' demand goes down by 10%, JW Fiber will still produce more Atherton doorskins in response to JW Door's increased demand. (See id. at 51-54 (Castillo testimony).)

Additionally, the mix methodology allocation scheme contains a forfeiture policy. Under the forfeiture policy, if an independent doorskin customer does not order all of the doorskins allotted to it, the customer "forfeits" the unordered doorskins, and the unordered doorskins are placed into inventory either at a JW Door facility or at a JW Fiber plant. (ECF No. 59 at 130-31 (Bolan testimony); ECF No. 60 at 55 (Castillo testimony).) In other words, the unordered doorskins do not "roll over to a future week. It's use it that week, buy it, or it's lose it, erased from

21

the record." (ECF No. 59 at 131 (Bolan testimony).) Although JELD-WEN argued that JW Fiber treats JW Door the same in the allocation system as JELD-WEN treats independent doorskin customers, such as Steves, (Id. at 125 (Bolan testimony)), this contention simply is not correct because the on-hand doorskin inventory from the forfeiture policy is reserved for JW Door alone, not for independent doorskin customers. (Id. at 164 (Fedio testimony).)

### (3) Production Capacity

In the notice of allocation, in its briefing, and at the hearing, JELD-WEN contended that its annual production capacity was approximately ████████ doorskins. (See, e.g. ECF No. 7-1 at 12 (notice of allocation); ECF No. 45 at 4, 19-20 (JELD-WEN'S SUPPLEMENTAL BRIEF IN OPPOSITION TO STEVES' MOTION FOR PRELIMINARY INJUNCTION ("JELD-WEN's Supplemental Memorandum")); ECF No. 59 at 209 (Fedio testimony).) However, at trial in Steves I, Stephen Fancher ("Fancher"), a JELD-WEN employee, testified that JELD-WEN's production capacity was ████████ doorskins. (Steves I, ECF No. 1769 at 90-92, 100.) At the time of Fancher's testimony, it was to JELD-WEN's advantage to accurately state its production capacity. And Castillo confirmed, at his deposition and in the evidentiary hearing, that Fancher's testimony in Steves I was true and accurate at the time it was given. (ECF No. 46-5 at 30:14-31:3 (Castillo Dep.); ECF No. 60 at 36 (Castillo testimony).)

22

Both Fedio and Castillo blamed the asserted ██████████ doorskin decrease (██████████ to which Fancher testified in 2018 and ██████████ in 2019) in production capacity on problems at the Dodson plant in Louisiana. (ECF No. 59 at 182–84 (Fedio testimony); ECF No. 60 at 36–40 (Castillo testimony).) However, a chart that Fedio created for the purpose of making business decisions stated that JW Fiber's production capacity for standard operating days was ██████████ doorskins and that the demonstrated capacity for so-called "stretch" operating days was ██████████ doorskins. (ECF No. 46-17 at 4.) Even though allocation has been declared, JW Fiber has not begun operating in stretch mode. (ECF No. 59 at 178 (Fedio testimony).)

To supplement the doorskins that the North American plants can produce, JELD-WEN has ███████████████████████████ ██████████████████████████████████████████████. (ECF No. 59 at 169 (Fedio testimony).) ████████████████████████ ██████████████████████████████████████████████ ██████████████████████████. (ECF No. 46-20 at 6; see also ECF No. 59 at 171 (Fedio testimony).) ██████████ ██████████████████████████████████. (ECF No. 60 at 44 (Castillo testimony).) ██████████████████ ██████████████████████████████. (ECF No. 59 at 171–72 (Fedio testimony).) Therefore, ██████████████████████ doorskins will ease the pressure on JW Fiber because JW Fiber can

use these ███████████████████████ to supply JW Door, which in turn allows JW Fiber to fulfill other orders by using the ███ ████████ doorskins that it would have used to fulfill JW Door's orders but for the ████████████████.

## IV. THE LEGAL FRAMEWORK

To secure a preliminary injunction, Steves "must demonstrate that (1) [it is] likely to succeed on the merits; (2) [it] will likely suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in [Steves'] favor; and (4) the injunction is in the public interest." <u>League of Women Voters v. North Carolina</u>, 769 F.3d 224, 236 (4th Cir. 2014). Steves has the burden of proof on all four components of the test.

Preliminary injunctions may be classified as being either mandatory or prohibitory. Here, Steves asserts that the preliminary injunction it seeks, with the exception of one provision, is prohibitory, and JELD-WEN contends that the injunction that Steves seeks is mandatory. (ECF No. 46 at 6-7; ECF No. 31 at 1.) Thus, before turning to the merits of the Preliminary Injunction Motion, it is necessary to resolve this dispute because the measure of Steves' burden of proof depends on the nature of the relief sought. Specifically, plaintiffs seeking prohibitory injunctions must make a clear showing of their likelihood of success; however, "[t]o justify a mandatory injunction, . . . the movant must demonstrate a clear and convincing probability of

24

success." Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc., 193 F. Supp. 3d 556, 566 (E.D. Va. 2016). In other words, for mandatory injunctive relief to be available, the movant's "right to relief must be indisputably clear." Communist Party of Ind. v. Whitcomb, 409 U.S. 1235, 1235 (1972); Mountain Valley Pipeline, LLC v. 6.56 Acres of Land, 915 F.3d 197, 216 n.8 (4th Cir. 2019) (same). There appear to be no material differences between the terms "clear and convincing" and "indisputably clear" when the particular facts of the cases are examined.[11] The right to relief must be clearly established because "[m]andatory preliminary injunctive relief in any circumstance is disfavored, and warranted only in the most extraordinary circumstances." Taylor v. Freeman, 34 F.3d 266, 270 n.2 (4th Cir. 1994). In other words, mandatory injunctions "should be granted only in those circumstances where the exigencies of the situation demand such relief." East Tenn. Nat. Gas Co. v. Sage, 361 F.3d 808, 828 (4th Cir. 2004) (quoting Wetzel v. Edwards, 635 F.2d 283, 286 (4th Cir. 1980)) (internal quotation marks omitted).

"Whereas mandatory injunctions alter the status quo, prohibitory injunctions aim to maintain the status quo and prevent irreparable harm while a lawsuit remains pending." League of Women Voters, 769 F.3d at 236 (quoting Pashby v. Delia, 709 F.3d 307,

---

[11] For ease of reference, this MEMORANDUM OPINION uses the term "clear and convincing."

25

319 (4th Cir. 2013)) (internal quotation marks omitted). However, "[t]o be sure, it is sometimes necessary to require a party who has recently disturbed the status quo to reverse its actions, but such an injunction restores, rather than disturbs, the status quo ante." Id. (quoting Aggarao v. MOL Ship Mgmt. Co., 675 F.3d 355, 378 (4th Cir. 2012)) (internal quotation marks and alterations omitted). The Fourth Circuit "has defined the status quo as the last uncontested status between the parties which preceded the controversy." Pashby, 709 F.3d at 320 (quoting Aggarao, 675 F.3d at 378) (internal quotation marks omitted).

Here, the last uncontested status between the parties that preceded this controversy was in October 2019 before Masonite announced its price increase on October 30, 2019, before Steves increased its weekly orders that same week, and before JELD-WEN stopped confirming and delivering all, or substantially all, of Steves' doorskin orders. (ECF No. 7 at 3-4; ECF No. 31 at 10; ECF No. 46 at 6.) Consequently, the status quo last existed on October 29, 2019.

Steves seeks an order requiring JELD-WEN to:

> 1) Terminate allocation, effective retroactively to January 1, 2020;
>
> 2) Terminate the ordering, confirmation, and delivery process JELD-WEN instituted as part of its implementation of allocation;
>
> 3) Revert to the ordering, confirmation, and delivery process the parties previously practiced, including

JELD-WEN's delivery of doorskins within thirty days of receiving Steves' purchase orders, effective retroactively to November 25, 2019; and

4) Deliver to Steves all doorskins Steves ordered from November 25, 2019 until the date of the Court's Order ("Undelivered Prior-Placed Orders") in the following manner:

   a) Beginning from the week of March 9, 2020, deliver to Steves, in addition to Steves' regularly-placed weekly orders, 262,400 doorskins per week from the Undelivered Prior-Placed Orders until all Undelivered Prior-Placed Orders have been filled; and

   b) Deliver doorskins from the Undelivered Prior-Placed Orders in the order in which Steves placed them.

(ECF No. 47 at 2.) At the March 5-6, 2020 hearing, Steves also suggested that, if the Court lifted allocation and had concerns about Steves placing unreasonably disproportionate orders, the Court could require that Steves' orders remain within ten to fifteen percent of its yearly forecast. (ECF No. 60 at 112-13.)

To determine if the requested injunction is mandatory or prohibitory, it is necessary to evaluate each sub-part of the request individually. First, Steves' request that the Court order JELD-WEN to terminate allocation does require JELD-WEN to reverse its actions, but only to restore the status quo that existed in October 2019. This section of the requested injunction is thus not mandatory. Second, Steves' request that the Court order JELD-WEN to terminate the ordering, confirmation, and delivery process JELD-WEN introduced as part of its allocation scheme is also not

27

mandatory because, although it requires an affirmative act on JELD-WEN's part, it only requests that JELD-WEN reverse its actions to restore the status quo. Similarly, Steves' third request—that JELD-WEN revert to the ordering, confirmation, and delivery process the parties previously practiced—is merely a request that JELD-WEN return to the status quo and is thus not mandatory. Lastly, Steves' fourth request—that JELD-WEN deliver all undelivered doorskins that Steves ordered from November 25, 2019 to the date of the Court's order—is not mandatory. Although, on its face, Steves' fourth request asks that the Court order JELD-WEN to act, it does so only to the extent necessary to restore the status quo from October 2019 by delivering the currently outstanding doorskin orders. Consequently, because Steves' requested injunction seeks to restore, rather than disturb, the status quo, it is a prohibitory, and not a mandatory, injunction.

