**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION**

| | |
|---|---|
| STEVES AND SONS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 3:20-cv-00098 |
| | ) |
| JELD-WEN, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

**JELD-WEN, INC.'S MEMORANDUM IN SUPPORT OF MOTION FOR
RULE 65(c) BOND REGARDING APRIL 10, 2020 PRELIMINARY INJUNCTION**

Defendant JELD-WEN, Inc. ("JELD-WEN"), through its undersigned counsel, hereby moves this Court pursuant to Rule 65(c) of the Federal Rules of Civil Procedure to require that Plaintiff Steves & Sons, Inc. ("Steves") post a bond of ▬▬▬▬▬ as security for the preliminary injunction order the Court entered in this case on April 10, 2020.  *See* ECF No. 121 (Order), 123 (Opinion).  As discussed below, this requested amount is necessary to serve as security against the substantial harm and prejudice JELD-WEN will suffer from complying with the Court's preliminary injunction order in the event that order proves wrongfully issued.

## I.     The Court Should Require Steves To Post A Rule 65(c) Bond of ▬▬▬▬▬.

Federal Rule of Civil Procedure 65(c) states that a "court may issue a preliminary injunction … *only if* the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c) (emphasis added).  Under this Rule, a bond securing a preliminary injunction order is required in all but the most exceptional of circumstances.  *See, e.g.*, *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 & n.3 (4th Cir. 1999) (describing the bond requirement as "mandatory and unambiguous").  The purpose of the bond is to "cover[] incidental and consequential costs and either the losses the unjustly restrained party has suffered while wrongfully being prohibited from engaging in certain activities or the complainant's unjust enrichment while his adversary was improperly enjoined."  11A Charles Alan Wright et al., *Federal Practice & Procedure* § 2973 (3d ed.).  This is a real risk given that a preliminary injunction is granted on an incomplete and quickly compiled record.  *See, e.g.*, *Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 284 (4th Cir. 2002) ("[G]ranting a preliminary injunction requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way.  'The danger of a mistake in this setting is substantial.'" (brackets in original) (citations omitted)); *see also Front Range Equine Rescue v. Vilsack*, 844 F.3d 1230, 1233-34 (10th

Cir. 2017) (explaining "there is a presumption of recovery" for a defendant who has been wrongfully enjoined).

In calculating the amount of bond to require as security for a preliminary injunction, the question for the Court is not whether the party opposing the injunction will prevail on appeal, but simply how much harm the appealing party will suffer from complying with the injunction if it proves wrongful. *See, e.g.*, *M-I LLC v. FPUSA, LLC*, No. SA:15-CV-406-DAE, 2015 WL 6738823, at *16 (W.D. Tex. Nov. 4, 2015) (considering "potential lost profits, lost market share, and associated costs of relaunch" (citation omitted)). In making that determination, "the district court should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order." *Hoechst Diafoil*, 174 F.3d at 421 n.3. In short, the amount of the bond "ordinarily depends on the gravity of the potential harm to the enjoined party": the greater the potential for harm to the enjoined party, the higher the bond should be set. *Id.* Moreover, "[w]hen setting the amount of security, district courts should err on the high side." *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir. 2000), *opinion amended on denial of reh'g*, 209 F.3d 1032 (7th Cir. 2000) (per curiam).

In *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1384-85 (Fed. Cir. 2006), for instance, the Federal Circuit affirmed the requirement of a $400 million bond because the enjoined party presented evidence demonstrating that it would suffer prejudice and harm to the tune of approximately $400 million from complying with a preliminary injunction intended to prevent infringement of a pharmaceutical compound. Many other courts have similarly upheld the imposition of multi-million dollar bonds where the evidence presented demonstrated that the requested amount of the Rule 65(c) bond was commensurate with the harm and prejudice the

enjoined party would suffer from complying with the order enjoining it. *See, e.g.*, *Snap-On Tools Co. v. C/Net, Inc.*, No. 97C5803, 1997 WL 33483145, at *12 (N.D. Ill. Oct. 3, 1997) (discussing appropriateness of $150 million bond to secure preliminary injunction against CNET for use of the mark "Snap!"); *see also Equitable Nat'l Life Ins. Co., Inc. v. AXA Equitable Life Ins. Co.*, No. 2:19-cv-644-RJS-DBP, 2020 WL 292171, at *18 (D. Utah Jan. 21, 2020) (setting $10 million bond in trademark dispute); *M-I LLC*, 2015 WL 6738823, at *16 (imposing a $10 million bond and noting that court may "take into consideration factors such as" "lost revenue," "lost market share[,] and costs of relaunch"); *Manpower Inc. v. Mason*, 405 F. Supp. 2d 959, 976 (E.D. Wis. 2005) (imposing $7.5 million bond in franchisor/franchisee infringement suit where "lost profits and transition costs" to defendant amounted to between $6 and $7 million); *Philip Morris Inc. v. Star Tobacco Corp.*, 879 F. Supp. 379, 389 (S.D.N.Y. 1995) (imposing $5 million bond on preliminary injunction that halted marketing of defendant's products given its "adverse economic impact," even though defendant was aware of plaintiff's objections prior to suit); *Am. Hosp. Supply Corp. v. Hosp. Prods. Ltd.*, 780 F.2d 589, 612-14 (7th Cir. 1986) (affirming $5 million bond for injunction related to enforcement of contract); *Phila. World Hockey Club, Inc. v. Phila. Hockey Club, Inc.*, 351 F. Supp. 462, 516 (E.D. Pa. 1972) (requiring $2.5 million bond as security for injunction preventing NHL from engaging in monopolistic practices shielding hockey players from outside leagues).

