# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
# RICHMOND DIVISION

| | |
|---|---|
| STEVES AND SONS, INC., | ) |
| Plaintiff, | ) ) ) |
| v. | ) Civil Action No. 3:20-cv-000098 ) |
| JELD-WEN, INC., | ) ) |
| Defendant. | ) ) ) |

## DECLARATION OF DANIEL CASTILLO

I, Daniel Castillo, pursuant to 28 U.S.C. § 1746, hereby declare:

1. My name is Daniel Castillo. I am over the age of 18 and have personal knowledge of the facts set forth below.

2. I am President for North America Doors at JELD-WEN, Inc. ("JELD-WEN"). I have been in this position since February 2018. I am responsible for JELD-WEN's door business, which includes both JELD-WEN's production of doorskins and its production and sale of interior molded doors.

3. JELD-WEN will suffer substantial monetary harm from the Order of Preliminary Injunction issued by the Court on April 10, 2020. I have been asked to quantify the harm JELD-WEN will suffer during the pendency of the preliminary injunction. For purposes of my analysis, I have assumed the injunction will be in effect for about sixteen weeks, from

approximately April 13, 2020 until July 27, 2020. I chose July 27, 2020 as the end date because I have been advised that is an approximate date that a final judgment after trial might be entered.[1]

4. Under the terms of the Court's order, I understand that once the order becomes effective, JELD-WEN must, among other things, (i) terminate allocation effective retroactively to January 1, 2020, (ii) fill Steves' orders and deliver an additional 262,400 doorskins per week to Steves until all of Steves' prior orders have been filled, and (iii) revert to the parties' previous ordering, confirmation, and delivery process pending the results of trial on the merits.

5. As explained in more detail below, I estimate that JELD-WEN will suffer approximately ███████ in damages during the pendency of the preliminary injunction. Complying with the injunction will result in JELD-WEN not being able to supply doorskins to its door business, which means JELD-WEN will lose sales of doors that it would otherwise have made but for the injunction. In addition, as described more fully below, JELD-WEN will lose ███████ ███████ ███████ ███████ ███████. This damages amount is conservative, because it does not take into account the inevitable loss of customers who will source doors from suppliers other than JELD-WEN during the period of the injunction in light of JELD-WEN's inability to serve them.

**A.  JELD-WEN's Production Capacity**

6. At present, JELD-WEN is running at maximum capacity for its production of doorskins. All of JELD-WEN's doorskin dies are currently being used at JELD-WEN's four

---

[1] JELD-WEN has used the end of July as an anticipated date for the conclusion of the trial on the merits of this matter and entry of subsequent judgment, which may be optimistic in light of the ongoing Covid-19 pandemic. To the extent the injunction remains in place for longer than sixteen weeks, JELD-WEN will suffer additional damages.

doorskin (or "fiber") plants, each of which is operating 24 hours a day, 7 days a week. Thus, JELD-WEN cannot produce any more doorskins than it is currently producing.

7. JELD-WEN's fiber plants are operating in "standard" mode. Under "stretch" mode, JELD-WEN can shift scheduled downtime to a later time in the production calendar to meet short-term demands. A "stretch" mode is only possible, however, if there is a scheduled downtime that can be postponed. It is not possible for JELD-WEN to enter "stretch" mode during the next sixteen weeks because JELD-WEN does not have any scheduled downtime in the second quarter, so it is unable to defer any such downtime.

8. JELD-WEN estimates that the maximum number of skins it can manufacture during the next sixteen weeks is approximately ▓▓▓▓▓▓▓. This includes JELD-WEN's new Rockport dies, which have been implemented in JELD-WEN's Dodson, Louisiana plant over the past few weeks.

9. JELD-WEN's weekly doorskin production capacity over the next five weeks will be approximately ▓▓▓▓ doorskins per week. Going back to the start of 2019, JELD-WEN's weekly production capacity has been approximately ▓▓▓▓ doorskins per week.[2] Therefore, the portion of the Court's order requiring that JELD-WEN deliver 262,400 doorskins per week to Steves, in addition to filling Steves' regularly-placed orders, will require JELD-WEN to dedicate more than a quarter of its weekly production just to filling Steves' prior orders.

10. While JELD-WEN can mitigate the effects of the Court's order using its current inventory of doorskins, as explained below, even when adding in current inventory to JELD-WEN's production capacity, JELD-WEN still does not have the capacity to meet total demand

---

[2] JELD-WEN's first quarter production for 2020 was slightly reduced in light of the approximately 4.5 days of time when JELD-WEN's Towanda fiber plant was forced to idle due to an order of the Governor of Pennsylvania requiring the closure of all non-essential businesses due to the COVID-19 pandemic.

from Steves, JELD-WEN's other trade customers, and JELD-WEN's own internal doorskin needs to support its door business.

