**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| STEVES AND SONS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | Civil Action No. 3:20-cv-00098 |
| v. ) | |
| ) | |
| JELD-WEN, INC., ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

**JELD-WEN, INC.'S MEMORANDUM IN SUPPORT OF ITS**
**MOTION TO DISMISS COUNTS ONE AND TWO OF STEVES AND SONS, INC.'S**
**FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM**

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

FACTUAL BACKGROUND ....................................................................................... 2

ARGUMENT .............................................................................................................. 6

I.       Steves' Antitrust Claim Fails as a Matter of Law............................................ 6

         A.      Steves Does Not Allege Facts Plausibly Showing Its Purported Injuries
                 Were Caused by the 2012 Acquisition.................................................... 8

         B.      Steves Cannot Plausibly Allege Facts Showing That Its Purported Injury
                 Constitutes Antitrust Injury................................................................... 12

II.      Steves' Tortious Interference Claim Fails as a Matter of Law. ....................... 16

         A.      Steves Cannot Bootstrap Its Contract Claim Into a Tort Claim........................... 16

         B.      Steves Fails to Allege JELD-WEN's Knowledge of Steves' Contracts or
                 Prospective Contractual Relations. ....................................................... 18

                 1.       Steves Has Not Alleged that JELD-WEN Had Requisite Knowledge
                          of Steves' Contracts with its Customers. .................................... 18

                 2.       Steves Has Not Alleged that JELD-WEN Had Any Knowledge of
                          Steves' Prospective Contractual Relations. ............................... 21

         C.      Steves Has Not Alleged a Breach of Contract to Support its Claim for
                 Tortious Interference with Contract....................................................... 22

CONCLUSION........................................................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*,
   369 F.3d 732 (3d Cir. 2004) .................................................................. 13

*Abex Corp. v. Md. Cas. Co.*,
   790 F.2d 119 (D.C. Cir. 1986) ............................................................... 24

*Acierno v. Preit-Rubin, Inc.*,
   199 F.R.D. 157 (D. Del. 2001)................................................................ 21

*Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*,
   910 F.2d 139 (4th Cir. 1990)................................................................. 6, 7

*Allen Family Foods, Inc. v. Capitol Carbonic Corp.*,
   2011 WL 1205138 (Del. Super. Ct. Mar. 31, 2011).................................. 26

*Allen v. Washington Hosp.*,
   34 F. Supp. 2d 958 (W.D. Pa. 1999) ...................................................... 25

*Anderson v. Wachovia Mortg. Corp.*,
   621 F.3d 261 (3d Cir. 2010)............................................................. 23, 24

*Anesthesia Servs., P.A. v. Anesthesia Advantage, P.C.*,
   2013 WL 3352672 (Del. Super. Ct. June 27, 2013)................. 16, 18, 20, 21

*Architects Collective v. Gardner Tanenbaum Grp., L.L.C.*,
   2010 WL 2721401 (W.D. Okla. July 6, 2010) ......................................... 20

*Austin v. Blue Cross & Blue Shield of Ala.*,
   903 F.2d 1385 (11th Cir. 1990)...................................................... 6, 13, 15

*Bank of Am., N.A. v. New England Quality Serv., Inc.*,
   2017 WL 57793 (D. Vt. Jan. 4, 2017)..................................................... 25

*Beard Research, Inc. v. Kates*,
   8 A.3d 573 (Del. Ch. 2010)............................................................ 16, 22, 23

*Boulden v. Albiorix, Inc.*,
   2013 WL 396254 (Del. Ch. Jan. 31, 2013) ............................................. 17

*Browning v. Data Access Sys., Inc.*,
   2011 WL 2163555 (Del. Super. Ct. Jan. 31, 2011)................................... 22

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
    429 U.S. 477 (1977) ................................................................ 6, 12

*Charter Oil Co. v. Am. Emp'rs' Ins. Co.*,
    69 F.3d 1160 (D.C. Cir. 1995) ............................................... 26

*City of Pittsburgh v. W. Penn Power Co.*,
    147 F.3d 256 (3d Cir. 1998) ................................................. 8, 9

*CMI, Inc. v. Intoximeters, Inc.*,
    918 F. Supp. 1068 (W.D. Ky. 1995) ..................................... 25

*Concord Boat Corp. v. Brunswick Corp.*,
    207 F.3d 1039 (8th Cir. 2000) ............................................. 6, 8

*Cornell Glasgow, LLC v. La Grange Props., LLC*,
    2012 WL 2106945 (Del. Super. Ct. June 6, 2012) ................ 18

*D'Andrea v. Rafla-Demetrious*,
    146 F.3d 63 (2d Cir. 1998) ................................................... 25

*Data Mgmt. Internationalé, Inc. v. Saraga*,
    2007 WL 2142848 (Del. Super. Ct. July 25, 2007) ............ 16, 17

*Del. State Univ. Student Hous. Found. v. Ambling Mgmt. Co.*,
    556 F. Supp. 2d 367 (D. Del. 2008) ................................... 16, 17

*Discovery Commc'ns, LLC v. Comput. Scis. Corp.*,
    2013 WL 3448076 (D. Md. July 8, 2013) ........................... 19, 20

*Expressions Hair Design v. Schneiderman*,
    137 S. Ct. 1144 (2017) ......................................................... 24

*Global Fitness Holdings, LLC v. Fed. Recovery Acceptance, Inc.*,
    2015 WL 12600167 (D. Utah Aug. 31, 2015) ....................... 25

*Gym Door Repairs, Inc. v. Young Equip Sales, Inc.*,
    206 F. Supp. 3d 869 (S.D.N.Y. 2016) ................................... 22

*KMS Rest. Corp. v. Wendy's Int'l, Inc.*,
    361 F.3d 1321 (11th Cir. 2004) ............................................ 25

*Kuroda v. SPJS Holdings, L.L.C.*,
    971 A.2d 872 (Del. Ch. 2009) ............................................. 17

*Lokhova v. Halper*,
    2020 WL 963032 (E.D. Va. Feb. 27, 2020) ......................... 22

*Medtech Prods. Inc. v. Ranir, LLC*,
  596 F. Supp. 2d 778 (S.D.N.Y. 2008) ............................................................... 20

*Merck & Co. v. SmithKline Beecham Pharm. Co.*,
  1999 WL 669354 (Del. Ch. Aug. 5, 1999) ......................................................... 19

*Newman v. Universal Pictures*,
  813 F.2d 1519 (9th Cir. 1987) ........................................................................... 13

*Novell, Inc. v. Microsoft Corp.*,
  505 F.3d 302 (4th Cir. 2007) .................................................................... 6, 12, 14

*O.K. Sand & Gravel, Inc. v. Martin Marietta Techs., Inc.*,
  36 F.3d 565 (7th Cir. 1994) .................................................................................. 8

*Oksanen v. Page Mem'l Hosp.*,
  945 F.2d 696 (4th Cir. 1991) (en banc) .................................................... 6, 12, 13

*Orion Pictures Distribution Corp. v. Syufy Enters.*,
  829 F.2d 946 (9th Cir. 1987) ........................................................................ 13, 14

*OverDrive, Inc. v. Baker & Taylor, Inc.*,
  2011 WL 2448209 (Del. Ch. June 17, 2011) ..................................................... 23

*Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*,
  507 F.3d 117 (2d Cir. 2007) ....................................................................... 8, 9, 10

*Price v. Sorrell*,
  784 P.2d 614 (Wyo. 1989) ................................................................................. 25

*Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*,
  296 F.3d 308 (4th Cir. 2002) ............................................................................. 24

*Procaps S.A. v. Patheon, Inc.*,
  845 F.3d 1072 (11th Cir. 2016) ......................................................................... 14

