UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
RICHMOND DIVISION

| | |
|---|---|
| STEVES AND SONS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| JELD-WEN, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

Civil Action No. 3:20-cv-000098

**OPPOSITION TO MOTION TO DISMISS COUNTS ONE AND TWO
OF STEVES AND SONS, INC.'S AMENDED COMPLAINT
<u>FOR FAILURE TO STATE A CLAIM</u>**

**PUBLIC VERSION**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION ........................................................................................................................1

STANDARD OF REVIEW ..........................................................................................................2

STATEMENT OF FACTS ...........................................................................................................2

    I.   JELD-WEN's Long History of Illegal and Anticompetitive Conduct ................................3

    II.  JELD-WEN's Illegal and Anticompetitive Conduct has Continued Unabated,
       Culminating Most Recently in a Scheme to Restrict Output of Doorskins ........................4

    III. JELD-WEN's Anticompetitive and Intentional Actions Deprived Steves of Business from
        Existing and Potential Customers .....................................................................................6

ARGUMENT ................................................................................................................................7

    I.   JELD-WEN's Recycled Attacks On Steves' Antitrust Claim Lack Merit .........................7

       A.  Steves Has Adequately Alleged Antitrust Impact .........................................................7

       B.  Steves Has Adequately Alleged Antitrust Injury ........................................................12

    II.  Steves Plausibly Pleads Claims for Tortious Interference .................................................18

       A.  Steves Adequately Alleges Tortious Interference Claims That Are Independent of Its
           Breach of Contract Claim ............................................................................................18

       B.  Steves Adequately Alleges that JELD-WEN's Intentional Acts Interfered with Its
           Contracts in a Manner Recognized by Delaware Law ................................................21

           1.   Steves Plausibly Pleads Facts Showing that JELD-WEN Had Knowledge of
                Steves' Contracts with Customers ........................................................................22

           2.   Steves Plausibly Pleads Facts Showing that JELD-WEN's Actions Caused It to
                Breach Its Contracts with Customers ....................................................................24

           3.   Delaware Law Supports a Tort Claim Based on the Facts Alleged Here .............24

       C.  Steves Adequately Alleges that JELD-WEN's Intentional Acts Interfered with Its
           Prospective Business Relations ...................................................................................27

CONCLUSION ...........................................................................................................................30

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Acierno v. Preit-Rubin, Inc.*,
    199 F.R.D. 157 (D. Del. 2001) ........................................................................30

*Agilent Techs., Inc. v. Kirkland*,
    No. 3512-VCS, 2009 WL 119865 (Del. Ch. Jan. 20, 2009)....................................27

*Allen Family Foods, Inc. v. Capitol Carbonic Corp.*,
    No. CIVAN10C10313, 2011 WL 1205138 (Del. Super. Ct. Mar. 31, 2011)....................25, 26

*Amphastar Pharm., Inc. v. Momenta Pharm., Inc.*,
    297 F. Supp. 3d 222 (D. Mass.) ................................................................8, 11

*Anderson v. Wachovia Mortg. Corp.*,
    621 F.3d 261 (3d Cir. 2010)........................................................................26, 27

*Anesthesia Servs., P.A. v. Anesthesia Advantage, P.C.*,
    No. N11C-03-005, 2013 WL 3352672 (Del Super. Ct. June 27, 2013) ............................23, 30

*Architects Collective v. Gardner Tanenbaum Grp., L.L.C.*,
    No. 08-1354-D, 2010 WL 2721401 (W.D. Okla. July 6, 2010) ............................................24

*Atlantic Richfield Co. v. USA Petroleum Co.*,
    495 U.S 328 (1990)........................................................................17

*Bailey v. Va. Dep't of Alcoholic Beverage Control*,
    No. 2:18-cv-392, 2019 WL 2590796 (E.D. Va. Apr. 25, 2019) ......................................28, 29

*Barber & Ross Co. v. Lifetime Doors, Inc.*,
    810 F.2d 1276 (4th Cir. 1987) ........................................................................17

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)........................................................................2

*Bhole, Inc. v. Shore Investments, Inc.*,
    67 A.3d 444 (Del. 2013) ........................................................................19, 20, 22

*Blue Shield of Virginia v. McCready*,
    457 U.S. 465 (1982)........................................................................8, 17

*Boulden v. Albiorix*,
    No. 7051-VCN, 2013 WL 396254 (Del. Ch Feb. 7, 2013)....................................21

*Browning v. Data Access Systems, Inc.*,
  No. 09C-10-248, 2011 WL 2163555 (Del. Sup. Ct. Jan. 31, 2011) .......................................29

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977)........................................................................................12, 13, 17, 18

*Callahan v. A.E.V., Inc.*,
  182 F.3d 237 (3d Cir. 1999)........................................................................................8

*Chapter 7 Tr. Constantino Flores v. Strauss Water Ltd.*,
  No. 11141-VCS, 2016 WL 5243950 (Del. Ch. Sept. 22, 2016) .......................................25, 26

*City of Pittsburgh v. West Penn Power Co.*,
  147 F.3d 256 (3d Cir. 1998)........................................................................................10, 11

*Concord Boat Corp. v. Brunswick Corp.*,
  207 F.3d 1039 (8th Cir. 2000) ........................................................................................11

*Cornell Glasgow, LLC v. La Grange Props., LLC*,
  No. N11C-05-016, 2012 WL 2106945 (Del. Super. Ct. June 6, 2012) .......................19, 20, 21

*Corning Inc. v. SRU Biosystems, LLC*,
  292 F. Supp. 2d 583 (D. Del. 2003)........................................................................................27, 28

*Data Management Internationale, Inc. v. Saraga*,
  No. 05C-05-108, 2007 WL 2142848 (Del. Super. Ct. July 25, 2007).........................18, 19, 21

*DeBonaventura v. Nationwide Mut. Ins. Co.*,
  428 A.2d 1151 (Del. 1981) ........................................................................................20

*Delaware State University Student Housing Foundation v. Ambling Mgmt. Co.*,
  556 F. Supp. 2d 367 (D. Del. 2008)........................................................................................21

*Discovery Comm'cns, LLC v. Comput. Scis. Corp.*,
  No. DKC 12-289, 2013 WL 3448076 (D. Md. July 8, 2013)...........................................23, 24

*E.I. DuPont Nemours v. Kolon Indus., Inc.*,
  688 F. Supp. 2d 443 (E.D. Va. 2009) ........................................................................................13

*In re: EpiPen Mktg., Sales Practices & Antitrust Litig.*,
  336 F. Supp. 3d 1256 (D. Kan. 2018)........................................................................................8

*Fresenius Kabi USA, LLC v. Par Sterile Prod., LLC*,
  No. 16-4544, 2017 WL 548944 (D.N.J. Feb. 10, 2017) .......................................................10

*In re Gabapentin Patent Litig.*,
  649 F. Supp. 2d 340 (D.N.J. 2009) ........................................................................................11

*Garber v. Whittaker*,
  174 A. 34 (Del. Super. Ct. 1934) .......................................................................18

*Gelboim v. Bank of Am. Corp.*,
  823 F.3d 759 (2d Cir. 2016)................................................................................8

*Gemini Physical Therapy & Rehabilitation, Inc. v. State Farm Mutual Automobile*
  *Ins. Co.*,
  40 F.3d 63 (3d Cir. 1994) ...................................................................................27

*Glen Holly Entm't, Inc. v. Tektronix, Inc.*,
  343 F.3d 1000 (9th Cir. 2003) ............................................................................14

*Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*,
  206 F. Supp. 3d 869 (S.D.N.Y. 2016).................................................................29

*HTI Health Servs., Inc. v. Quorum Health Grp., Inc.*,
  960 F. Supp. 1104 (S.D. Miss. 1997)............................................................13, 14

*Irwin & Leighton, Inc. v. W.M. Anderson Co.*,
  532 A.2d 983 (Del. Ch. 1987).............................................................................20

*In re K-Dur Antitrust Litig.*,
  338 F. Supp. 2d 517 (D.N.J. 2004) .....................................................................10

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
  232 F.3d 979 (9th Cir. 2000) ...............................................................................8

*Kuroda v. SPJS Holdings, L.L.C.*,
  971 A.2d 872 (Del Ch. 2009)........................................................................20, 21

*Lee-Moore Oil Co. v. Union Oil Co. of Cal.*,
  599 F.2d 1299 (4th Cir. 1979) ............................................................................14

*Lokhova v. Halper*,
  No. 1:19-cv-632, 2020 WL 963032 (E.D. Va. Feb. 27, 2020) ............................29

*Medtech Prod. Inc. v. Ranir*,
  LLC, 596 F. Supp. 2d 778 (S.D.N.Y. 2008).......................................................24

*Merck & Co. v. SmithKline Beecham Pharm. Co.*,
  No. 15443-NC, 1999 WL 669354 (Del. Ch. Aug. 5, 1999) .................................23

