UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| STEVES AND SONS, INC., | |
| Plaintiff, | |
| v. | Civil Action No. 3:20-cv-00098-REP |
| JELD-WEN, INC., | |
| Defendant. | |

**PLAINTIFF STEVES AND SONS, INC.'S MEMORANDUM IN OPPOSITION
TO DEFENDANT JELD-WEN, INC.'S MOTION FOR A STAY
<u>OF INJUNCTION PENDING APPEAL</u>**

**PUBLIC VERSION**

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................1

STANDARD OF REVIEW .....................................................................................................2

ARGUMENT ..........................................................................................................................4

    I.   JELD-WEN HAS FAILED TO SHOW A SUBSTANTIAL LIKELIHOOD OF
        SUCCESS ON THE MERITS OF ITS APPEAL .................................................4

        A.  JELD-WEN's First Issue:  Pre-Allocation Breach .......................................6

        B.  JELD-WEN's Second Issue:  Allocation ......................................................8

        C.  JELD-WEN's Third Issue:  Mix Methodology ..........................................10

        D.  JELD-WEN's Fourth Issue:  JELD-WEN Door ........................................13

        E.  JELD-WEN's Fifth Issue:  Balance of the Equities...................................14

        F.  JELD-WEN's Sixth Issue:  Public Interest .................................................15

        G.  JELD-WEN's Final Issue:  Backorders ......................................................19

    II.  THE COURT'S TEMPORARY GRANT OF INJUNCTIVE RELIEF WILL NOT
        IRREPARABLY HARM JELD-WEN ...............................................................23

    III. THE BALANCE OF HARDSHIPS DO NOT FAVOR GRANTING A STAY ..............26

    IV. THE PUBLIC INTEREST DOES NOT FAVOR A STAY .............................................28

CONCLUSION ......................................................................................................................29

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                **Page(s)**

*Adidas Am., Inc. v. Skechers USA, Inc.*,
   890 F.3d 747 (9th Cir. 2018) ............................................................................26

*Anderson v. City of Bessemer, N.C.*,
   470 U.S. 564 (1985)..........................................................................................5

*Audiology Distribution, LLC v. Hawkins*,
   578 F. App'x 260 (4th Cir. 2014) ....................................................................26

*Bank of Am., N.A. v. Won Sam Yi*,
   294 F. Supp. 3d 62 (W.D.N.Y. 2018) ..............................................................29

*Cent. Mills, Inc. v. Iced Apparel, Inc.*,
   No. 97-CIV-4492, 1998 WL 41584 (S.D.N.Y. Jan. 30, 1998) .........................17

*Centro Tepeyac v. Montgomery Cty.*,
   722 F.3d 184 (4th Cir. 2013) (en banc) .............................................................6

*CoreTel Virginia, LLC v. Verizon Virginia, LLC*,
   808 F.3d 978 (4th Cir. 2015) .......................................................................3, 10

*Cuomo v. U.S. Nuclear Regulatory Comm'n*,
   772 F.2d 972 (D.C. Cir. 1985) .........................................................................29

*Dixon v. Edwards*,
   290 F.3d 699 (4th Cir. 2002) .............................................................................4

*Edudata Corp. v. Scientific Comp., Inc.*,
   746 F.2d 429 (8th Cir. 1984) ...........................................................................15

*F.T.C. v. Ross*,
   743 F.3d 886 (4th Cir. 2014) .............................................................................3

*In re Grand Jury Proceedings Under Seal*,
   947 F.2d 1188 (4th Cir. 1991) ...........................................................................4

*Hoglan v. Robinson*,
   714 F. App'x 264 (4th Cir. 2018) ......................................................................6

*Int'l Refugee Assistance Project v. Trump*,
   CV TDC-17-0361, 2017 WL 1315538, at *2 (D. Md. Apr. 10, 2017)....................4

*Interox Am. v. Indust., Inc.*,
   736 F.2d 194 (5th Cir. 1984) ...........................................................................15

*Isbell v. John Crane, Inc.*,
  30 F. Supp. 3d 725 (N.D. Ill. 2014) ..................................................................14

*Lytle v. Griffith*, 240 F.3d 404 (4th Cir. 2001)..............................................................4

*Nken v. Holder*, 556 U.S. 418 (2009) ......................................................2, 3, 4, 23

*Ohio State Conference of N.A.A.C.P. v. Husted*,
  769 F.3d 385 (6th Cir. 2014) ..........................................................................3

*Pashby v. Delia*,
  709 F.3d 307 (4th Cir. 2013) .......................................................................3, 5

*In re Reveal AC, Inc.*,
  802 F.3d 558 (3d Cir. 2015).............................................................................23

*Standard Havens Prod., Inc. v. Gencor Indus., Inc.*,
  897 F.2d 511 (Fed. Cir. 1990).......................................................................4, 5

*State of Wash. v. J-Z Sales Corp.*,
  610 P.2d 390 (Wash. Ct. App. 1980).................................................................8

*U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v.
  Village at Lakeridge, LLC*, 138 S. Ct. 960 (2018)........................................5, 7, 11

*U.S. Fire Ins. Co. v. Allied Towing Corp.*,
  966 F.2d 820 (4th Cir. 1992) ..........................................................................10

*United Indus. Corp. v. Clorox Co.*,
  140 F.3d 1175 (8th Cir. 1998) ........................................................................28

*Wildman v. Berwick Univ. Pictures*,
  983 F.2d 21 (5th Cir. 2002) .............................................................................4

**Statutes and Rules**

6 Del. C. § 2-306.............................................................................................................7

6 Del. C. § 2-615.......................................................................................................11, 12

Fed. R. App. P. 8(a)(1)(A) .............................................................................................23

Fed. R. Civ. P. 65(d)(1)...................................................................................................22

**Other Authorities**

1 White, Summers, & Hillman, Uniform Commercial Code § 4:29 (6th ed. 2019).....................12

42 Am. Jur. 2d Injunctions § 121 (2020) ...................................................................29

## INTRODUCTION

By its present stay motion, JELD-WEN seeks to deprive Steves of the relief that this Court has already determined it sorely needs. For the last six months, JELD-WEN has failed to fill Steves' purchase orders, first arguing that Steves' orders were unreasonably disproportionate under Delaware's Uniform Commercial Code and then claiming a need for allocation based on a dubious assessment of production capacity. These unjustified shortages—which total more than one million missing doorskins—are irreparably harming Steves, severely damaging Steves' relationships with its door customers, some of whom have already chosen to permanently take their business elsewhere in light of Steves' inability to reliably fill their orders. Steves has been forced to draw down its existing inventory to salvage the orders it can, which in turn has left it unable to pursue new business opportunities.

Faced with these mounting losses and the prospect of a permanently depressed inventory, Steves moved the Court for a grant of preliminary injunctive relief on February 14, 2020, which JELD-WEN promptly opposed. *See* Motion for TRO & Preliminary Injunction, ECF No. 2; JW Opposition, ECF No. 31. That motion was extensively litigated. All told, the Court received three sets of briefs on the issue and heard comprehensive testimony and argument from both sides over the course of two days.