In the alternative, if the Court determines that allocation is appropriate, Steves asks for an order requiring JELD-WEN to:

1) Supply Steves with ▇▇ of JELD-WEN's North American production of molded doorskins, or approximately ▇ ▇▇▇▇ doorskins, during allocation, effective retroactively to January 1, 2020;

2) Refrain from restricting Steves' purchases by molded doorskin design and size;

3) Revert to the ordering, confirmation, and delivery process the parties previously practiced, including JELD-WEN's delivery of doorskins within thirty days of receipt of Steves' purchase orders, effective retroactively to November 25, 2019; and

4) Deliver to Steves all doorskins that Steves ordered from JELD-WEN between November 25, 2019 and the date of the Court's Order ("Undelivered Prior-Placed Orders") in the following manner:

    a) Beginning from the week of March 9, 2020, deliver to Steves, in addition to Steves' regularly-placed weekly orders, 262,400 doorskins per week from the Undelivered Prior-Placed Orders until all Undelivered Prior-Placed Orders have been filled; and

    b) Deliver doorskins from the Undelivered Prior-Placed Orders in the order in which Steves issued the purchase orders to JELD-WEN.

5) Provide to Steves bi-weekly reports setting forth, for the previous two weeks, JELD-WEN's production of molded doorskins and the number of doorskins ordered by and shipped to JELD-WEN's contracted molded doorskin customers and JELD-WEN's North American door manufacturing operations.

(ECF No. 47 at 2-3.) In this alternative proposed injunction, the first request—that JELD-WEN supply Steves ▮▮▮▮ of its North American production of doorskins merely asks that JELD-WEN comply with the contract. Although the status quo in October 2019 existed before allocation went into effect, the Court nevertheless views this request as prohibitory because it seeks to restore the status quo that would exist with allocation. As the Second Circuit stated in Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27 (2d Cir. 1995), "[c]onfusion in breach of contract cases as to whether an injunction is mandatory or prohibitory may stem from the meaning of 'status quo.' A plaintiff's view of the status quo is the situation that would prevail if its version of the contract were performed. A defendant's view of the status quo is its continued

failure to perform as the plaintiff desires. To a breach of contract defendant, any injunction requiring performance may seem mandatory." Id. at 34. The Second Circuit noted that, because the "preliminary relief [requested in that case] arguably alters the status quo by doing more than is required by the Agreement, it might be considered mandatory." Id. at 34-35.

In this case, the existence of allocation has altered the status quo. Within this altered environment, Steves' request that JELD-WEN supply Steves with ████ of its North American production does not attempt to alter the status quo and instead merely requests that JELD-WEN comply with the Supply Agreement. Thus, it is prohibitory, notwithstanding that it addresses something that happened after October 2019 and that it requires some action on JELD-WEN's part. And, in any event, the parties agree that, under allocation, Steves' percentage of JELD-WEN's doorskin production is ████. (See, e.g., ECF No. 45 at 21; ECF No. 47 at 2.)

Steves' second request—that JELD-WEN be ordered to refrain from using its mix methodology—is clearly a request for a prohibitory injunction because it only asks that JELD-WEN be ordered to stop acting. For the reasons stated previously, Steves' third and fourth requests are not mandatory. Lastly, as Steves concedes, its last alternative request is mandatory because it requests that JELD-WEN provide bi-weekly reports for purposes not related to restoring the status quo.

30

## V. APPLICATION OF THE STANDARD

The test for the issuance of a prohibitory preliminary injunction is the same whether the request is prohibitory or mandatory. Thus, Steves "must demonstrate that (1) [it is] likely to succeed on the merits; (2) [it] will likely suffer irreparable harm absent an injunction; (3) the balance of hardships weighs in [Steves'] favor; and (4) the injunction is in the public interest." League of Women Voters v. North Carolina, 769 F.3d 224, 236 (4th Cir. 2014). As explained above, to the extent Steves requests a prohibitory injunction, Steves "must make a 'clear showing' that it is likely to succeed on the merits of at least one of its claims at trial." Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc., 193 F. Supp. 3d 556, 566 (E.D. Va. 2016). However, to the extent Steves requests a mandatory injunction, Steves must show that its "right to relief [is] indisputably clear" or make its showing clearly and convincingly. See Communist Party of Ind. v. Whitcomb, 409 U.S. 1235, 1235 (1972); Handsome Brook Farm, LLC, 193 F. Supp. 3d at 566. Because Steves has met its burden of proof, the Court will grant the requested injunction in the preferred form. The alternative form thus need not be addressed.

### A. Likelihood of Success

"First, plaintiffs seeking preliminary injunctions must demonstrate that they are likely to succeed on the merits." Pashby v. Delia, 709 F.3d 307, 321 (4th Cir. 2013). However, to meet

31

this requirement, a plaintiff "need not show a certainty of success." Id. "To justify a mandatory injunction, however, the movant must demonstrate a clear and convincing probability of success." Handsome Brook Farm, LLC, 193 F. Supp. 3d at 566. Steves meets both measures on the likelihood of success factor.

Under Delaware law,[12] "the elements of a breach of contract claim are: 1) a contractual obligation; 2) a breach of that obligation by the defendant; and 3) a resulting damage to the plaintiff." H-M Wexford LLC v. Encorp, Inc., 832 A.2d 129, 140 (Del. Ch. 2003). For the reasons explained below, the Court concludes that Steves has made the necessary showing of its likelihood of success on COUNT THREE.[13] In particular, Steves has met its burden to demonstrate the likelihood of success on its claims in COUNT THREE that: (1) JELD-WEN breached the Supply Agreement by not supplying Steves with the doorskins it ordered in the fourth quarter of 2019 (the so-called pre-allocation breach); (2) JELD-WEN breached the Supply Agreement by improperly declaring

---

[12] The Supply Agreement provides that it "and any questions or disputes which may arise hereunder shall be construed and governed by the laws of the State of Delaware . . . ." (Ex. 1 § 10 (internal alteration omitted).)

[13] Thus, it is not necessary to assess Steves' likelihood of success on its antitrust and tortious interference claims. See W. Indus.-N., LLC v. Lessard, No. 1:12-cv-177, 2012 WL 966028, at *2 (E.D. Va. Mar. 21, 2012) ("In general, where multiple causes of action are alleged, a plaintiff need only show likelihood of success on one claim to justify injunctive relief."). And, as noted previously, COUNT FOUR is linked closely with COUNT THREE.

allocation; and (3) even if allocation were appropriate, JELD-WEN's methodology is neither fair nor reasonable.

### (1) The Alleged Pre-Allocation Breach

The parties do not dispute that Steves' Q4 orders occurred before allocation went into effect. (See ECF No. 7 at 19; ECF No. 31 at 17.) Instead, they dispute whether JELD-WEN breached its obligation under the Supply Agreement by not supplying Steves all the doorskins that Steves ordered in the fourth quarter.

In November 2018, Steves informed JELD-WEN that its 2019 forecast was twelve million doorskins. (ECF No. 46-1 ¶¶ 30–31.) The total number of doorskins actually ordered by Steves in 2019 was 14,271,531. (Id. ¶ 31.)

As required by the Supply Agreement, Steves provided more specific forecasts for the second (Q2), third (Q3), and fourth (Q4) quarters of 2019. (ECF No. 59 at 45–46.) Steves' Q2 forecast was 3,750,000 doorskins; its actual number of orders was 3,289,760. (ECF No. 46-1 ¶ 31.) Steves' Q3 forecast was 3,575,000 doorskins; its actual number of orders was 3,150,430. (Id.) Steves' Q4 forecast was 3,700,000 doorskins; its actual number of orders was 3,963,090. (Id.) This figure—3,963,090 doorskins ordered—represents a 7.11% deviation from Steves' Q4 forecast. Relative to Steves' actual orders in the second and third quarters, Steves ordered 20.47% and 25.80% more, respectively, in the fourth

33

quarter. However, compared to Steves' Q2 and Q3 forecasts, Steves' Q4 orders were only 5.68% and 10.86% more, respectively.

6 Del. C. § 2-306, which is identical to UCC § 2-306, provides that:

> A term which measures the quantity by the output of the seller or the requirements of the buyer means such actual output or requirements as may occur in good faith, except that **no quantity unreasonably disproportionate to any stated estimate** or in the absence of a stated estimate to any normal or otherwise comparable prior output or requirements may be tendered or demanded.

6 Del. C. § 2-306(1) (emphasis added). In a requirements contract, a "buyer may not increase its requirements by an unreasonably disproportionate amount . . . ." Brewster of Lynchburg, Inc. v. Dial Corp., 33 F.3d 355, 364-65 (4th Cir. 1994). "[W]ith respect to requirements contracts[,] the seller assumes the risk of all good faith variations in the buyer's requirements . . . ."[14] Id. at 365 (quoting NCC Sunday Inserts, Inc. v. World Color Press, Inc., 759 F. Supp. 1004, 1008 (S.D.N.Y. 1991)) (internal quotation marks and alteration omitted).