Here, the evidence demonstrates that complying with the Court's preliminary injunction will have a substantial harmful and prejudicial effect on both JELD-WEN's doorskin and door

business, and so the amount of the bond Steves should be required to post should be equally substantial.[1]

***JELD-WEN's Doorskin Business***. JELD-WEN has analyzed the harm it will suffer from complying with the preliminary injunction for both (i) the next five weeks, which is how long it will take JELD-WEN to fill Steves' "backorders," assuming JELD-WEN supplies 262,400 extra doorskins to Steves per week in addition to Steves' existing orders, and (ii) the additional eleven weeks which marks the period after JELD-WEN fills all of Steves' prior orders through July 27, 2020, the approximate date by which JELD-WEN anticipates a final judgment. *See* Decl. of Daniel Castillo ("Castillo Decl."), attached as Exhibit 1, at ¶¶ 11-20.[2] For each of these periods—5 weeks and 16 weeks—JELD-WEN has measured both its doorskin production capacity, *see id.* ¶¶ 6-9, as well as its actual and forecasted doorskin demand, *id.* ¶¶ 12-20. JELD-WEN has also taken account of its current inventory of doorskins to the extent it can satisfy short-term demand. *See id.* ¶ 10.

To forecast the harm to JELD-WEN from complying with the preliminary injunction over the next five weeks, JELD-WEN analyzed the Steves orders that have not been filled since November 25, 2019 ("Prior Unfilled Orders"), actual confirmed orders from Steves and other JELD-WEN customers for the next four weeks, and forecasted orders from Steves and other JELD-WEN customers for the fifth week. *Id.* ¶¶ 12-15. JELD-WEN's analysis reveals that Steves' demand over this period (including its Prior Unfilled Orders, actual orders for the next four weeks,

---

[1] JELD-WEN's estimated figures are conservative because they do not factor in the inevitable loss of customers who will source doors from suppliers other than JELD-WEN during the period of the injunction in light of JELD-WEN's inability to serve them. *See* JELD-WEN's Suppl. Opp'n to Pl.'s Mot. for Prelim. Inj. (ECF No. 45) at 29.

[2] JELD-WEN has used the end of July as an anticipated date for the conclusion of the trial on the merits of this matter and entry of subsequent judgment, which may be optimistic in light of the ongoing Covid-19 pandemic. JELD-WEN reserves the right to seek an additional bond in the event this Court does not reach a final judgment by July 27, 2020.

4

and forecasted orders for the fifth week) and the demand from JELD-WEN's other trade customers will cause substantial shortages for JELD-WEN during this period. *Id.* ¶¶ 16-17. In particular, demand from trade customers (including Steves' orders and backorders) will consume all of current inventory and a substantial portion of JELD-WEN's production capacity, such that JELD-WEN will be unable to meet all of its needs for ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ doorskins for its own business. *Id.*

To forecast the harm to JELD-WEN from complying with the preliminary injunction order for the entire 16-week injunction period, JELD-WEN forecasted demand by design family for its contract customers after the fifth week (May 11) and continuing through July 2020. *Id.* ¶ 18. This analysis shows that Steves' demand over this period will entirely consume (in fact, exceed) JELD-WEN's production capacity for ▇▇▇▇▇ doorskins. In other words, in order to comply with the Court's order, the entirety of JELD-WEN's ▇▇▇▇▇ doorskin production would be shipped to Steves. *Id.* ¶ 19. That means JELD-WEN will not be able to supply *any* ▇▇▇▇▇ doorskins to any of the other four contract customers. In fact, JELD-WEN would be unable to completely fulfill Steves' actual and forecasted orders for ▇▇▇▇▇ doorskins. Additionally, Steves' forecasted demand and the forecasted demand of JELD-WEN's other trade customers during this time period will result in shortages for JELD-WEN in several design families, including ▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ doorskins. *Id.* ¶ 20.