B.   **How the Court's Order Will Impact JELD-WEN's Doorskin Business.**

11.   JELD-WEN's doorskin business will be substantially affected as a result of the Court's preliminary injunction. JELD-WEN has analyzed the effect for both (i) the next 5 weeks (the amount of time it will take JELD-WEN to fill Steves' "backorders," assuming JELD-WEN is able to supply 262,000 extra doorskins to Steves per week in addition to Steves' (and JELD-WEN's other trade customers') existing orders), and (ii) the following eleven weeks, after JELD-WEN fills all of Steves' prior orders and through July 27, 2020.

12.   ***First 5 Weeks of Injunction***.   JELD-WEN has analyzed the doorskin orders from November 25, 2019 to present that Steves alleges JELD-WEN has not yet filled. JELD-WEN has also analyzed the orders Steves and JELD-WEN's other trade customers have placed for the next few weeks that JELD-WEN has confirmed, but not yet filled.

13.   With regard to Steves' allegedly unfilled orders from November 25, 2019 to present, I understand that Steves identified these orders in response to an interrogatory response served by Steves on April 9, 2020 (the "Prior Unfilled Orders"). Based on the purchase orders that Steves identified, JELD-WEN estimates that the Prior Unfilled Orders encompass 1,166,394 doorskins. It will take JELD-WEN 5 weeks to fill those Prior Unfilled Orders in accordance with the Court's order that JELD-WEN deliver 262,400 extra doorskins per week to Steves. JELD-WEN will fill those Prior Unfilled Orders in the order in which Steves placed them, until all of Steves' prior orders have been filled. This corresponds to the weeks of April 13, 20, 27, May 4, and May 11 (the "Prior Unfilled Order Period"). JELD-WEN's analysis of the Prior Unfilled

Orders and weeks in which JELD-WEN would be required to fill them is the first analysis in Exhibit A.

14. For the next four weeks (the production weeks of April 13, 20, 27, and May 4), JELD-WEN has already confirmed doorskin orders for Steves and its four other trade customers.

15. With regard to the fifth week (the production week of May 11), JELD-WEN is able to forecast doorskin demand by design family for all of its trade customers except Steves. On March 17, 2020, JELD-WEN asked each trade customer (including Steves) to provide, by the end of March, a forecast of its monthly doorskin requirements by design family and size through the end of 2020 so that JELD-WEN could plan its production, and to determine the best means to implement the allocation method that was then in place. Each customer provided the requested forecast except for Steves, which refused to provide the forecast that the other trade customers provided. Instead, Steves provided only a general forecast for the second quarter of 2020 (███████████████████████████) and identified a SKU-level report for the next four weeks based on orders it had already placed. Thus, for Week 5 of JELD-WEN's present analysis, JELD-WEN used forecasted demand as received from each of its other trade customers and assumed forecasted demand for Steves based on Steves' historical purchases.[3]

16. After analyzing the actual confirmed orders for Weeks 1-4 and the forecasted orders for Week 5, JELD-WEN prepared the second analysis in Exhibit A, which reflects its trade customers' demand by doorskin design family during the next five weeks (the Prior Unfilled Order

---

[3] Specifically, beginning with Week 5 (the week of May 11), JELD-WEN used Steves' second-quarter total doorskin forecast of ██████ and assumed Steves' demanded doorskin product mix by design family would be proportional to the orders Steves made in August, September and October 2019 (the period preceding Steves' change in ordering patterns following Masonite's October 2019 price increase announcement). If Steves provides more detailed forecasts, as JELD-WEN's other customers have done, then JELD-WEN can review and update its analysis based on the forecasts Steves provides. JELD-WEN anticipates, however, that if Steves' more recent ordering patterns are applied to the analysis, it would only exacerbate the doorskin shortages described herein, as Steves' more recent orders have skewed (as compared to its historical purchases) toward doorskin designs that are already in shortage.

Period) that JELD-WEN will be required to fill. JELD-WEN then added the volume of Steves' Prior Unfilled Orders that it will be required to fill by design family during this period. (This portion of the analysis does not take into account JELD-WEN's internal doorskin needs, and only addresses JELD-WEN's ability to meet the demand of Steves and JELD-WEN's other trade customers.) Finally, JELD-WEN reflected its production capacity over this 5-week period, as well as its current inventory by design family.