*Rhodes v. E.I. du Pont de Nemours & Co.*,
  636 F.3d 88 (4th Cir. 2011) ............................................................................... 24

*S. Home Care Servs., Inc. v. Visiting Nurse Servs., Inc. of S. Conn.*,
  2015 WL 4509425 (D. Conn. July 24, 2015) ..................................................... 19

*St. Louis Convention & Visitors Comm'n v. NFL*,
  154 F.3d 851 (8th Cir. 1998) ............................................................................. 25

*Triple Canopy, Inc. v. Moore*,
  2005 WL 1629768 (N.D. Ill. July 1, 2005) ....................................................... 25

*Turner v. Va. Dep't of Med. Assistance Servs.*,
  230 F. Supp. 3d 498 (W.D. Va. 2017) ..................................................................... 8

*Valley Prods. Co. v. Landmark*,
  128 F.3d 398 (6th Cir. 1997) ................................................................................. 13

*Varlesi v. Wayne State Univ.*,
  909 F. Supp. 2d 827 (E.D. Mich. 2012) ................................................................ 21

*White v. Ransmeier & Spellman*,
  950 F. Supp. 39 (D.N.H. 1996) ............................................................................. 25

*Worthington v. Palmer*,
  2015 WL 7571822 (E.D. Va. Nov. 24, 2015) ................................................. 10, 21

**Other Authorities**

Altman, Louis & Pollack, Malla,
  *Callmann on Unfair Competition, Trademarks and Monopolies* (4th ed. 2019) ...................... 13

Dobbs, Dan D. et al.,
  *The Law of Torts* (2d ed. 2019) ........................................................................... 26

Restatement (Second) of Torts § 766 ........................................................................ 22

Restatement (Second) of Torts § 766A ........................................................... 23, 24, 25, 26

# INTRODUCTION

For nearly four years, Steves and JELD-WEN litigated a wide-ranging dispute that generated multiple jury verdicts, numerous final decisions by this Court, and several related appeals to the Fourth Circuit (which remain pending). This is not that case. In this case, Steves alleges an entirely distinct breach of contract based on an unrelated "allocation" provision in the parties' Supply Agreement that played no role in the prior litigation. Steves' claim involves a new dispute that began in November 2019—well after the parties' original dispute was fully briefed and awaiting argument before the Fourth Circuit, and more than seven years after JELD-WEN's acquisition of Craftmaster Manufacturing, Inc. ("CMI").

Despite the manifest differences between this case and the parties' prior dispute, Steves seeks to employ the same playbook here. According to Steves, *any* purported breach of the Supply Agreement by JELD-WEN automatically equates to an antitrust injury traceable back to the 2012 CMI acquisition (and hence entitles Steves to treble its breach of contract damages and possible attorneys' fees), no matter how distantly removed in time or how remote in causal nexus that subsequent breach may be from the years-old acquisition. As a matter of logic, the 2012 CMI acquisition has no connection to the alleged contract breach at issue in this case. And as a matter of law, Steves does not and cannot plausibly allege an antitrust claim on these facts, because its First Amended Complaint—like its original complaint—does not plausibly allege the essential elements of antitrust impact, injury, and causation that are required to state a claim under the Clayton Act.

Steves' First Amended Complaint also continues to include a meritless claim for tortious interference, premised on the theory that the alleged breaches of contract prevented Steves from serving its own customers or acquiring new ones. But Delaware law clearly forbids that approach, rejecting efforts to bootstrap run-of-the-mill breach of contract claims into independent torts. And

even if Steves' claim were theoretically viable, it has failed to allege the basic facts that Delaware law requires for a tortious interference claim, including that JELD-WEN had the requisite knowledge or that any breach of contract has actually occurred.   As such, Steves' tortious interference claim likewise fails as a matter of law.

Put simply, this case is a breach of contract case and nothing more.   The Court should dismiss Steves' antitrust and tortious interference claims (Counts One and Two) with prejudice.

## FACTUAL BACKGROUND

This Court presided over a prior breach of contract, antitrust, and trade secrets dispute between Steves and JELD-WEN, and it is intimately familiar with the facts and issues of that case. The judgment entered in that case is currently the subject of multiple appeals before the Fourth Circuit.  *See Steves & Sons, Inc. v. JELD-WEN, Inc.*, No. 3:16-cv-00545 (E.D. Va.) ("*Steves I*"); *Steves & Sons, Inc. v. JELD-WEN, Inc.*, Nos. 19-1397 & 19-2466 (4th Cir.).   As this Court has already recognized, despite Steves' efforts to tie this case to the previous one, *see, e.g.*, First Am. Compl. ("FAC") at 1-2, the claims raised in the present dispute are distinct from those raised in *Steves I.  See Steves I*, Order Denying Pl.'s Expedited Mot. for Inj. in Supp. of Am. Final J. (Feb. 14, 2020), ECF No. 2036.   This case involves a different provision of the Supply Agreement—the Supply Agreement's "allocation" provision, *see* Supply Agreement § 20 (ECF No. 107-1)—that was not at issue in *Steves I*, and it is premised on conduct that occurred more than six months after the amended final judgment in *Steves I* was entered and more than seven years after the CMI transaction closed.

In its First Amended Complaint, Steves alleges that beginning in October 2019, JELD-WEN breached the parties' Supply Agreement by "fail[ing] and refus[ing] to deliver to Steves all doorskins ordered within 30 days of receipt of Steves' purchase orders."  FAC ¶ 37.  As JELD-WEN has explained to Steves, that failure was caused by "an increased demand for

2

doorskins that JELD-WEN could not meet," which was in turn caused by an unexpected price increase for interior molded doors imposed by Masonite (which JELD-WEN followed for its own doors) that was announced in October 2019. *Id.* ¶¶ 47-48.

In December 2019, realizing that it was physically incapable of producing enough doorskins to meet that increased demand (notwithstanding JELD-WEN's around-the-clock doorskin production), JELD-WEN invoked the allocation provision of the parties' Supply Agreement for the first time in the parties' nearly 8-year contractual relationship. *Id.* ¶ 44. Under that provision, when JELD-WEN "recognizes an actual or anticipated shortage in production capacity over the current or anticipated demand," it must provide Steves with a notice of allocation stating its "current production capacity in North America indicating a shortage in production capacity, which will then result in the need for an allocation period." *Id.* ¶ 42 (quoting Supply Agreement § 20). The allocation period will then begin "effective the first day of the month following the notice of allocation." *Id.* In accordance with that provision, JELD-WEN sent Steves a notice of allocation on December 19, 2019, and the resulting allocation period began in January 2020. *Id.* ¶ 44.

In this case, Steves alleges that in invoking and applying allocation, JELD-WEN has violated its contractual obligations under the Supply Agreement in various ways. In particular, Steves alleges that JELD-WEN has violated the Supply Agreement because, according to Steves:

(i)     JELD-WEN had no right to invoke allocation, because (Steves claims) JELD-WEN's production capacity is actually higher than the capacity stated in the notice of allocation (which was based on JELD-WEN's historical production), *see id.* ¶¶ 44-46;

(ii)    in Steves' view, JELD-WEN may not consider its own internal demand for doorskins in administering allocation, *id.* ¶¶ 51-54; and

(iii)   the Supply Agreement requires JELD-WEN to sell Steves any doorskins Steves orders up to its total allocation amount, and does not allow JELD-WEN to ration

particular styles of doorskins in accordance with internal and external demand, *id.* ¶¶ 56-59.

JELD-WEN is fully prepared to litigate Steves' breach of contract theories at the proper time. This motion, however, focuses on the two other substantive claims that Steves asserts in its First Amended Complaint: its claim under the Clayton Act in Count One, *see id.* ¶¶ 89-93, and its tortious interference claim in Count Two, *see id.* ¶¶ 94-111.