*In re Neurontin Antitrust Litig.*,
  No. 02-1390, 2009 WL 2751029 (D.N.J. Aug. 28, 2009) ...............................10, 11

*Orion Pictures Distribution Corp. v. Syufy Enterprises*,
  829 F.2d 946 (9th Cir. 1987) ..............................................................................15

*Peckham v. Cont'l Cas. Ins. Co.*,
  895 F.2d 830 (1st Cir. 1990)..................................................................8

*Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*,
  507 F.3d 117 (2d Cir. 2007)............................................................11, 12

*Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs.*,
  296 F.3d 308 (4th Cir. 2002) ....................................................25, 26, 27

*Robertson v. Sea Pines Real Estate Co., Inc.*,
  679 F.3d 278 (4th Cir. 2012) ..................................................................2

*Rochester Drug Co-Op., Inc. v. Braintree Labs.*,
  712 F. Supp. 2d 308 (D. Del. 2010)......................................................11

*S. Home Care Servs., Inc. v. Visiting Nurse Servs., Inc. of S. Conn.*,
  No. 13-cv-00792, 2015 WL 4509425 (D. Conn. July 24, 2015) ...........24

*Schaefer v. Bouffault*,
  772 S.E.2d 589 (Va. 2015)....................................................................26

*Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.*,
  113 F.3d 405 (3d Cir. 1997).....................................................................8

*Segovia v. Equities First Holdings, LLC*,
  No. 06C09-149, 2008 WL 2251218 (Del. Super. Ct. May 30, 2008).....19

*Simon v. PNC Bank, Nat'l Ass'n*,
  No. 2:16-cv-388, 2017 WL 3726059 (E.D. Va. Aug. 29, 2017) (Allen, J.) ...........25

*Sprint Nextel Corp. v. AT & T, Inc.*,
  821 F. Supp. 2d 308 (D.D.C. 2011) .................................................13, 14

*Steves and Sons, Inc. v. JELD-WEN, Inc.*,
  292 F. Supp. 3d 656 (E.D. Va. 2018) ....................................................15

*In re Suboxone Antitrust Litig.*,
  MDL No. 2445, 2017 WL 4910673 (E.D. Pa. Oct. 30, 2017)............8, 11

*Tichy v. Hyatt Hotels Corp.*,
  376 F. Supp. 3d 821 (N.D. Ill. 2019) .....................................................10

*Tobey v. Jones*,
  706 F.3d 379 (4th Cir. 2013) ..................................................................2

*Turner v. Thomas*,
  930 F.3d 640 (4th Cir. 2019) ..................................................................2

*Varlesi v. Wayne State Univ.*,
    909 F. Supp. 2d 827 (E.D. Mich. 2012)................................................................30

*Worthington v. Rose Palmer, Esq.*,
    No. 3:15-cv-410, 2015 WL 7571822 (E.D. Va. Nov. 24, 2015) .............................29

*Wright v. North Carolina*,
    787 F.3d 256 (4th Cir. 2015) ...................................................................................2

*Z Channel Ltd. P'ship v. Home Box Office, Inc.*,
    931 F.2d 1338 (9th Cir. 1991) ................................................................................16

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
    395 U.S. 100 (1969).................................................................................................7

**Other Authorities**

Intentional Interference with a Contractual Relationship § 12.7, DEL. P.J.I. CIV.
    § 12.7 (2000)..........................................................................................................26

Restatement (Second) of Torts § 766........................................................23, 25, 26, 27

## **INTRODUCTION**

Eight years ago, JELD-WEN acquired Craftmaster Manufacturing, Inc. ("CMI") in violation of the antitrust laws. That merger, as a jury later found, virtually eliminated domestic competition for doorskins. Steves thus was left with no choice but to continue purchasing doorkins from JELD-WEN even as the company sought to "kill off" Steves by increasing prices, reducing quality, and, eventually, terminating Steves' Supply Agreement. Since then, JELD-WEN has found new ways to exploit its unlawful control over the interior molded doorskins market, undermining Steves' ability to do business and, most recently, choking off Steves' supply of doorskins. As Steves' amended complaint lays out in painstaking detail, the crux of Steves' antitrust injury now, as it was before, is Steves' inability to turn elsewhere for supply—a situation made possible by JELD-WEN's unlawful acquisition of CMI. The ensuing shortage in doorskins has forced Steves to turn away new and existing customers—some of whom have been with Steves for generations—because Steves can no longer fill all of their orders for finished doors. Worse still, armed with knowledge of Steves' contracts with current customers and future business opportunities, JELD-WEN has taken advantage of Steves' presently weakened state to take some of Steves' customers for itself.

In its motion to dismiss, JELD-WEN attempts to revive many of the arguments it made in support of its prior, unsuccessful motion to dismiss in *Steves I* and tries to evade the fact that it is violating federal antitrust law and common-law duties by insisting that Steves has pleaded, at most, a claim for breach of contract. JELD-WEN is wrong. To be sure, JELD-WEN is breaching the Supply Agreement by improperly imposing allocation and implementing its mix methodology. But the amended complaint amply alleges that JELD-WEN is also wielding its illegally acquired market power to injure Steves, in violation of section 7 of the Clayton Act and JELD-WEN's common-law duty not to intentionally interfere with Steves' business relations.

The motion to dismiss should be denied.

## STANDARD OF REVIEW

"At this stage of the litigation," a court's "task is limited" to determining only "whether the complaint[] state[s] a plausible claim for relief to survive a motion to dismiss." *Robertson v. Sea Pines Real Estate Co., Inc.*, 679 F.3d 278, 284 (4th Cir. 2012). To survive a motion to dismiss, a complaint "need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). After *Twombly* was decided, the Fourth Circuit reiterated that "a complaint is to be construed liberally so as to do substantial justice," and that "pleading standards require that the complaint be read liberally in favor of the plaintiff." *Wright v. North Carolina*, 787 F.3d 256, 263 (4th Cir. 2015) (citations omitted).

## STATEMENT OF FACTS

Like its motion to dismiss in *Steves I*,[1] JELD-WEN cherry-picks allegations from the amended complaint to paint an unduly narrow picture of this case. *See* Mem. in Supp. of Mot. To Dismiss at 2–5, Dkt. No. 145 ("Mem."). JELD-WEN's current motion, which recycles many of the same arguments unsuccessfully advanced in *Steves I*, should be denied for the essentially the same, as well as additional, reasons. Order, *Steves I*, Dkt. No. 64 (E.D. Va. Oct. 21, 2016). Viewing the allegations in the light most favorable to Steves, and drawing all reasonable inferences in Steves' favor as required by law, *see Turner v. Thomas*, 930 F.3d 640, 644 (4th Cir. 2019), the following facts establish Steves' entitlement to relief on its antitrust and tort claims.

---

[1] *Steves & Sons, Inc. v. JELD-WEN, Inc.*, No. 3:16-cv-545 (E.D. Va.) ("*Steves I*").

## I. JELD-WEN'S LONG HISTORY OF ILLEGAL AND ANTICOMPETITIVE CONDUCT

Steves is in the business of manufacturing and selling interior molded doors. Am. Compl. ¶ 16. Manufacturing interior molded doors requires interior molded doorskins, which form the primary exterior faces of each interior molded door. *Id.* ¶ 17.

Today, only two companies in the United States manufacture interior molded doorskins: JELD-WEN and Masonite. *Id.* ¶ 20. Until 2012, a third company, CMI, also made and sold interior molded doorskins in the United States. *Id.* ¶ 19. But in 2012, JELD-WEN acquired CMI, eliminating it as a doorskin supplier from which independent door manufacturers like Steves could purchase doorskins. *Id.* ¶ 20. As a jury conclusively determined in *Steves I*, "[t]he merger substantially lessened competition in the doorskin market." *Id.* ¶ 22 (citation omitted).

Shortly before JELD-WEN acquired CMI, JELD-WEN and Steves signed a long-term Supply Agreement "under which Steves agreed to purchase at least 80% of its doorskin requirements from JELD-WEN and JELD-WEN agreed to supply doorskins to Steves." *Id.* ¶ 23. After acquiring CMI, JELD-WEN began exploiting its enhanced market power to raise doorskin prices and diminish quality. *Id.* ¶¶ 26–27. JELD-WEN also embarked on a campaign to "kill off" Steves and other independent doors manufacturers, knowing that Steves had nowhere else to turn to obtain interior molded doorskins given the elimination of choice resulting from the merger. *Id.* ¶¶ 80–81. JELD-WEN's anticompetitive behavior resulted in a jury verdict in favor of Steves, finding that JELD-WEN's merger with CMI violated the Clayton Act and caused Steves to suffer antitrust injury and millions of dollars in antitrust damages. *See id.* ¶¶ 29–30. Although this Court ordered JELD-WEN to divest the Towanda doorskin plant acquired from CMI in the merger, *id.* ¶ 31, the Court stayed divestiture pending JELD-WEN's appeal. As a result, JELD-WEN's

3

stranglehold on the doorskins market remains unchanged, as does Steves' inability to turn elsewhere for doorskins—a position JELD-WEN continues to exploit. *See, e.g.*, *id.* ¶ 33.