After weighing the evidence and making detailed factual findings, the Court concluded that there is a "substantial likelihood, amounting to a near certainty," that Steves will prevail on its breach of contract and declaratory judgment claims against JELD-WEN.  Order at 1, ECF No. 123. Acknowledging the "clear[] and convincing[]" strength of both the merits of Steves' claims and the severe and immeasurable impact JELD-WEN's actions have had—and continue to have—on Steves' business, the Court granted Steves' motion for preliminary injunctive relief on April 10,

2020, ordering JELD-WEN to terminate allocation effective retroactively and begin filling Steves' outstanding orders. *See id.*

As JELD-WEN's own brief acknowledges, the Court's 81-page memorandum opinion makes clear that the decision was not made lightly. *See* JW Br. at 3, ECF. No. 180 (describing the Court's "extended consideration and analysis"); *see also* Mem. Op., ECF No. 121. Nonetheless, JELD-WEN asks this Court to stay its order based on old arguments and evidence the Court has already carefully considered and rejected. *See generally* JW Br. JELD-WEN has not made the heightened showing required to justify delaying the remedies to which Steves has shown both a legal right and an urgent need. Indeed, it should go without saying that as long as allocation remains effective, Steves will continue to disappoint many of its remaining customers every week, either by short shipping orders or failing to deliver doors on time. This will only cement the impression that Steves has become an unreliable supplier, unable to secure the critical supply of doorskins necessary to fulfill its customers' needs. Furthermore, continued allocation all but guarantees that Steves will be unable to grow its business in the aftermath of JELD-WEN and Masonite's announced price increases, depriving interior molded door customers of lower-priced alternatives and further weakening Steves' long-term business prospects.

The Court should deny JELD-WEN's motion for a stay beyond the temporary stay that the Court entered, and which expires on April 29. To the extent the Court is inclined to stay any part of the injunction, that stay should be limited to a partial stay of Part D of its order, for the reasons given below.

## STANDARD OF REVIEW

"A stay is an intrusion into the ordinary processes of administration and judicial review." *Nken v. Holder*, 556 U.S. 418, 428 (2009) (internal quotation marks omitted). For this reason, "a stay is not a matter of right, even if irreparable injury might otherwise result." *Id.* at 433 (quotation

marks omitted). Thus, the party seeking the stay must make a "strong showing that [it] is likely to succeed on the merits," that it will be "irreparably injured absent a stay," that a stay will not "substantially injure" other interested parties, and that the public interest favors the issuance of a stay. *Id.* at 434. This four-factor test places a "heavy burden" on the party seeking a stay, *see Ohio State Conference of N.A.A.C.P. v. Husted*, 769 F.3d 385, 389 (6th Cir. 2014), and is so calibrated to ensure that courts do not "reflexively hold[] a final order in abeyance pending review," *Nken*, 556 U.S. at 427.

To demonstrate a strong likelihood of success on the merits, JELD-WEN must show that the Fourth Circuit is likely to find that this Court abused its discretion in granting the preliminary injunction. *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013). Where, as here, determination of the underlying motion turned largely on the Court's resolution of factual disputes, the abuse of discretion standard is a high bar. Although the Fourth Circuit reviews this Court's legal conclusions *de novo*, it reviews any factual findings for clear error. *Id.* This means that the Fourth Circuit will not disturb the Court's factual findings—and attendant conclusions—unless it is "left with a definite and firm conviction that a mistake has been committed." *CoreTel Virginia, LLC v. Verizon Virginia, LLC*, 808 F.3d 978, 988 (4th Cir. 2015) (quotation marks omitted); *accord F.T.C. v. Ross*, 743 F.3d 886, 895 (4th Cir. 2014) ("Although a different fact-finder may have come to a contrary conclusion from that reached by the experienced district judge in this case, the rigorous clear error standard requires more than a party's simple disagreement with the court's findings." (internal quotation marks omitted)). JELD-WEN has failed to demonstrate any error in the Court's findings, let alone errors so clear as to suggest a significant likelihood of reversal.[1]

---

[1] In its April 23 order temporarily staying the injunction, the Court stated that it issued the brief stay to give the parties time to "discuss potential modifications to the" preliminary injunction

## ARGUMENT

I.   **JELD-WEN HAS FAILED TO SHOW A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS OF ITS APPEAL**

JELD-WEN has not carried its burden of showing that a stay is warranted. Although JELD-WEN seeks to downplay its burden at this stage of the proceedings by characterizing its burden as merely raising a "substantial question," JW Br. at 2-3, it never explains what constitutes a "substantial question." As the Supreme Court has emphasized in a decision issued after each of JELD-WEN's cited cases, "[i]t is not enough" for JELD-WEN to show "that the chance of success on the merits [is] better than negligible," or even possible. *Nken*, 556 U.S. at 434. Instead, JELD-WEN must make a "***strong*** showing that [it] is ***likely to succeed*** on the merits" of its appeal. *Id.* (emphases added).[2]  JELD-WEN does not come close to making such a showing where, as noted

---

order. Order, ECF No. 197. As discussed, Steves will work in good faith to see if a compromise can be reached with regard to a partial stay or other arrangement, and if successful, propose a mechanism for this Court to implement such an agreement. Steves notes, however, that this Court lacks jurisdiction to modify the preliminary injunction because JELD-WEN has already filed a notice of appeal to the Fourth Circuit. "Generally, the filing of a notice of appeal immediately transfers jurisdiction of all matters relating to the appeal from the district court to the court of appeals." *Lytle v. Griffith*, 240 F.3d 404, 407 n.2 (4th Cir. 2001). And although there is an exception to that rule for "matters in aid of the appeal," *id.* (citation omitted), that exception has generally been limited to non-substantive clarifications, steps to memorialize the district court's ruling, or any actions otherwise in aid of the appeal. *See, e.g.*, *Dixon v. Edwards*, 290 F.3d 699, 709 n.14 (4th Cir. 2002) (allowing district courts to cure "imprecise wording" in an order); *In re Grand Jury Proceedings Under Seal*, 947 F.2d 1188, 1190 (4th Cir. 1991) (permitting district courts to issue written decisions after the order has been appealed). It has not been applied to substantive changes to the scope of the actual order being appealed. Indeed, as a court explained in detail in *Int'l Refugee Assistance Project v. Trump*, district courts are not permitted to "move the target for the court of appeals" or "tak[e] actions that might duplicate or confuse issues before the appellate court." CV TDC-17-0361, 2017 WL 1315538, at *2 (D. Md. Apr. 10, 2017) (citations omitted). Accordingly, Steves takes JELD-WEN's motion at face value, as a motion for a stay.

  [2] The Fourth Circuit has never adopted the "substantial question" test for a stay. And courts that had adopted that test or some variation thereof before *Nken* emphasized that they would accept this lower showing of likelihood of success only "*provided* the other factors militate in [the] movant's favor." *Standard Havens Prod., Inc. v. Gencor Indus., Inc.*, 897 F.2d 511, 513 (Fed. Cir. 1990); *see also Wildman v. Berwick Univ. Pictures*, 983 F.2d 21, 23 (5th Cir. 2002) (explaining that the movant "need only present a substantial case on the merits ***when a serious legal question***

above, this Court's decision will be reviewed to determine whether the Court abused its discretion in making credibility determinations and factual findings. *Pashby*, 709 F.3d at 319.

JELD-WEN characterizes each of its challenges to the Court's injunction ruling as raising "legal issues," *see* JW Br. at 3, to invoke *de novo* appellate review. But each of the issues dispositive of Steves' right to the relief awarded by the Court are questions of fact or mixed questions of law and fact that "immerse courts in case-specific factual issues." *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Village at Lakeridge, LLC*, 138 S. Ct. 960, 967 (2018). Such questions are reviewed only for clear error. *See id.* at 969; *Pashby*, 709 F.3d at 319. Thus, to prevail on its request for a stay, JELD-WEN must show a strong likelihood that the Fourth Circuit will conclude that the Court's factual findings were ***clearly erroneous***.