---

[14] Here, there have been no allegations of bad faith. To the extent that JELD-WEN alleges that ████████████████ ████████████████████████████████████, (ECF No. 31 at 19), Steves has clarified that its new warehouse will replace, not expand, a storage facility that Steves currently leases, (ECF No. 46-1 ¶ 110). That showing stands unrebutted.

Whether Steves is contractually entitled to receive all of the doorskins it ordered in Q4 of 2019 depends on whether Steves' orders were unreasonably disproportionate to its estimates. The statute's provision that the buyer's requirements must not be "unreasonably disproportionate **to any stated estimate** or in the absence of a stated estimate to any normal or otherwise comparable prior output" makes clear that the relevant reference point in this case is Steves' stated estimate, specifically its Q4 forecast. See 6 Del. C. § 2-306 (emphasis added). Only if Steves had not issued a Q4 forecast would its prior requirements be the relevant reference point under § 2-306. The record is clear that Steves' Q4 orders only deviated from its Q4 estimate by 7.11%. In contrast, the cases to which JELD-WEN cites all point to deviations of more than twenty percent as being unreasonable. (See ECF No. 31 at 18-19.)[15]

---

[15]   JELD-WEN contends that Steves' Q4 orders were "unreasonably disproportionate to its historical ordering pattern . . . ." (ECF No. 31 at 18.)   For instance, JELD-WEN states that Steves' "Week 44 order for ███████ doorskins exceeded Steves' weekly average from the first three quarters by 61%." (Id. at 5.) However, JELD-WEN incorrectly compares Steves' Q4 orders to its Q1 through Q3 orders.   As explained above, Steves' Q4 forecast is the relevant reference point under 6 Del. C. § 2-306.   Consequently, the question is not whether Steves' Q4 orders were unreasonably disproportionate to its historical ordering patterns, but whether Steves' Q4 orders were unreasonably disproportionate to its Q4 forecast.

On this record, and taking into account the terms of the Supply Agreement, and the applicable law, Steves clearly has shown a strong likelihood of succeeding on its contention that its Q4 orders were not unreasonably disproportionate to its stated Q4 forecast and that JELD-WEN, as the seller, assumed the risk of Steves' good-faith variations. Therefore, there is a strong likelihood that the finder of fact will find that JELD-WEN's refusal to supply Steves with its Q4 orders of doorskins constitutes a breach of the Supply Agreement.[16]

Contrary to JELD-WEN's argument, the terms and conditions that JELD-WEN attached to its order acknowledgements do not change this result, at least on this record. JELD-WEN's terms and conditions attached to the end of the order acknowledgement state that:

> All orders are subject to approval and acceptance by Seller. Seller reserves the right to accept orders in whole or in part. Such acceptance will take the form of shipment of the order. Shipment of less than the entire order shall be deemed acceptance of that portion of the order actually shipped. Written or oral notice acknowledging receipt of an order does not constitute acceptance by Seller of the unshipped portion of any order. Any different or additional terms and conditions proposed by Buyer in its purchase

---

[16] In so deciding, the Court does not need to decide whether the issue must be decided by a jury. That issue is not now before the Court. And, even if the increase was 20.47% and 25.80%, a jury could reasonably find these increases not to be disproportionate to the estimates at issue.

> order or otherwise not specifically approved
> and accepted in writing by Seller are
> therefore rejected by Seller.

(Hearing Ex. 2.) However, this term was not included in the Supply Agreement. Nor have the parties modified the Supply Agreement to include this term.[17] And, the Supply Agreement clearly provides that the "Agreement constitutes the entire Agreement between the Parties and **may not be modified or amended except in writing signed by each of the Parties** or authorized agents of the Parties. There are no understandings, agreements or representations, express or implied, not specified in this Agreement." (Ex. 1 § 18 (emphasis added).) This clause, at least on this record, forecloses the argument that the terms and conditions in the order acknowledgement override the Supply Agreement's provisions.

Wholly apart from the text of Section 18, Steves has shown, on this record, that JELD-WEN's terms and conditions would not apply because Steves explicitly rejected them in a letter to JELD-WEN on July 30, 2015. (ECF No. 49-1 at 102.) In that letter, Steves "note[s] that Jeld-Wen has recently begun including new terms and conditions in its acknowledgments of Steves's orders . . . Steves hereby objects to these new terms and

---

17    (ECF No. 59 at 40-42 (JELD-WEN's counsel stating that the terms and conditions were "supplement" to Supply Agreement and Bolan testifying that she was not aware of Steves signing document accepting JELD-WEN's terms and conditions).)

37

conditions and rejects their addition to the Doorskin Product Agreement signed May 1, 2012, between Jeld-Wen and Steves." (Id.)

Moreover, 6 Del. C. § 2-209, identical to UCC § 2-209, provides that a "signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants such a requirement on a form supplied by the merchant must be separately signed by the other party." 6 Del. C. § 2-209(2). Consequently, terms slipped into invoices or order acknowledgments cannot modify a signed agreement that excludes modification unless the parties agree to the modification in writing. See Wing Shing Products (BVI), Ltd. v. Simatelex Manufactory Co., 479 F. Supp. 2d 388, 405 (S.D.N.Y. 2007) (finding that party's "insertion of the new language into [its] invoices was legally inoperative" under 6 Del. C. § 2-209(2) because parties "did not execute a written amendment to the terms of the Supply Agreement"). Therefore, at least on this record, Steves not only refused to accept JELD-WEN's terms and conditions in writing but also sent JELD-WEN a letter expressly rejecting these terms and conditions. (ECF No. 49-1 at 102.) Thus, the terms and conditions JELD-WEN attached to its order acknowledgments do not apply.

### (2) The Alleged Allocation Breach

As to allocation, it is necessary to keep in mind Section 20 of the Supply Agreement, which provides that:

> If, during the term of this Agreement, JELD-WEN recognizes an actual or anticipated shortage in production capacity over the current or anticipated demand, JELD-WEN shall immediately notify STEVES of JELD-WEN'[s] <u>current production capacity in North America indicating a shortage in production capacity</u>, which will then result in the need for an allocation period ("notice of allocation").

(Ex. 1 § 20 (emphasis added).) Thus, under the text of the Supply Agreement, whether JELD-WEN has also breached the Supply Agreement by improperly declaring allocation depends on whether JELD-WEN recognized an actual or anticipated shortage in production capacity.

### (a) JELD-WEN's Production Capacity

In its notice of allocation, JELD-WEN asserted that its annual production capacity was approximately ▆▆▆▆▆▆ doorskins. (ECF No. 7-1 at 12.) Steves clearly has shown a substantial likelihood of success in proving that JELD-WEN's annual production capacity is ▆▆▆▆▆▆ doorskins at a minimum and ▆▆▆▆▆▆ doorskins if operating in stretch mode. Thus, Steves likely will succeed in its claim that there was no contractual basis for declaring allocation under Section 20 of the Supply Agreement and that, in declaring allocation, JELD-WEN breached the Supply Agreement.

The parties dispute JW Fiber's doorskin production capacity. The January 23, 2020 letter to Steves regarding allocation included a spreadsheet showing that JW Fiber's net production in 2019 was ▆▆▆▆▆▆ doorskins and that demand exceeded supply by ▆▆▆▆▆▆

39

doorskins. (Id. at 21.) JELD-WEN has since maintained that its production capacity is only ████████. (See, e.g., ECF No. 31 at 21; ECF No. 45 at 19.) In contrast, Steves has introduced evidence that the production capacity is higher and is either ████████████, as Stephen Fancher testified at the trial in Steves I, or ████ or ████████████ as shown in JW Fiber's internal business documents. (ECF No. 46 at 8-9.) For the reasons stated below, the Court finds that Steves has shown clearly and convincingly a likelihood of establishing that JELD-WEN's production capacity is ████████ doorskins at a minimum and ████████████ at a stretch. (ECF No. 46-17 at 4.)

Even if JELD-WEN's production capacity has changed since Fancher swore in Steves I that JELD-WEN's production capacity was ████████ doorskins annually, JW Fiber's internal business documents make clear that its production capacity is considerably greater than the ████████ capacity it used when declaring allocation. Exhibit 13[18] is a chart that Fedio prepared for a business meeting to discuss the production capacity. The chart clearly stated that the demonstrated capacity[19] for standard

---

[18]   Exhibit 13 is attached to PLAINTIFF STEVES AND SONS, INC.'S SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR A PRELIMINARY INJUNCTION (ECF No. 46) ("Steves' Supplemental Memorandum").

[19]   As explained in more detail below, although the chart states that it shows demonstrated capacities for JELD-WEN's North American plants, Fedio testified that the figures for the Dodson plant represent an estimate of what Dodson may be able to achieve,

operating days was ██████████ doorskins and that the demonstrated capacity for stretch operating days was ██████████ doorskins. (Id.) "Demonstrated capacity" indicates the number of doorskins JELD-WEN plants have shown they are able to produce, given, *inter alia*, downtime for maintenance and changing dies. (See ECF No. 59 at 177–78, 182–83 (Fedio testimony).) Although operating at a stretch is not sustainable in the long run, Fedio testified that stretch operation could occur "for a short period of time, like the period of about a year." (Id. at 183 (Fedio testimony).)