***JELD-WEN's Door Business***. Because JELD-WEN will experience a shortage of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ doorskins during the 16-week injunction period, JELD-WEN will be unable to meet its own forecasted door needs for doors requiring those doorskins. *Id.* ¶¶ 22-23. Collectively, JELD-WEN's analysis shows that during the next sixteen weeks, it will be unable to supply itself with

5

approximately ███ doorskins that are needed for door production and sales, which would result in lost sales of approximately ███ doors. *Id.* ¶ 25.

JELD-WEN's inability to provide these doors to its customers will also cause JELD-WEN to lose ███████████████████████████████████████████████████████

███████████████████████████████████████. *Id.* ¶ 26. ███████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████ *Id.*

Based on JELD-WEN's good-faith estimations, JELD-WEN expects that complying with the injunction the Court has ordered will cause JELD-WEN to lose nearly nearly ███████

████████████████████████████████████████████████████████████. *Id.* ¶ 27.

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

These lost profits are the very definition of tangible hardship and demand a correspondingly substantial Rule 65(c) bond.

## II. There Is No Basis for Absolving Steves of Rule 65(c)'s Requirements.

There is no indication that Steves would be unable to post or should otherwise be exempt from posting a Rule 65(c) bond of ███████, given that the fee required to post a bond "is a very small fraction of the sum involved." *Mead Johnson*, 201 F.3d at 888. As this Court well knows, Steves has been in business for over 150 years, and that business is, by Steves' own admission, booming. ████████████████████████████████████████████████

6

interior molded doors, and Steves is on pace to sell ▇▇▇▇ doors in 2020, ▇▇▇▇

▇▇▇▇

▇▇▇▇.  *See* JELD-WEN's Suppl. Opp'n to Pl.'s Mot. for Prelim. Inj. (ECF No. 45) at 10. And, despite the interruptions many businesses are experiencing due to the global coronavirus pandemic, Steves recently noted that "demand for doors remains strong." Pl.'s Mem. Regarding Current Circumstances (ECF No. 76) at 1. Thus, the Court can be assured that Steves can afford the substantial bond this case demands.

Put simply, given the significant harm that complying with the preliminary injunction order will impose on JELD-WEN, Rule 65(c) requires an equally substantial security bond to compensate JELD-WEN for that harm if the preliminary injunction order ultimately proves wrongfully issued. *Hoechst Diafoil*, 174 F.3d at 421 & n.3. JELD-WEN therefore respectfully requests that the Court establish a bond requirement of ▇▇▇▇ in this case.

## CONCLUSION

For the foregoing reasons, in accordance with Rule 65(c), JELD-WEN respectfully requests that the Court require Steves to post a bond of ▇▇▇▇ as security for the preliminary injunction order.

7

Dated: April 13, 2020                              Respectfully submitted,

                                                                   JELD-WEN, Inc.

                                                                   By counsel

<u>/s/ *Brian C. Riopelle*</u>
Brian C. Riopelle (VSB #36454)
Gregory J. DuBoff
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
(804) 775-1084 – Tel.
(804) 698-2150 – Fax
briopelle@mcguirewoods.com

*Attorneys for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 13th day of April 2020, the following counsel of record have been served using the CM/ECF system, which will then send a notification of such filing (NEF) to the registered participants as identified on the NEF to receive electronic service, including:

Lewis F. Powell III
John S. Martin
Alexandra L. Klein
Maya M. Eckstein
Douglas M. Garron
R. Dennis Fairbanks, Jr.
Michael Shebelskie
William H. Wright, Jr.
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
(804) 788-8200 – Tel.
(804) 788-8218 – Fax
lpowell@huntonAK.com
martinj@huntonAK.com
aklein@huntonAK.com
meckstein@huntonAK.com
dgarrou@huntonAK.com
dfairbanks@huntonAK.com
mshebelskie@huntonAK.com
cwright@huntonAK.com

Ted Dane
Glenn Pomerantz
Gregory Sergi
Munger, Tolles & Olson LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9288 – Tel.
(213) 683-4088 – Fax
ted.dane@mto.com
glenn.pomerantz@mto.com
gregory.sergi@mto.com

Kyle Mach
Emily C. Curran-Huberty
Munger, Tolles & Olson LLP

560 Mission Street, 27th Floor
San Francisco, CA 94105
(415) 512-4000 – Tel.
(415) 512-4077 – Fax
kyle.mach@mto.com
emily.curran-huberty@mto.com

*Attorneys for Plaintiff*

Marvin G. Pipkin
Kortney Kloppe-Orton
Pipkin Law
10001 Reunion Place, Suite 6400
San Antonio, TX 78216
(210) 731-6495 – Tel.
(210) 293-2139 – Fax

*Of Counsel*

/s/ *Brian C. Riopelle*
Brian C. Riopelle (VSB #36454)
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
(804) 775-1084 – Tel.
(804) 698-2150 – Fax
briopelle@mcguirewoods.com

*Attorney for Defendant*