17. As this analysis makes clear, Steves' combined demand over this period (including its Prior Unfilled Orders, actual orders for Weeks 1-4, and forecasted orders for Week 5) and the demand from JELD-WEN's other trade customers will cause substantial shortages during this period. In particular, demand from trade customers (including Steves' orders and backorders) will consume all of current inventory and a substantial portion of JELD-WEN's production capacity, such that JELD-WEN will be unable to meet all of its needs for its own business for ▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ doorskins.

18. ***Entire Period***. The third analysis in Exhibit A reflects JELD-WEN's forecasted demand by design family for its trade customers for the entire 16-week injunction period—both during the period when JELD-WEN is filling Steves' Prior Unfilled Orders and continuing until the end of July 2020. The exhibit also reflects JELD-WEN's production capacity for that period.[4]

19. As the third analysis in Exhibit A reflects, Steves' demand over this period will entirely consume (in fact, exceed) JELD-WEN's production capacity for ▉▉▉ doorskins for this period. In other words, under the Court's order, the entirety of JELD-WEN Fiber's ▉▉▉ doorskin production would be consumed by Steves. That means JELD-WEN will not be able to

---

[4] As above, this forecasted demand is derived from the detailed (by design family) demand forecasts provided in March 2020 by all trade customers other than Steves. To estimate Steves' orders, JELD-WEN has used Steves' overall quarterly demand forecasts and applied assumptions about the mix of Steves' anticipated orders to arrive at estimates by design family as described above.

6

supply *any* ▬▬▬ doorskins to any of the other four contract customers. In fact, JELD-WEN would be unable to completely fulfill Steves' actual and forecasted orders for ▬▬▬ doorskins.

20. And once again, the forecasted demand for Steves and JELD-WEN's other trade customers during this time period will result in shortages in several design families, including ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ doorskins.

C. **The Court's Order Will Significantly Damage JELD-WEN's Door Business.**

21. The above analysis all concerns JELD-WEN's doorskin business and JELD-WEN's inability to satisfy its actual and projected doorskin needs. The Court's Order will, however, substantially harm JELD-WEN's door business.

22. First, as described above, JELD-WEN will experience a shortage in a substantial number of its doorskin design families during the injunction period—both during the Prior Unfilled Order Period and the entire 16-week injunction period. This will lead to an inability to meet all forecasted door needs for doors requiring those doorskins. Indeed, as described above and reflected in Exhibit A, JELD-WEN will experience a shortage in ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ doorskins, and therefore will not be able to meet the full demand for doors across nearly half of its product mix for months.

23. Second, after the Prior Unfilled Order Period (when JELD-WEN is no longer supplying Steves with an extra 262,000 doorskins per week in addition to Steves' regular orders), JELD-WEN will be unable to supply its non-Steves trade customers with *any* ▬▬▬ doorskins. Because JELD-WEN cannot supply these trade customers with ▬▬▬ doorskins, JELD-WEN will also not be able to supply its own doors business with ▬▬▬ doorskins (or make doors incorporating those doorskins).

24.     JELD-WEN does not believe it can make up the shortfalls described above before late July for either its doorskin business or its door business by accessing supply from Latvia. As preliminary matter, JELD-WEN only imports ▓▓▓▓▓▓ and ▓▓▓▓ doorskins from its Latvian facility. As reflected in Exhibit A, JELD-WEN does not anticipate a shortage of ▓▓▓▓ doorskins, so any importation from Latvia would not be of assistance in making up any shortfall for that design. With respect to ▓▓▓▓ doorskins, Latvia's fiber presses are scheduled to be down for 3 weeks starting in late April due to the Covid-19 pandemic. Even when that facility re-opens, JELD-WEN does not anticipate receiving skins from that facility until the third or fourth week of July, at which time JELD-WEN will have already missed most (if not all) of the more than ▓▓▓▓ door orders (corresponding to ▓▓ doorskins) for which JELD-WEN projects a shortage.

25.     In total, JELD-WEN's analysis shows that during the next sixteen weeks, it will be unable to supply itself with approximately ▓▓▓▓ doorskins that are needed for door production and sales, which would result in a shortfall of approximately ▓▓▓▓ interior molded doors.

26.     Additionally, JELD-WEN's inability to provide these doors to its customers will cause JELD-WEN to lose sales of ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████████████████████

27.    As a result of this shortfall, in total, JELD-WEN will lose approximately

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████    A more detailed breakdown of this analysis (including by month) is reflected in Exhibit B.  Further information is available at the Court's request.

28.    Finally, the above impact numbers do not account for lost future business due to customers sourcing doors and other products from JELD-WEN's competitors during the period of the injunction.  JELD-WEN estimates that these additional loses would be ████████████.

\* \* \*

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 13, 2020.

_____
Daniel Castillo