For its antitrust claim, Steves reaches back more than seven years to JELD-WEN's 2012 acquisition of CMI, asserting once again that this acquisition should have been prohibited under the Clayton Act because it reduced competition in the doorskin market. *See, e.g.*, *id.* ¶¶ 19-22, 26, 29, 71-73, 76-77. Despite occasional conclusory allegations that its purported injuries occurred "as a result of the illegal merger," *id.* ¶ 78, Steves does not allege that the 2012 acquisition itself caused the sudden increase in demand for doorskins in October 2019, JELD-WEN's inability to fill that demand, or JELD-WEN's resulting decision to invoke the allocation provision of a contract that pre-dates the acquisition. And although Steves' First Amended Complaint (unlike its original complaint) alleges in passing that the 2012 acquisition "disincentivize[d]" JELD-WEN from producing additional doorskins, and alleges "[o]n information and belief" that absent the acquisition JELD-WEN would have reopened a mothballed factory or otherwise increased its production capacity to meet the sudden spike in demand, it alleges no facts to support those implausible and speculative assertions. *Id.* ¶ 82. Instead, Steves relies primarily on the theory that if the acquisition had not occurred, "Steves could turn to the competitive market" to acquire all the doorskins it wants at its preferred prices. *Id.* ¶ 80; *see also id.* ¶ 86. Again, however, Steves provides no further factual allegations to support that assertion. In particular, it provides no factual allegations whatsoever to describe what the doorskin market would look like today if the 2012 acquisition had never occurred, or to show that, absent the acquisition, CMI would have been

4

willing and able to sell Steves doorskins today at the prices, quantities, and preferred designs that Steves demands.

For its tortious interference claim, Steves alleges that JELD-WEN's purported breaches of the Supply Agreement have rendered Steves "unable to fill all or some of the door orders" placed by its customers. *Id.* ¶ 105. Steves does not allege that JELD-WEN actually knew that it was causing Steves to breach any specific provision of its contracts or lose any specific business expectancy, or that JELD-WEN has caused any third party to breach any contract with Steves, or even that Steves itself has actually breached any of its contracts as a result of JELD-WEN's actions.

On April 10, 2020, this Court entered a preliminary injunction order requiring JELD-WEN to end allocation as to Steves and to ship Steves an additional 262,400 doorskins per week until all of Steves' prior orders are filled. Mem. Op. (ECF No. 121) ("PI Op."); Order of Prelim. Inj. (ECF No. 123). The Court based its preliminary injunction solely on Steves' breach of contract claim, explaining that there were substantial issues preventing preliminary injunctive relief on Steves' antitrust and tortious interference claims. PI Op. at 5 n.4. As to the antitrust claim, the Court explained that the record was "scant" with respect to "whether th[e] antitrust violation caused the damages alleged in this case," and there was "a dispute as to whether the Complaint alleges antitrust impact or antitrust injury." *Id.* As to Steves' tortious interference claim, the Court explained that there was likewise "a substantial issue as to whether the Complaint adequately alleges the tortious interference claims therein presented." *Id.*[1]

---

[1] The Court entered its preliminary injunction order after Steves filed its First Amended Complaint, but the order focuses on the claims as alleged in the original complaint. *See* PI Op. at 1-4.

**ARGUMENT**

I.     **Steves' Antitrust Claim Fails as a Matter of Law.**

To state an antitrust claim under the Clayton Act, a private plaintiff must allege facts plausibly showing both *antitrust impact* and *antitrust injury*, each of which requires a clear causal link between the challenged conduct and the plaintiff's alleged harm.  To show antitrust *impact*, a plaintiff must "construct a hypothetical market, a 'but for' market, free of the restraints and conduct alleged to be anticompetitive," and allege facts plausibly showing that the challenged anticompetitive conduct has made it worse off than it would be in that but-for world—in other words, it must show that the challenged conduct is a but-for cause of its injury.  *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1055 (8th Cir. 2000) (citation omitted); *see, e.g.*, *Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp.*, 910 F.2d 139, 149 (4th Cir. 1990) (plaintiff must show a "reasonably probable causal link" between the challenged conduct and its injury).  To show antitrust *injury*, a plaintiff must demonstrate an "'injury of the type the antitrust laws were intended to prevent and that flows from that which makes [the] defendants' acts unlawful.'"  *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 311 (4th Cir. 2007) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  Under that element, the plaintiff must show not only a causal connection between the challenged conduct and its injury, but that the *anticompetitive* aspects of that conduct were what caused its injury, such that its own injury "coincides with the public detriment tending to result from the alleged violation." *Austin v. Blue Cross & Blue Shield of Ala.*, 903 F.2d 1385, 1389-90 (11th Cir. 1990); *see Oksanen v. Page Mem'l Hosp.*, 945 F.2d 696, 709 (4th Cir. 1991) (en banc) (plaintiff must show harm not just to itself "as an individual competitor," but to "competition as a whole").

Steves cannot meet either of those essential requirements here.  The conduct that Steves claims was anticompetitive in its Clayton Act claim is JELD-WEN's 2012 acquisition of CMI, a

transaction that closed more than seven years before the declared allocation.  *See* FAC ¶ 90.  While JELD-WEN acknowledges this Court has already found that acquisition anticompetitive in a proceeding alleging breaches of separate provisions of the Supply Agreement, that alone is not enough to allow Steves' current claim to go forward, for Steves cannot plausibly allege that any harm it has suffered from the failure to completely fill its doorskin orders—conduct that Steves alleges began a few months ago—is causally related to that long-ago acquisition.  *Post hoc ergo propter hoc* is a logical fallacy, not a viable theory of causation.

In fact, the conduct at issue in this case is so attenuated from the 2012 acquisition that Steves makes only a cursory effort to connect the two.  Even after being put on notice of this failure by JELD-WEN's motion to dismiss the original complaint, *see* JELD-WEN's Mem. in Supp. of Mot. to Dismiss Counts One & Two of Pl.'s Complaint (ECF No. 81)—filed a week before Steves filed its First Amended Complaint—Steves makes no attempt to allege facts in its First Amended Complaint plausibly showing what the doorskin market would have looked like today absent the 2012 acquisition, let alone that CMI (a company that has not existed for more than seven years) would be willing and able today to provide Steves with all the doorskins that it wants at the prices, quantities, and types that Steves alleges JELD-WEN was unable to provide.  Just as fatal to its claim, the First Amended Complaint (like the original complaint) makes no attempt to allege facts showing that the injuries Steves claims it has suffered from the alleged contractual breaches coincide with any broader harm to the market at large.  Because Steves has failed to put forward any facts plausibly showing the "reasonably probable causal link" necessary for either antitrust impact or antitrust injury, its Clayton Act claim must be dismissed.  *Adv. Health-Care Servs.*, 910 F.2d at 149.

### A.   Steves Does Not Allege Facts Plausibly Showing Its Purported Injuries Were Caused by the 2012 Acquisition.

To plead antitrust impact, a plaintiff must allege facts plausibly showing that its injury was the "but-for result of [a defendant's] anticompetitive conduct." *Turner v. Va. Dep't of Med. Assistance Servs.*, 230 F. Supp. 3d 498, 507 (W.D. Va. 2017); *see, e.g.*, *O.K. Sand & Gravel, Inc. v. Martin Marietta Techs., Inc.*, 36 F.3d 565, 573 (7th Cir. 1994) (antitrust plaintiff must show that "the violation was the cause-in-fact of the injury: that 'but for' the violation, the injury would not have occurred" (citation omitted)).   To assess causation, courts must "look back from the vantagepoint of the injury to test the nature of the cause, rather than to presume antitrust injury wherever there is an agreement or merger that results in harm." *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 266 (3d Cir. 1998).   The burden is on the plaintiff to "construct a hypothetical market, a 'but for' market, free of the restraints and conduct alleged to be anticompetitive," and plausibly show that the alleged anticompetitive conduct has caused it an injury that it would not have suffered in that but-for world.   *Concord Boat*, 207 F.3d at 1055-57. If a plaintiff fails to allege facts plausibly showing the requisite causal link between the alleged anticompetitive conduct and its alleged injury, its antitrust claim must be dismissed.