## II.    JELD-WEN'S ILLEGAL AND ANTICOMPETITIVE CONDUCT HAS CONTINUED UNABATED, CULMINATING MOST RECENTLY IN A SCHEME TO RESTRICT OUTPUT OF DOORSKINS

This case arises from JELD-WEN's continued exercise of its illegally acquired market power. In its latest illegal use of its market power, JELD-WEN has begun restricting output of doorskins to Steves. Am. Compl. ¶¶ 36–65.

Beginning with purchase orders issued in October 2019, JELD-WEN started withholding doorskins from Steves—outright refusing to deliver all of Steves' ordered doorskins within 30 days of receiving the purchase orders. *Id.* ¶ 37. To date, "JELD-WEN has not delivered more than 1 million doorskins ordered in 2020, despite the passage of more than 30 days since JELD-WEN received Steves' purchase orders." *Id.* ¶ 41. JELD-WEN claims that it must limit Steves' orders because of "a shortage in production capacity," *id.* ¶ 42, but JELD-WEN has not complied with the Supply Agreement's requirements governing the imposition of allocation on Steves. *See id.* ¶¶ 43–55. Indeed, numerous facts highlight the problems with JELD-WEN's decision to impose allocation:

(1) JELD-WEN "has a demonstrated ability to produce at least 56 million doorskins per year in North America," but claimed to Steves that its capacity was limited to "approximately 50 million doorskins per year," *id.* ¶¶ 44–45;

(2) JELD-WEN claimed that the capacity shortage was caused by a rush of orders in anticipation of JELD-WEN's own price increase, but that price increase took effect in early February 2020 and yet allocation continues, *id.* ¶¶ 47–48, 55;

4

(3) JELD-WEN is fulfilling its own needs for doorskins first and actively soliciting its interior door customers to increase their orders, despite claiming a shortage in doorskin supply and restricting Steves' supply of doorskins, *id.* ¶¶ 51–54, 100; and

(4) JELD-WEN imposed allocation in a way designed to harm Steves to the greatest extent possible, treating Steves differently from how JELD-WEN treats its own interior door manufacturing division and limiting Steves' ability to order specific SKUs and designs. *See id.* ¶¶ 56–59, 100, 106, 109.

Prior to JELD-WEN's acquisition of CMI, any effort to restrict Steves' supply would have been economically irrational and unlikely to succeed. Due to the competitive nature of the doorskins market, Steves simply could have turned to a different supplier, like CMI, to fulfill its needs. *See id.* ¶ 80. Furthermore, such a supplier would have been incentivized to produce doorskins in accordance with Steves' demands—rather than dedicating doorskin output primarily to its internal demand, as JELD-WEN is now doing—out of a desire to keep Steves' business. *See id.* ¶ 81. But JELD-WEN's acquisition of CMI has made that impossible. *See id.* Because there are effectively no other alternative sources of supply available, Steves has no choice but to accept JELD-WEN's restrictions on doorskins output—a decision that has devastated Steves' relationships with many of its new and existing customers and curtailed its ability to solicit new business opportunities. *See id.* ¶ 85–86. Indeed, as long as allocation is in place and the market remains in its present anticompetitive state, Steves' ability to fulfill its customers' orders is effectively controlled by JELD-WEN, whose allocation methodology dictates not only the quantity of doors Steves can make but the types of doors it can offer as well. *Id.* ¶ 59.

III.   **JELD-WEN'S ANTICOMPETITIVE AND INTENTIONAL ACTIONS DEPRIVED STEVES OF BUSINESS FROM EXISTING AND POTENTIAL CUSTOMERS**

JELD-WEN's deliberate, unjustified imposition of allocation and elimination of competition in the doorskins market have substantially undermined Steves' ability to do business with current customers and court new ones. *See* Am. Compl. ¶¶ 95–111.

Despite Steves having contracts and long-term business relationships with numerous interior door customers, *id.* ¶¶ 95–96 (listing specific customers), JELD-WEN's intentional and illegal act of limiting Steves' access to doorskins has prevented Steves from filling "all or some door orders" placed under existing customer contracts and caused existing customers to stop ordering entirely or, at least, to reduce their orders of interior doors from Steves. *Id.* ¶ 105 (noting that ███████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

███████████████); *see also id.* ¶ 106. That is precisely what JELD-WEN intended, knowing that these customers would turn to it for interior molded doors if Steves were crippled in its ability to meet their needs, *see id.* ¶¶ 98–101—indeed, JELD-WEN has offered at least some of Steves' existing customers attractive rebates for 2020 if they increase their orders from JELD-WEN, *see id.* ¶ 100.

JELD-WEN similarly knew that Steves was on the cusp of securing new or increased business from several customers, including companies that "had been customers of JELD-

WEN's." *Id.* ¶ 98.[2] Specifically, JELD-WEN knew that 

*Id.* ¶¶ 97, 101. Those business opportunities did not come to fruition as a result of JELD-WEN's improper conduct. *Id.* ¶ 108.

## ARGUMENT

### I.   JELD-WEN'S RECYCLED ATTACKS ON STEVES' ANTITRUST CLAIM LACK MERIT

Recycling the same arguments and citing largely the same cases from its motion to dismiss in *Steves I*, JELD-WEN seeks dismissal of Steves' antitrust claim for lack of antitrust impact and injury. This Court should reject JELD-WEN's well-worn arguments as it did before, for largely the same reasons. Order, *Steves I*, Dkt. No. 64 (E.D. Va. Oct. 21, 2016).

#### A.   Steves Has Adequately Alleged Antitrust Impact

To prove antitrust impact at trial, Steves need only show that JELD-WEN's violation of section 7 is "a material cause of [its] injury; [Steves] need not exhaust all possible alternative sources of injury in fulfilling [its] burden of proving compensable injury." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 114 n.9 (1969); *see also Steves I*, Dkt. No. 1025 at 31 (jury instruction providing that to prove causation, "Steves is not required to prove that JELD-WEN's alleged antitrust violation was the sole cause of its injury, nor does Steves need to eliminate all other possible causes of injury"). The antitrust causation inquiry thus raises "issues of fact best left

---

[2] That the allegations in paragraphs 97 and 98 of the amended complaint are made "based on information and belief" has no impact on the analysis for reasons given below. *See infra* at 28–29.

to the jury," *Callahan v. A.E.V., Inc.*, 182 F.3d 237, 257 (3d Cir. 1999), which are "not typically resolved through motions to dismiss." *In re Suboxone Antitrust Litig.*, MDL No. 2445, 2017 WL 4910673, at *14 (E.D. Pa. Oct. 30, 2017) (quoting *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997)).[3]

This case presents no exception. In seeking dismissal of Steves' antitrust claim, JELD-WEN baldly asserts that "Steves cannot plausibly allege" that JELD-WEN's "long-ago" violation of the Clayton Act caused Steves' present shortfall of doorskins. Mem. at 9. If JELD-WEN means by this that the passage of time has rendered any causal connection between JELD-WEN's illegal acquisition and Steves' current injuries tenuous or remote, JELD-WEN is wrong. Indeed, in *Steves I*, the jury found that the ***same*** violation of section 7 of the Clayton Act will drive Steves out of business once the Supply Agreement lapses in September 2021—which will be nearly two years ***after*** the output restrictions at issue here began. *Steves I*, Dkt. 1022 at 2.

Moreover, Steves' well-pleaded amended complaint, which incorporates the prior jury's verdict and this Court's divestiture order, amply "allege[s] facts capable of supporting a finding or inference" that JELD-WEN's adjudged antitrust violation continues to harm Steves. *In re: EpiPen Mktg., Sales Practices & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1296 (D. Kan. 2018). In its amended complaint, Steves explains how the merger unlawfully increased JELD-WEN's market power by reducing the number of suppliers in the relevant market for interior molded doorskins

---

[3] *See also Blue Shield of Virginia v. McCready*, 457 U.S. 465, 468 n.2 (1982) (accepting on a motion to dismiss that "but for the alleged conspiracy . . . , [the plaintiff] would have been reimbursed"); *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 773 n.11 (2d Cir. 2016) ("These disputed claims of causation and injury cannot be decided on a Rule 12(b)(6) motion." (quoting *Knevelbaard Dairies v. Kraft Foods, Inc.*, 232 F.3d 979, 989 (9th Cir. 2000)); *Amphastar Pharm., Inc. v. Momenta Pharm., Inc.*, 297 F. Supp. 3d 222, 228 (D. Mass.) ("[C]ausation questions are 'peculiarly within the competence of the factfinder' and should be left for the jury" (quoting *Peckham v. Cont'l Cas. Ins. Co.*, 895 F.2d 830, 837 (1st Cir. 1990)).

from three to two, even providing the specific market share for each manufacturer in the relevant market. Am. Compl. ¶¶ 19–22, 67–71. Wielding its enhanced market power, JELD-WEN raised prices, reduced quality, and pursued a scheme to "kill off" Steves, which it regarded as a formidable competitor. *Id.* at 2 & n.3, ¶¶ 27, 33, 74, 77, 80. After those efforts resulted in tens of millions of dollars in treble damages and this Court's divestiture order, JELD-WEN simply shifted tactics. *Id.* ¶¶ 28–31, 33. With the divestiture order stayed pending appeal, JELD-WEN remains free to exercise its illegally obtained market power. *Id.* ¶¶ 32, 73, 79. So it began restricting output by refusing to fill Steves' orders, declaring allocation, and implementing its so-called "mix methodology." *Id.* ¶¶ 37–40, 44–45, 52–53.