As shown below, JELD-WEN has not even tried to make that showing. *See* JW Br. at 3 (arguing that JELD-WEN "need only demonstrate that its appeal will raise a substantial legal question" to satisfy the likelihood of success factor (internal quotation marks omitted)). Nor could it. The law in this circuit is clear: "[I]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer, N.C.*, 470 U.S. 564, 573–74 (1985). In sum, "if the district court applied a correct preliminary injunction standard, made no clearly erroneous findings of material fact, and demonstrated a firm grasp of the legal principles pertinent to the underlying

---

*is involved and* [it can] ***show that the balance of the equities weighs heavily in favor of granting the stay***" (internal quotation marks omitted)).  Absent such circumstances, courts have vigorously enforced the traditional requirement that the party seeking a stay show a "strong likelihood of success on appeal." *See Standard Havens Prod., Inc.*, 897 F.2d at 513.  JELD-WEN has not demonstrated that the other factors favor a stay, much less that the balance of the equities heavily favors a stay, so in no court would JELD-WEN's mere showing of "a substantial legal question" carry the day.

dispute, then no abuse of discretion occurred." *Hoglan v. Robinson*, 714 F. App'x 264, 265 (4th Cir. 2018) (quoting *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 192 (4th Cir. 2013) (en banc)). That is precisely the situation here.

Of the issues identified by JELD-WEN as satisfying the likelihood of success prong, only four are actually necessary to support the full scope of this Court's injunction: pre-allocation breach, allocation breach, balance of the equities, and public interest. Each of these turns on the Court's findings of fact, and none of those findings is erroneous (let alone clearly so). Two additional issues identified by JELD-WEN—mix methodology and JELD-WEN's decision to limit Steves' orders based on JELD-WEN Door's needs—are subsidiary findings regarding the improper manner in which JELD-WEN implemented allocation. Accordingly, it will be unnecessary for the Fourth Circuit to reach them if it determines, as is likely, that the Court did not abuse its discretion in concluding that JELD-WEN lacked a proper basis for implementing allocation under *any* methodology. In any event, the Court's findings on these issues were also fully supported in the record and unlikely to be disturbed on appeal. The seventh and final issue concerns whether ordering JELD-WEN to fulfill Steves' backorders is an appropriate form of interim relief, which, as explained herein, it most assuredly is. Put simply, JELD-WEN has failed to show a strong likelihood of success on any of these issues that would entitle it to a stay as a matter of the Court's discretion. Steves addresses these seven issues in the order they appear in JELD-WEN's motion.

A.     **JELD-WEN's First Issue:  Pre-Allocation Breach**

With respect to the Court's treatment of Steves' pre-allocation breach of contract claim, JELD-WEN simply repeats its failed argument that Steves' fourth quarter 2019 orders were unreasonably disproportionate under Delaware law when compared to its historical orders. JW Br. at 3-4. But as the Court explained in its memorandum opinion, Delaware law only permits a

supplier to refuse to deliver quantities "unreasonably disproportionate to any ***stated estimate***" where the buyer has provided such a prior stated estimate. Mem. Op. at 34 (quoting 6 Del. C. § 2-306) (emphasis added). Only "in the absence of a stated estimate" does the baseline comparison shift to "any normal or otherwise comparable prior output." 6 Del. C. § 2-306. Here, Steves provided JELD-WEN with a fourth quarter estimate of 3.7 million doorskins to which JELD-WEN never objected, and which thus must be "regarded as a center around which the parties intend the variation to occur." *Id.* § 2-306 cmt.3.

The proper question then is whether a deviation of just 7.11% from a quarterly estimate constitutes an "unreasonably disproportionate" order under Delaware law.[3] This is not a purely legal issue, but a mixed question of law and fact subject to clear error review. As the Supreme Court explained in *CWCapital Asset Management*, when neither the legal test nor the basic facts are in dispute, an appellate court's standard of review turns on "how much legal work" applying the test will require. 138 S. Ct. at 968. In *CWCapital*, the Bankruptcy Court was tasked with determining whether a romantic relationship between two parties transformed one of them into a "non-statutory insider" under the Bankruptcy Code, such that the purchase of a loan by one person from the other "was not an arm's length transaction." *Id.* at 965 (quotation marks omitted). The Court concluded that clear error review applied on appeal because there were no legal principles for the reviewing court to clarify and because courts had "never tried to elaborate" on the arms-length test before. *Id.* at 968.

---

[3] Although JELD-WEN makes a point of noting that Steves' Fourth Quarter estimate was higher than its estimates for the two preceding quarters, *see* JW Br. at 4, the Second and Third Quarter estimates are irrelevant to Steves' Fourth Quarter orders for the simple reason that they were not estimates for the Fourth Quarter.

So too here. The Delaware courts have never articulated an overarching principle regarding what percentage in excess of a stated estimate constitutes an "unreasonably disproportionate" order under § 2-306. And JELD-WEN still offers no authority for the proposition that an increase of just 7.11% in quarterly demand constitutes an unreasonably disproportionate order that excuses performance under the Supply Agreement.[4] In light of the fact-intensive nature of this inquiry and the Court's substantial discretion, JELD-WEN cannot make a sufficiently strong showing that the Fourth Circuit would deem the Court's resolution of the issue erroneous, much less clearly erroneous.

### B.   **JELD-WEN's Second Issue:  Allocation**

JELD-WEN next contests the Court's factual finding that JELD-WEN's doorskin capacity ███████████████████████████████████████████████████████████████ ██████ such that allocation was improperly invoked. JW Br. at 4. Nothing in JELD-WEN's argument is new; moreover, it ignores the Court's extensive discussion as to why JELD-WEN's stated production of ████████████████ in 2019 is not a credible estimate of its production capacity. *See* Mem. Op. at 39-44. Nonetheless, JELD-WEN baldly asserts that the Court "appears to have ignored or discounted . . . undisputed evidence." JW Br. at 4. That is simply not the case.

To begin, JELD-WEN wrongly suggests it is "undisputed" that JELD-WEN's actual doorskin production corresponds to its production ***capacity***. JW Br. at 4. Steves has repeatedly challenged JELD-WEN's claim that its actual production of ████████████████ in 2019 represents its total production capacity. *See* Steves Mem. at 20, ECF No. 7; Steves Supp. Mem. at 8-10, ECF No. 46. And JELD-WEN cites no evidence—nor is there any—supporting its

---

[4] JELD-WEN previously relied exclusively on cases from other jurisdictions where orders exceeded stated estimates to a far greater degree – i.e,, 20% or higher.  *See* JW Opp. Br. at 18-19, ECF No. 31 (citing *State of Wash. v. J-Z Sales Corp.*, 610 P.2d 390, 394 (Wash. Ct. App. 1980)).

contention that "[t]he best evidence of JELD-WEN's production capacity is its actual performance."[5] JW Br. at 4. It is axiomatic that production cannot *exceed* capacity; it is equally true, however, that capacity can exceed production. *See Steves II* H'rg Tr. 64:13-15, ECF No. 61 (Castillo acknowledging that JELD-WEN's capacity was "at least" the total number of orders manufactured and shipped). Furthermore, JELD-WEN's CFO expressly stated in its 2019 Q3 earnings call with investors that JELD-WEN was "ramping up new capacity" for doors and had the "capacity to grow with [door] customers . . . in 2020"—something that would be impossible if, as JELD-WEN now claims, its actual production in 2018 and 2019 represented its total production capacity. Steves' Supp. Mem. Ex. 14, ECF No. 46; *see also Steves I* H'rg Tr. 116:25-117:7, *Steves I* ECF No. 2038 (Q: So without excess capacity of door skins, Jeld-Wen cannot have [ex]cess capacity of doors, can it, sir? . . . A: Yes, they would have to have capacity from the fiber group to grow the door group.").