The ██████████ and ██████████ capacities in Exhibit 13 stand in sharp contrast to the ██████████ capacity posited as the basis for allocation in the letter to Steves. Exhibit 13 was prepared to help make business decisions, including decisions about how to spend money and future investments. (Id. at 182 (Fedio testimony).) Experience and logic teach that, as a matter of sound business practice, companies do not make business decisions based on information they know, or believe to be, unreliable or inaccurate. That the production capacities listed in Exhibit 13 were used to make business decisions is telling and provides strong evidence to support a finding that the production capacity was

---

not its demonstrated capacity. (ECF No. 59 at 182–84 (Fedio testimony).) Fedio estimated that Dodson's demonstrated capacity was approximately ██████████ doorskins lower than the forecast. (Id. at 184.)

███████████ for standard operating days and ██████████ for stretch operating days.

Moreover, the week before allocation was declared, Fedio sent another chart to Bolan.[20] That chart was prepared to help determine whether to declare allocation. In Exhibit 12, Fedio listed the production capacity as ███████████ doorskins. (ECF No. 46-16 at 3; ECF No. 59 at 190 (Fedio testimony).)[21]

The production capacities in JELD-WEN's internal documents not only are consistent with each other but also uniformly state that JELD-WEN's production capacity is significantly over ██ ██████████ doorskins. Consequently, in the likelihood of success analysis, the Court (as a jury likely would at trial) will give controlling weight to the production capacities in the internal documents used in making business decisions.

---

[20]   Exhibit 12 to Steves' Supplemental Memorandum. (ECF No. 46-16 at 3; ECF No. 59 at 190 (Fedio testimony).)

[21]   He also added the ██████████ doorskins JELD-WEN expected to receive soon thereafter and raised the total number of doorskins to be either produced or received to ███████████ doorskins. (ECF No. 46-16 at 3; ECF No. 59 at 193-94 (Fedio testimony).)

███████████████████████████████████████████████
██████. (ECF No. 46-20 at 6; see also ECF No. 59 at 169–172 (Fedio testimony).) This influx of doorskins necessarily raises JELD-WEN's production capacity far beyond the ███████████ doorskins listed in JELD-WEN's letter to Steves. The ███████████ capacity is not part of JELD-WEN's North American production capacity, the capacity defined in Section 20, but the record shows that the ██████████████████████████████████████████ would free up approximately ███████████ doorskins in North American capacity.

42

JELD-WEN now argues that inefficiencies and operational problems at the Dodson plant account for the decline in production capacity since Fancher testified in 2018 that it was ████████. However, the Dodson problems cannot explain this ████████ drop (from ████████ to ████████). To begin, the record shows that since 2017, Dodson's production level has only decreased by approximately ████████ doorskins, not ████████. (ECF No. 45-13 at 14.)

It is correct that Castillo testified that Dodson's theoretical design capacity has decreased by ████████ doorskins. However, in contrast, JELD-WEN's business documents show that its actual production capacity has only decreased by, at most, ████████ doorskins. (ECF No. 60 at 40-41 (Castillo testimony).)

In a further effort to use Dodson's production problems to justify the contention that JELD-WEN's overall production capacity is ████████ doorskins per year, Fedio testified that Exhibit 13 included estimates, not demonstrated capacities, for the Dodson plant. (ECF No. 59 at 182-84 (Fedio testimony).) Fedio then estimated that Dodson's demonstrated capacity was approximately ████████ doorskins lower than the ████████ (standard) and ████████ (stretch) capacities included in Exhibit 13. (ECF

No. 46-17 at 4; ECF No. 59 at 184 (Fedio testimony).)[22]
Notwithstanding the claimed decline in Dodson's production levels,
JELD-WEN's overall production capacity is still higher than ▆▆
▆▆▆▆▆ doorskins both at standard and stretch operating levels,
even after taking Fedio's testimony that Dodson's demonstrated
capacity is likely ▆▆▆▆▆▆▆▆ doorskins lower than the
estimates of ▆▆▆▆▆ and ▆▆▆▆▆▆ in Exhibit 13. (ECF No. 59
at 182-84 (Fedio testimony).)

Because JW Fiber's internal business documents are more
reliable and indicative of the actual production capacity, they
are accorded controlling weight on the ▆▆▆▆▆▆ and ▆▆▆▆▆
production capacities listed within them.[23] Fedio's testimony to
the contrary is not credible. Consequently, the Court finds that,
on this record, Steves likely will prove JELD-WEN's production

---

[22]  However, it is worth noting that Dodson produced more than
▆▆▆▆▆▆▆ sellable doorskins in 2017 and still produces more
than ▆▆▆▆▆▆ total doorskins, although (after accounting
for various losses) the number of sellable doorskins decreased to
▆▆▆▆▆ in 2019. (ECF No. 45-13 at 14; ECF No. 59 at 189 (Fedio
testimony).) These figures indicate that, although Dodson might
fall short of the demonstrated capacities listed in Exhibit 13, it
has not fallen behind by over ▆▆▆▆▆ doorskins.

[23]  Additionally, the record shows that JELD-WEN anticipates
▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆. However, the Court has also considered Fedio's testimony
that Dodson produces approximately ▆▆▆▆▆▆▆▆ doorskins
than contemplated in JELD-WEN's internal documents. Because ▆▆
▆▆▆▆▆▆▆▆▆▆▆▆▆▆ and the estimated
shortage of doorskins from Dodson are approximately equal, the
Court will not deviate from the production capacities stated in
JELD-WEN's internal documents.

capacity is ████████ doorskins at a minimum and ████████ at a stretch.

In sum, the record here necessitates the conclusion that Steves has shown clearly and convincingly a strong likelihood of success on its claim that the contractually-required basis for declaring allocation did not exist and that declaring allocation breached Section 20 and Section 4 of the Supply Agreement.

### (b)  Design Shortages

The record shows that, at the time allocation was declared, the doorskin shortage was only as to two JELD-WEN doorskin styles: Rockport and Carrara.  Steves asserts that Section 20 does not allow allocation when the shortage extends to only two (of the very many) styles.  Steves is correct that Section 20 addresses JELD-WEN's "production capacity" in North America as a whole, not the styles of doorskins.  Thus, under the text of the Supply Agreement, a shortage of only two styles does not appear to animate the right of allocation as to all JELD-WEN Product ("the full range of JELD-WEN's doorskins").

JELD-WEN agrees that the Supply Agreement does not specifically address the circumstance of a shortage in only two styles.  The record is not altogether clear as to JELD-WEN's response on that point, but JELD-WEN appears to think 6 Del. C. § 2-615(b) supplies the answer.  That, however, is an argument that JELD-WEN uses to defend the mix methodology issue.  And, so

45

the issue is best addressed in Section V(A)(3) below but the answer there applies equally here.

### (3) The Alleged Mix Methodology Breach

Steves argues that, even if allocation were appropriate under Section 20, use of the mix methodology is a breach of Section 20 and Section 4 of the Supply Agreement. Section III(C)(ii) above outlines the mix methodology. In general, the method allocates, not by volume as provided in Section 20, but by style.

JELD-WEN admits that the mix methodology is not mentioned in the Supply Agreement. But, according to JELD-WEN, 6 Del. C. § 2-615 authorizes JELD-WEN to impose the mix methodology as the mode of allocation.

6 Del. C. § 2-615, which is substantively identical to UCC § 2-615, governs excuses by failure of presupposed conditions and provides, in relevant part, that:

> Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance:
>
> (a) Delay in delivery or non-delivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his or her duty under a contract for sale if performance as agreed has been made impracticable <u>by the occurrence of a contingency</u> **the non-occurrence of which was a basic assumption on which the contract was made** or by compliance in good faith with any applicable foreign or domestic governmental regulation or order whether or not it later proves to be invalid.

> (b) Where the causes mentioned in paragraph (a) affect only a part of the seller's capacity to perform, he or she must allocate production and deliveries among his or her customers but may at his or her option include regular customers not then under contract as well as his or her own requirements for further manufacture. He or she may so allocate in any manner which is fair and reasonable.
>
> (c) The seller must notify the buyer seasonably that there will be delay or non-delivery and, when allocation is required under paragraph (b), of the estimated quota thus made available for the buyer.

6 Del. C. § 2-615 (emphasis added).

"Discharge by reason of impracticability requires proof of three elements. First, the party claiming discharge must establish the occurrence of an event the non-occurrence of which was a basic assumption of the contract. The event need not be unexpected, unforeseeable, or even unforeseen. The non-occurrence of that event, however, must have been a fundamental assumption on which both parties made the contract." Freidco of Wilmington, Ltd. v. Farmers Bank, 529 F. Supp. 822, 825 (D. Del. 1981) (internal citations omitted). "Second, it must be shown that continued performance is not commercially practicable. Although the standard of impracticability is not impossibility, neither is it mere impracticability." Id. "The burden of proving the elements of [commercial impracticability] is on the party seeking to avoid performance." In re Westinghouse Elec. Corp., 517 F. Supp. 440,

450 (E.D. Va. 1981). "Finally, the party claiming discharge must show that it did not expressly or impliedly agree to perform in spite of impracticability that would otherwise justify his nonperformance." Freidco of Wilmington, Ltd., 529 F. Supp. at 825-26. In other words, "[t]hree elements must be proven before excuse becomes available under § 2-615: (1) the seller must not have assumed the risk of some unknown contingency; (2) the nonoccurrence of the contingency must have been a basic assumption underlying the contract; and (3) the occurrence of that contingency must have made performance commercially impracticable." Roy v. Stephen Pontiac-Cadillac, Inc., 543 A.2d 775, 777 (Conn. App. Ct. 1988) (quoting Iowa Elec. Light & Power Co. v. Atlas Corp., 467 F. Supp. 129, 134 (N.D. Iowa 1978)) (internal quotation marks omitted).