The Second Circuit's decision in *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507 F.3d 117 (2d Cir. 2007), is illustrative.   In that case, the defendant was a crushed-stone manufacturer that bought its only significant competitor, acquiring a monopoly in the market.   *Id.* at 119.   It subsequently terminated its distribution agreement with the plaintiff, depriving the plaintiff of its supply of crushed stone and driving it out of the market.   The Second Circuit held that the plaintiff failed to state an antitrust claim because its alleged injury—the termination of its distribution agreement—"was not caused by an exercise of the defendant's newly acquired [market] power."   *Id.* at 123.   Instead, the claimed injury arose from the defendant's *contractual*

power to terminate the agreement, which was something it "could have just as well done without having monopoly power." *Id.* In short, the plaintiff's alleged harm was an "incidental matter which the merger … certainly did not cause," so the plaintiff could not show the antitrust impact required for a claim challenging the merger under the Clayton Act. *Id.*

The Third Circuit's decision in *City of Pittsburgh v. West Penn Power Co.* reinforces the same point. There, the Third Circuit held that the City of Pittsburgh failed to state an antitrust claim because the harm it alleged—the payment of higher rates for electric utility service—would likely have existed whether or not the challenged merger was consummated, so the injury did not flow from the transaction at issue. 147 F.3d at 266. Because the plaintiff could not show "a direct link between the alleged antitrust violation and [its] purported injury," insofar as it would have suffered the same harm even in a but-for world without the challenged anticompetitive conduct, its antitrust claim could not go forward. *Id.* at 268.

Steves' antitrust claim suffers from the same problem. As the First Amended Complaint makes clear, Steves premises its antitrust claim on the injuries it claims it is suffering as a result of JELD-WEN's purported breaches of the Supply Agreement in the past few months—not on any injuries directly traceable to the long-ago 2012 acquisition. *See, e.g.*, FAC ¶¶ 78-79 (alleging that JELD-WEN "failed to timely deliver, or deliver at all, hundreds of thousands of doorskins," "declared allocation on the basis of an artificial production capacity," "limited Steves to an artificial percentage of its doorskin production," and "improperly limited Steves to a mix of doorskins"). And unlike the previous case before this Court, where Steves argued that the 2012 acquisition actually *caused* JELD-WEN to decide to breach the Supply Agreement by charging higher prices, Steves cannot plausibly allege here that the 2012 acquisition somehow caused JELD-WEN's decision to invoke its contractual right to allocation. Steves' only attempt to address

9

this issue is the conclusory allegations that all its injuries have occurred "as a result of the illegal merger." *Id.* ¶ 78. But of course, such conclusory allegations are entitled to no weight when evaluating a motion to dismiss. *Worthington v. Palmer*, 2015 WL 7571822, at *3 (E.D. Va. Nov. 24, 2015) (Payne, J.) ("[T]he basic pleading standards set by [*Bell*] and [*Iqbal*] … foreclose conclusory, factually unsupported claims …."). That is especially true given that it is clear from Steves' own allegations that the purported contractual breaches "could have just as well [occurred] without" the acquisition. *Port Dock*, 507 F.3d at 123. Because the acquisition "certainly did not cause" those purported breaches, *id.*, Steves cannot use that years-old acquisition to transform its breach of contract claims into an antitrust case.

Nor can Steves save its antitrust claim with the generic allegation that "[w]ere it not for JELD-WEN's illegal merger, Steves could turn to the competitive market to prevent JELD-WEN from imposing these anticompetitive terms and restricting Steves' volumes." FAC ¶ 80; *see also id.* ¶ 86. Steves makes no attempt to plead facts actually showing what the doorskin market would look like today if the 2012 acquisition had never occurred, let alone that Steves would have been able to acquire (from CMI or elsewhere) all the various doorskins it wants at the prices it demands in that but-for world. In any event, even if Steves could allege *facts* plausibly showing that it could have obtained doorskins elsewhere absent the 2012 acquisition, that still would not make that years-old acquisition the *cause* of Steves' purported injury; it would at best show that Steves might have ameliorated the *effects* of that breach of contract injury had the acquisition never occurred. As such, Steves' unsupported speculation about how it might have been able to supply its doorskin needs today if there had been no acquisition in 2012 is simply insufficient to state a plausible claim.

Apparently realizing that its original allegations were insufficient, Steves' First Amended Complaint adds allegations that the Towanda factory today "devotes its output primarily to the

doorskins that JELD-WEN's door plants demand," and that absent the acquisition, Towanda "would instead produce greater quantities of doorskins demanded by other customers."  FAC ¶ 81. Again, Steves simply assumes (without any supporting factual allegations) that absent the acquisition, CMI would have remained an independent entity for over seven more years, and then would have been willing to sell Steves whatever doorskins from Towanda that Steves wanted at prices that Steves would accept.  In any event, Steves' theory is implausible on its face.  Even if CMI were an independent entity—and nothing else in the market changed in the intervening seven years—CMI would dedicate most of its doorskin production to its own door needs, just like JELD-WEN does.  While Steves alleges that, but for the merger, Towanda "would ... produce greater quantities of doorskins demanded by other customers," *id.*, there is no factual basis to suppose that an independent CMI/Towanda would dedicate more of its production capacity to Steves than JELD-WEN is doing.  Moreover, Steves notably does *not* allege that JELD-WEN today directs Towanda to produce *solely* the doorskin styles that JELD-WEN requires for its own doors.  Steves also alleges no facts plausibly showing that the styles it wants from Towanda are substantially different from the styles JELD-WEN wants; on the contrary, its own allegations indicate that *both* parties would prefer for Towanda to produce more of the styles that door customers now desire.  *See id.* ¶ 58; *see also* PI Op. at 18-19 (explaining that there is a shortage for Rockport and Carrara doorskins).

Equally baseless is Steves' new conclusory allegation that the acquisition "disincentivizes" JELD-WEN from increasing its doorskin production, and its allegation "[o]n information and belief" that JELD-WEN would otherwise have responded to the sudden spike in demand by reopening its mothballed factory in Marion, North Carolina, or increasing its capacity at other plants.  FAC ¶ 82.  As to the former, Steves alleges no facts explaining how the acquisition

allegedly disincentivizes JELD-WEN from expanding its capacity to meet increased demand for doorskins, especially when much of that demand comes from within JELD-WEN itself.  As to the latter, Steves presents no facts to explain how or why the 2012 acquisition prevented JELD-WEN from bringing its Marion factory back into operation or from taking other unspecified steps to "increas[e] capacity at other plants," let alone how those measures would (or even could) have avoided the sudden doorskin shortage caused by the Masonite price increase.  *Id.*  Once again, Steves fails not only to plausibly allege facts showing what the world would have looked like today if the acquisition had never occurred, but to plausibly allege that it has suffered an injury that it would not have suffered in that but-for world.  That failure to plausibly allege antitrust impact dooms Steves' antitrust claim.