Even if JELD-WEN faced an actual shortage of doorskins (it does not), Steves' harms today still flow directly from JELD-WEN's unlawful merger. Since the merger, JELD-WEN has stood as the near-exclusive supplier of doorskins to independents, and high barriers to entry have allowed JELD-WEN to maintain that market position. *Id.* ¶¶ 67–69, 78–79 (Masonite presentation concluding the interior doorskin business "is not easy to replicate" and takes approximately four years and $100 to $150 million). Without the threat of competition, JELD-WEN has no incentive to increase capacity to meet Steves' and other independent door manufacturers' needs, while Masonite has ceased selling doorskins entirely. Am. Compl. ¶¶ 20, 72-74. By contrast, absent the merger, JELD-WEN plausibly would have increased capacity or, failing that, Steves could have turned to CMI to meet its needs under the Supply Agreement. *Id.* ¶¶ 75–77, 80–82. By focusing only on its conduct over the last six months, JELD-WEN overlooks that the merger, not allocation, eliminated Steves' ability to protect itself by turning to a competitive supplier. *Id.* ¶¶ 80–81, 86. Until that loss of competition is addressed through divestiture, Steves and other doorskin customers will remain at JELD-WEN's mercy.

9

Attacking these allegations as insufficient, JELD-WEN first contends that Steves must "construct" an elaborate hypothetical world in its pleadings. Mem. at 6–7. This greatly distorts the pleading requirements for causation in the antitrust context, where causation is widely acknowledged to be a question of fact ill-suited for disposition on a motion to dismiss. *See supra* at 8 & n.3. Steves' amended complaint shows that JELD-WEN's unlawfully acquired market power and, concomitantly, its ability to harm competition, persist today. Steves "is not required to dispose of every alternative theory of causation." *Fresenius Kabi USA, LLC v. Par Sterile Prod., LLC*, No. 16-4544, 2017 WL 548944, at *3 (D.N.J. Feb. 10, 2017); *In re Neurontin Antitrust Litig.*, No. 02-1390, 2009 WL 2751029, at *12 (D.N.J. Aug. 28, 2009); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 535 (D.N.J. 2004). Nor must Steves "provide a more detailed economic analysis at the pleading stage." *Tichy v. Hyatt Hotels Corp.*, 376 F. Supp. 3d 821, 844 (N.D. Ill. 2019). So long as Steves has "linked" its injuries to JELD-WEN's anticompetitive conduct, it has adequately pleaded antitrust impact. *Id.* (internal alternation omitted). To be sure, the precise scope of that impact will depend on the work of economists and/or accountants whose expert analyses will be presented to the jury. But antitrust plaintiffs have no obligation (or even ability) to include such details in their complaints.

The few authorities that JELD-WEN musters in support of its argument do not suggest otherwise. In *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256 (3d Cir. 1998)—which JELD-WEN also raised in *Steves I*—"the regulatory scheme mandated that [the two merging parties] not compete," so "any injury suffered by the [plaintiff] did not flow from the defendants'

conduct, but, rather, from the realities of the regulated environment." *Id.* at 265. No such barrier

to establishing antitrust impact has been alleged here.[4]

JELD-WEN also insists that its breaches of the Supply Agreement sever any causal

connection between its anticompetitive merger and Steves' present injuries. *See* Mem. at 8–9.

JELD-WEN asserts that "Steves cannot plausibly allege here that the 2012 acquisition somehow

caused JELD-WEN's decision to invoke its contractual right to allocation," *id.* at 9, but this is, in

fact, exactly what the amended complaint alleges. *E.g.*, Am. Compl. ¶¶ 74–77; *see also id.* ¶ 83

("[T]he merger has made it possible for JELD-WEN and Masonite to . . . ***restrict output of interior***

***molded doorskins*** sold to independent door customers like Steves . . . ." (emphasis added)).[5] JELD-

WEN makes no attempt to explain why these directly on-point allegations are somehow

insufficient. Instead, JELD-WEN ignores them.

JELD-WEN likewise relies on *Port Dock & Stone Corp. v. Oldcastle Northeast, Inc.*, 507

F.3d 117 (2d Cir. 2007). But that case, which also featured prominently in JELD-WEN's failed

motion to dismiss in *Steves I*, remains inapposite. The plaintiff's alleged injury in *Port Dock*—

termination as a distributor—had nothing to do with the enhanced market power from the merger,

but rather the defendant's decision to vertically integrate, which was something it "could have just

---

[4] Even further afield, the portion of *Concord Boat Corp. v. Brunswick Corp.* quoted by JELD-WEN excluded under *Daubert* an expert's opinion that rested on assumptions "not grounded in . . . economic reality." 207 F.3d 1039, 1056 (8th Cir. 2000). Nowhere does that decision suggest a plaintiff must offer an intricate economic analysis to survive a motion to dismiss. *See id.* at 1055–57.

[5] In any event, courts have repeatedly rejected motion-to-dismiss arguments based on causation issues where the defendant, like JELD-WEN, merely points to another factor that may have contributed to the plaintiff's alleged injuries. *See, e.g., Amphastar Pharm., Inc. v. Momenta Pharm., Inc.*, 297 F. Supp. 3d 222, 228 (D. Mass. 2018); *In re Suboxone Antitrust Litig.*, 2017 WL 4910673, at *13; *Rochester Drug Co-Op., Inc. v. Braintree Labs.*, 712 F. Supp. 2d 308, 318 (D. Del. 2010); *In re Gabapentin Patent Litig.*, 649 F. Supp. 2d 340, 356-57 (D.N.J. 2009); *In re Neurontin Antitrust Litig.*, 2009 WL 2751029, at *12.

as well done without" the merger. 507 F.3d at 123. As in *Steves I*, Steves is not alleging any harm here resulting from JELD-WEN's decision to vertically integrate. JELD-WEN was vertically integrated before the 2012 merger (as was CMI). Instead, Steves alleges injuries based on JELD-WEN's restriction of output, which Steves alleges stems directly from JELD-WEN's enhanced market power. Am. Compl. ¶¶ 74–77.

Indeed, JELD-WEN buries in its own brief an effective acknowledgment that Steves has adequately alleged causation. In JELD-WEN's words, even if Steves "could have obtained doorskins elsewhere absent the 2012 acquisition, that still would not make that years-old acquisition the ***cause*** of Steves' purported injury; it would at best just show that Steves might have ameliorated the ***effects*** of that breach of contract injury had the acquisition never occurred." Mem. at 10. But being unable to "ameliorate the effects" of JELD-WEN's output restrictions because the merger has left Steves without an alternative source of supply ***is*** an injury caused by JELD-WEN's section 7 violation, because Steves would not have been harmed but for JELD-WEN's illegal merger. Because—as JELD-WEN concedes—"Steves might have ameliorated the effects" of JELD-WEN's output restrictions but for the anticompetitive merger, Steves ***has*** sufficiently alleged antitrust impact.  As explained further in the next section, these injuries are precisely the type that the antitrust laws are intended to address.

### B.      Steves Has Adequately Alleged Antitrust Injury

Taking another page out of its unsuccessful *Steves I* playbook, JELD-WEN asserts that Steves failed to adequately allege antitrust injury. But this argument, much like the one JELD-WEN advanced in *Steves I*, relies on a mischaracterization of the amended complaint.

Antitrust injury is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). To that end, antitrust injury "reflect[s] the anticompetitive effect

either of the violation or of anticompetitive acts made possible by the violation." *Id.* Where, as here, it is alleged that the defendant's anticompetitive acts have eliminated alternative sources of supply for the defendant's customers—thereby harming ***both*** competitors and competition—it is abundantly clear that the antitrust injury requirement has been adequately pleaded. *E.I. DuPont Nemours v. Kolon Indus., Inc.*, 688 F. Supp. 2d 443, 460 (E.D. Va. 2009) ("the antitrust injury requirement is sufficiently pled where plaintiff alleges that he was excluded from participation in a particular market, and the result was a decrease in competition in that market."); *see, also, e.g.*, *Sprint Nextel Corp. v. AT & T, Inc.*, 821 F. Supp. 2d 308, 320 (D.D.C. 2011) ("Where a defendant, by means of anticompetitive conduct, restricts or forecloses a competitor plaintiff's access to a necessary input, courts have found that the resulting loss is injury of the type that the antitrust laws were designed to prevent."); *HTI Health Servs., Inc. v. Quorum Health Grp., Inc.*, 960 F. Supp. 1104, 1114 (S.D. Miss. 1997) (finding injury where the merger "foreclose[d] a competitor from a key source of supply that, absent the merger, would otherwise be open to it").