Recognizing the many flaws in JELD-WEN's position, the Court emphasized that it credited JELD-WEN's internal business documents, which consistently described JELD-WEN's doorskin production capacity as ████████████████████████████ as more reliable evidence of capacity than JELD-WEN's actual production of ████████ ███████. Mem. Op. at 40. As the Court pointed out, as recently as "the week before allocation was declared," and in connection with JELD-WEN's internal discussions regarding the decision to declare allocation, JELD-WEN Fiber Vice President Bruce Fedio prepared a chart listing JELD-

---

[5] As a matter of common sense, what a company actually makes in any given year in response to consumer demand does not reveal the maximum amount it can make in the face of greater demand. JELD-WEN may well have produced in 2015 and 2016 ███████████████ ████████ JW Br. at 4 n.1, but that is only further proof that actual production varies due to demand—not capacity. *See* Ex. 11, Steves Supp. Mem., ECF No. 46 (projecting increasing doorskin demand from 2015 and onwards and distinguishing demand from capacity).

WEN's production capacity as ███████████—well over the ███████████ JELD-WEN claims was its capacity in 2019. *See id.* at 42 (citing ECF No. 46-16 at 3 and ECF No. 59 at 190). Because "[t]he production capacities in JELD-WEN's internal documents not only are consistent with each other but also uniformly state that JELD-WEN's production is significantly over ███████████," the Court accorded those documents controlling weight. *Id.*

That decision, which was the product of careful consideration of both the evidence and individual witness credibility, *see id.* at 10, is entitled to "great[] deference" on appeal and will be reversed only upon a showing of clear error. *CoreTel Virginia, LLC*, 808 F.3d at 988 (quotation marks omitted); *see also U.S. Fire Ins. Co. v. Allied Towing Corp.*, 966 F.2d 820, 824 (4th Cir. 1992) ("Because this determination by the district court was based upon assessments of witness credibility, it is deserving of the highest degree of appellate deference."). This is too high a burden for JELD-WEN to meet, particularly in light of its request for a stay. It is therefore exceedingly unlikely that JELD-WEN will succeed in its arguments on appeal that the Court abused its discretion in concluding that Steves has "shown clearly and convincingly a strong likelihood" that "the contractually-required basis for declaring allocation did not exist." Mem. Op. at 44.

## C.    JELD-WEN's Third Issue:  Mix Methodology

JELD-WEN also asserts that "there are substantial grounds for concluding that JELD-WEN did not breach the Supply Agreement by instituting its allocation mix methodology." JW Br. at 5. As an initial matter, the Court's findings regarding mix methodology were not necessary to its injunction ruling. The Court found that Steves had shown a high likelihood of demonstrating that allocation was unjustified irrespective of how JELD-WEN chose to implement it. *See* Mem. Op. at 45. In any case, JELD-WEN also fails to show a likelihood of demonstrating on appeal that the Court abused its discretion with regard to this issue.

It is undisputed that the Supply Agreement, which provides for allocation to be declared based only on shortages in JELD-WEN's **total** North American production capacity, does not permit JELD-WEN to restrict Steves' supply of doorskins by "mix" or design.  *See* JW Br. at 5; Mem. Op. at 46 ("JELD-WEN admits that the mix methodology is not mentioned in the Supply Agreement."). Instead, JELD-WEN argues that its novel decision to restrict doorskin purchases by design "fairly and reasonably" reflects the "on-the-ground realities of doorskin manufacturing" and, thus, is a permissible way to implement allocation under Delaware law. JW Br. at 5. But the Court's findings on this issue are also subject to clear error review. *See CWCapital Asset Mgmt. LLC*, 138 S. Ct. at 969. And JELD-WEN again fails to show a substantial likelihood of demonstrating that the Court's findings were clearly erroneous.

To begin, JELD-WEN does not even contest this Court's dispositive conclusion that 6 Del. C. § 2-615(b)'s "fair and reasonable" provision likely does not apply at all. *See* Mem. Op. at 47-50. To invoke the provisions of section 2-615 concerning allocation, a supplier must first show that its performance was made impracticable "by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made." 6 Del. C. § 2-615(a). As this Court found, however, neither doorskin shortages nor the announced price increases for finished doors would constitute an unforeseen event. *See* Mem. Op. at 48-49. To the contrary, that the parties clearly contemplated that demand for JELD-WEN's doorskins might exceed capacity is reflected in the fact that they chose to include an allocation provision in the Supply Agreement in the first place.  Nor can JELD-WEN claim that it could not anticipate that the announcement of major price increases would lead to a short-term spike in demand for doorskins before those increases went into effect.  Thus, the situation in which JELD-WEN claims

to have found itself in Fall 2019 was one expressly contemplated by the contract, precluding JELD-WEN from invoking section 2-615.

Regardless, JELD-WEN's argument is flawed because Section 2-615(b) does not provide a rigid set of rules defining what constitutes a "fair and reasonable" method of allocation. *See* 1 White, Summers, & Hillman, Uniform Commercial Code § 4:29 (6th ed. 2019) ("One should note that a direction to allocate pro rata is far from an explicit and rigid set of allocation rules."). Instead, courts are empowered to use their discretion to determine whether, ***based on the facts they have found***, a defendant's chosen method of allocation seems fair and reasonable. In this case, the Court found that there were several aspects of JELD-WEN's mix methodology that appeared to be neither fair nor reasonable. JELD-WEN has provided no basis for concluding that the Court's findings as to each were clearly erroneous.[6]

First, this Court found as a matter of undisputed fact that JELD-WEN decides what mix of doorskins it will produce based solely on its internal needs and not on "independent doorskin customers' demand." Mem. Op. at 62. Thus, if JELD-WEN Door requires substantially fewer Santa Fe doorskins during allocation, JELD-WEN's contract customers have no choice but to accept a smaller number of Santa Fes even if those customers' demand for the style goes up. *Id.* at 62 n.31; *see also Steves II* H'rg Tr. 48:25-54:5, ECF No. 61. The Court found that this method of allocating doorskins was neither fair nor reasonable, because it "clearly favors JELD-WEN ***to the detriment of its independent doorskin customers***, including Steves." *See* Mem. Op. at 63

---

[6] JELD-WEN does not challenge the Court's findings regarding JELD-WEN's forfeiture policy, *see* Mem. Op. at 64–66. Accordingly, even if JELD-WEN is entitled to a stay more broadly, the portion of the Court's injunction ordering JELD-WEN to terminate the "ordering, confirmation, and delivery process" relevant to forfeiture, Ord. at 3, will remain in effect.

(emphasis added). JELD-WEN's bare assertions that allocating by design family reflects the "on-the-ground realities of doorskin manufacturing" do nothing to disturb that finding.

Second, the Court found that the mix methodology "bind[s] Steves to the purchases it made in 2019" for each doorskin style, Mem. Op. at 63. The Court found that this cap "prevent[s] Steves from adjusting to the current demand of its own door customers," and that adding such a second layer of purchasing restrictions on top of the restriction limiting Steves' overall purchases to a specified allocation percentage was neither fair nor reasonable. Mem. Op. at 63. These findings are borne out by the evidentiary record, and JELD-WEN provides no basis to disturb them.

Indeed, JELD-WEN cites neither case law nor evidence suggesting that the Court's decision with respect to JELD-WEN's mix methodology was clearly erroneous or an abuse of discretion. It is therefore apparent that JELD-WEN cannot make a strong showing of success on this claim.

### D.  **JELD-WEN's Fourth Issue:  JELD-WEN Door**

JELD-WEN also argues that the Court erred in finding that JELD-WEN is a noncontract "customer" within the meaning of the Supply Agreement, *see* JW Br. at 5-6, which prohibits JELD-WEN from limiting Steves' doorskin supply based on the needs of "customers to which JELD-WEN has no commitment to sell under a supply agreement." *See* Ex. 1 § 20, ECF No. 107-1. This issue again involves the manner in which JELD-WEN may implement a properly justified allocation period, and thus has no bearing on the Court's primary determination that JELD-WEN did not have an adequate basis for declaring allocation. *See supra* p.10. But in any event, it is again clear that JELD-WEN has not made the strong showing required to obtain a stay.