For 6 Del. C. § 2-615(a) to allow for allocation (even when the Supply Agreement itself does not), JELD-WEN must first establish that the Supply Agreement assumed that an increase in demand such that demand exceeded the supply of doorskins was a contingency the non-occurrence of which was a basic assumption on which the Supply Agreement was made. It is difficult to see how that showing can be made. The very existence of the allocation provision is strong evidence that Steves and JELD-WEN contemplated a situation where demand for doorskins would exceed supply. Indeed, Section 20 of the Supply Agreement explicitly provides for

allocation in the event that "JELD-WEN recognizes an actual or anticipated shortage in production capacity over the current or anticipated demand . . . ." (Ex 1 ¶ 20.)

JELD-WEN invokes § 2-615 on the theory that Masonite's price increase was unforeseeable and a "shot heard around the world" and that this price increase is thus the contingency the non-occurrence of which animates § 2-615. (See ECF No. 60 at 226–27.) This argument is not at all persuasive. Although market participants may have been surprised to see sizeable increases in door prices, the record does not disclose how JELD-WEN can show that a basic assumption of the Supply Agreement was that the price of doors would not change. Such an assumption would appear to be entirely illogical. Furthermore, that demand would vary based on doorskin style is self-evident. JELD-WEN has offered nothing to the contrary on either point. Nor has JELD-WEN offered evidence that it was a basic assumption of the Supply Agreement that demand would be equal across all doorskin styles. For the foregoing reasons, it appears on this record that the finder of fact most likely would find that the Supply Agreement assumed that, on occasion, demand for doorskins might exceed supply and did not assume that door prices would not increase. Thus, JELD-WEN is not likely to clear the first hurdle.

In other words, JELD-WEN is quite unlikely to prove that a significant increase in price by Masonite in which JELD-WEN joined

or an increase in demand was "a contingency, the non-occurrence of which was a basic assumption on which the [Supply Agreement] was made." 6 Del. C. § 2-615(a).[24] And, unless that showing can be made, the allocation cannot be justified by relying on § 2-615(b).[25]

### (c)    The Allocation Method's Unreasonableness

Under the allocation provisions in Section 20 of the Supply Agreement, Steves is entitled to ███[26] of JELD-WEN's production volume during allocation. (See, e.g. ECF No. 46 at 2.) Assuming that allocation was properly declared, if, as is clearly shown, the North American production capacity is ███████ doorskins at a minimum and ████████ at a stretch, Steves would be entitled to ██████ of ██████████ doorskins under standard operation and ██████ of ██████████ under stretch operation. For the reasons stated below, Steves has shown a strong likelihood of success in proving that the Supply Agreement requires that Steves' requirements be

---

[24]    In so concluding, the Court is not foreclosing disposition of this issue as a matter of law.

[25]    The state of affairs as to the proof on the first two elements under the doctrine of commercial impracticability makes it unnecessary to consider whether JELD-WEN has shown that it did not expressly or impliedly agree to perform in spite of any impracticability that would otherwise justify non-performance.

[26]    Although Steves initially contested this figure, (ECF No. 7-1 ¶ 33), the parties have since agreed that Steves is entitled to ██████ of JELD-WEN's production, (see ECF No. 60 at 143, 181-82), and the Court will not examine this percentage in light of its previous finding that JELD-WEN breached the Supply Agreement by not supplying Steves' Q4 orders.

met before JW Door is supplied and that the mix methodology does not adhere to that requirement in the Supply Agreement. Thus, Steves has clearly and convincingly shown a strong likelihood that the mix methodology is neither fair nor reasonable.

### (i) JW Door Is Not a Contract Customer.

The parties fiercely dispute whether Steves' supply of doorskins during allocation can be reduced by providing doorskins to JW Door, as is done in the mix methodology. Section 20 of the Supply Agreement states, in relevant part, that:

> During the allocation period, STEVES will be allowed to purchase up to the percentage number of JELD-WEN production volume during allocation provided by JELD-WEN in the January 30 notification referenced above, **provided that volumes purchased by customers to which JELD-WEN has no commitment to sell under a supply agreement cannot limit JELD-WEN's provision of volume requested by STEVES during allocation.**

(Ex. 1 § 20 (emphasis added).) The Supply Agreement was executed on May 1, 2012. (<u>Id.</u> at 1.)

It is undisputed that there is no intracompany supply agreement by which JW Fiber is committed to supply doorskins to JW Door. (ECF No. 60 at 10 (Castillo testimony).) However, whether JW Fiber considers JW Door a "customer" is the subject of some dispute. Castillo contends that JW Fiber does not consider, or refer to, its door plants (JW Door) as customers. (<u>Id.</u> at 95 (Castillo testimony).) However, JW Fiber's own internal documents

undercut its position. For example, a PowerPoint created by Bolan, Fedio, and Castillo summarizes the allocation provision in other contract customers' supply agreements as requiring ███████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

(Hearing Ex. 7 at 4 (emphasis added) (internal emphasis omitted); see also ECF No. 60 at 101-02 (Castillo testimony).) Although Castillo claimed that this sentence "separat[ed] Jeld-Wen from that -- from calling ourselves customers" and reiterated that "[w]e don't refer to ourselves as customer[s]," (ECF No. 60 at 102), the definition of "including" belies these assertions. The word "including" is "used for saying that a person or thing is part of a particular group or amount." Including, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/including. The "[t]erm may, according to context, express an enlargement and have the meaning of *and* or *in addition to*, or merely specify a particular thing already included within general words theretofore used." Black's Law Dictionary (6th ed. 1990). The phrase "███

██████████████████████████████████████████," clearly refers to a specific group—"████████████████████"—and uses the word "include" to specifically single out "██████████████████" (██

████) as a customer already included within the general words "███

████████████."

52

The business charts listing "JELD-WEN IC [Internal Consumption]" as a "customer" further support the conclusion that JW Doors is a customer within the meaning of Section 20. (See ECF No. 45-22 at 3-4, 6; see also ECF No. 60 at 102 (Castillo testimony) ("Q. And among the customers listed here is Jeld-Wen internal consumption; right, sir? A. Correct.").) Thus, by virtue of the common meaning of the text of the Supply Agreement, Castillo's testimony, and internal business documents, Steves has shown a substantial likelihood that it will prove that: (1) JW Door is a customer for purposes of applying Section 20; and (2) JW Door does not have a contract. Consequently, there is clear and convincing evidence that Steves will prove that JELD-WEN has breached the Supply Agreement by limiting Steves' doorskin supply during allocation to supply JW Door. Although JELD-WEN's management now believes that it was "inconceivable . . . to omit JELD-WEN," (ECF No. 59 at 137 (Bolan testimony)), the Supply Agreement seems to require just that.[27]

---

[27]    Philip Orsino ("Orsino"), the lead negotiator for the Supply Agreement submitted a declaration stating that:

███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████
███████████████████████████████████     (ECF No. 45-20 ¶ 4.)

This statement is vague and unconvincing. At most, it could mean

However, even if, as JELD-WEN seems to contend on occasion, the Supply Agreement were ambiguous on the point, ███████████ ███████████████████████████████████████████████████ provide strong evidence that would resolve any perceived ambiguity.  This is because ███████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████, whereas the Supply Agreement contains no such provision and actually provides otherwise.  It is therefore beneficial to examine ███████████████████████████████████.

███████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████

---

that Orsino is stating JELD-WEN's view.  And, a unilateral perception does not a contract make.  Moreover, JELD-WEN did not bring Orsino to trial for cross-examination.  The Court does not credit his declaration.

(Hearing Ex. 4 at 2 (emphasis added).) ████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████. (ECF No. 60 at
105.)[28]

████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████. (ECF No. 46-21 at 3.) ████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████
████████████. (Id. at 2.)

████████████████████████████████████████████████████████
██████████████████████████



---

[28] There seems to be no dispute over what the metadata show.

(Hearing Ex. 8 at 3 (emphasis added).) ███████████████

███████████████████████████████████████████████████

███████████████████████. (*Id.* at 1.)

███████████████████████████████████████████

███████████████████████████████████████████████████

███████████. (Hearing Ex. 5 at 1; see also ECF No. 60 at 17.)

███████████████████████████

(Hearing Ex. 5 at 6 (emphasis added).) ███████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████

███████████. (*Id.* at 1.)

███████████████████████████████████████

███████████████████████████████████████████████████

 (Hearing Ex. 6 at 1.)

(Id. at 6 (emphasis added).)

(Id. at 1.)