### B.   Steves Cannot Plausibly Allege Facts Showing That Its Purported Injury Constitutes Antitrust Injury.

Even if Steves had plausibly alleged facts showing that it suffered some kind of harm because of the 2012 acquisition—that is, facts showing that Steves would not have suffered the injury it claims here in a hypothetical world where that acquisition never happened—its Clayton Act claim would still fail for lack of antitrust injury, because Steves cannot show an "injury of the type the antitrust laws were intended to prevent."  *Novell*, 505 F.3d at 311.  Because the antitrust laws exist for "the protection of *competition*, not *competitors*," *Brunswick*, 429 U.S. at 488 (emphasis added), a plaintiff seeking to bring an antitrust claim must show that whatever injury it suffered "as an individual competitor" coincides with the injury to "competition as a whole" caused by the allegedly anticompetitive practices, *Oksanen*, 945 F.2d at 709.  Steves cannot make that showing here.

Steves' breach of contract and antitrust claims in this matter rest on precisely the same asserted injury: that JELD-WEN failed to deliver Steves all of the doorskins Steves has ordered,

and that JELD-WEN instituted allocation and limited the number of doorskins Steves would receive contrary to the provisions of the Supply Agreement.  But those allegations at best assert that JELD-WEN failed to live up to its *contractual* duties under the Supply Agreement—not that JELD-WEN failed to comply with the broader duty imposed by the antitrust laws to refrain from anticompetitive conduct.  Conversely, Steves' allegations that JELD-WEN deprived Steves of the benefits that Steves expected under the Supply Agreement show at most a private *contractual* injury, not one that "coincides with" any "public detriment tending to result from the alleged violation."  *Austin*, 903 F.2d at 1389-90.   Whatever harm Steves may have suffered from JELD-WEN's alleged failure to satisfy its obligations under the Supply Agreement, it is only a harm to Steves "as an individual competitor," not to "competition as a whole."  *Oksanen*, 945 F.2d at 709.  And if, as Steves claims, JELD-WEN did indeed breach its obligations under the Supply Agreement, Steves will be fully compensated for those injuries by its breach of contract claim.  Those purported contractual harms, with their accompanying contractual remedies, cannot constitute an *antitrust* injury.

Courts in analogous cases have regularly rejected plaintiffs' efforts to assert antitrust injury by pointing to a breach of contract.  *See, e.g.*, *Newman v. Universal Pictures*, 813 F.2d 1519, 1522-23 (9th Cir. 1987); *Orion Pictures Distribution Corp. v. Syufy Enters.*, 829 F.2d 946, 948-49 (9th Cir. 1987); *Valley Prods. Co. v. Landmark*, 128 F.3d 398, 403-04 (6th Cir. 1997); *2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732, 738-39 (3d Cir. 2004); 1 Louis Altman & Malla Pollack, *Callmann on Unfair Competition, Trademarks and Monopolies* § 4:48 (4th ed. 2019).  In *Orion*, for instance, the Ninth Circuit rejected the plaintiff's Sherman Act allegation that the defendant theater owner's monopolization of the regional theaters market enabled its later breach of the parties' contract to display plaintiff's film.  829 F.2d at 949.  The

court held that the defendant's duties "were fixed by its [pre-existing] contractual commitment," so the plaintiff's contractual losses "d[id] not constitute antitrust injury." *Id.* Instead, the plaintiff suffered only "a breach of contract, not an antitrust injury," even if it was the defendant's later monopolization of the region's theaters that enabled it to breach the parties' contract. *Id.* Steves' claim fails for the same reason: it asserts injury under the parties' pre-existing contract (entered into before the CMI acquisition was consummated), not under antitrust law. There is no legal basis for Steves to convert its contractual injury into treble antitrust damages by "dress[ing] up in antitrust garb what is, at best, a … contract violation.'" *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1087 (11th Cir. 2016).

On the contrary, Steves' own allegations show that it impermissibly seeks to use the antitrust laws as a sword—to protect its position as a competitor relative to others in the market—rather than as a shield to protect competition. Steves' claim in this case is not that JELD-WEN should be forced to take some action that would increase supply or lower prices for the market as a whole. Instead, Steves' avowed goal in this suit is to obtain an edge over its interior molded door competitors (including JELD-WEN) by taking advantage of what it believes are the more favorable terms in its own Supply Agreement, to obtain more than its allocated share of its preferred doorskin styles. *See, e.g.*, FAC ¶¶ 56-59; *see also* PI Op. at 59-60. Even if Steves' reading of the Supply Agreement were correct—and it is not—Steves' inability to disadvantage its competitors by acquiring a greater share of JELD-WEN's limited doorskin production, based on its alleged individual contractual rights, is not an "injury of the type the antitrust laws were intended to prevent." *Novell*, 505 F.3d at 311. Indeed, it is very nearly the opposite.

Steves' other allegations throughout the First Amended Complaint underscore its lack of antitrust injury. For instance, Steves alleges that the current shortage "does not justify refusing to

fill Steves' orders or placing Steves on allocation" *under the Supply Agreement*.  FAC ¶ 49.  Steves

thus compares the Supply Agreement to JELD-WEN's "letters announcing its price increases to

door customers," in which "JELD-WEN specifically reserved the right to reject door orders that

deviated from door customers' historical weekly order size averages," and argues that "[t]he

Supply Agreement contains no parallel provision that would allow JELD-WEN to do the same to

Steves."  *Id.*  Again, however, that argument rests not on any claim that Steves is sharing in some

general public injury caused by anticompetitive conduct, but rather on the theory that Steves has

suffered a distinct contractual harm all its own.  Steves cannot allege an antitrust injury that

"coincides with the public detriment," *Austin*, 903 F.2d at 1389-90, based on purportedly unique

contractual protections that it claims give it an edge over its competitors.

Steves' new allegations in the First Amended Complaint do not solve this fundamental

problem.  As explained above, *see supra* at 10-11, Steves' assertion (at FAC ¶ 81) that Towanda

would make wholly different production decisions if it were independent today is implausible on

its face and factually unsupported.  But even if Steves could overcome that hurdle, it has presented

no factual allegations to suggest that other independent door manufacturers have suffered similar

harm from the mix of doorskin styles produced at Towanda.  Instead, Steves' allegations show at

most that *Steves* has not received the doorskin styles it believes it is entitled to obtain under the

Supply Agreement—a purely contractual harm that, to the extent it exists, Steves would be fully

protected against by the Supply Agreement.

The bottom line for Steves' theory of antitrust injury is simple.  As far as Steves is

concerned, any time JELD-WEN breaches the Supply Agreement in any way, Steves can sue not

only for breach of contract but also for treble antitrust damages, on the theory that *any* harm it

suffers is somehow the fault of (or enabled by) the acquisition.  That extraordinary theory is

foreclosed by settled law, as it effectively ignores the antitrust injury and impact requirements altogether.  Because Steves has not alleged and cannot allege facts in this case plausibly showing that the 2012 acquisition caused any injury it has suffered from the current doorskin shortage, and because its assertion that JELD-WEN has failed to live up to the Supply Agreement shows at most contractual injury, its antitrust claim in Count One should be dismissed with prejudice.

## II.     Steves' Tortious Interference Claim Fails as a Matter of Law.

Steves' allegation that JELD-WEN "tortiously interfered with Steves' contracts … and business expectanc[ies]," FAC at 2, also fails as a matter of law for three reasons.  First, Delaware law prohibits a plaintiff from "bootstrapping" a tortious interference claim onto a breach of contract claim, which is precisely what Steves is attempting to do here.  *See, e.g.*, *Del. State Univ. Student Hous. Found. v. Ambling Mgmt. Co.*, 556 F. Supp. 2d 367, 377-78 (D. Del. 2008).  Second, Steves fails to allege that JELD-WEN had the requisite knowledge to support a claim for either "tortious interference with contract" or "tortious interference with prospective contractual relations."  *Anesthesia Servs., P.A. v. Anesthesia Advantage, P.C.*, 2013 WL 3352672, at *5-6 (Del. Super. Ct. June 27, 2013).  And third, the First Amended Complaint does not allege a breach of contract, a required element for "tortious interference with contract" under Delaware law.  *Beard Research, Inc. v. Kates*, 8 A.3d 573, 605-07 (Del. Ch. 2010).  For these reasons, the Court should dismiss Count Two as a matter of law.