JELD-WEN nonetheless insists that Steves' allegations "at best assert that JELD-WEN failed to live up to its ***contractual*** duties under the Supply Agreement" and thus that Steves' injuries are merely "contractual." Mem. at 13. If this argument sounds familiar, that is because JELD-WEN took the same position in its motion to dismiss in *Steves I*. *See* Mem. In Supp. of Mot. to Dismiss at 11, *Steves I*, Dkt. No. 29 (E.D. Va. Aug. 5, 2016) ("Steves' alleged injury arises from JELD-WEN's contractual power under the Supply Agreement to determine prices and not from the CMI acquisition."). But just as the argument remains unchanged, so too do its flaws.

Much like before, JELD-WEN's memorandum disregards the amended complaint's substantial allegations regarding antitrust injury. The amended complaint alleges that JELD-WEN's acquisition of CMI in 2012 dramatically altered the market for interior molded doorskins.

13

Am. Compl. ¶¶ 71–73. Indeed, a jury has already determined that the merger—which reduced the number of doorskin suppliers in the United States from three to two—was anticompetitive. *Id.* ¶¶ 28, 72–73, 77. Following the merger, the only other supplier of doorskins, Masonite, announced that it would "stop[] selling doorskins at competitive prices and terms," "leaving JELD-WEN as the only practical source of doorskin supply." *Id.* ¶ 72.

The specific harm Steves has alleged is not merely that JELD-WEN failed to satisfy its obligations under the Supply Agreement by improperly invoking and applying allocation; it is that JELD-WEN's anticompetitive merger ensured that Steves had ***nowhere else to turn*** to acquire doorskins when JELD-WEN began restricting Steves' supply. *Id.* ¶ 80–81. This is quintessential antitrust injury. *See, e.g.*, *Sprint Nextel Corp.*, 821 F. Supp. 3d at 320; *HTI Health Servs., Inc.*, 960 F. Supp. at 1114; *see also Lee-Moore Oil Co. v. Union Oil Co. of Cal.*, 599 F.2d 1299, 1304 (4th Cir. 1979) (concluding antitrust injury existed where defendant's decision to terminate a supply agreement, "allegedly in furtherance of a conspiracy among the major oil producers, deprived [plaintiff] of the opportunity to deal in major brand gasoline . . . and forced [plaintiff] to deal in independent brands"); *Glen Holly Entm't, Inc. v. Tektronix, Inc.*, 343 F.3d 1000, 1011 (9th Cir. 2003) ("One form of antitrust injury is coercive activity that prevents its victims from making free choices between market alternatives." (internal quotation marks omitted)). As this Court explained in its order denying JELD-WEN's motion to dismiss in *Steves I*, dismissal is unwarranted when the complaint has alleged that "the 2012 merger by eliminating one of only three suppliers then in the market, by enhancing JELD-WEN's market power, and by increasing the ability of JELD-WEN and Masonite (the remaining supplier) to coordinate . . . increased costs, reduced quality and reduced output of doorskins available to [Steves]." Order, *Steves I*, Dkt. No. 64 at 2–3 (E.D. Va. Oct. 21, 2016).

14

JELD-WEN's efforts to spin Steves' antitrust injuries as mere breach of contract complaints fail to account for the fact that it was the ***merger***—not the breach—that took away Steves' ability to purchase from alternative suppliers. JELD-WEN's reliance on *Orion Pictures Distribution Corp. v. Syufy Enterprises*, 829 F.2d 946 (9th Cir. 1987), is thus misplaced. In *Orion*, the plaintiff, a film distributor, sought antitrust damages for the defendant's refusal to pay contractually required guarantees per the parties' licensing agreement. *Id.* at 948. Following the defendant's breach, the plaintiff opted to place its film in other theaters not run by the defendant. *Id.* However, "[b]ecause theaters with the largest grossing potential had already licensed films to show during the Christmas season," the plaintiff wound up earning substantially less money than it would have had the defendant paid the guarantees. *Id.* The Ninth Circuit concluded that these allegations were insufficient to show antitrust injury because "competition was no longer a factor in determining [the defendant's] obligation to [the plaintiff]." *Id.* at 949. Indeed, the plaintiff's injury in *Orion* would have been identical absent any anticompetitive conduct at all. Once the defendant chose to breach the agreement, the theaters with the largest grossing potential would have been unavailable regardless of the state of the licensing market.

This case is not *Orion*. To begin, the Supply Agreement "contain[s] provisions intended to preserve competition." *Steves and Sons, Inc. v. JELD-WEN, Inc.*, 292 F. Supp. 3d 656, 668 (E.D. Va. 2018) (denying JELD-WEN's previous motion for summary judgment that argued that the existence of the Supply Agreement meant that Steves could not prove antitrust injury). It expressly provides that "[i]n any year including an allocation period, the quantity purchase commitment in [the quantity section] shall not apply." Am. Compl., Ex. 1 at 8. Thus, the "competition alleged to be injured," *Steves I*, 292 F. Supp. 3d at 668 (internal quotation marks omitted)—here, the competition among doorskin suppliers for Steves' business—***did not end*** with the signing of the

15

contract. *See Z Channel Ltd. P'ship v. Home Box Office, Inc.*, 931 F.2d 1338, 1342 (9th Cir. 1991)

(explaining there was no antitrust injury in a prior case because "[w]hen [plaintiffs] signed

contracts to perform in or direct [two movies], the competition among movie producers for those

services ended"). To the contrary, the Supply Agreement grants Steves the right to source

doorskins from competing suppliers, free from quantity restrictions, in the event JELD-WEN

declares allocation.[6] *See* Am. Compl., Ex. 1 at 8. The amended complaint therefore ***does not*** allege

that JELD-WEN's decision to breach the Supply Agreement restricted Steves' ability to turn to

other suppliers, thereby causing Steves to suffer antitrust injury. The amended complaint alleges

that JELD-WEN's anticompetitive ***merger*** did so. *Id.* at ¶¶ 80, 86.

Indeed, the anticompetitive effects of the merger continue to harm Steves, both as a

customer of doorskins and as a competing producer of interior molded doors, by eliminating all

other domestic sources of supply. As the amended complaint alleges, "[w]ere it not for JELD-

WEN's illegal merger, Steves could turn to the competitive market to prevent JELD-WEN from

imposing these anticompetitive terms and restricting Steves' volumes." *Id.* ¶ 80. At the very least,

the pre-merger competitive market would have preserved "Steves' ability to procure interior

molded doorskins from other suppliers." *Id.* ¶ 86. Steves' inability to turn to that competitive

market—the availability of which is guaranteed to it by antitrust laws—is an antitrust injury. *See

id.* ¶¶ 80, 86. Thus, unlike the plaintiff in *Orion*, Steves' loss would not have been identical absent

JELD-WEN's anticompetitive conduct. By restricting Steves' and other independent doorskin

customers' ability to source doorskins elsewhere, JELD-WEN has made it substantially more

---

[6] The Supply Agreement also permits Steves to purchase outside the 80% purchase commitment to JELD-WEN if another supplier offers doorskins at a purchase price "at least 3% less than the then current JELD-WEN delivered price for the product but only after JELD-WEN has had a reasonable opportunity to match such lower purchase price." Am. Compl., Ex. 1 at 3-4.

16

difficult for Steves "to compete against JELD-WEN for the sale of interior molded doors." *Id.*

¶ 80. All of these injuries "flow[] from that which makes defendants' acts unlawful," *Brunswick*

*Corp.*, 429 U.S. at 489, and "stem[] from [the] competition-*reducing* aspect or effect" of the 2012

merger, *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S 328, 344 (1990) (emphasis added).[7]

JELD-WEN complains that permitting Steves' antitrust claims to move forward means it

will be on the hook for treble damages any time it breaches the Supply Agreement. Mem. at 15.

But JELD-WEN seems to forget that it has already been found liable for an antitrust violation that

reduced competition, ***and that there has (so far) been no remedy for that loss.*** It is entirely

appropriate for JELD-WEN to suffer the consequences if it wields the illegal market power it

gained from the merger—and which it still possesses—to harm Steves or others today.  Contract

violation or no, restricting output is precisely the type of injury the antitrust laws are intended to

prevent, precisely what the amended complaint alleges JELD-WEN to be doing as a direct result

of its illegal acquisition of CMI, and precisely what is harming Steves today. Am. Compl. ¶ 80.