 JELD-WEN asserts "there is no plausible argument that JELD-WEN is a 'customer' of JELD-WEN, Inc." at all, and therefore should not be subject to the exclusionary language from the location provision. JW Br. at 6. As the Court noted in its decision, however, there is plenty of

record evidence supporting its finding that JELD-WEN Door *is* a customer of JELD-WEN Fiber. *See* Mem. Op. at 51-60. ████████████████████████████

████████████████████████████████████████████████

████████████████ *Id.* at 51-53. Furthermore, there is nothing inherent to the word "customer" that would exclude JELD-WEN Door simply because it is a sister division to JELD-WEN Fiber within the same corporate entity. *See, e.g.*, *Isbell v. John Crane, Inc.*, 30 F. Supp. 3d 725, 730 (N.D. Ill. 2014) (describing a company's other departments as "internal customers"). Accordingly, this issue does not support the grant of a stay.

### E.      JELD-WEN's Fifth Issue:  Balance of the Equities

JELD-WEN next argues the Court "did not separately analyze the equities . . . and gave no apparent weight to the harm that JELD-WEN would face from complying with its injunction." JW Br. at 6. This too flies in the face of the Court's extensive opinion. After finding that "Steves is likely to suffer irreparable harm absent an injunction," the Court recognized that "an injunction will impact JELD-WEN," and addressed that harm at length. Mem. Op. at 71. The Court walked through JELD-WEN's Impact Analysis, which projected ████████████████████████ ████████████████████████ among other harms. *Id.* at 71-72. But the Court found that "JELD-WEN offered no evidence that would support these assertions," and had in fact relied on "patently untrue or unsupported assumptions" in support of its Impact Analysis. *Id.* at 72–73. The Court thus concluded that, although JELD-WEN would "suffer some hardship" from filling Steves' orders, which would require it to "reduce[] the number of doorskins it supplies to JW Door," *id.* at 73, this unquantified hardship did not outweigh Steves' risk of irreparable harm absent injunctive relief, *id.* at 71.

In short, JELD-WEN identifies no legal error on the Court's part but instead quarrels with the Court's decision to accord JELD-WEN's stated harm ***less weight***. But one side or the other

must prevail when the equities are balanced, and plainly this Court must have discretion to consider the reliability of the evidence in making its judgment. That is especially true given the substantial evidence Steves presented of the irreparable harm it would suffer absent termination of the allocation procedure. *See* Mem. Op. at 67-71. Under these circumstances, JELD-WEN has failed to demonstrate a likelihood that the Fourth Circuit would conclude that the Court abused its discretion when balancing the equities. *See Edudata Corp. v. Scientific Comp., Inc.*, 746 F.2d 429, 430 (8th Cir. 1984) ("[W]e may not disturb that court's balancing of the equities absent an abuse of discretion.").

**F.     JELD-WEN's Sixth Issue:  Public Interest**

JELD-WEN additionally contends that "there are substantial questions as to whether the Preliminary Injunction Order favors the public interest." JW Br. at 7. JELD-WEN once again contests this Court's ***fact finding***. JELD-WEN cannot and does not challenge the Court's conclusion that the public interest generally favors the enforcement of contracts. *See* Mem. Op. at 75-76; *see also Interox Am. v. Indust., Inc.*, 736 F.2d 194, 203 (5th Cir. 1984). Nor does JELD-WEN point to any countervailing public interest considerations that it identified in the injunction proceeding that would favor a stay.

Instead, JELD-WEN attempts to present new speculative arguments and evidence regarding the adverse impact of the injunction on third parties—arguments different from those it raised in opposition to the injunction motion itself.

***Doorskin customers***. In adjudicating Steves' motion for preliminary injunctive relief, the Court paid "careful attention to the potential impact of an injunction on JELD-WEN's other independent doorskin customers," Mem. Op. at 76, and repeatedly pressed both parties at the preliminary injunction hearing on the impact, if any, of a potential injunction on these customers. *See, e.g. Steves II* H'rg Tr. 22:18-20, ECF No. 59 ("It's one thing to tell Jeld-Wen they have to

15

stop serving themselves. It is quite another to say they have to stop – they have to stop serving

other people."). Yet, aware of Steves' request for an order requiring JELD-WEN to deliver 262,400

doorskins per week from its backlog, Proposed Ord., ECF No. 47, JELD-WEN's own witness

"testified that JELD-WEN was capable of filling Steves' orders by taking away doorskins from

JW Door" and that JELD-WEN "could theoretically fill all of the orders that independent

companies are making." Mem. Op. at 76–77.

The only exceptions JELD-WEN identified were the Rockport and Carrara styles, which it

claimed were in short supply. *See* Mem. Op. at 77. But as the Court observed, the evidence did not

support JELD-WEN's suggestion that it would need "to reduce its other independent doorskin

customers' supply of Rockport and Carrara doorskins" to meet Steves' demand, *inter alia*, in light

of the evidence that JELD-WEN: (i) was not operating at stretch capacity; (ii) was slated to receive

additional Rockport and Carrara dies; and (iii) expected the demand for Rockport and Carrara to

decrease. *Id.* The Court's observations have since proven prescient. JELD-WEN's new evidence

no longer claims that JELD-WEN will be unable to fill its other contract customers' orders for

Rockport and Carrara doorskins under the injunction. *See generally* Castillo Decl., ECF No. 134.[7]

---

[7] At an April 23 telephonic hearing with the Court, JELD-WEN again raised issues regarding its ability to supply Steves with Rockport and Carrara doorskins under the timetable required by the Court's injunction order. Without conceding that JELD-WEN's unsubstantiated claims of unfeasibility are meritorious, but mindful of the Court's admonition that the parties should attempt to reach agreement with regard to the implementation of the injunction, Steves has advised JELD-WEN of its willingness to have that portion of Part D of the Court's injunction order relating to unfilled Rockport and Carrara orders partially stayed, so that JELD-WEN can defer delivery of 50% of those doorskins until after trial. If that were done, JELD-WEN's main claim of hardship would be ameliorated, and there would be no basis for staying any other portion of the injunction. However, Steves wishes to emphasize that, under the applicable legal standard as reflected herein, JELD-WEN has not made an adequate showing to support a stay. Steves makes these proposals not because JELD-WEN has satisfied the legal standard, but rather mindful of the court's admonition that in considering effective implementation of its injunctive remedy, the parties should use a rifle, not a shotgun.

At the bond hearing, JELD-WEN presented an entirely different claim of harm relating to

███████████. JELD-WEN's belated attempts to introduce such speculative new evidence are

insufficient to merit a stay of the injunction. For one, this evidence was never subject to cross-

examination and came weeks after the preliminary injunction hearing and days after the Court's

order. It is therefore not entitled to consideration. *See, e.g.*, *Cent. Mills, Inc. v. Iced Apparel, Inc.*,

No. 97-CIV-4492, 1998 WL 41584, at *1 (S.D.N.Y. Jan. 30, 1998) (concluding that "Defendant's

submission" related to its costs "comes too late" where "defendant had defaulted and failed to offer

any evidence of its costs" at an earlier phase of the case).[8]

For another, even assuming this evidence may be fairly considered, it suggests at most that

███████████████████████████████████████████████████████

███████████████████████████. *See* Castillo Decl. ¶ 15, ECF No. 134. That

is hardly sufficient to show a strong likelihood of success on the merits of JELD-WEN's appeal

as to the entire injunction, which covers designs that are not at any risk of shortage with respect to

contract customer demand. This is particularly true where ███████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

---

[8] JELD-WEN essentially has sought reconsideration without purporting to satisfy the high standard for reconsideration. That request should be rejected for the same reasons given in connection with the bond briefing. *See* Steves Supp. Bond Response at 7–8, ECF No. 172.