JELD-WEN objects to consideration of these contracts as parol evidence. The Delaware statute governing parol evidence, identical to UCC § 2-202, provides that:

> Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented

> (a) By course of performance, course of dealing, or usage of trade (§ 1-303); and
>
> (b) By evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

6 Del. C. § 2-202.    However, "[i]n construing an ambiguous contractual provision, a court may consider evidence of prior agreements and communications of the parties as well as trade usage or course of dealing." Eagle Indus., Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1233 (Del. 1997).    "This is true notwithstanding the presence of a routine integration clause . . . ." Id. at 1233 n.10.

In other words, although "the parol evidence rule bars the admission of evidence from outside the contract's four corners to vary or contradict [] unambiguous language . . . , where reasonable minds could differ as to the contract's meaning, a factual dispute results and the fact-finder must consider admissible extrinsic evidence." GMG Capital Invs., LLC v. Athenian Venture Partners I, L.P., 36 A.3d 776, 783 (Del. 2012). Thus, if "the Court determines that the language is ambiguous, then all objective extrinsic evidence is considered: the overt statements and acts of the parties, the business context, prior dealings between the parties, and other business customs and usage in the industry." In re Explorer Pipeline Co., 781 A.2d 705, 713-14 (Del. Ch. 2001) (quoting Bell Atl. Meridian Sys. v. Octel Commc'ns Corp., No. Civ.

A. 14348, 1995 WL 707916, at *6 (Del. Ch. Nov. 28, 1995)) (internal quotation marks omitted).

Although the Court has concluded that Steves has a substantial likelihood of proving that the language of the Supply Agreement is not ambiguous and that it prohibits JELD-WEN from limiting Steves' doorskin supply during allocation in order to supply the needs of JW Door, the Court would reach the same conclusion after examining the parol evidence offered—*i.e.*, ██████████████████████
████████████████████████. ████████████████
████████████████████████████████████████
████████████████████████████████████████
███████. And ████████████████████████████
████████████████████████████. ████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████. Indeed, ████████
████████████████████████████████████████
████████████████████████████. Although requiring JELD-WEN to supply Steves first will inevitably impact JW Door to an extent, the Supply Agreement's allocation provision requires that to occur because, according to Castillo, Steves "got a better deal," than did ██████ and ████████. (ECF No. 46-5 at

46:4-12 (Castillo Dep.).) [29] And, on this record, Steves clearly and convincingly has made a strong showing that JELD-WEN will have to comply with that deal.

Consequently, because the Supply Agreement does not explicitly provide that JELD-WEN may supply itself and limit Steves' orders and ████████████████████████████████████ ████████████████████████████████████████████,

to the extent there is any ambiguity in the Supply Agreement's allocation provision, Steves has significantly added to the substantial likelihood of proving that Section 20 does not permit JELD-WEN to limit Steves' doorskin supply under allocation to service JELD-WEN's internal needs and that, by doing precisely that, the mix methodology is neither fair nor reasonable.

### (ii) Caps on Doorskin Styles and Forfeiture

Under allocation, Steves is entitled, as provided in Section 20, to █████ of JELD-WEN's doorskins each week. However, under the mix methodology, within this █████ cap, the methodology further limits purchases based on doorskin styles. JELD-WEN explained its mix methodology to Steves as follows:

---

[29] However, given that JELD-WEN's production capacity is at least ██████████ doorskins higher than JELD-WEN claimed and that JELD-WEN is capable of producing even more doorskins in its stretch capacity for a year, this reduction may be smaller than anticipated. Thus, it may be difficult but it appears that JELD-WEN has the capacity to supply all of Steves' orders, subject to statutory reasonableness requirements, and must do so before supplying JW Door.

> Methodology: We will run the allocation based on your historical mix. This not only represents our demonstrated capacity, but it provides the best opportunity for us to deliver to your needs. We will offer an exception-based system for design families or SKUs that you may need outside of this. We ask that you include design family and size needs and we will identify if we can run this and in what, if any quantity, and then establish a shipment timing.
>
> \*\*\*
>
> Allocation Process: We have developed an Allocation Model that defines usage by design family by customer based on 2019 actual shipments.
>
> We will run our actual net finished production through the Allocation Model. We will then provide you with an Allocation Order Guideline that captures total skins available by design family for the week. This will be calculated using your allocation percentage. We will provide this to you on Tuesdays . . . .

(ECF No. 7-1 at 14.) In other words, under the mix methodology, "[e]ach JELD-WEN external doorskin customer is entitled to the same percentage of a given design as that customer purchased in the preceding year." (ECF No. 45-4 ¶ 41.) Ostensibly, "[t]his allocation methodology applies to all of JELD-WEN's doorskin customers, including JELD-WEN Door." (Id. ¶ 42.)

As discussed above, 6 Del. C. § 2-615(a) does not allow for allocation. However, even if it did, JELD-WEN's mix methodology is neither fair nor reasonable. 6 Del. C. § 2-615(b) provides that:

> Where the causes mentioned in paragraph (a)
> affect only a part of the seller's capacity to
> perform, he or she must allocate production
> and deliveries among his or her customers but
> may at his or her option include regular
> customers not then under contract as well as
> his or her own requirements for further
> manufacture. **He or she may so allocate in any**
> **manner which is fair and reasonable.**

(Emphasis added.)[30]

It is undisputed that, under the mix methodology, JW Fiber decides what mix of doorskins to produce based on JW Door's needs and does not base its mix on its independent doorskin customers' demand. (ECF No. 59 at 91-92 (Bolan testimony).) In other words, JW Fiber increases or decreases its production of certain mixes in response to increased or decreased demand from JW Door, without regard for the independent doorskin customers' demand. (Id. at 92-93 (Bolan testimony).) Thus, the number of doorskins of each style JELD-WEN's independent doorskin customers receive under the mix methodology depends on how many doorskins of each are produced. (ECF No. 60 at 49-50 (Castillo testimony).)[31]

---

[30]    Of course, as explained in Section V(A)(3) above, the proviso ("but may . . . own requirements") is not available to JELD-WEN because of the text of Section 20 of the Supply Agreement.

[31]    However, most of the demand (60%) for doorskins comes from JW Door. (Id. at 49 (Castillo testimony); see also ECF No. 46-5 at 135:1-6 (Castillo Dep.).) Consequently, under the mix methodology, because JW Door is the largest consumer of the doorskins JW Fiber produces, if JW Door's demand for a certain type of doorskin—such as the Santa Fe—goes down by 10% and Steves' demand for the same Santa Fe doorskin goes up by 10%, JELD-WEN would produce fewer Santa Fe doorskins and Steves would

In sum, the mix methodology clearly favors JELD-WEN to the detriment of its independent doorskin customers, including Steves. Therefore, there is a substantial likelihood that Steves will prove this method of allocation to be neither fair nor reasonable.

Moreover, there is a substantial likelihood that Steves will prevail on its position that binding Steves to the purchases it made in 2019 is not fair or reasonable because even JELD-WEN acknowledges that the demand for certain types of doorskins fluctuates each year, even if JELD-WEN contends that these changes are not significant. (See ECF No. 59 at 93-95 (Bolan testimony).) The caps under the mix methodology thus prevent Steves from adjusting to the current demand of its own door customers. Given the text of Section 4 and the course of dealing under the Supply Agreement (which does not limit Steves by style and which has, since 2012, allowed Steves to order in accord to the demand for its product), there is a substantial likelihood that the mix methodology will be proved to be neither fair nor reasonable.

---

consequently be allocated fewer Santa Fe doorskins. (ECF No. 60 at 51-54 (Castillo testimony).) Conversely, if JW Door's demand for Santa Fe doorskins increased by 10% and Steves' demand decreased by 10%, JELD-WEN would produce more Santa Fe doorskins. (Id. (Castillo testimony).) In weeks where Steves does not order all of the doorskins available to it in a given week, Steves forfeits those doorskins, even if Steves was not offered sufficient numbers of the same doorskin style in a previous week. (See ECF No. 59 at 130-31 (Bolan testimony).) These forfeited doorskins are subsequently designated for JW Door. (Id. at 164 (Fedio testimony).)

The Supply Agreement defines the term "Product" as "the full range of JELD-WEN molded doorskin products." (Ex. 1 § 1.) Nowhere in the Supply Agreement does it provide that JELD-WEN can limit orders on each doorskin style, as opposed to only capping the total number of doors ordered. (See generally Ex. 1; see also ECF No. 59 at 144 (Bolan testifying that Supply Agreement does not address mix).) Instead, the allocation provision provides that "JELD-WEN shall provide STEVES with a percentage number **regarding its Product** . . . ." (Ex. 1 ¶ 20 (emphasis added).) Consequently, this provision, given its literal meaning, specifies that, under allocation, Steves can purchase up to a certain percentage of the full range of JELD-WEN molded doorskin products. There appears to be nothing in this provision to suggest that, during allocation, an additional limitation on the basis of style of doorskin may be imposed to limit that contractual right. Nor is there on the record as it now stands evidence to support such a limitation. Instead, the allocation provision contemplates that Steves may purchase up to ▮▮▮▮ of any of JELD-WEN's doorskins. Thus, on the current record, Steves clearly and convincingly has shown that it is likely to prevail on its position that, under the Supply Agreement, Steves is entitled to receive doorskins of any style.