### A.     Steves Cannot Bootstrap Its Contract Claim Into a Tort Claim.

Delaware law forbids the "gratuitous 'bootstrapping' of contract claims into tort claims" because "a breach of contract will not generally constitute a tort."  *Data Mgmt. Internationalé, Inc. v. Saraga*, 2007 WL 2142848, at *3 (Del. Super. Ct. July 25, 2007).  As a result, "a plaintiff bringing a claim based entirely upon a breach of the terms of a contract generally must sue in contract, and not in tort."  *Id.*  This principle holds even if a plaintiff alleges "an intentional,

knowing, wanton, or malicious action by the defendant." *Id.*   The key question is whether the plaintiff alleges "wrongful conduct beyond the breach of contract itself"; if not, then any tort claims must be dismissed under the bootstrapping doctrine.  *Id.*; *see also, e.g.*, *Boulden v. Albiorix, Inc.*, 2013 WL 396254, at *15-16 (Del. Ch. Jan. 31, 2013); *Del. State*, 556 F. Supp. 2d at 377 (dismissing tortious interference claim and rejecting argument that defendant management company had "damage[d] the Foundation's reputation with [the university's] students" because the tort claim "arose solely" from the parties' contract).

Steves' tortious interference claim is precisely the type of claim that Delaware's bootstrapping doctrine bars.  The First Amended Complaint makes clear that Steves' purported injuries stem from a common source: JELD-WEN's alleged breach of contract.  *See* FAC at 2 (characterizing JELD-WEN's misconduct as failing to "deliver[] to Steves the doorskins it orders … as JELD-WEN is required to do by the Supply Agreement").  The First Amended Complaint does not allege any facts showing that JELD-WEN has harmed Steves by "violat[ing] an independent legal duty[] apart from the duty imposed by contract," *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 889 (Del. Ch. 2009); despite a few conclusory allegations that JELD-WEN committed various "misrepresentations," "acts of deceit," and other violations, FAC ¶ 104, the only conduct that is alleged to have harmed Steves (and any of its current or prospective relationships with its customers) is JELD-WEN's purported violation of the Supply Agreement by either (i) failing to deliver doorskins Steves believes should have been delivered under the contract and/or (ii) by declaring an allocation in alleged contravention of the terms of the Supply Agreement.  That is presumably why Steves describes its requested relief in purely contractual terms: "requiring JELD-WEN to sell Steves the doorskins it orders and to perform as [Steves

believes] the parties' contract requires."  FAC at 3.  Once again, Steves' alleged injuries all arise from JELD-WEN's purported non-performance of the parties' Supply Agreement.

In short, Steves' tortious interference claim amounts only to an allegation that JELD-WEN's failure to fill Steves' doorskin orders under the contract had the effect of damaging Steves' relationships with current and prospective customers.  *See id.* ¶¶ 103, 109.  But any such losses are recoverable (at all) as breach-of-contract damages, not under a tortious interference theory.  Merely "intoning the *prima facie* elements" of tortious interference while doing no more than "telling the story of the defendant's failure to perform under the contract" is forbidden under Delaware law.  *Cornell Glasgow, LLC v. La Grange Props., LLC*, 2012 WL 2106945, at *8 (Del. Super. Ct. June 6, 2012).  Count Two must therefore be dismissed independent of the reasons described further below.

## B.   Steves Fails to Allege JELD-WEN's Knowledge of Steves' Contracts or Prospective Contractual Relations.

Steves' tortious interference claim also fails as a matter of law because the First Amended Complaint does not allege that JELD-WEN had the knowledge necessary to commit either form of tortious interference.  Under Delaware law, both "tortious interference with contract" and "tortious interference with prospective contractual relations" require "knowledge to support intent."  *Anesthesia Servs.*, 2013 WL 3352672, at *5-6.

### 1.   Steves Has Not Alleged that JELD-WEN Had Requisite Knowledge of Steves' Contracts with its Customers.

To be liable for "tortious interference with contract," a defendant "must have knowledge of the contract with which he is interfering *and of the fact that he is interfering with the performance of the contract.*"  *Id.* at *5 (citation omitted).  As this language suggests, "knowledge of the contract itself is insufficient to establish a tortious interference claim."  *Id.*  Instead, a defendant must be "aware of the actual provision" with which he is interfering.  *Id.*; *see also Merck*

18

*& Co. v. SmithKline Beecham Pharm. Co.*, 1999 WL 669354, at *45 (Del. Ch. Aug. 5, 1999) (denying tortious interference argument because although the party "knew at least generally of [a contract's] existence," there was no evidence that it "was aware of its specific terms"); *cf. Discovery Commc'ns, LLC v. Comput. Scis. Corp.*, 2013 WL 3448076, at *3-4 (D. Md. July 8, 2013) (applying the Restatement and holding that plaintiff "must allege that [defendant] had knowledge of the[] specific provisions" of the contract with which it allegedly interfered); *S. Home Care Servs., Inc. v. Visiting Nurse Servs., Inc. of S. Conn.*, 2015 WL 4509425, at *11 (D. Conn. July 24, 2015) (concluding that, under both New York and Connecticut law, "liability depends on 'actual knowledge' of the 'particular contractual provision' alleged to have been violated" (citation omitted)).

As discussed in Part II.C below, Steves has not alleged an actual *breach* of any third-party contract. But even setting that issue aside, the First Amended Complaint lacks any allegation that JELD-WEN knew about Steves' contractual obligations in general, much less that JELD-WEN was aware of Steves' specific obligations to any particular customer. All the First Amended Complaint alleges is that JELD-WEN, "as a seller of molded interior residential doors," "had knowledge of Steves' existing contracts, its continuing business relationships with doors customers, and its relationship with other doors customers expected to result in sales of doors." FAC ¶ 98. This allegation cannot support a tortious-interference-with-contract claim for two reasons.

First, as a threshold matter, Steves does not plausibly allege that JELD-WEN knew about any of Steves' contracts. While it is plausible that JELD-WEN, as a "direct competitor of Steves," would have some awareness of who Steves' customers are, it is not reasonable to infer that JELD-WEN would thereby have "knowledge of Steves' existing contracts" or even that Steves

had an ongoing contract with any particular customer.  *Id.*  The fact that Steves sells doors to a customer does not mean that such sales are governed by an overarching contract.  And the First Amended Complaint lacks any factual allegations plausibly suggesting that JELD-WEN knew whether Steves had an existing contract with any particular customer.

Second, even assuming JELD-WEN knew as a general matter that Steves had a contract with a particular customer—which the First Amended Complaint does not allege—"knowledge of [a] contract itself is insufficient to establish a tortious interference claim."  *Anesthesia Servs.*, 2013 WL 3352672, at *5.  To state such a claim, Steves must allege that JELD-WEN was "aware of the actual provision" allegedly violated as a result of JELD-WEN's conduct.  *Id.*  On this point, the First Amended Complaint is silent.  Steves does not (and cannot) allege that JELD-WEN knew about any provision of any of Steves' contracts.  And absent that knowledge, JELD-WEN could not possibly know that it was "interfering with the performance of the contract."  *Id.* (emphasis & citation omitted).  For this reason, Steves fails to state a claim of tortious interference with contract.  *See Medtech Prods. Inc. v. Ranir, LLC*, 596 F. Supp. 2d 778, 797 (S.D.N.Y. 2008) (dismissing tortious interference claim because complaint failed to allege defendants were aware of specific provisions which created the breach); *Discovery Commc'ns*, 2013 WL 3448076, at *4 (holding that plaintiff's "general allegations of [defendant's] knowledge of the contract are inadequate to state a claim for tortious interference with a contract"); *Architects Collective v. Gardner Tanenbaum Grp., L.L.C.*, 2010 WL 2721401, at *3 (W.D. Okla. July 6, 2010) (holding allegation defendant "knew … of the existence of [third party's] contract with Plaintiff" insufficient to support a tortious-interference-with-contract claim).