Unsurprisingly, JELD-WEN cites no law for the proposition that, having utilized its unlawfully

gained market power to harm competition once, it may escape liability under the antitrust laws for

subsequent attempts to do the same.[8] Just as baseless is the notion that JELD-WEN's continued

---

[7] JELD-WEN cites, without elaboration, to a handful of additional cases that supposedly "reject[] plaintiffs' efforts to assert antitrust injury by pointing to a breach of contract." Mem. at 13. For the reasons discussed above, Steves has not asserted antitrust injury solely on the basis of a breach of contract, but in any event, both the Supreme Court and the Fourth Circuit have recognized that antitrust injury may arise notwithstanding the existence of a contract breach. *See, e.g.*, *Blue Shield of Va. v. McCready*, 457 U.S. 465, 468 n.2, 481–84 (1982) (holding antitrust injury was adequately pleaded where conduct allegedly breached an insurance contract, but would not have occurred "but for the alleged [violation of the Sherman Act]"); *Barber & Ross Co. v. Lifetime Doors, Inc.*, 810 F.2d 1276, 1278–80 (4th Cir. 1987) (antitrust injury existed where breach of contract left plaintiff exposed to anticompetitive tying scheme).

[8] JELD-WEN also accuses Steves of attempting to "use the antitrust laws as a sword—to protect its position as a competitor relative to others in the market—rather than as a shield."  Mem.

anticompetitive conduct is somehow immune to antitrust scrutiny merely because the conduct also constitutes a breach of contract.

## II.     STEVES PLAUSIBLY PLEADS CLAIMS FOR TORTIOUS INTERFERENCE

JELD-WEN argues that Steves' tort claims should be dismissed for two reasons. First, JELD-WEN claims that the alleged tort claims are prohibited under Delaware law because they arise entirely from the alleged breach of the Supply Agreement. Mem. at 16–18. According to JELD-WEN, such "bootstrapping" of tort claims is not permitted. Second, JELD-WEN contends that Steves has not adequately pleaded facts to maintain claims for tortious interference with contract and tortious interference with prospective business relations. *Id.* at 18–26. JELD-WEN is wrong in all respects—Steves' tort claims should be permitted to go forward.

### A.     Steves Adequately Alleges Tortious Interference Claims That Are Independent of Its Breach of Contract Claim

Steves properly alleges independent tortious interference claims that can coexist with its breach of contract claim. Although Delaware courts prohibit the "gratuitous 'bootstrapping' of contract claims into tort claims," *Data Management Internationale, Inc. v. Saraga*, No. 05C-05-108, 2007 WL 2142848, at *3 (Del. Super. Ct. July 25, 2007), that doctrine only applies where a tort action "is ***based entirely*** on a breach of the terms of a contract between the parties, ***and not on a violation of some duty imposed by law***," *Garber v. Whittaker*, 174 A. 34, 36 (Del. Super. Ct. 1934) (emphasis added) (seminal case on this issue). Here, Steves alleges that JELD-WEN is

---

at 14. This is incorrect on its own terms, but, regardless, there is no recognized principle of antitrust law that prevents antitrust plaintiffs from suing to protect their rights unless they are also trying to benefit "the market as a whole," *id*. The relevant inquiry is whether the injury to the plaintiff is "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful," *Brunswick*, 429 U.S. at 489, which Steves' injury is for the reasons set forth above.  As it happens, the legal protections afforded to Steves will also benefit consumers, such as the many customers who would have the option to buy Steves' product if only JELD-WEN was not illegally restricting Steves' access to doorskins.

violating (1) an independent common-law duty to refrain from intentionally interfering with the business relations of others, and (2) federal antitrust laws.

*Data Management*, the most frequently cited case on "bootstrapping" in Delaware, is particularly instructive here. In *Data Management*, a tenant under a commercial lease agreement sued its landlord for breach of contract and conversion after the landlord intentionally disposed of the tenant's property. *Id.* at *1. The court rejected the landlord's bootstrapping argument for the conversion claim, finding that the tenant could maintain both the tort and contract actions. *Id.* at *2–3. According to the court, "the ***source*** of the duty" is what matters in determining whether a contract claim has been improperly bootstrapped into a tort claim. *Id.* at *4 (emphasis added). Because there was "a general duty grounded in tort law to refrain from converting another's property . . . independent of any obligations imposed by the contract," the court held that the tenant could assert its tort claim alongside the contract claim. *Id.* at *3; *accord Segovia v. Equities First Holdings, LLC*, No. 06C09-149, 2008 WL 2251218, at *19 (Del. Super. Ct. May 30, 2008) ("A plaintiff may . . . seek relief in tort based on the same facts as a breach of contract claim when the defendant has breached a duty imposed by law that exists outside the agreement binding the parties."); *see also Cornell Glasgow, LLC v. La Grange Props., LLC*, No. N11C-05-016, 2012 WL 2106945, at *1 (Del. Super. Ct. June 6, 2012) ("[i]n some instances . . . tort claims are justified when facts and circumstances reveal that ***something more than failed performance*** was responsible for the breakdown of the contractual relationship.") (emphasis added).

Consistent with *Data Management*, Steves alleges that its tortious interference claims derive from a common-law duty completely separate from the Supply Agreement. *See* Am. Compl. ¶¶ 98–100. Like the conversion claim in *Data Management*, the tortious interference claims that Steves alleges here are intentional torts. *See Bhole, Inc. v. Shore Investments, Inc.*, 67 A.3d 444,

19

453 (Del. 2013) (stating intent element for contract-interference claim); *DeBonaventura v. Nationwide Mut. Ins. Co.*, 428 A.2d 1151, 1153 (Del. 1981) (same for prospective-interference claim). Thus, under Delaware law, JELD-WEN has a separate and distinct common-law duty to refrain from intentionally interfering with another entity's business contracts and relations. *See, e.g.*, *Bhole*, 67 A.3d at 453; *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 992 (Del. Ch. 1987). Steves alleges that JELD-WEN breached this common-law duty when—through misrepresentation, violations of the antitrust laws, deceit, and other means—it intentionally interfered with Steves' contracts and prospective business relations with other entities. Am. Compl. ¶ 103. These allegations are more than sufficient to place this case beyond the reach of Delaware's anti-bootstrapping rule.

Further distinguishing this case from a bootstrapping scenario, JELD-WEN's actions "reveal that something more than failed performance" explains its breach of the Supply Agreement. *Cornell Glasgow*, 2012 WL 2106945 at *1. Indeed, the gravamen of Steves' complaint is that JELD-WEN is trying to undermine its rivals through anticompetitive behavior. *See* Am. Compl. at 1–3. Count Two, the tortious interference count, specifically alleges that JELD-WEN's violations of the Supply Agreement form only one facet of the company's broader predatory program—which also includes bad-faith dealing, violations of common-law duties, and violations of federal antitrust laws. *See* Am. Compl. ¶¶ 98–99. In short, Steves' tort claims are not only based on JELD-WEN's violation of its common law duty, but also on JELD-WEN's violations of federal law in its attempts to cripple Steves.

The only other arguably relevant case that JELD-WEN cites further supports Steves' argument. In *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872 (Del Ch. 2009), the chancery court dismissed the tortious interference claim not because the plaintiff bootstrapped it to a contract

claim, but because the defendants were not "strangers" to the contract with which they were alleged to have interfered. *Id.* at 884; *see also Cornell Glasgow*, 2012 WL 2106945, at *9 (dismissing tortious interference claims for same reason). In Delaware, "[i]t is well settled that a party to a contract cannot be held liable for breaching the contract and for tortiously interfering with that contract." *Kuroda*, 971 A.2d at 884. Unlike the plaintiff in *Kuroda*, Steves alleges that JELD-WEN interfered with contracts and business relationships between Steves and a long list of third parties over which JELD-WEN exercises no control, including ███████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████ Am. Compl. ¶ 100. *Kuroda* thus poses no barrier to Steves' claim.[9]

In sum, Steves alleges that JELD-WEN breached a common-law duty separate from its breach of the Supply Agreement, and that JELD-WEN's predatory, anticompetitive behavior violated federal antitrust laws. Because both of those duties exist independently of the Supply Agreement, Delaware's rule against bootstrapping does not apply.

### B. Steves Adequately Alleges that JELD-WEN's Intentional Acts Interfered with Its Contracts in a Manner Recognized by Delaware Law

JELD-WEN argues that Steves has not sufficiently pleaded a claim for tortious interference with contract in several ways: (1) Steves does not allege that JELD-WEN knew about its contracts

---

[9] JELD-WEN relies heavily on *Delaware State University Student Housing Foundation v. Ambling Mgmt. Co.*, 556 F. Supp. 2d 367 (D. Del. 2008). That federal magistrate judge's opinion (1) is not a binding interpretation of Delaware law, and (2) based its analysis almost entirely on *Data Management*. The case thus sheds little light on the proper analysis under Delaware law. *Boulden v. Albiorix*, No. 7051-VCN, 2013 WL 396254 (Del. Ch Feb. 7, 2013), is likewise inapposite because it did not even involve tortious interference claims.

21

with third-party customers; (2) Steves identifies no contracts that have been breached as a result of JELD-WEN's intentional conduct; and (3) even if Steves has identified such a contract, Delaware law does not recognize a tortious-interference-of-contract claim when a defendant's intentional misconduct causes a plaintiff to breach a contract with a third party.[10] *See* Mem. at 15–19. JELD-WEN's arguments are meritless.