***Door customers***. JELD-WEN additionally argues that the Court's analysis of the public interest was flawed because it gave "no consideration" to the harm the injunction will have on JELD-WEN's ***door*** customers. JW Br. at 7-8. But this is a harm that JELD-WEN gave only cursory treatment in the preliminary injunction proceeding. *See* JW Supp. Br. at 28-31, ECF No. 45 (discussing impact of injunctive relief on ***doorskin*** customers); JW Opp. Br. at 30, ECF No. 31 (arguing injunctive relief is not in public interest because it would "privilege Steves" over its ***door manufacturer*** competitors); *Steves II* H'rg Tr. 251:22-25, ECF No. 61 (briefly arguing that "the relevant nonparties here are Jeld-Wen's other contract customers who would be harmed by this injunction, but . . . also as well Jeld-Wen's door customers"). At any rate, the Court made clear in its opinion that although it thought JELD-WEN would necessarily receive fewer doorskins under the injunction, JELD-WEN had not introduced sufficiently reliable evidence to suggest that JELD-WEN—and by extension, JELD-WEN's door customers—would be seriously harmed by it. *See* Mem. Op. at 71–72.

JELD-WEN's new evidence again does not undermine the Court's finding. Its untimely damages analysis omits ███████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████. *See* Steves Bond Br. at 7–9, ECF No. 156 (discussing critical omissions in JELD-WEN's analysis). JELD-WEN has therefore failed to make any credible showing that it will be unable to fill its customers' needs. Beyond that, JELD-WEN has introduced ***no evidence*** suggesting that its door customers will be unable to turn elsewhere for doors in the event JELD-WEN cannot fill its customers' orders. In fact, JELD-WEN itself has consistently complained that any grant of injunctive relief will "expand [Steves'] capacity" to fulfill door customer demand. JW Opp. Br. at 30, ECF No. 31. This

necessarily presumes that JELD-WEN's door customers will be able to seek their doors elsewhere (and specifically, from Steves). JELD-WEN's speculation that customers may not be able to fill their orders from a different manufacturer because the process may involve "higher prices and lower quality" is manifestly contrary to the record, which reflects that Steves declined to follow JELD-WEN's decision to increase prices for interior molded doors by up to 27%. *See* Sam Steves II Decl. ¶ 8, ECF No. 7-1. If anything, JELD-WEN's door customers will ***benefit*** from the injunction, which restores the ability of Steves and other contract customers to compete for their business.

In short, there is no reason to believe that the Fourth Circuit will consider any of the Court's findings regarding public interest clearly erroneous.

### G.   JELD-WEN's Final Issue:  Backorders

Finally, JELD-WEN questions whether "fill[ing] . . . unfilled backorders is appropriate interim relief." JW Br. at 8. But ending the backlog is the very foundation of this Court's order to restore the status quo. Lacking those deliveries has disrupted Steves' normal operating inventory of doorskins, and that disruption will ***continue*** to harm Steves unless the injunction takes effect. If JELD-WEN had robbed Steves of doorskins already in Steves' operating inventory, then this Court unquestionably could order JELD-WEN to return those doorskins as interim relief. The fact that JELD-WEN has instead held Steves' doorskins hostage from the beginning makes no difference; Steves continues to be harmed all the same.

Just as JELD-WEN's door plants maintain an operating inventory of doorskins and obtain additional doorskins from JELD-WEN's doorskin factories, *see* Steves Bond Response at 8 & Ex. 2, ECF Nos. 156 & 156-2, so too does Steves, which needs both a working inventory and a continuous supply of doorskins to operate in the normal course, *see* Sam Steves II Decl. ¶¶ 9, 12, 15, 25–26, 109, ECF No. 46-1. Steves uses that operating inventory to make doors immediately

(without waiting for deliveries from JELD-WEN). New deliveries of doorskins replenish that inventory so the cycle can continue. That operating inventory is managed using "a computer algorithm that takes into consideration the orders Steves receives and will receive from its customers, based on contractual requirements, buying patterns and additional information from customers and the market." Sam Steves II Decl. ¶ 109, ECF No. 46-1. Before JELD-WEN stopped filling Steves' orders, Steves was able to maintain an operating inventory of doorskins that could be used to fill its door customers' orders. Since then, Steves' operation has suffered from depleted inventory, forcing some customer orders to go unfilled, and others to be delayed—all to the continuing detriment of its goodwill. If the backlog is not addressed, that situation will continue, and this Court's preliminary injunction will be largely ineffectual at preventing the continuing and future harm Steves faces.

The relevant question is not (as JELD-WEN implies) whether Steves has **already** been harmed by JELD-WEN's series of breaches. Obviously Steves was harmed in 2019 as soon as JELD-WEN first failed to fill Steves' orders. But parties seeking preliminary relief are rarely so fortunate as to be able to get to court without having suffered any injury at all. Indeed, a rule of "no relief for the already injured" would perversely encourage defendants like JELD-WEN to inflict swifter and surer injuries on a party in Steves' position, only to use those misdeeds to claim meaningful relief is no longer available.

Rather, the proper question is whether the portion of this Court's injunction relating to backlogged doorskins prevents **continuing** and **future** injury to Steves. Plainly, it does, because those backlogged orders continue to impair Steves' ability to serve its customers. As Sam Steves II testified, Steves' business depends on the trust that customers have developed in its ability to deliver quality doors on a timely basis. Sam Steves II Decl. ¶¶ 7, 83, 96, ECF No. 46-1. When

JELD-WEN stopped filling Steves' doorskin orders, "Steves initially drew from its doorskin inventory to fulfill its customers' orders. In short order, however, Steves had to resort to shorting most customer orders . . . ."  Sam Steves II Decl. ¶ 25, ECF No. 46-1. In other words, JELD-WEN's conduct disrupted both Steves' operating inventory and its customers' orders *in a way that has continued*. Steves is thus in a deep hole, unable to serve its customers today as it has in the past.

Steves' operating inventory has dipped far below its normal levels—it will take hundreds of thousands of doorskins to reset Steves' operating inventory to status quo levels. *See* Sam Steves II Decl. ¶ 26 & Ex. B, ECF No. 46-1. Related to the depleted state of Steves' inventory, Steves has been forced to short its door customers because of JELD-WEN's conduct. Leading up to JELD-WEN's actions, Steves had consistently filled more than 99% of customer orders, but by February 2020, that had dropped to less than 86%. *See* Sam Steves II Decl. ¶ 26 & Ex. B, ECF No. 46-1. As a result, "[a]s of March 1, 2020, Steves ha[d] orders on hand for thousands of doors that it [could] not fill because of JELD-WEN's failure to deliver doorskins."  Sam Steves II Decl. ¶ 77, ECF No. 46-1; *see also id.* ¶ 26 & Ex. B, ECF No. 46-1 (detailing unfilled orders).  This significant change, of course, is no happenstance—it is the direct and inevitable result of JELD-WEN's improper refusal to fill Steves' orders.  Before the conduct by JELD-WEN giving rise to the current action, for generations, Steves has prided itself and based its business on meeting its customers' expectations. Many customers have stuck with Steves for now, but its goodwill withers every day that Steves remains unable to fill its customers' orders—a problem that cannot be alleviated solely by terminating allocation moving forward. Sam Steves II Decl. ¶¶ 78–80, 83, 96, ECF No. 46-1. Steves needs JELD-WEN to fill backlogged doorskin orders in order to address its own backlogged door orders—and if the backlog provisions of the preliminary injunction are stayed, Steves will

lose the goodwill of its remaining door customers just as surely as if no injunction were granted at all.