In like fashion, Steves likely will prevail in its assertion that the forfeiture policy also makes the mix methodology unreasonable and unfair because the forfeiture policy provides

additional doorskins only to JW Door without giving independent doorskin customers the option to purchase doorskins in inventory. By giving JW Door more doorskins than it would normally receive under its allocation share, the forfeiture policy gives JW Door the opportunity to produce more doors and increase its share of the door market in which Steves competes.

The motive behind adopting the mix methodology is also probative of whether that allocation methodology is fair and reasonable. The publicly-stated reason for introducing the mix methodology was to ensure that customers were not "limit[ed] or zero[ed] out . . . of a particular family." (ECF No. 60 at 69 (Castillo testimony).) However, Bolan's notes indicate that she believed that an



(ECF No. 46-8 at 2.) Instead of implementing this ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ allocation scenario, JELD-WEN chose to implement the mix methodology. (ECF No. 59 at 84 (Bolan testimony).) This decision was made, even though Fedio had ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

███████████████████████████████████████

████████████████. More specifically, Fedio ██████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████ (Hearing Ex. 3 at 3.) That method would have allowed customers to order doorskins without a cap for styles not in shortage and to receive "the overall percentage that's determined from the allocation formula" for styles that are in shortage. (See ECF No. 59 at 200-02 (Fedio testimony).)

However, JELD-WEN chose not to implement this version of allocation because, purportedly, "you can't be partially on allocation." (Id. at 202 (Fedio testimony).) But there is persuasive evidence that JELD-WEN rejected the Fedio approach only because it was not helpful to JELD-WEN. Although it is natural for JELD-WEN to want to act in its own self-interest, because of its Supply Agreement with Steves and the foregoing evidence, Steves has a substantial likelihood of proving that the mix methodology is not one such method.

### (4) Impact of Breaches on Steves

As discussed in more detail below, JELD-WEN's breaches of the Supply Agreement have caused significant damage to Steves. The Court will address this issue further when discussing whether Steves has shown irreparable harm. For the reasons stated above,

Steves has shown a clear and convincing probability that it is likely to succeed at trial on its breach of contract claims.[32]

## B.    Irreparable Harm

The second facet of the analysis is whether Steves has demonstrated that it "will likely suffer irreparable harm absent an injunction . . . ." League of Women Voters v. North Carolina, 769 F.3d 224, 236 (4th Cir. 2014). The Supreme Court's "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008) (internal emphasis omitted). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of an injunction are not enough." Roe v. Dep't of Def., 947 F.3d 207, 228 (4th Cir. 2020) (quoting Di Biase v. SPX Corp., 872 F.3d 224, 230 (4th Cir. 2017)) (internal quotation marks and alteration omitted).  Further, the prospect must be for immediate irreparable injury, not an injury far down the road.    See, e.g., Direx Israel, Ltd. v. Breakthrough Med. Corp., 952 F.2d 802, 812 (4th Cir. 1991).

"The possibility of permanent loss of customers to a competitor or the loss of goodwill may give rise to irreparable harm." Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc.,

---

[32]    And, also on Count FOUR to the extent it is tied to COUNT THREE.

700 Fed. App'x 251, 263 (4th Cir. 2017) (quoting <u>Multi-Channel TV</u> <u>Cable Co. v. Charlottesville Quality Cable Operating Co.</u>, 22 F.3d 546, 552 (4th Cir. 1994)) (internal quotation marks and alteration omitted). "And while monetary damages generally do not give rise to irreparable harm, irreparable harm may still occur in extraordinary circumstances, such as when monetary damages are unavailable or unquantifiable." <u>Id.</u>

Steves has shown that it is likely to suffer irreparable harm in the absence of an injunction. Steves has had to inform ████████ ███████████████████████████████████████████████████ ██████████ that Steves is unable to fill their current and future orders. (ECF No. 46-1 ¶ 81.) In addition to being unable to fill the orders for existing customers, Steves has also shown that it has lost opportunities to acquire new business. For instance, a potential customer, ███████████████████████████████████ █████████████████████████████████████████████████████ ████████████████████████████████████ (ECF No. 7-1 ¶ 40 (quoting ███████████████████████████████████).) Although the lost profits from current orders Steves was unable to fill are quantifiable, Steves' monetary damages from losing potential future sales are "difficult, if not impossible, to measure fully." <u>W. Indus.-N., LLC v. Lessard</u>, No. 1:12-cv-177, 2012 WL 966028, at *5 (E.D. Va. Mar. 21, 2012) (quoting <u>Fid. Glob.</u> <u>Brokerage Grp. v. Gray</u>, No. 1:10-cv-1255, 2010 WL 4646039, at *3

(E.D. Va. Nov. 9, 2010)) (internal quotation marks omitted).
Additionally, in Handsome Brook Farm, LLC, 700 Fed. App'x 251, the
Fourth Circuit concluded that the district court "appropriately
exercised its discretion in finding that Handsome Brook would
suffer irreparable harm" because "Handsome Brook had already lost
customers, and [the conduct sought to be enjoined] may result in
further loss of customers." Id. at 263. As in Handsome Brook
Farm, LLC, Steves has already lost existing customers and future
business that is not speculative (███) because of JELD-WEN's
breaches of the Supply Agreement and allowing JELD-WEN to continue
with allocation reasonably can be expected to lead to further
losses of both sorts.

That several of Steves' former customers have entered into
long-term contracts with either JELD-WEN or Masonite is strong
proof of irreparable injury. ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████ (ECF No. 46-1 ¶ 85.) Other of Steves'
former customers have entered into supply agreements or other
agreements with Masonite or JELD-WEN, making it highly unlikely
that they will be able to return their business to Steves in the
foreseeable future. (Id. ¶ 86.) For instance, ████████████████

████████████████████████████████████████████████. (Id. ¶ 89.)
Steves likely will not be able to get customers like ████████

69

████████ back, at least for the term of the new agreements with Masonite and JELD-WEN. This actual loss of customers and the threat of permanent loss of customers support a finding of irreparable harm. See Update, Inc. v. Samilow, 311 F. Supp. 3d 784, 796 (E.D. Va. 2018) ("In this case, plaintiff is harmed not only by the loss of particular deals or particular work from clients, but plaintiff also risks losing future business opportunities with the clients defendant has diverted. Thus, plaintiff has sufficiently shown a risk of irreparable harm.").

In that regard, the record shows that JW Door is taking advantage of Steves' inability to service its customers to solicit these customers' business for JW Door. That is further proof of irreparable harm.

Lastly, the loss of goodwill also supports a finding of irreparable harm. In an industry in which timing is important, (see ECF No. 46-1 ¶ 83), Steves' reputation has been and continues to be tarnished whenever Steves is unable to fill its customers' orders. Although JELD-WEN contends that many of Steves' clients still view Steves favorably, (ECF No. 45 at 25-26), Steves shorting customers and being unable to fulfill orders gives it the reputation of being unreliable. See Handsome Brook Farm, LLC v. Humane Farm Animal Care, Inc., 700 Fed. App'x 251, 263 (4th Cir. 2017) ("The business's reputation continues to be tarnished as questions about the reliability of its labeling continue to

circulate."). Consequently, for the aforementioned reasons, the Court finds that Steves is likely to suffer irreparable harm absent an injunction.

## C. Balance of Hardships

The next step of the analysis is whether Steves has demonstrated that the balance of hardships weighs in its favor. League of Women Voters v. North Carolina, 769 F.3d 224, 236 (4th Cir. 2014). "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) (quoting Amoco Prod. Co. v. Vill. of Gambell, 480 U.S. 531, 542 (1987)) (internal quotation marks omitted).

Although the Court finds that Steves is likely to suffer irreparable harm absent an injunction, the Court also recognizes that an injunction will impact JELD-WEN. To demonstrate JELD-WEN's asserted hardship,

(ECF No. 60 at 88 (Castillo testimony).)

71

(ECF No. 45-15 at 8.)  In addition ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮.  (_Id._)  However, JELD-WEN offered no
evidence that would support these assertions or that would allow
Steves or the Court to test the validity of these conclusory
statements of loss.  The Court cannot rely on conclusory
statements.

    Additionally, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮.  (_Id._)  ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮  (ECF No. 60 at 83 (Castillo testimony).)
But orders of that magnitude have not been made.  ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮  (_Id._ at 79-81 (Castillo
testimony); _see also_ ECF No. 45-15 at 8.)  ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋. (See ECF No. 59 at 171–75 (Fedio testimony); ECF No. 60 at 80, 85 (Castillo testimony).) Consequently, although the Court recognizes that JELD-WEN would suffer some hardship, the Court cannot place significance on the ▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋▋.

JW Fiber has the capacity to fill all of Steves' orders if it reduces the number of doorskins it supplies to JW Door. (ECF No. 60 at 8 (Castillo testimony).) Indeed, Castillo testified that, apart from Rockport and Carrara doorskins, JW Fiber could supply Steves and all of its other independent doorskin customers if JELD-WEN reduced JW Door's supply. (Id. at 9–10 (Castillo testimony).)