### 2.    Steves Has Not Alleged that JELD-WEN Had Any Knowledge of Steves' Prospective Contractual Relations.

Steves' claim that JELD-WEN tortiously interfered with prospective contractual relations fails on similar grounds: the First Amended Complaint does not plausibly allege that JELD-WEN knew about any such expectancies.  To plead a claim for tortious interference with prospective contractual relations, Steves must allege enough facts to show that JELD-WEN had "knowledge of the … expectancy."  *Acierno v. Preit-Rubin, Inc.*, 199 F.R.D. 157, 164 (D. Del. 2001).  That knowledge must be "either actual or imputed"; mere allegations of "constructive knowledge" are not sufficient.  *Anesthesia Servs.*, 2013 WL 3352672, at *4 & n.54; *see id.* at *6 ("Tortious interference with prospective contractual relations cannot exist without knowledge to support intent.").

The First Amended Complaint makes only the conclusory assertion that "JELD-WEN … was aware that Steves was acquiring new business from entities like Reeb, BMC and BFS."  FAC ¶ 101.  But Steves offers no facts to support this allegation.  *See Worthington*, 2015 WL 7571822, at *3.  Instead, Steves alleges that "JELD-WEN had knowledge of Steves' relationship[s]" with these customers "through the activities of JELD-WEN's sales personnel, including but not limited to attendance at customer events and trade shows."  FAC ¶ 101.  But the mere fact that JELD-WEN employees might know that Steves sells doors to certain customers cannot support the inference that JELD-WEN knew about a specific business expectancy on the part of Steves.  "If knowledge of generalized business dealings were sufficient, … requiring the interferer to have knowledge of 'the' expectancy would become essentially meaningless."  *Varlesi v. Wayne State Univ.*, 909 F. Supp. 2d 827, 850 (E.D. Mich. 2012) (parentheses omitted).

Under established Delaware law, Steves' failure to allege that JELD-WEN had actual knowledge of a particular business expectancy is fatal to its attempted claim for tortious

interference with prospective contractual relations. *See Browning v. Data Access Sys., Inc.*, 2011 WL 2163555, at \*4 (Del. Super. Ct. Jan. 31, 2011) (dismissing tortious interference claim because "Plaintiffs d[id] not plead facts showing that [defendant] knew of Plaintiffs['] … business opportunities"); *see also Lokhova v. Halper*, 2020 WL 963032, at \*17 (E.D. Va. Feb. 27, 2020) (dismissing tortious interference claim because "[a]part from vague and conclusory language," the complaint "failed to allege facts indicating that any defendant … was aware of any specific contracts or business expectancies [plaintiff] may have had"); *Gym Door Repairs, Inc. v. Young Equip Sales, Inc.*, 206 F. Supp. 3d 869, 911 (S.D.N.Y. 2016) (dismissing tortious interference claim because "plaintiffs simply d[id] not allege that [defendants] knew of, and interfered with, a specific business opportunity"). Steves' claim for interference with prospective contractual relations must therefore be dismissed as well.

### C.   Steves Has Not Alleged a Breach of Contract to Support its Claim for Tortious Interference with Contract.

Steves has also failed to allege another essential element of a tortious-interference-with-contract claim under Delaware law: "an actual breach of a valid and enforceable contract." *Beard Research*, 8 A.3d at 605-07.  Steves cannot salvage this pleading deficiency by relying on a *different* cause of action—that JELD-WEN has made it more difficult for Steves to perform its own contracts—that the Delaware Supreme Court has never recognized.

Under Delaware law, a claim for tortious interference with contract arises "when the defendant wrongfully prevents a third party from performing a contract." *Chapter 7 Tr. Constantino Flores v. Strauss Water Ltd.*, 2016 WL 5243950, at \*10 (Del. Ch. Sept. 22, 2016); *see also* Restatement (Second) of Torts § 766 (premising liability on a defendant "inducing or otherwise causing the third person not to perform the contract").  As such, "to succeed under [a tortious interference with contract] theory," a plaintiff must allege that the defendant caused a third

party to commit "an actual breach of a valid and enforceable contract." *Beard Research*, 8 A.3d at 607.  But Steves does not even allege that a third party has breached any "valid and enforceable contract" with Steves, *see* FAC ¶¶ 94-111, much less that JELD-WEN caused any such breach.[2] As a result, Steves' claim for tortious interference with contract fails as a matter of law.  *See OverDrive, Inc. v. Baker & Taylor, Inc.*, 2011 WL 2448209, at *9 (Del. Ch. June 17, 2011) (dismissing tortious interference claim because "plaintiff fail[ed] to allege any breach of a third-party contract").  And even if Delaware law permitted Steves to sue for tortious interference on the theory that JELD-WEN caused Steves to break one of *its own* contracts, Steves does not allege facts identifying any "actual breach of a valid and enforceable contract" by Steves itself either. *Beard Research*, 8 A.3d at 607; *cf.* FAC ¶ 105 (alleging that Steves has been "unable to fill all or some of the door orders placed by" various customers, without alleging that this resulted in a breach of any contract).

Instead, Steves appears to advance a wholly different theory: that JELD-WEN should be held liable for preventing Steves from "performing on a contract with a third party," a theory that Steves draws not from existing Delaware law but from Section 766A of the Restatement (Second) of Torts.  *See* Pl.'s Suppl. Br. in Supp. of Mot. for Prelim. Inj. (ECF No. 46) at 22.  But neither the Delaware Supreme Court nor any other Delaware court has ever accepted that theory, and the Third Circuit has predicted that the Delaware Supreme Court would reject it.  *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 281 (3d Cir. 2010) ("We are aware of no cases in which

---

[2] The First Amended Complaint merely alleges that Steves has "supply agreements" with certain customers "under which the customers agree to purchase a percentage of their interior molded door requirements from Steves and/or agree to receive rebates based on purchase volumes."  FAC ¶ 95. Even if those "supply agreements" are valid and enforceable contracts—which Steves does not allege—the First Amended Complaint does not allege that any of these supply agreements have been breached, either by Steves or its customers.

the Delaware courts have adopted § 766A ....").  This Court should do the same.

When a state supreme court "has spoken neither directly nor indirectly on the particular issue," a federal court must "predict how that court would rule if presented with the issue." *Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002).  A federal court should "act conservatively when asked to predict how a state court would proceed on a novel issue of state law," recognizing that it is not the proper body to create new state common law. *Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88, 97-98 (4th Cir. 2011).  In addition, once a federal circuit court has expressed its "view of the law of a state in its jurisdiction," other federal courts will generally "defer to the local circuit's view." *Abex Corp. v. Md. Cas. Co.*, 790 F.2d 119, 125 (D.C. Cir. 1986); *see also Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144, 1149-50 (2017) ("We generally accord great deference to the interpretation and application of state law by the courts of appeals.").  This deference stems from a recognition that circuit courts "are better schooled in and more able to interpret the laws of their respective States" than other, unfamiliar courts. *Expressions Hair Design*, 137 S. Ct. at 1150.