### 1.  Steves Plausibly Pleads Facts Showing that JELD-WEN Had Knowledge of Steves' Contracts with Customers

Steves sufficiently alleges that JELD-WEN knew about its contracts with third-party customers, and that JELD-WEN knew its intentional actions would interfere with those contracts. Specifically, Steves pleads that JELD-WEN was aware that (1) Steves had a long-term agreement with ████████████████████████████████████████████████████████ ████████████████████████████, Am. Compl. ¶ 99, (2) Steves had a business relationship with ████ because JELD-WEN attempted to entice ████ into ordering significantly more doors from JELD-WEN, despite imposing allocation on Steves, *id.* ¶ 100, and (3) Steves had other long-term contracts because JELD-WEN is "a direct competitor of Steves for the sale of molded interior residential doors" and knew Steves was growing its share of the market, *id.* ¶¶ 98, 102. Moreover, Steves alleges that JELD-WEN knew that it was interfering with Steves' ability to perform under its agreements with its customers. *See id.* ¶¶ 98–102. Indeed, it is plainly reasonable to infer that JELD-WEN knew it was interfering with Steves' contracts because (1) JELD-WEN is a direct competitor of Steves in the business of selling molded interior residential doors and knows how the industry operates, *id.* ¶ 98, (2) JELD-WEN lost out on a contract that it knew was awarded to

---

[10] JELD-WEN does not dispute that (1) Steves has valid contracts with third-party customers, (2) its actions were "a significant factor in causing" Steves to breach its contracts with customers, (3) JELD-WEN's actions were unjustified, or (4) Steves was injured as a result. *Bhole, Inc.*, 67 A.3d at 453 (citation omitted).

Steves after a competitive solicitation and, as such, JELD-WEN knew the terms of that agreement, *id.* ¶ 99, and (3) JELD-WEN knew it was refusing to supply Steves with "a key component of molded doors," *id.* ¶ 17, which would prevent Steves from making the doors it was required to supply under its contracts. *See id.* at 2 n.3 ("JELD-WEN 'regard[s] Steves, a significant player in the interior door market, to be an independent to be killed off.'" (citation omitted)).

Despite those allegations, JELD-WEN argues that Steves does not plausibly allege that JELD-WEN knew about any of Steves' contracts principally based on the Delaware Superior Court's decision in *Anesthesia Servs., P.A. v. Anesthesia Advantage, P.C.*, No. N11C-03-005, 2013 WL 3352672 (Del Super. Ct. June 27, 2013). *See* Mem. at 18–20. To begin, that decision came after a trial on the merits. *Anesthesia Services*, 2013 WL 3352672, at *1. Steves should have the same opportunity to develop the record that was afforded there, since JELD-WEN's specific knowledge of Steves' business is information uniquely in the possession and control of JELD-WEN. *See infra* at 28–29. In any event, Steves' allegations are consistent with *Anesthesia Services*—Steves plausibly alleges that JELD-WEN knew that (1) Steves' contracts required it to supply interior molded doors, and (2) by refusing to fulfill Steves' order for doorskins, it was interfering with Steves' ability to perform under those contracts. *See Anesthesia Services*, 2013 WL 3352672, at *5 (plaintiff must show "both 'knowledge of the contract' and knowledge 'of the fact that he is interfering with the performance of the contract.'" (quoting Restatement (Second) of Torts § 766, cmt. i)). In sum, Steves' allegations are more than sufficient at this stage of the case.[11]

---

[11] All of the other cases cited by JELD-WEN either are distinguishable or offer nothing different than *Anesthesia Services*. *Merck & Co. v. SmithKline Beecham Pharm. Co.*, No. 15443-NC, 1999 WL 669354, at *1 (Del. Ch. Aug. 5, 1999) (decision rendered after "a two week trial and post-trial submission by the parties"); *Discovery Comm'cns, LLC v. Comput. Scis. Corp.*, No.

###### 2.    Steves Plausibly Pleads Facts Showing that JELD-WEN's Actions Caused It to Breach Its Contracts with Customers

Steves sufficiently alleges that JELD-WEN's misconduct has caused it to breach contracts and agreements with numerous customers. Am. Compl. ¶¶ 105–07. Specifically, JELD-WEN's actions have caused Steves "to be unable to fill all or some of the door orders" placed under existing contracts by ███████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████ *Id.* ¶ 105. JELD-WEN nitpicks these allegations, asserting that they are deficient because Steves does not use the magic words "breach" or "contract." *See* Mem. at 22–23 & n.2. But Steves is not required to use the word breach or contract when it plainly pleads sufficient facts to show that JELD-WEN's misconduct has caused it to be in default of its agreements with its existing customers. Put simply, the Court should reject JELD-WEN's attempt to put form before substance.

###### 3.    Delaware Law Supports a Tort Claim Based on the Facts Alleged Here

Although Delaware's highest court has not conclusively decided whether to recognize the tort claim alleged here, the best available evidence demonstrates that Delaware would address

---

DKC 12-289, 2013 WL 3448076, at *4 (D. Md. July 8, 2013) (applying Maryland tort law, and plaintiff did not allege that defendant knew about "the contract at the time of interference"); *S. Home Care Servs., Inc. v. Visiting Nurse Servs., Inc. of S. Conn.*, No. 13-cv-00792, 2015 WL 4509425, at *1 (D. Conn. July 24, 2015) (decision rendered on summary judgment after development of factual record); *Medtech Prod. Inc. v. Ranir*, LLC, 596 F. Supp. 2d 778, 797 (S.D.N.Y. 2008) (explaining that plaintiff pleaded specific facts inconsistent with the inference that defendant "had actual knowledge of the contracts with which it allegedly interfered"); *Architects Collective v. Gardner Tanenbaum Grp., L.L.C.*, No. 08-1354-D, 2010 WL 2721401 (W.D. Okla. July 6, 2010) (applying Oklahoma law, and stating that an allegation that defendant "knew or should have known of the existence" of a contract is insufficient) (emphasis added).

Steves' claim on the merits. *See Private Mortg. Inv. Servs., Inc. v. Hotel & Club Assocs.*, 296 F.3d 308, 312 (4th Cir. 2002) (stating that "decisions" from "the state's intermediate appellate court constitute[s] the next best indicia of what state law is") (citation omitted); *see also Simon v. PNC Bank, Nat'l Ass'n*, No. 2:16-cv-388, 2017 WL 3726059, at *6 (E.D. Va. Aug. 29, 2017) (Allen, J.) ("In absence of an on-point state high court decision federal courts . . . . 'must make an *Erie* guess and determine as best [they] can what the [state's high court] would decide.' 'To forecast [the] decision of the state's highest court,' federal courts consider circumstantial evidence including '*inter alia*: canons of construction, restatements of the law, treatises, recent pronouncements of general rules or policies by the state's highest court, well considered dicta, and the state's trial court decisions.'" (citations omitted)).

To begin, both of the Delaware state court decisions cited by JELD-WEN and by Steves on this issue have resolved the tort claim on the merits. *Chapter 7 Tr. Constantino Flores v. Strauss Water Ltd.*, No. 11141-VCS, 2016 WL 5243950 (Del. Ch. Sept. 22, 2016); *Allen Family Foods, Inc. v. Capitol Carbonic Corp.*, No. CIVAN10C10313, 2011 WL 1205138 (Del. Super. Ct. Mar. 31, 2011). In *Allen Family Foods*, the Superior Court of Delaware expressly stated that it "finds the views of those judges who have endorsed Section 766A as a valid expansion of the law of tortious interference of contract ***to be most persuasive***." 2011 WL 1205138, at *5 (emphasis added).[12] According to the court, it would be "irrational to recognize a cause of action for a party's conduct directed at a third party designed to prevent that third party from performing a contract

---

[12] Section 766A of the Restatement (2d) of Torts provides: "One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him."

with another and not recognize a similar cause of action for that other party where the actor's conduct is instead directed at the other to prevent them . . . from performing." *Id.* (citation omitted). Thus, the court concluded that "Delaware would not reject Section 766A."[13] *Id.* at \*6; *see also Strauss Water*, 2016 WL 5243950, at \*10 & n.53 (declining to formally adopt § 766A, but nonetheless analyzing the claim).

Turning to other persuasive sources, Delaware's model jury instructions contemplate that courts will often encounter claims exactly like the one alleged here:

> One who intentionally and improperly induces or otherwise intentionally prevents another from performing a contract with a third party or makes the performance of the contract more costly is responsible to the other party for the loss suffered as a result of the prevention or interference with the contract.

Intentional Interference with a Contractual Relationship § 12.7, DEL. P.J.I. CIV. § 12.7 (2000). And the Restatement (Second) of Torts expressly recognizes that a claim for tortious interference with contract exists when a defendant acts in a way that prevents a plaintiff from performing on a contract with a third party. Restatement (Second) of Torts § 766A. In short, an overwhelming amount of persuasive authority weighs in favor of addressing Steves' tort claim on the merits under Delaware law.