Moreover, although the backlogged doorskin orders were placed in the past, filling them now is the right remedy for the future. Steves sought such relief because those backlogged orders are the most suitable measure of what deliveries would ensure the status quo of its operations and customer relationships while this litigation proceeds. The logic is simple: Steves ordered doorskins it needed for its operations. When JELD-WEN didn't deliver doorskins to Steves, Steves had to operate at a doorskin deficit to a roughly similar extent—among other things, Steves drained its operating inventory to unsustainably low levels, and Steves' customer's orders went unfilled. This Court's preliminary injunction reflects an equitable judgment that, on the record made by the parties, instructing JELD-WEN to fill those backlogged orders is the fairest and most practicable way of preventing the harm that Steves continues to suffer, in an order with the clarity and specificity that Rule 65(d)(1)(B)-(C) requires.[9] And, as discussed above, that remedy stands alongside the other provisions of the injunction that ensure JELD-WEN continues to deliver new orders in the normal course. ***Together***, these provisions do what each alone could not: protect Steves from any further loss in business and goodwill pending a trial by jury.

\* \* \*

For all of JELD-WEN's arguments, the question presented here is a simple one: has JELD-WEN shown a strong likelihood of success on its claim that the Court abused its discretion by making clearly erroneous factual findings in support of its grant of injunctive relief?  It is clear

---

[9] To be clear, Steves' acknowledgment that the injunction can be partially stayed (to reflect JELD-WEN's claims about its lack of supply of Rockport and Carrara dooskins) is solely in response to JELD-WEN's claims of extreme hardship or impossibility from that aspect of the injunction—despite JELD-WEN's failure to present adequate proof of such burden, and despite the fact that Steves will itself suffer hardship from forgoing full relief under the injunction.

that JELD-WEN has not. Not only has JELD-WEN failed to engage with the clear error standard, it has not even attempted to argue "more than a mere possibility" of success on its appeal. *Nken*, 556 U.S. at 434. These failures are fatal to its request for a stay. *See id.* at 434 ("The first two factors of the traditional standard [for a stay] are the most critical."); *In re Reveal AC, Inc.*, 802 F.3d 558, 571 (3d Cir. 2015) ("[I]f the movant does not make the requisite showings on either of these first two factors, . . . the stay should be denied without further analysis." (alterations adopted)).

## II.  THE COURT'S TEMPORARY GRANT OF INJUNCTIVE RELIEF WILL NOT IRREPARABLY HARM JELD-WEN

JELD-WEN also fails to demonstrate that the irreparable harm factor weighs in favor of its requested total stay of the Court's injunction order, which is out of all proportion to its stated harm. *See* JW Br. at 9. As reflected above, Steves has already indicated that it would not object to a partial stay that would reasonably accommodate JELD-WEN's most serious concerns—such as allowing JELD-WEN to choose the order in which it fills Steves' back-orders (rather than filling them in the order in which they were received), or deferring shipment of 50% of the Rockport and Carrara designs that JELD-WEN had previously said presented its greatest difficulty in producing until after trial in the case. Although this Court lacks jurisdiction to modify the injunction in that way, the Court does have jurisdiction to stay the injunction in part.  See Fed. R. App. P. 8(a)(1)(A) (requiring stay motion in the district court).  The partial stay just described can be implemented by staying (indefinitely or until after trial, as the case may be) the relevant provisions of the preliminary injunction.

With regard to the vast majority of doorskin styles, however, it is undisputed that JELD-WEN has enough inventory on hand and production capacity to fill Steves' backlogged orders. *See* Supp. Castillo Decl. ¶ 10. Most of the provisions of the injunction therefore do not require that

JELD-WEN do the impossible.[10]  Furthermore, JELD-WEN's more recent claims of harm asserted in the telephonic hearings held on April 23 and 24 are substantially more limited in scope than those claimed in its stay motion, which requests that the Court stay its injunction order ***in its entirety***—an act that would deprive Steves of any benefit of the provisional relief to which Steves has demonstrated to the Court it is entitled.

In any event, credible evidence in the record does not support JELD-WEN's claim in its brief that the preliminary injunction will cause it to suffer irreparable harm by "mak[ing] it impossible for JELD-WEN to meet its own needs." JW Br. at 10. As Steves has already explained to the Court during the bond proceedings, JELD-WEN's new evidence of harm is predicated on many of the same unsupported assumptions that made its Impact Analysis and production capacity testimony unreliable, and which the Court has already rejected. For instance, Daniel Castillo continues to base his projections on a production capacity of approximately ████████ annually, even after the Court rejected that figure as inaccurate based on its review of the record evidence. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Furthermore, JELD-WEN's actual production numbers for 2019 reflect that it is capable of producing—and has actually produced—substantially more than its current estimate of ██████

---

[10] One proposal by JELD-WEN would actually put Steves in a far ***worse*** position than had it not filed, and prevailed, on its preliminary injunction motion—i.e., a proposal that JELD-WEN can take 10 or 12 weeks to fill orders for the doorskin styles that make up the great majority of Steves' orders. This result, far from remedying JELD-WEN's breach of the Supply Agreement, would cloak such breaches with the imprimatur of the Court, as the Supply Agreement requires JELD-WEN to fill Steves' orders within 30 days.  There is no basis for permitting JELD-WEN thus to further avoid its contractual obligations.

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████ .

     In addition to these flaws, Mr. Castillo's analysis omits any mention of JELD-WEN's substantial inventory of interior molded doorskins located at its ***door plants***. ███████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████ . The existence of ███████████████ ██████ critically undermines JELD-WEN's argument that any shortage in doorskins will produce immediate and irreparable harm. This is to say nothing of the fact that Mr. Castillo's analysis expressly discounts any effect that ████████████████████████ will have on JELD-WEN's total capacity, *see* Castillo Decl. ¶ 24—an omission the Court has already deemed unjustifiable given the fact that JELD-WEN intends to ███████████████████████████ ████████████ , which will necessarily increase the amount of doorskins to which JELD-WEN will have access. *See* Mem. Op. at 42 n.21. Indeed, Mr. Castillo himself testified to the Court that by ███████████████████████ , JELD-WEN can free up a corresponding amount of production capacity in North American to produce other doorskin designs in high demand. *See* Dkt. No. 61, at 44:1-45:23.

     These omissions are but a few of the ways Mr. Castillo's analysis fails to adequately support JELD-WEN's otherwise unsubstantiated claim that the injunction ███████████████ ████████████████████████████████████████ JW Br. at 10. JELD-WEN's attempts to match its claims of irreparable harm to Steves' injuries, *see id.* at 9, 11, thus reveal a profound misunderstanding of the parties' respective circumstances. Steves has been deprived of

over a million doorskins for the last half-year, which has produced ongoing and well-documented injuries, including the permanent loss of customers and goodwill. *See* Mem. Op. at 67–70. In contrast, JELD-WEN has ███████████████████████████████████████████████ ████████████████████████████████████—and failed to produce reliable evidence that the injunction will cause JELD-WEN to lose ***any*** customers during the approximately two-month span of this injunction, much less ***permanently*** or in a manner not compensable by damages, as Steves has. JELD-WEN has therefore failed to meet its burden of showing irreparable harm absent a stay. *See, e.g.*, *Audiology Distribution, LLC v. Hawkins*, 578 F. App'x 260, 261–62 (4th Cir. 2014) (affirming district court's finding of no irreparable harm where defendant "produced scant evidence regarding how its operations had been or might be affected"); *Adidas Am., Inc. v. Skechers USA, Inc.*, 890 F.3d 747, 759–61 (9th Cir. 2018) (finding no evidence of irreparable harm where the movant for preliminary injunctive relief failed to introduce sufficient evidence probative of its theory of irreparable harm).