To supply Steves' orders will affect the supply of Rockport and Carrara doorskins. In 2019, JW Fiber shipped ▋▋▋▋ Carrara doorskins to JW Door; ▋▋▋▋ to Steves; ▋▋▋ to ▋▋; ▋▋ to ▋▋▋; ▋▋ to ▋▋; and ▋▋ to ▋▋▋. (ECF No. 45-22 at 3.) In 2019, JELD-WEN shipped ▋▋▋▋ Rockport doorskins to JW Door; ▋▋▋ to Steves; ▋▋▋ to ▋▋; to ▋▋; ▋▋ to ▋▋; and ▋ to ▋▋▋. (Id.) Although these figures represent actual shipments, not orders, it is clear that JELD-WEN ships more Rockport doorskins to itself than it does to its independent doorskin customers combined, including Steves.

However, with respect to the Carrara doorskins, the difference is less stark, and JELD-WEN only ships to itself ███ more doorskins than it ships to Steves. Based on these figures, Castillo conceded that JELD-WEN would only run out of Carrara and Rockport doorskins if Steves and the other independent doorskin customers approximately doubled their orders. (ECF No. 60 at 60-63 (Castillo testimony).) And Castillo agreed that, although Steves sharply increased its orders, it did not double them. (See id. at 63-64 (Castillo testimony).)

The Court also notes that any hardship stems from JELD-WEN's obligations under the Supply Agreement—in other words, any hardship to JELD-WEN stems from it being required to stop breaching the Supply Agreement. Consequently, the "balance of [equities] tips in [Steves'] favor, as [JELD-WEN] will suffer no unjustifiable hardship by complying with [its] contractual obligations." Grout Doctor Glob. Franchise Corp. v. Groutman, Inc., No. 7:14-cv-105, 2015 WL 2353698, at *7 (E.D.N.C. May 15, 2015).

D.    Public Interest

The final facet of the analysis is whether Steves has demonstrated that the injunction is in the public interest or will not adversely affect the public interest. League of Women Voters v. North Carolina, 769 F.3d 224, 236 (4th Cir. 2014). "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the

extraordinary remedy of injunction." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) (quoting Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982)) (internal quotation marks omitted).

The law of both the Fourth Circuit and Delaware favor enforcements of contracts. "Public policy is usually made in the face of competing considerations, and in the context of this case the primary such consideration is freedom of contract . . . [T]he most enlightened judicial policy is to let people manage their own business in their own way, unless the ground for interference is very clear." Smithy Braedon Co. v. Hadid, 825 F.2d 787, 790 (4th Cir. 1987) (quoting Dr. Miles Med. Co. v. John D. Park & Sons Co., 220 U.S. 373, 411 (1911)) (internal quotation marks omitted). Similarly, "Delaware courts are strongly in favor of enforcement of contracts freely entered into by parties . . . ." O'Leary v. Telecom Res. Serv., LLC, No. 10C-03-108, 2011 WL 379300, at *5 (Del. Super. Ct. Jan. 14, 2011); see also Libeau v. Fox, 880 A.2d 1049, 1056 (Del. Ch. 2005) ("When parties have ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement, and will only interfere upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract.").

Because the Supply Agreement is a valid and binding contract into which both Steves and JELD-WEN entered voluntarily and the "public has an interest in protecting the legitimate expectations of parties to a contract," Update, Inc. v. Samilow, 311 F. Supp. 3d 784, 796 (E.D. Va. 2018), the Court finds that it is in the public interest to issue a preliminary injunction.

The Court must, of course, pay careful attention to the potential impact of an injunction on JELD-WEN's other independent doorskin customers—███, ███, ███, and ███. A showing that fulfilling Steves' orders would require that JELD-WEN stop supplying its independent doorskin customers entirely would be evidence that would give pause for concern. However, JELD-WEN's own witness testified that JELD-WEN was capable of filling Steves' orders by taking away doorskins from JW Door. (ECF No. 60 at 8-9 (Castillo testimony).) More specifically, Castillo testified that:

> Q. My question, sir, is if you take the amount of door skins that Steves is ordering, not the number that Jeld-Wen is shipping it but the number that Steves is ordering, Jeld-Wen has plenty of capacity to fill those orders even if it means reducing Jeld-Wen's own portion of the door skins it's giving itself today; right?
>
> A. Yes.
>
> Q. And, similarly, because Jeld-Wen is allocating the majority of its skins to itself today, even if Steves received

everything it's ordering today, it could theoretically fill all of the orders that independent companies are making as well; right? It just might have to make some additional sacrifices from its own share?

A. In total, yes. In mix, no . . . I believe specifically on Rockport and Carrara, the demand from Steves would outstrip everybody else's.

\*\*\*

Q. So to be clear, the only styles that you believe would be short in that circumstance are the Rockport and Carrara styles; right, sir?

A. They are the ones that come to mind.

Q. As you sit here today, you can't think of any other styles you would be short of; correct?

A. Correct.

(Id. at 8–10.) Although Castillo suggested that JELD-WEN would have to reduce its other independent doorskin customers' supply of Rockport and Carrara doorskins, the Court must assess those remarks in light of Fedio's testimony that: (1) JELD-WEN is currently not operating at stretch capacity; (2) by the end of March 2020, JELD-WEN will have received additional Rockport dies; and (3) JELD-WEN "has additional Carrara dies in the works." (ECF No. 59 at 174–75, 178 (Fedio testimony).) Additionally, the Court notes that Castillo conceded that JELD-WEN would only run out of Carrara and Rockport doorskins if Steves and the other independent doorskin customers doubled their orders, a prospect for which there is no

evidentiary support.[33] (ECF No. 60 at 60-63 (Castillo testimony).) And, according to Bolan, the demand for Rockport and Carrara doorskins is diminishing. (ECF No. 59 at 78 (Bolan testimony that demand was "tapering off"); see also ECF No. 59 at 174-75 (Fedio testimony)(Q. Well, you didn't purchase the Carrara dies as promptly as the Rockport dies because you think the demand for Carrara will actually fall off soon; right? A. That's my personal opinion, yes.").) Consequently, the record shows that JELD-WEN will not have to deprive ████, ████, ████, or ████ of their doorskin supply in order to service Steves as required by the Supply Agreement.

In balancing the hardships, it is necessary to assess what impact, if any, the coronavirus (COVID-19) spread has, or reasonably may be expected to have, on the parties and on the public interest. To that end, the Court, *sua sponte*, asked the parties to submit briefing on the question. The parties submitted simultaneous opening[34] and reply[35] briefs.

---

[33] And, if Steves were to try to take unfair advantage of the injunction by that or any other means, JELD-WEN can ask the Court to intervene.

[34] JELD-WEN'S SECOND SUPPLEMENTAL BRIEF IN OPPOSITION TO STEVES' MOTION FOR PRELIMINARY INJUNCTION (ECF No. 75) ("JELD-WEN Opening"); STEVES AND SONS, INC.'S MEMORANDUM REGARDING CURRENT CIRCUMSTANCES (ECF No. 76) ("Steves Opening").

[35] JELD-WEN'S RESPONSE TO STEVES' MEMORANDUM REGARDING CURRENT CIRCUMSTANCES (ECF No. 92) ("JELD-WEN Reply"); STEVES AND SONS, INC.'S RESPONSE TO JELD-WEN'S SECOND SUPPLEMENTAL BRIEF IN

Without doubt, the parties, like the rest of the nation, are affected by the COVID-19 spread. And, like all businesses that are permitted to operate under current governmental restrictions, both parties face many challenges. Upon consideration of the briefs and supporting information, the Court concludes that the foregoing analysis respecting the balance of hardships and the public interest remain unchanged.

JELD-WEN argues that its own interest and the public interest militate against an injunction. However, the record discloses that, the COVID-19 spread notwithstanding, JELD-WEN's production capacity has not been reduced.[36] And, nothing in the current circumstances alters the analysis that there should have been no allocation or that, even if allocation was permitted, the needs of JW Door are not to be taken into account in an allocation insofar as Steves is concerned. Nor is there evidence that the COVID-19 spread affects the analysis of the validity, reasonableness, or fairness of the mix methodology.

The record also is that Steves has an increase in orders from its customers. But, although demand for Steves' doors is up, the supply of doorskin remains as shown in the record with the same

---

OPPOSITION TO STEVES' MOTION FOR PRELIMINARY INJUNCTION (ECF No. 93) ("Steves Reply").

[36] The Towanda plant was idle for about 100 hours while JELD-WEN secured a listing as an essential business. But this idleness was temporary.

attendant harmful consequences: Steves cannot meet its obligations or take on new customers and continues to suffer the harm outlined in Section V(B).

JELD-WEN argues that the issuance of an injunction is foreclosed because of the volatility of the COVID-19 spread and the possible future damage it will cause. JELD-WEN cites Real Truth About Obama, Inc. v. FEC, 575 F.3d 342, 349 (4th Cir. 2009), and Billups v. City of Charleston, 194 F.Supp.3d 452, 479 (D.S.C. 2016), in support of that point. Neither case remotely resembles the record in this case.

Nor is the Court persuaded by JELD-WEN's argument that an injunction would require ongoing judicial supervision to assure that JELD-WEN is abiding by the injunction. The Court has confidence that JELD-WEN will obey orders of the Court. But, should supervision become necessary, a Special Master could be appointed to that end.

For the foregoing reasons, the Court concludes that the COVID-19 spread provides no reason to change the analysis of the balance of hardship or public interest factors set out above.

### CONCLUSION

For the foregoing reasons, Steves' MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION (ECF No. 2) will be

granted to the extent that an Order of Preliminary Injunction will be issued.

It is so ordered.

_____ /s/ REP
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: April 10, 2020