Applying those principles, this Court should reject Steves' request that this Court create a new claim for tortious interference under Delaware law whenever one party has made another's performance under a contract more expensive or burdensome.  As noted, no Delaware court—much less the Delaware Supreme Court—has ever upheld such a claim.  This Court should be especially reluctant to expand Delaware tort law under those circumstances.  On top of that, this Court should defer to the Third Circuit's conclusion in *Anderson* that the Delaware Supreme Court would reject such a claim.  621 F.3d at 281.  As the Third Circuit explained, the key distinction between a claim under the Restatement (Second) of Torts § 766A on one hand and a tortious interference claim under existing Delaware law on the other is that "a § 766A plaintiff is not

required to show that the defendant caused the *breach* of the plaintiff's contract," but only that "plaintiff's performance was caused to be more expensive or burdensome." *Id.* (alteration omitted). Without the bright line that the requirement of an actual breach creates, the Third Circuit explained, evidence in support of a Section 766A claim would inevitably be "too speculative and subject to abuse to provide a meaningful basis for a cause of action." *Id.*; *see also CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1079-80 (W.D. Ky. 1995) (criticizing § 766A as "all encompassing," "vague," and "necessarily involv[ing] highly speculative damages"). As such, the Third Circuit had little difficulty concluding that the Delaware Supreme Court would refuse to adopt the problematic theory Steves advances here.

Several other states and federal courts have rejected that theory too. Some states, like Wyoming, have rejected causes of action under Section 766A outright. *See, e.g.*, *Price v. Sorrell*, 784 P.2d 614, 616 (Wyo. 1989). And in other federal jurisdictions, courts have consistently refused to recognize Section 766A claims absent express state authority. *See, e.g.*, *KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1323 (11th Cir. 2004) (Florida); *Triple Canopy, Inc. v. Moore*, 2005 WL 1629768, at *7 (N.D. Ill. July 1, 2005) (Illinois); *Global Fitness Holdings, LLC v. Fed. Recovery Acceptance, Inc.*, 2015 WL 12600167, at *11-12 (D. Utah Aug. 31, 2015) (Kentucky); *St. Louis Convention & Visitors Comm'n v. NFL*, 154 F.3d 851, 865 (8th Cir. 1998) (Missouri); *White v. Ransmeier & Spellman*, 950 F. Supp. 39, 41 n.2 (D.N.H. 1996) (New Hampshire); *D'Andrea v. Rafla-Demetrious*, 146 F.3d 63, 66 (2d Cir. 1998) (New York); *Allen v. Washington Hosp.*, 34 F. Supp. 2d 958, 964-65 (W.D. Pa. 1999) (Pennsylvania); *Bank of Am., N.A. v. New England Quality Serv., Inc.*, 2017 WL 57793, at *9-10 (D. Vt. Jan. 4, 2017) (Vermont). Commentary on § 766A likewise cautions that "the rule in § 766A may be broader than many courts will accept," as "thousands of acts" could subject a party to liability under that capacious

rule. Dan D. Dobbs et al., *The Law of Torts* § 634 (2d ed. 2019). This Court should follow that persuasive authority and likewise refuse to accept § 766A as a viable basis for pleading tortious interference under Delaware law.

None of the dicta in the Delaware Superior Court's—not the Delaware Supreme Court's— unpublished decision in *Allen Family Foods, Inc. v. Capitol Carbonic Corp.*, 2011 WL 1205138 (Del. Super. Ct. Mar. 31, 2011), should persuade this Court otherwise. Though some language in that decision, when taken out of context, might suggest theoretical support for § 766A, the *Allen Family Foods* court ultimately did not reach the issue because the plaintiff there had "failed to plead a viable claim … under Section 766A or otherwise." *Id.* at *1. As later Delaware cases have clarified, *Allen Family Foods* should *not* be read "for the proposition that Delaware has formally adopted Section 766A as a cause of action," as § 766A "has never formally been recognized by Delaware courts." *Flores*, 2016 WL 5243950, at *10 & n.53. A lone Superior Court judge's musings in *Allen Family Foods* are far from the requisite "clear signal[]" that the Third Circuit "'clearly misread' [Delaware state] law" as would be necessary for this Court to disregard *Anderson*. *Charter Oil Co. v. Am. Emp'rs' Ins. Co.*, 69 F.3d 1160, 1164 (D.C. Cir. 1995). This Court should follow the Third Circuit and the clear weight of state and federal authority, and refuse to recognize a novel tort claim that no Delaware court has ever adopted.[3]

---

[3] Even assuming that Delaware were to recognize § 766A, Steves has not even pled this cause of action. Section 766A imposes liability on a defendant who "intentionally and improperly interferes with [a plaintiff's] performance of a contract." Restatement (Second) of Torts § 766A. But Steves only alleges that it has been "unable to fill all or some of the door orders placed by" various customers. FAC ¶ 105. Under Delaware law, Steves has no contractual obligation to fill door orders placed by its customers. "[A]n order or other offer to buy goods … shall be construed as inviting acceptance either by a prompt promise to ship or by the prompt or current shipment of conforming or non-conforming goods …." Del. Code tit.6, § 2-206(1)(b). Steves, therefore, fails to allege that JELD-WEN's conduct has prevented Steves from performing any action that it is contractually obligated to perform.

**CONCLUSION**

For the foregoing reasons, JELD-WEN respectfully requests that the Court dismiss Counts One and Two of Steves' First Amended Complaint in their entirety and with prejudice.


Dated: April 15, 2020                                 Respectfully submitted,


                                                      JELD-WEN, Inc.

                                                      By counsel

                                                      /s/ *Brian C. Riopelle*
                                                      Brian C. Riopelle (VSB #36454)
                                                      Gregory J. DuBoff
                                                      McGuireWoods LLP
                                                      Gateway Plaza
                                                      800 East Canal Street
                                                      Richmond, VA 23219
                                                      (804) 775-1084 – Tel.
                                                      (804) 698-2150 – Fax
                                                      briopelle@mcguirewoods.com

                                                      *Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of April 2020, the following counsel of record have

been served using the CM/ECF system, which will then send a notification of such filing (NEF) to

the registered participants as identified on the NEF to receive electronic service, including:


Lewis F. Powell III
John S. Martin
Alexandra L. Klein
Maya M. Eckstein
Douglas M. Garron
R. Dennis Fairbanks, Jr.
Michael Shebelskie
William H. Wright, Jr.
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
(804) 788-8200 – Tel.
(804) 788-8218 – Fax
lpowell@huntonAK.com
martinj@huntonAK.com
aklein@huntonAK.com
meckstein@huntonAK.com
dgarrou@huntonAK.com
dfairbanks@huntonAK.com
mshebelskie@huntonAK.com
cwright@huntonAK.com

Ted Dane
Glenn Pomerantz
Gregory Sergi
Munger, Tolles & Olson LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9288 – Tel.
(213) 683-4088 – Fax
ted.dane@mto.com
glenn.pomerantz@mto.com
gregory.sergi@mto.com

Kyle Mach
Emily C. Curran-Huberty
Munger, Tolles & Olson LLP

560 Mission Street, 27th Floor
San Francisco, CA 94105
(415) 512-4000 – Tel.
(415) 512-4077 – Fax
kyle.mach@mto.com
emily.curran-huberty@mto.com

*Attorneys for Plaintiff*

Marvin G. Pipkin
Kortney Kloppe-Orton
Pipkin Law
10001 Reunion Place, Suite 6400
San Antonio, TX 78216
(210) 731-6495 – Tel.
(210) 293-2139 – Fax

*Of Counsel*

/s/ *Brian C. Riopelle*
Brian C. Riopelle (VSB #36454)
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
(804) 775-1084 – Tel.
(804) 698-2150 – Fax
briopelle@mcguirewoods.com

*Attorney for Defendant*