In arguing to the contrary, JELD-WEN relies on (1) a single decision from the Third Circuit, and (2) out-of-state precedent discussing Restatement (Second) of Torts § 766A. JELD-WEN's argument fails for two reasons. First, the Third Circuit's decision in *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261 (3d Cir. 2010), is not applicable here. *Anderson* predates all of the Delaware case law cited above, which the Fourth Circuit considers the most persuasive authority in terms of predicting how the Delaware Supreme Court would decide this issue. *Private Mortg.*

---

[13] Virginia courts have taken the same approach to § 766A. *Schaefer v. Bouffault*, 772 S.E.2d 589, 602 (Va. 2015).

*Inv. Servs.*, 296 F.3d at 312. Moreover, *Anderson* hardly discusses Delaware law or legal principles; instead, *Anderson* relies almost entirely on a previous Third Circuit decision explaining why **Pennsylvania** likely would not recognize a tort claim under § 766A. *See Anderson*, 621 F.3d at 281 (relying on *Gemini Physical Therapy & Rehabilitation, Inc. v. State Farm Mutual Automobile Ins. Co.*, 40 F.3d 63 (3d Cir. 1994)). But that has little bearing on whether **Delaware** would adopt a similar view—particularly in light of *Allen Family Foods* and *Strauss Water*.

Second, *Anderson* (and the out-of-state courts relied on by JELD-WEN, *see* Mem. at 18) were worried about an issue not present here: whether § 766A expands tort liability too far by potentially holding defendants liable for actions that do not result in breach but only make it "more expensive or burdensome" for plaintiffs to perform under their contracts. *Anderson*, 621 F.3d at 281; *see also* Mem. at 16–18 (focusing on this issue as a reason not to allow Steves' claim to proceed). As noted above, Steves sufficiently pleads that JELD-WEN's actions have caused it to breach contracts with its interior door customers. *See supra* Part II.B.2. Thus, there is no need for this Court to decide whether Delaware would adopt a more expansive form of liability recognized in § 766A.

In short, every Delaware decision cited in the briefs considered the merits of tort claims like the one alleged here. This Court should do the same.

## C. Steves Adequately Alleges that JELD-WEN's Intentional Acts Interfered with Its Prospective Business Relations

JELD-WEN also claims that Steves did not adequately allege JELD-WEN's tortious interference with its prospective contractual relations. Mem. at 19–21. Specifically, JELD-WEN argues that Steves failed to allege JELD-WEN's actual knowledge of these prospective relations. *Id.* at 20–21 (citing *Agilent Techs., Inc. v. Kirkland*, No. 3512-VCS, 2009 WL 119865, at *6–7 (Del. Ch. Jan. 20, 2009) (specific prospective relations); *Corning Inc. v. SRU Biosystems, LLC*,

292 F. Supp. 2d 583, 585 (D. Del. 2003) (defendant knowledge)). Again, JELD-WEN vastly understates Steves' allegations in the amended complaint and the reasonable inferences drawn from those allegations.

To begin, Steves' amended complaint expressly identifies several specific parties with whom it had business expectancies. Am. Compl. ¶ 97. These potential customers include, but are not limited to, ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████████████ *Id.* Steves also adequately alleges that JELD-WEN's misconduct caused the additional business not to be awarded to Steves. *Id.* ¶ 108.

All that remains is JELD-WEN's knowledge of Steves' relations, which is information that JELD-WEN would know better than anyone else. Accordingly, Steves' amended complaint alleges, based on information and belief, JELD-WEN:

- knew that Steves was acquiring new business from ███████████, *id.* ¶ 101;

- knew about Steves' relationships with ████████████ and other customers based on the activities of its sales personnel, *id.*; and

- was also generally aware that Steves was rapidly growing its interior door business based on forecasts showing significantly greater doorskin orders for 2020 than Steves had forecasted for 2019, *id.* ¶ 102.

That Steves made these allegations based on information and belief is irrelevant. Allegations based on "information and belief" are appropriate when the "factual basis" for the allegations are "only available to" the defendant until discovery has been completed in the case. *Bailey v. Va. Dep't of*

*Alcoholic Beverage Control*, No. 2:18-cv-392, 2019 WL 2590796, at *5 (E.D. Va. Apr. 25, 2019). As long as "the contextual facts for such allegations are plausible," the courts treat allegations based on information and belief like every other factual allegation. *Id.* (string citing cases). Here, JELD-WEN alone has access to the documents showing whether JELD-WEN knew about Steves' growing business with ███████████████████, among other customers.

JELD-WEN protests that Steves' allegations are insufficient, relying on various inapposite cases. *See* Mem. at 21–22. For example, the court in *Gym Door Repairs, Inc. v. Young Equip. Sales, Inc.*, 206 F. Supp. 3d 869 (S.D.N.Y. 2016), dismissed one of plaintiff's tortious-interference claims because the "best" allegation made by plaintiff was that defendants "were aware," without elaboration, of plaintiffs' relationships with certain prospective clients. *Id.* at 911. The court, however, allowed other tortious-interference claims to go forward where plaintiffs alleged slightly more factual detail. *See id.* at 912. Under *Gym Door Repairs*, Steves plainly alleges enough to survive a motion to dismiss. Moreover, the tortious-interference claim in *Lokhova v. Halper*, No. 1:19-cv-632, 2020 WL 963032 (E.D. Va. Feb. 27, 2020), was dismissed for three independent reasons, including that plaintiff effectively abandoned it by not responding to defendants' motion to dismiss arguments, and the claim was "duplicative of her defamation claim." *Id.* at *17 & n.26. Although the court also stated that the complaint did not "allege facts indicating that any defendant, particularly any media defendant, was aware of any specific contracts or business expectancies," the court did not identify the factual deficiencies in any detail. *See id.* at *17.[14]

---

[14] JELD-WEN also cites *Worthington v. Rose Palmer, Esq.*, No. 3:15-cv-410, 2015 WL 7571822 (E.D. Va. Nov. 24, 2015), but that case has no application here outside of the standard of review. *Id.* at *3 (finding that a pro se complaint alleging conspiracy claims against judges, lawyers, and others related to the death of a third-party failed to state a claim). And *Browning v. Data Access Systems, Inc.*, No. 09C-10-248, 2011 WL 2163555 (Del. Sup. Ct. Jan. 31, 2011), is equally far afield because plaintiffs "had no business" with defendant; indeed, "[p]laintiffs [did] not plead[] any facts suggesting [defendant] was even aware they existed." *Id.* at *1.

The remaining cases cited by JELD-WEN all point to the right result here—allow Steves' tort claim to go forward until discovery concludes at which point JELD-WEN's knowledge of Steves' business relations will be clear. *See Anesthesia Services*, 2013 WL 3352672, at *1 (deciding the knowledge issue after a bench trial); *Acierno v. Preit-Rubin, Inc.*, 199 F.R.D. 157, 165 (D. Del. 2001) (deciding the knowledge issue on summary judgment); *see also Varlesi v. Wayne State Univ.*, 909 F. Supp. 2d 827, 850 (E.D. Mich. 2012) (granting summary judgment to defendant on a tortious-interference claim arising under Michigan law where plaintiff "adduced no evidence" that defendant knew about the specific "job opportunity").

## **CONCLUSION**

The motion to dismiss should be denied.

Dated:  April 20, 2020

> Respectfully submitted,
>
> **STEVES AND SONS, INC.**
>
> By:  /s/ Lewis F. Powell III
> Lewis F. Powell III (VSB No. 18266)
> Michael Shebelskie (VSB No. 27459)
> Maya M. Eckstein (VSB No. 41413)
> HUNTON ANDREWS KURTH LLP
> Riverfront Plaza, East Tower
> 951 East Byrd Street
> Richmond, Virginia 23219-4074
> Telephone:  (804) 788-8200
> Facsimile:   (804) 788-8218
> lpowell@hunton.com
> mshebelskie@hunton.com
> meckstein@hunton.com

Glenn D. Pomerantz (pro hac vice)
Kyle W. Mach (pro hac vice)
Emily Curran-Huberty (pro hace vice)
MUNGER, TOLLES & OLSON LLP
355 S. Grand Avenue, 50th Floor
Los Angeles, CA 90071
Telephone:  (213) 683-9132
Facsimile:  (213) 683-5161

Marvin G.  Pipkin (pro hac vice)
Kortney Kloppe-Orton (pro hace vice)
PIPKIN LAW
10001 Reunion Place, Suite 6400
San Antonio, TX  78216
Telephone:     (210) 731-6495
Facsimile:     (210) 293-2139
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on April 20, 2020, I caused a copy of the foregoing to be electronically filed using the CM/ECF system, which will send notification to counsel of record of such filing by operation of the Court's electronic system.  Parties may access this filing via the Court's electronic system.

By  /s/Lewis F. Powell III
        Lewis F. Powell III

32