## III.    THE BALANCE OF HARDSHIPS DO NOT FAVOR GRANTING A STAY

JELD-WEN asserts, without evidence, that denying a stay "will not cause Steves any substantial harm." JW Br. at 11. That statement is false. As the Court has already found, Steves' ongoing lack of access to adequate doorskin supply—made worse by the substantial amount of backlogged doorskins that has accumulated over the past six months—continues to damage its relationships with its customers. *See* Mem. Op. at 69 ("[A]llowing JELD-WEN to continue with allocation reasonably can be expected to lead to ***further losses*** of [existing customers and future business]" (emphasis added)). Staying the injunction will only prolong these injuries and exacerbate Steves' problems, particularly in light of the fact that Steves has not been able to replenish its substantially depressed inventory during allocation. *See* Sam Steves II Decl. ¶ 108, ECF No. 46-1. In addition, without the protection of the Court's injunction, Steves will continue

26

to be shut out of future business opportunities on account of its limited doorskin supply even as JELD-WEN actively courts some of Steves' customers away. *See* Mem. Op. at 70 ("[T]he record shows that JW Door is taking advantage of Steves' inability to service its customers to solicit these customers' business for JW Door.").

JELD-WEN's brief addresses none of these substantial harms the Court has already deemed irreparable. Instead, JELD-WEN asks the Court to rely on JELD-WEN's unsubstantiated and heavily qualified promise that it will "adjust its allocation methodology" to satisfy its customers' "needs for the majority of [JELD-WEN's] doorskin designs (provided those orders are consistent with their historical ordering patterns." JW Br. at 12. As the Court has recognized, JELD-WEN has interpreted historically consistent orders in an unduly narrow fashion, and used that as a pretext for wrongly withholding hundreds of thousands of doorskins from Steves. *See* Mem. Op. at 35. Furthermore, JELD-WEN has not promised to fill ***all*** of its customers' orders— just the "majority" of them. JW Br. at 12. Moreover, JELD-WEN's conduct for the past several years strongly suggests that any of its promises to "do the right thing" should be taken with a significant grain of salt.[11] In any event, even if JELD-WEN voluntarily chooses to end allocation moving forward, that would not solve Steves' continuing inventory problems and inability to solicit new business.

---

[11] Steves recently filed a second motion seeking a remedy for JELD-WEN's continued refusal to charge the correct prices for doorskins as determined by the jury in the previous case. As the Court found in its order and accompanying memorandum opinion dated November 19, 2019, JELD-WEN improperly refused to conform its 2018 and 2019 prices to take into account the jury's findings that it had been overcharging Steves, and awarded Steves approximately $7 million in damages. *See Steves I* Ord., ECF No. 1981; *Steves I* Mem. Op. at 28, ECF No. 1980. Even after that ruling, JELD-WEN has continued to overcharge Steves in defiance of the jury's verdict and the Court's ruling. This conduct necessitated the most recent motion, which seeks an order of specific performance requiring JELD-WEN to charge the correct prices. *See Steves I* Mot., ECF No. 2043.

Where, as here, the plaintiff's hardships absent injunctive relief are concrete, irreparable, and ongoing, and the defendant's proposed hardships absent a stay are speculative or insufficiently serious, the balance of equities strongly counsel against the grant of a stay. *See United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1184 (8th Cir. 1998) (concluding that the balance of equities did not tip in one party's favor where the harm claimed was "highly speculative").

## IV.   THE PUBLIC INTEREST DOES NOT FAVOR A STAY

Neither will a stay further the public interest. Although JELD-WEN claims that the preliminary injunction "will cause significant harm to JELD-WEN's doorskin customers and door customers," these claims find no support in the factual record. As Steves has already discussed, JELD-WEN has ample capacity between JELD-WEN Fiber's inventory, JELD-WEN Door's inventory, and JELD-WEN's production capacity to meet its contract customers' forecasted demand for ███████████████. *See supra* p.17. ████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

JELD-WEN has also failed to produce reliable evidence suggesting that its door customers will be negatively impacted by any alleged shortage in JELD-WEN's ability to fill orders. *See supra* pp. 24-25. JELD-WEN's concern has consistently been that an injunction will enable Steves to increase its share of the finished doors market and compete with JELD-WEN for customers. JW Opp. Br. at 30. This necessarily presumes that, if given the choice, and with the impediment of JELD-WEN's unjustified allocation removed, some customers will ***voluntarily*** shift their business to Steves (perhaps on account of Steves' substantially lower prices). But that is a reason to put the injunction into effect, not to stay it:  The public interest in free choice, competition, and lower

prices favors allowing Steves and other independent door manufacturers to compete with JELD-WEN, freed from the effects of JELD-WEN's unjustified imposition of allocation. *See Cuomo v. U.S. Nuclear Regulatory Comm'n*, 772 F.2d 972, 978 (D.C. Cir. 1985) ("The public interest may, of course, have many faces—favoring . . . both fostering competition and preserving the economic viability of existing public services." (quotation marks omitted)). Beyond that, "there is a well-recognized public interest in enforcing contracts." 42 Am. Jur. 2d Injunctions § 121 (2020); *see also Bank of Am., N.A. v. Won Sam Yi*, 294 F. Supp. 3d 62, 82 (W.D.N.Y. 2018) ("The Court finds that the issuance of this injunction would serve the public interest by holding Defendants to their contractual obligations."). Accordingly, the public interest does not favor the issuance of a stay.

## CONCLUSION

For the foregoing reasons, Steves respectfully urges the Court to deny JELD-WEN's request for a stay.   If the Court is inclined to grant a partial stay, Steves respectfully submits that that stay should be limited to either:  (i) staying the portion of Part D of the Court's injunction order pertaining to 50% of Steves' past orders of Rockport and Carrara designs, delivery of which can be deferred until after trial; or (ii) permitting JELD-WEN to select from the entirety of Steves' back-orders which doorskins it will supply each week over the next few weeks, rather than having to filling those orders in the order in which they were made.

Dated:  April 24, 2020

Respectfully submitted,

**STEVES AND SONS, INC.**

By:     /s/Lewis F. Powell III
Lewis F. Powell III (VSB No. 18266)
Michael Shebelskie (VSB No. 27459)
Maya M. Eckstein (VSB No. 41413)
Matthew R. McGuire (VSB No. 84194)
HUNTON ANDREWS KURTH LLP

Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, Virginia 23219-4074
Telephone:  (804) 788-8200
Facsimile:   (804) 788-8218
lpowell@hunton.com
mshebelskie@hunton.com
meckstein@hunton.com
mmcguire@hunton.com

Glenn D. Pomerantz
Kyle W. Mach
Emily Curran-Huberty
MUNGER, TOLLES & OLSON LLP
355 S. Grand Avenue, 50th Floor
Los Angeles, CA 90071
Telephone:  (213) 683-9132
Facsimile:  (213) 683-5161

Marvin G.  Pipkin
Kortney Kloppe-Orton
PIPKIN LAW
10001 Reunion Place, Suite 6400
San Antonio, TX  78216
Telephone:     (210) 731-6495
Facsimile:      (210) 293-2139
*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

    I hereby certify that on April 24, 2020 I caused a copy of the foregoing to be electronically filed using the CM/ECF system, which will send notification to counsel of record of such filing by operation of the Court's electronic system.  Parties may access this filing via the Court's electronic system.

                    By  /s/Lewis F. Powell III
                            Lewis F. Powell III