**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | | |
|---|---|---|
| STEVES AND SONS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 3:20-cv-00098 |
| v. | ) | |
| | ) | **FILED UNDER SEAL** |
| JELD-WEN, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**JELD-WEN, INC.'S REPLY IN SUPPORT OF ITS**
**MOTION TO DISMISS COUNTS ONE AND TWO OF STEVES AND SONS, INC.'S**
**FIRST AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

ARGUMENT ......................................................................................................... 2

I.    Steves' Antitrust Claim Fails as a Matter of Law. ......................................... 2

      A.    Steves Does Not Allege Facts Plausibly Showing Its Purported Injuries
            Were Caused by the 2012 Acquisition ................................................... 2

      B.    Steves Cannot Plausibly Allege Facts Showing That Its Purported Injury
            Constitutes Antitrust Injury .................................................................. 8

II.   Steves' Tortious Interference Claim Fails as a Matter of Law. ...................... 10

      A.    Steves Cannot Bootstrap Its Contract Claim Into a Tort Claim ............. 11

      B.    Delaware Does Not Recognize Steves' Tortious Interference Claim ....... 14

      C.    Steves Fails to State a Claim Under § 766A. ...................................... 17

            1.    Steves Has Not Alleged Requisite Knowledge of Steves'
                  Contracts. ................................................................................. 17

            2.    Steves Has Not Alleged Requisite Knowledge of JELD-WEN'S
                  Supposed Interference. ............................................................. 18

      D.    Steves Has Not Alleged JELD-WEN Had Requisite Knowledge of Steves'
            Prospective Contractual Relations. ...................................................... 19

CONCLUSION .................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*,
  369 F.3d 732 (3d Cir. 2004)................................................................................9

*Acierno v. Preit-Rubin, Inc.*,
  199 F.R.D. 157 (D. Del. 2001) .........................................................................19

*Allen Family Foods, Inc. v. Capitol Carbonic Corp.*,
  2011 WL 1205138 (Del. Super. Ct. Mar. 31, 2011) .........................................16

*Anderson v. Wachovia Mortg. Corp.*,
  497 F. Supp. 2d 572 (D. Del. 2007)..................................................................16

*Anderson v. Wachovia Mortg. Corp.*,
  621 F.3d 261 (3d Cir. 2010).........................................................................15, 16

*Anesthesia Servs., P.A. v. Anesthesia Advantage, P.C.*,
  2013 WL 3352672 (Del. Super. Ct. June 27, 2013) .....................................17, 19

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)....................................................................................3, 4, 5

*Bakotic v. Bako Pathology LP*,
  2018 WL 6601172 (Del. Super. Ct. Dec. 10, 2018) .........................................12

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)...........................................................................................7

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*,
  429 U.S. 477 (1977)..........................................................................................10

*Chapter 7 Tr. Constantino Flores v. Strauss Water Ltd.*,
  2016 WL 5243950 (Del. Ch. Sept. 22, 2016) ..............................................15, 16

*City of Pittsburgh v. W. Penn Power Co.*,
  147 F.3d 256 (3d Cir. 1998)................................................................................6

*Cornell Glasgow, LLC v. La Grange Props., LLC*,
  2012 WL 2106945 (Del. Super. Ct. June 6, 2012) ...........................................14

*Cross v. Batterson*,
  2017 WL 2798398 (N.D. Ill. June 28, 2017) ...................................................13

*Data Mgmt. Internationalé, Inc. v. Saraga*,
  2007 WL 2142848 (Del. Super. Ct. July 25, 2007) ..................................................11, 13, 14

*Delaware State Univ. Student Housing Found. v. Ambling Mgmt. Co.*,
  556 F. Supp. 2d 367 (D. Del. 2008) .............................................................................11, 12, 13

*Dynamis Therapeutics, Inc. v. Alberto-Culver Int'l, Inc.*,
  2010 WL 3834405 (D. Del. Sept. 24, 2010) ......................................................................12, 13

*Factors Etc., Inc. v. Pro Arts, Inc.*,
  652 F.2d 278 (2d Cir. 1981) ....................................................................................................15

*Frazier v. Experian Info. Sols., Inc.*,
  2018 WL 3785131 (D. Md. Aug. 9, 2018) ...............................................................................20

*Fresenius Kabi USA, LLC v. Par Sterile Prods., LLC*,
  2017 WL 548944 (D.N.J. Feb. 10, 2017) ..................................................................................5

*Furnari v. Wallpang, Inc.*,
  2014 WL 1678419 (Del. Super. Ct. Apr. 16, 2014) ................................................................12

*Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*,
  708 F. Supp. 2d 1209 (D.N.M. 2010) .....................................................................................13

*In re Actos End-Payor Antitrust Litig.*,
  848 F.3d 89 (2d Cir. 2017) ........................................................................................................3

*In re K-Dur Antitrust Litig.*,
  338 F. Supp. 2d 517 (D.N.J. 2004) ...........................................................................................5

*In re Neurontin Antitrust Litig.*,
  2009 WL 2751029 (D.N.J. Aug. 28, 2009) ...............................................................................5

*Kable Prods. Servs., Inc. v. TNG GP*,
  2017 WL 2558270 (Del. Super. Ct. June 13, 2017) ...........................................................18, 19

*Kochert v. Greater Lafayette Health Servs.*,
  463 F.3d 710 (7th Cir. 2006) .....................................................................................................3

*Lokhova v. Halper*,
  2020 WL 963032 (E.D. Va. Feb. 27, 2020) ............................................................................20

*Mellon Bank, N.A. v. Ternisky*,
  999 F.2d 791 (4th Cir. 1993) ..............................................................................................15, 16

*MMCA Grp., Ltd. v. Hewlett-Packard Co.*,
  2010 WL 147937 (N.D. Cal. Jan. 12, 2010) ...........................................................................13

*Nemec v. Shrader*,
    991 A.2d 1120 (Del. 2010) ...........................................................................................12

*Newman v. Universal Pictures*,
    813 F.2d 1519 (9th Cir. 1987) .......................................................................................9

*Novell, Inc. v. Microsoft Corp.*,
    505 F.3d 302 (4th Cir. 2007) .........................................................................................8

*O.K. Sand & Gravel, Inc. v. Martin Marietta Techs., Inc.*,
    36 F.3d 565 (7th Cir. 1994) ...........................................................................................3

*Orion Pictures Distrib. Corp. v. Syufy Enters.*,
    829 F.2d 946 (9th Cir. 1987) .........................................................................................9

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
    507 F.3d 117 (2d Cir. 2007).......................................................................................5, 6

*Procaps S.A. v. Patheon, Inc.*,
    845 F.3d 1072 (11th Cir. 2016) .....................................................................................9

*Rhodes v. E.I. du Pont de Nemours & Co.*,
    636 F.3d 88 (4th Cir. 2011) ....................................................................................14, 15

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*,
    171 F.3d 912 (3d Cir. 1999).........................................................................................3

*Talley v. Christiana Care Health Sys.*,
    2019 WL 668272 (D. Del. Feb. 19, 2019) ..................................................................13

*Tichy v. Hyatt Hotels Corp.*,
    376 F Supp. 3d 821 (N.D. Ill. 2019) .............................................................................5

*Turner v. Va. Dep't of Med. Assistance Servs.*,
    230 F. Supp. 3d 498 (W.D. Va. 2017) ..........................................................................3

*Valley Prods. Co. v. Landmark*,
    128 F.3d 398 (6th Cir. 1997) .........................................................................................9

*Varlesi v. Wayne State Univ.*,
    909 F. Supp. 2d 827 (E.D. Mich. 2012)......................................................................20

## Other Authorities

Del. P.J.I. Civ. § 12.7 (2000) .............................................................................................16

Restatement (Second) of Torts § 766A................................................................... *passim*

## INTRODUCTION

This case is nothing more than a straightforward breach of contract claim.   Steves' opposition cannot obscure that fact, or the glaring flaws in its antitrust and tortious interference claims.   Because those claims are neither factually nor legally sustainable under the allegations in the First Amended Complaint, ECF No. 105 ("FAC"), they must be dismissed as a matter of law.

As to its antitrust claim, Steves asks this Court to adopt an extraordinarily broad and entirely unsupported antitrust theory that would subject JELD-WEN to unprecedented antitrust liability for practically any commercial decision it makes.   According to Steves, the "crux of [its] antitrust injury" is its "inability to turn elsewhere for supply," ECF No. 184 ("Opp'n") at 1, which it blames on JELD-WEN's acquisition of Craftmaster International ("CMI") in 2012, *more than seven years ago*.   Steves therefore claims that *any* conduct by JELD-WEN that post-dates the 2012 acquisition, and that allegedly harms Steves' commercial interests, automatically gives rise to an antitrust violation traceable to the 2012 acquisition and compensable by treble damages, because (Steves claims) absent the acquisition Steves could *always* have gone to a different doorskin supplier and bought doorskins on better terms there.

That approach is foreclosed by settled law.   Stating an antitrust claim requires more than just general allegations that the defendant engaged in some anticompetitive conduct in the past; instead, a plaintiff must plead facts plausibly showing both *antitrust impact*, meaning that the challenged anticompetitive conduct (here, the 2012 acquisition) was a but-for cause of the alleged harm, and *antitrust injury*, meaning that the plaintiff's own alleged harm was the type of anticompetitive injury to the market as a whole that the antitrust laws are intended to prevent.

Steves cannot meet either requirement here.   As to antitrust impact, Steves effectively concedes it has not pleaded any facts plausibly showing what the doorskin market would look like today if the 2012 acquisition had never occurred.   In particular, Steves pleads no facts plausibly

showing that absent the 2012 acquisition, Steves would have been able to obtain from CMI the doorskins it wants at the prices, designs, and quantities it demands.  As to antitrust injury, Steves offers no persuasive response to the fundamental problem that the harms it asserts stem from JELD-WEN's alleged failure to satisfy its obligations *under the Supply Agreement*, not from the 2012 acquisition.  Those unique contractual injuries do not coincide with any broader anticompetitive harm to the market as a whole, and so cannot support an antitrust claim.

Steves' tortious interference claim suffers from equally fatal problems, which Steves' opposition does nothing to cure.  That tortious interference claim at bottom asserts nothing more than that JELD-WEN breached its contractual obligations, which means the claim is barred by Delaware's bootstrapping doctrine.  Even setting that doctrine aside, Steves' tortious interference claim is based on a section of the Restatement (Second) of Torts (§ 766A) that Delaware courts have never recognized—and whose elements Steves would fail to satisfy even if it were viable under Delaware law.  Those deficiencies individually and collectively require dismissing Steves' tortious interference claim.  Because Steves cannot even plead (let alone prove) the factual allegations necessary to make out its antitrust and tortious interference claims, the motion to dismiss those claims should be granted with prejudice.

## ARGUMENT

## I.     Steves' Antitrust Claim Fails as a Matter of Law.

Steves does not dispute that to state a viable antitrust claim, it must allege facts plausibly showing both antitrust *impact* and antitrust *injury*.  The FAC fails to do either.

### A.     Steves Does Not Allege Facts Plausibly Showing Its Purported Injuries Were Caused by the 2012 Acquisition.

The basic requirement of antitrust impact is simple: to bring suit under the antitrust laws, a plaintiff must show that the alleged anticompetitive conduct was "the cause-in-fact of [its] injury:

that 'but for' the violation, the injury would not have occurred." *O.K. Sand & Gravel, Inc. v. Martin Marietta Techs., Inc.*, 36 F.3d 565, 573 (7th Cir. 1994). Here, the FAC simply fails to allege facts plausibly showing that the purported anticompetitive conduct it challenges—an acquisition that took place more than *seven years ago*—actually caused the sudden doorskin shortage that began last October, or any of the injuries Steves claims to have suffered as a result of that shortage.

Steves' assertion that it need not show the 2012 acquisition was the *sole* cause of its injury, Opp'n at 7, misses the point. The issue is not whether Steves must show the 2012 acquisition was the *only* cause of its injury, but whether Steves has pleaded facts plausibly showing that the 2012 acquisition "was a material *and but-for* cause of [its] injury," meaning that absent the acquisition, Steves would not have suffered that injury. *In re Actos End-Payor Antitrust Litig.*, 848 F.3d 89, 97 (2d Cir. 2017) (emphasis added); *see, e.g.*, *O.K. Sand & Gravel*, 36 F.3d at 573; *Kochert v. Greater Lafayette Health Servs.*, 463 F.3d 710, 718 (7th Cir. 2006); *Turner v. Va. Dep't of Med. Assistance Servs.*, 230 F. Supp. 3d 498, 507 (W.D. Va. 2017). While that but-for causation inquiry may sometimes depend on disputed factual questions, *see* Opp'n at 7-8, that is not the case here, as the FAC wholly fails to plausibly allege facts showing but-for causation and so must be dismissed as a matter of law. *See, e.g.*, *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 921, 934 (3d Cir. 1999) (affirming dismissal of antitrust claims for failure to plead an adequate "causal link"); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) ("[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss.").

Steves asserts that the FAC adequately alleges that the 2012 acquisition continues to injure it today—more than seven years later—because that acquisition "reduc[ed] the number of suppliers in the relevant market … from three to two." Opp'n at 8-9. But that assertion only

underscores Steves' but-for causation problem:  Steves has alleged no facts plausibly showing that, but for the acquisition, there would *still* be three doorskin suppliers in the market today who would be willing to offer Steves doorskins at the prices, quantities, and designs that Steves demands. Steves has put forward nothing in its FAC to show that CMI (a company that was in severe financial distress in 2012) would have remained a viable independent business for the next seven years.  Even if CMI had remained independent, moreover, Steves fails to plausibly allege that CMI would have been willing to sell doorskins to Steves today rather than (like Masonite) refusing to do business with Steves at the prices Steves demands.  In sum, Steves offers nothing more than a conclusory assertion that absent the acquisition it "could have turned to CMI to meet its needs under the Supply Agreement."  *Id.* at 9.  That conclusory assertion is utterly unsupported by any plausible factual allegations and must be disregarded.  *Iqbal*, 556 U.S. at 678.

Steves also suggests in passing that it has plausibly alleged that "absent the [acquisition], JELD-WEN plausibly would have increased capacity."  Opp'n at 9.  But the FAC makes no allegation (let alone any plausible factual allegation) that JELD-WEN would have increased its production capacity more over the past seven years absent the acquisition.  Instead, the FAC alleges only that absent the acquisition, JELD-WEN would have met the abrupt increase in doorskin demand in October 2019 by suddenly increasing its production capacity overnight, either by "reopening its mothballed factory in Marion, North Carolina" or by "increasing capacity at other plants" in some unspecified way.  FAC ¶ 82.  Those allegations are implausible on their face. With or without the 2012 acquisition, it would be neither economical nor even possible for JELD-WEN to suddenly—within days or weeks—restart production at a mothballed plant, or suddenly improve its overall production, to meet a temporary surge in doorskin demand.

Otherwise, JELD-WEN would in fact have done exactly that, and avoided limiting both its customers' doorskin purchases and its own door production under allocation.

Rather than alleging facts showing that the 2012 acquisition was a but-for cause of its purported injuries, Steves disclaims any need to show what the doorskin market would have looked like if the acquisition had not occurred. Opp'n at 10. But it is well established (and Steves does not appear to dispute) that but-for causation is an essential element of an antitrust claim, *see supra* pp. 2-3, and Steves cannot plead but-for causation without alleging facts to show how the market would have operated absent the alleged anticompetitive act (here, the 2012 acquisition). None of the out-of-circuit district court cases that Steves cites are to the contrary; in fact, those cases hold that an antitrust plaintiff must plead facts showing that its injury "flows from the [alleged] anti-competitive conduct," which necessarily requires facts showing that the injury would not have occurred absent that conduct. *Fresenius Kabi USA, LLC v. Par Sterile Prods., LLC*, 2017 WL 548944, at *3 (D.N.J. Feb. 10, 2017); *see In re Neurontin Antitrust Litig.*, 2009 WL 2751029, at *12 (D.N.J. Aug. 28, 2009); *In re K-Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 535 (D.N.J. 2004); *Tichy v. Hyatt Hotels Corp.*, 376 F Supp. 3d 821, 843 (N.D. Ill. 2019) (antitrust plaintiffs must show that "but for the violation, the injury would not have occurred").[1] Steves' assertion that it should not have to bear this burden until it reaches the jury is meritless; if Steves cannot even plead facts that make its claim plausible, it has no right to reach a jury at all. *Iqbal*, 556 U.S. at 678.

Steves cannot distinguish the cases cited in JELD-WEN's memorandum showing that its factual allegations are insufficient to survive a motion to dismiss. Like the plaintiff in *Port Dock*,

---

[1] So too for the other cases Steves cites as holding that "merely point[ing] to another factor that may have contributed to the plaintiff's alleged injuries" is not enough to warrant dismissal. Opp'n at 11 n.5. The problem with the FAC is not that other factors may have *contributed* to Steves' injury, but that Steves has failed to plead facts that would show that the alleged anticompetitive conduct was a *but-for cause* of its injuries.

Steves' alleged harm derives not from the conduct it challenges as anticompetitive (the 2012 acquisition), but from an unrelated event (the sudden spike in doorskin demand and JELD-WEN's inability to meet that demand) that the challenged conduct "certainly did not cause." *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 123 (2d Cir. 2007).  As in *Port Dock*, the sudden increase in doorskin demand here and JELD-WEN's resulting inability to fill all of Steves' orders "could have just as well" occurred even if the 2012 acquisition had never happened.  *Id.*  As for *City of Pittsburgh*, while the *reason* that the plaintiff there could not show but-for causation is obviously different, the same principle applies: because "[t]here are no facts averred" in the FAC that plausibly establish "any causal connection between the harm which has arguably been suffered by [Steves] and the alleged [antitrust] violation," the FAC must be dismissed.  *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 268 (3d Cir. 1998).

Recognizing that it has failed to plead what the doorskin market would look like absent the 2012 acquisition, Steves invents a new causal theory: that the 2012 acquisition actually caused JELD-WEN's decision, more than seven years later, to invoke allocation.  Opp'n at 11.  But as JELD-WEN pointed out in its opening brief, *see* ECF No. 145 ("Mem.") at 9-10, the FAC does not actually allege that theory, let alone any facts that could make that theory plausible.  None of the paragraphs in the FAC that Steves cites says anything to suggest that the 2012 acquisition actually triggered the decision to invoke allocation years in the future.  Opp'n at 12 (citing FAC ¶¶ 74-77).[2]  On the contrary, the FAC recognizes that the "real facts that led [JELD-WEN] to

---

[2] Steves may have intended to cite FAC ¶¶78-81, but those paragraphs are no more helpful.  Setting aside the conclusory assertions that JELD-WEN "restricted output … as a result of" the acquisition, and that allocation was a "direct result" of the acquisition, *id.* ¶¶ 78, 80, Steves alleges no facts plausibly showing that the acquisition more than seven years earlier was what actually impelled JELD-WEN to allocation in late 2019—or conversely, that JELD-WEN would have chosen not to invoke allocation in response to its sudden doorskin shortage if that long-ago acquisition had never taken place.

declare allocation" were the sudden increase in the price of interior molded doors and the resulting "'spike' in demand from customers seeking to purchase doors before the price increase became effective." FAC ¶ 47. The conclusory allegation that Steves quotes in its brief does not even attempt to assert otherwise; it says only that the acquisition "made it possible" for JELD-WEN to "restrict output," not that the 2012 acquisition actually caused JELD-WEN to refuse certain of Steves' 2019 orders and declare allocation (an assertion that would be implausible on its face). Opp'n at 11 (emphasis omitted) (quoting FAC ¶ 83).

Steves' assertion that JELD-WEN has conceded antitrust impact is equally specious. *Contra* Opp'n at 12. Even assuming that, absent the 2012 acquisition, CMI would have been willing and able today to sell Steves the doorskins Steves claims JELD-WEN failed to provide at the prices and quantities Steves demands—an assertion that Steves does not support with factual allegations—that still would not make that years-old acquisition the *cause* of Steves' purported injury. Mem. at 10. Instead, as the factual allegations of the FAC make clear, the only cause of Steves' alleged injury was the sudden increase in the demand for doorskins and JELD-WEN's resulting inability to provide Steves with all of the doorskins that Steves wanted. Steves cannot rely on the purported effects of a merger more than seven years in the past to turn a straightforward breach of contract claim into an antitrust suit for treble damages.

Unable to identify any allegations that would "nudge[] [its] claims … across the line from conceivable to plausible," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007), Steves spends much of its opposition insisting that this Court already resolved this question in its favor in *Steves I*. But the question for antitrust impact purposes is not whether the 2012 acquisition was anticompetitive; it is whether Steves has plausibly alleged that the acquisition caused the specific injuries it claims here. Even assuming that Steves succeeded in proving that the acquisition caused

it *some* form of antitrust injury in *Steves I*, that does not relieve Steves of the burden of plausibly alleging that it caused *this* injury. Because the FAC falls well short of meeting that burden, Steves' antitrust claim must be dismissed.

### B. Steves Cannot Plausibly Allege Facts Showing That Its Purported Injury Constitutes Antitrust Injury.

Steves' antitrust claim must also be dismissed because Steves has not pleaded an "injury of the type the antitrust laws were intended to prevent." *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 311 (4th Cir. 2007). Rather than pleading an injury to competition as a whole, Steves has alleged harm only to itself from the alleged breach of its own Supply Agreement with JELD-WEN. Steves' attempts to recharacterize the idiosyncratic injury for which it seeks relief as a broader harm to the market are wholly unpersuasive.

Steves claims that it has alleged harm to the market as a whole by asserting that the 2012 acquisition "eliminated [an] alternative source[]" of doorskin supply. Opp'n at 13-14. But Steves is not seeking a remedy for its inability to obtain doorskins *from CMI*; if it were, Steves would have to prove that CMI (i) would still be in business today, (ii) would have the doorskin styles Steves wants, (iii) would be willing to sell them to Steves, and (iv) would be willing to do so at prices that would allow Steves to profit on the sale of its doors. The FAC alleges none of those facts. Instead, it suggests that Steves is just seeking a remedy for its inability to obtain doorskins *from JELD-WEN* in the quantities and designs that Steves claims *the Supply Agreement* requires— a contractual injury unique to Steves and not shared by the market at large. *See* FAC ¶¶ 78-79.[3]

---

[3] Steves' repeated assertion that the acquisition took away its ability to purchase doorskins from alternative "suppliers" in the plural, or took away "all other domestic sources of supply," is puzzling in the extreme. Opp'n at 14, 16. The only "supplier" that JELD-WEN acquired in the 2012 acquisition was CMI. To the extent Steves is suggesting that the acquisition caused *Masonite* to decide to stop selling to Steves, *see id.* at 14, that baseless suggestion is nowhere alleged in the FAC, and Masonite's independent decision of course would not be JELD-WEN's fault.

Steves' attempt to distinguish *Orion Pictures* is thus unavailing.  Here, as in *Orion*, the parties' obligations to each other were "fixed by [their] contractual commitment," and any harms Steves suffered from the breach of those obligations "do not constitute antitrust injury."  *Orion Pictures Distrib. Corp. v. Syufy Enters.*, 829 F.2d 946, 949 (9th Cir. 1987).  Steves' assertion that the Supply Agreement contains provisions intended to preserve competition is irrelevant, *contra* Opp'n at 16, because the remedy Steves seeks here is not premised on the doorskins Steves might have purchased from CMI—which would require Steves to show not only that CMI would still exist and would be willing to sell to Steves—but also the styles CMI would have provided and the prices it would have charged.  Instead, Steves' claim is premised on the doorskins that Steves believes it was contractually entitled to receive from JELD-WEN.  That alleged breach of a contractual entitlement is not an injury recognized by the antitrust laws.

Steves makes no effort to address any of the other cases JELD-WEN has cited showing that Steves cannot rely on its breach of contract allegations to establish antitrust injury.  *See Newman v. Universal Pictures*, 813 F.2d 1519, 1522-23 (9th Cir. 1987); *Valley Prods. Co. v. Landmark*, 128 F.3d 398, 403-04 (6th Cir. 1997) (affirming dismissal of antitrust claim because plaintiff's contract losses "would have been suffered … whether or not" defendant had acted anticompetitively); *2660 Woodley Rd. Joint Venture v. ITT Sheraton Corp.*, 369 F.3d 732, 738-39 (3d Cir. 2004) (rejecting antitrust claim because plaintiff's "injury was caused by a breach of contract").  Instead, Steves just asserts in a footnote that "antitrust injury may arise notwithstanding the existence of a contract breach."  Opp'n at 17 n.7.  But even assuming that may be true in some cases, that does not give plaintiffs carte blanche to "dress up in antitrust garb what is, at best, a ... contract violation."  *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1087 (11th Cir. 2016).

Most remarkably, Steves whole-heartedly embraces the view that given the 2012 acquisition, JELD-WEN can now be held liable for treble damages and attorneys' fees under the federal antitrust laws "any time it breaches the Supply Agreement"—indeed, any time JELD-WEN takes any action that interferes with Steves' commercial interests, "[c]ontract violation or no." Opp'n at 17. That theory would eviscerate the antitrust injury doctrine. The whole point of that doctrine is to make clear that not every injury—indeed, not even every injury that is caused by anticompetitive conduct (which Steves' injuries were not)—is of "concern to the antitrust laws." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 487 (1977). Any theory under which Steves may automatically extract treble damages and attorneys' fees from JELD-WEN any time Steves believes that it has suffered some injury traceable in some way to the 2012 acquisition would openly flout that settled Supreme Court precedent. Thus, even assuming *arguendo* that Steves can permissibly seek antitrust damages from JELD-WEN a second time based on the same 2012 acquisition that it challenged in *Steves I*, it must at least plead facts demonstrating that the acquisition was a but-for cause of its new injury, and that such injury is of the type the antitrust laws are intended to prevent. Because Steves has failed to plausibly plead any such facts, its antitrust claim must be dismissed.

## II.     Steves' Tortious Interference Claim Fails as a Matter of Law.

Steves' opposition fails to cure any of the four independent reasons why its tortious interference claim must be dismissed: (1) Delaware's bootstrapping doctrine bars this claim; (2) Steves brings a claim under the Restatement (Second) of Torts § 766A, which Delaware law does not recognize as a cause of action; (3) even assuming the viability of § 766A, the FAC does not adequately plead such a claim; and (4) Steves does not allege that JELD-WEN knew of Steves' purported business expectancies or that JELD-WEN was interfering with them.

## A.      Steves Cannot Bootstrap Its Contract Claim Into a Tort Claim.

Two basic premises demonstrate that Steves' claim must be dismissed under the Delaware bootstrapping doctrine.  First, to avoid the bootstrapping doctrine, a plaintiff must allege "wrongful conduct beyond the breach of contract itself."  Mem. at 17 (quoting *Data Mgmt. Internationalé, Inc. v. Saraga*, 2007 WL 2142848, at *3 (Del. Super. Ct. July 25, 2007)).  And second, the only conduct Steves claims has caused it any injury here is JELD-WEN's purported violation of the Supply Agreement.  *Id.*

Steves' opposition does not meaningfully refute either of these premises.  As to the former, Steves does not dispute that "[e]ven an intentional, knowing, wanton, or malicious action by the defendant will not support a tort claim if the plaintiff cannot assert wrongful conduct beyond the breach of contract itself."  *Data Mgmt.*, 2007 WL 2142848, at *3.

As to the latter, Steves does not dispute that the only harms it alleges stem from the same conduct it claims breached either Section 4 or Section 20 of the Supply Agreement.  But Steves appears to argue that the same conduct can support both contract and tort claims if, in breaching a contract, a defendant also violates an independent duty imposed by law.  Opp'n at 18.  That assertion finds no support under Delaware law.  In fact, the district court rejected this exact argument in *Delaware State University Student Housing Foundation v. Ambling Management Co.*, 556 F. Supp. 2d 367 (D. Del. 2008).  There, the plaintiff defended its tortious interference claim by arguing that the defendant "had a duty, independent of its contractual obligations to [plaintiff], to refrain from actions that would damage [plaintiff's] reputation with … students."  *Id.* at 377.  The court nevertheless dismissed the claim because the complaint failed to "plead any intentional or wrongful *conduct* other than the alleged breach of the [parties' agreements]."  *Id.* at 376-77 (emphasis added).  Steves offers no basis to question that reasoning, instead simply asking the Court to disregard that decision.  *See* Opp'n at 21 n.9.

But *Delaware State* is no outlier.  In *Nemec v. Shrader*, for example, the Delaware Supreme Court likewise rejected the argument that the same conduct could subject a defendant to both tort and contract liability.  991 A.2d 1120, 1129 (Del. 2010).  There, the court affirmed dismissal of a fiduciary duty claim as "superfluous" to the plaintiff's breach of contract claim, explaining that the defendant's "contract duties … superseded and negated any distinct fiduciary duties arising out of the same conduct that constituted [the] contractual breach."  *Id.*; *see also id.* (citing the "well-settled principle that where a dispute arises from obligations that are expressly addressed by contract, that dispute will be treated as a breach of contract claim").  For the same reason, Delaware permits a fraud claim to survive alongside a breach of contract claim only if "the [fraud] claim is based on conduct that is separate and distinct from the conduct constituting the breach."  *Furnari v. Wallpang, Inc.*, 2014 WL 1678419, at *8 (Del. Super. Ct. Apr. 16, 2014).

Many cases apply this same principle—as *Delaware State* did—to tortious interference claims.  In *Bakotic v. Bako Pathology LP*, a medical group countersued a former executive for breach of contract and tortious interference, claiming he had unlawfully solicited the group's employees, dissuaded a potential employee from accepting employment, and dissuaded employees from continuing to work for the group.  2018 WL 6601172, at *5-6 (Del. Super. Ct. Dec. 10, 2018).  The court dismissed the tortious interference claim against that executive, explaining that there were no allegations of "any wrongful conduct beyond [the defendant's] alleged breach of the non-solicitation covenants" in his employment agreement.  *Id.* at *6.  So too in *Dynamis Therapeutics, Inc. v. Alberto-Culver International, Inc.*, where the plaintiff alleged that the defendant "breached its duty to develop, produce, and commercialize" technology under the parties' licensing contract, and also brought a tortious interference claim on grounds that the defendant's conduct "interfered with [plaintiff's] relationship with [potential business partners]

who were otherwise interested in commercializing" that technology. 2010 WL 3834405, at *5 (D. Del. Sept. 24, 2010). The court dismissed the tortious interference claim, explaining that the plaintiff did not allege that the defendant "interfered with [the plaintiff's] business relations through any separate tortious act" other than the alleged breaches of contract. *Id.*

The same principle applies equally here, where Steves fails to plausibly "assert wrongful conduct beyond the breach of contract itself." *Del. State*, 556 F. Supp. 2d at 377; *see also Talley v. Christiana Care Health Sys.*, 2019 WL 668272, at *4 (D. Del. Feb. 19, 2019) (plaintiff "must allege wrongful conduct that amounts to something beyond that constituting a breach of … contract"); *MMCA Grp., Ltd. v. Hewlett-Packard Co.*, 2010 WL 147937, at *1 (N.D. Cal. Jan. 12, 2010) (applying Delaware law and rejecting tortious interference claim based on "conduct … identical to the conduct that form[ed] the basis" for plaintiff's contract claim); *Guidance Endodontics, LLC v. Dentsply Int'l, Inc.*, 708 F. Supp. 2d 1209, 1265-66 (D.N.M. 2010) (rejecting tort claim under Delaware law because "Defendants allege[d] the exact same conduct … to support their claim of fraudulent inducement that they allege as a breach of contract"); *Cross v. Batterson*, 2017 WL 2798398, at *4-5 (N.D. Ill. June 28, 2017) (dismissing tort claim under Delaware law because plaintiffs' "allegations as to how [defendant] perpetrated fraud [were] coextensive with their allegations that [defendant] breached the contract").

Unsurprisingly, Steves fails to cite a single case in which a tortious interference claim was allowed to proceed alongside a breach of contract claim. And the cases in which other torts have survived all involved separate wrongful conduct that caused some separate injury. In *Data Management*, for example, the court permitted the plaintiff to pursue both contract and tort claims because it alleged that the defendant landlord committed wrongful conduct beyond the breach of

13

the parties' lease agreement.  2007 WL 2142848, at *2, *4 (citing allegations that the landlord "removed, gave away, and/or destroyed personal possessions worth more than $80,000").

Steves repeatedly cites *Cornell Glasgow, LLC v. La Grange Properties, LLC*, for the proposition that, "[i]n some instances, … tort claims are justified when facts and circumstances reveal that something more than failed performance was responsible for the breakdown of the contractual relationship."  2012 WL 2106945, at *1 (Del. Super. Ct. June 6, 2012).  To start, that proposition cuts *against* Steves' argument, since the FAC makes clear that JELD-WEN's allegedly "failed performance" under the Supply Agreement was precisely what caused Steves' purported injuries.  In any event, Steves' reliance on *Cornell Glasgow* is puzzling because that court *applied* the bootstrapping doctrine to dismiss the plaintiffs' fraud, negligent misrepresentation, and tortious interference claims.  *Id.* at *8-9.  Indeed, the quote that Steves repeats was part of a lengthy critique of the growing trend of commercial parties raising "tort claims [that] amount to nothing more than an effort to 'pile on' diaphanous claims of misbehavior on top of contractual breach claims that alone are adequate to redress the 'wrong' that allegedly has been committed."  *Id.* at *1.  Steves' tortious interference claim is only the latest in that trend, and, like the tort claims in *Cornell Glasgow*, should be dismissed.

## B.     Delaware Does Not Recognize Steves' Tortious Interference Claim.

As JELD-WEN has already explained, *see* Mem. at 23-26, this Court should not expand Delaware law by recognizing a new common law cause of action under Restatement (Second) of Torts § 766A.  Steves offers no compelling argument to the contrary.

As an initial matter, Steves does not refute the premise, explained by the Fourth Circuit, that "a federal court in the exercise of its diversity jurisdiction should act conservatively when asked to predict how a state court would proceed on a novel issue of state law."  *Rhodes v. E.I. du Pont de Nemours & Co.*, 636 F.3d 88, 97-98 (4th Cir. 2011).  Given that the Delaware Supreme

Court has not addressed § 766A—as Steves acknowledges, Opp'n at 24—and no other Delaware court has *ever* found a defendant liable under that theory, the conservative approach here is plainly to refuse to create this unprecedented form of state tort liability. *See Rhodes*, 636 F.3d at 97-98 (refusing to recognize a liability-expanding exception "in the first instance").

While the Delaware Supreme Court has not addressed § 766A, the Third Circuit—whose domain of course includes Delaware—has. And in doing so, the Third Circuit unequivocally predicted that Delaware would *not* adopt § 766A as a cause of action. *Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 281 (3d Cir. 2010). Where a court of appeals has predicted how a state within its jurisdiction would rule on a question of state law, "the federal courts of other circuits should defer to that holding … in all situations except the rare instance when it can be said with conviction that the pertinent court of appeals has disregarded clear signals emanating from the state's highest court pointing toward a different rule." *Factors Etc., Inc. v. Pro Arts, Inc.*, 652 F.2d 278, 283 (2d Cir. 1981). The Fourth Circuit consistently relies on this principle in deferring to local circuits' interpretations of state law. *See, e.g.*, *Mellon Bank, N.A. v. Ternisky*, 999 F.2d 791, 796 (4th Cir. 1993). Unable to dispute that this court should defer to the home-circuit's clear prediction, Steves attempts to attack the Third Circuit's decision in *Anderson* (which indisputably concerned a claim brought under Delaware law) as itself relying on an earlier case involving Pennsylvania law. Opp'n at 27. But it is hardly surprising that, in evaluating what a state's highest court may do, a court of appeals might assess a neighboring state's law. More fundamentally, it is not this Court's place to second-guess the local circuit's interpretation.

Steves also tries to marginalize *Anderson* by pointing to two later state trial court decisions that considered, but ultimately rejected, § 766A claims. Opp'n at 26 (citing *Chapter 7 Tr. Constantino Flores v. Strauss Water Ltd.*, 2016 WL 5243950, at *10 & n.53 (Del. Ch. Sept. 22,

2016); *Allen Family Foods, Inc. v. Capitol Carbonic Corp.*, 2011 WL 1205138, at *6 (Del. Super. Ct. Mar. 31, 2011)).  But Fourth Circuit precedent requires deference to *Anderson* absent "clear signals emanating from [Delaware's] highest court pointing to a different rule." *Mellon Bank*, 999 F.2d at 796.  Trial court dicta will not suffice, particularly when the later case (*Constantino Flores*) expressly clarified that the earlier (*Allen*) should *not* be read "for the proposition that Delaware has formally adopted Section 766A as a cause of action." *Constantino Flores*, 2016 WL 5243950, at *10 & n.53.

Steves' final argument relies on a pattern jury instruction, *see* Opp'n at 26 (citing Del. P.J.I. Civ. § 12.7 (2000)), drafted more than ten years before *Allen* (the first case to even countenance the possibility of a § 766A claim under Delaware law).  As such, that instruction clearly does not affirm *Allen*.  Several other facts also undermine the usefulness of this instruction in predicting state law.  For example, "[n]one of the cases cited as authority by the instruction … actually involve the type of tortious interference claim covered by § 766A." *Anderson v. Wachovia Mortg. Corp.*, 497 F. Supp. 2d 572, 584 (D. Del. 2007).  And the "instructions themselves warn that they 'are merely advisory,' and that 'practitioners should not use them without also reviewing the applicable statutes, court rules, and case law.'" *Id.* (brackets omitted) (finding the pattern instruction "unpersuasive" on whether § 766A affords a viable cause of action in Delaware).

In sum, Steves' only authorities in support of a new § 766A claim are trial court dicta and a lone pattern jury instruction.  By contrast, the Third Circuit has squarely addressed this issue and predicted Delaware would not recognize this claim.  Federal courts nationwide are likewise nearly uniform in their unwillingness to recognize § 766A claims absent state authority. *See* Mem. at 25-26.  This Court should refuse to expand Delaware common law by adopting this novel theory.

### C.     Steves Fails to State a Claim Under § 766A.

Even if this Court were inclined to recognize a new Delaware cause of action under § 766A, the allegations in the FAC do not state a claim even under that dubious theory.  Specifically, the FAC fails to allege JELD-WEN had (1) knowledge of Steves' contracts and (2) knowledge that its conduct was interfering with Steves' performance under any contract.

### 1.     Steves Has Not Alleged Requisite Knowledge of Steves' Contracts.

Under Delaware law, a defendant cannot tortiously interfere with a contract unless he is not only aware of the contract itself, but also aware of "the actual provision" with which he is interfering.  *Anesthesia Servs., P.A. v. Anesthesia Advantage, P.C.*, 2013 WL 3352672, at *5-6 (Del. Super. Ct. June 27, 2013); *see* Mem. at 18-20.  Steves does not dispute that point; it simply chooses to ignore it, arguing only that "JELD-WEN knew about [Steves'] contracts with third-party customers."  Opp'n at 22.  As discussed below, the FAC does not even go that far.  But even if it did, that allegation would still fall short of what Delaware law requires.

To satisfy the knowledge requirement, Steves tries to rely on the blanket allegation that:

> [A]s a seller of molded interior residential doors and a direct competitor of Steves for the sale of molded interior residential doors, JELD-WEN had knowledge of Steves' existing contracts, its continuing business relationships with doors customers, and its relationship with other door customers expected to result in sales of doors, some of which had been customers of JELD-WEN's.

FAC ¶ 98.  Those allegations are insufficient as a matter of law.  JELD-WEN's status as Steves' competitor cannot establish knowledge that Steves has a contract with any particular customer, much less the particularities of such contracts.  If that were sufficient, Delaware's requirement that a defendant have "actual or imputed knowledge" of a plaintiff's contract would be meaningless. *Anesthesia Servs.*, 2013 WL 3352672, at *4.

Steves tries to bridge this gap with the abstruse claim that JELD-WEN "knows how the industry operates."  Opp'n at 22.  But neither the FAC nor Steves' opposition explains how

"industry operat[ions]" could provide JELD-WEN with actual knowledge of particular terms of Steves' contracts.  Even assuming industry standards are relevant, they further undermine Steves' position: like sellers in other industries, sellers of interior molded doors often have no contractual obligation to fulfill the orders they receive.  This explains why Steves does not allege that its purported inability to fulfill customer orders has resulted in any *actual breach* of any contract.

Steves' allegations about two specific customers come no closer to plausibly alleging that JELD-WEN had actual knowledge of Steves' particular contractual obligations to those customers.  Steves alleges that JELD-WEN was aware of its "long-term agreement[]" with ███ because "JELD-WEN and Steves participated in ███ 2019 line review, with Steves being awarded the business."  FAC ¶ 99.  But even if JELD-WEN knew ███ has increased its business with Steves as a result of this "review," such awareness would still fall well short of knowledge that Steves has a binding contract with ███, much less the particular provisions of that contract.

Even more speculative is the allegation that "JELD-WEN was aware that Steves had an ongoing relationships [sic] with businesses like ███ … because JELD-WEN has attempted to entice businesses like ███ into ordering significantly more doors from JELD-WEN."  *Id.* ¶ 100. Efforts to sell more of one's own products to a customer hardly show knowledge of that customer's contractual relationships with others, let alone the specific terms of those contracts.

### 2.    Steves Has Not Alleged Requisite Knowledge of JELD-WEN'S Supposed Interference.

Not only does Steves fail to allege that JELD-WEN was aware of Steves' particular contractual obligations with its door customers, it also fails to allege that JELD-WEN had any knowledge it was interfering with those obligations.  *See Kable Prods. Servs., Inc. v. TNG GP*, 2017 WL 2558270, at *6 (Del. Super. Ct. June 13, 2017) (plaintiff must show defendant had

knowledge not only of "the contract with which he is interfering," but also "the fact that he is interfering with the performance of the contract").

The FAC does not allege that JELD-WEN knew it was interfering with any provision of any of Steves' contracts with third-party customers, and Steves can only suggest otherwise by inventing new allegations. According to Steves, its FAC "plausibly alleges that JELD-WEN knew that (1) Steves' contracts required it to supply interior molded doors, and (2) by refusing to fulfill Steves' order for doorskins, it was interfering with Steves' ability to perform under those contracts." Opp'n at 23. But Steves fails to cite any paragraph of the FAC for either of these assertions, and for good reason: the FAC does not include either allegation.

Instead, the FAC simply alleges JELD-WEN's actions have "caused Steves to be unable to fill all or some of the door orders placed by [its customers]." FAC ¶ 105. The FAC never alleges Steves had a contractual obligation to fill those orders, let alone that JELD-WEN was aware of those obligations and knew its conduct would interfere with them. *See id.* This is not mere "nitpick[ing]" or a "magic words" requirement, *contra* Opp'n at 24; it is a critical element of Steves' claim. *See Kable Prods.*, 2017 WL 2558270, at *6. If Steves cannot allege JELD-WEN's awareness of a contract provision that actually requires Steves to fill its customers' orders, JELD-WEN cannot possibly be said to have known it was interfering with that contract.

### D. Steves Has Not Alleged JELD-WEN Had Requisite Knowledge of Steves' Prospective Contractual Relations.

To plead a claim for tortious interference with prospective contractual relations, Steves must allege facts showing that JELD-WEN had "knowledge of the ... expectancy." *Acierno v. Preit-Rubin, Inc.*, 199 F.R.D. 157, 164-65 (D. Del. 2001). That knowledge must be "either actual or imputed"; mere allegations of "constructive knowledge" are insufficient. *Anesthesia Servs.*, 2013 WL 3352672, at *4 & n.54; *see id.* at *6 ("Tortious interference with prospective contractual

19

relations cannot exist without knowledge to support intent."). If a complaint "fail[s] to allege facts indicating that a[] defendant … was aware of any specific contracts or business expectancies," the claim must be dismissed. *Lokhova v. Halper*, 2020 WL 963032, at \*17 (E.D. Va. Feb. 27, 2020).

Steves fails to identify allegations in the FAC supporting JELD-WEN's supposed awareness of Steves' purported business expectancies. The only support it offers for its conclusory assertion that JELD-WEN "was aware that Steves was acquiring new business from [certain customers]" is that JELD-WEN was "aware of Steves' *relationships* with … customers through the activities of JELD-WEN's sales personnel." FAC ¶ 101 (emphasis added). But that allegation does not provide a sufficient factual basis to raise a plausible inference that JELD-WEN was aware of any specific expectancy. "If knowledge of generalized business dealings were sufficient, … requiring the interferer to have knowledge of 'the' expectancy would become essentially meaningless." *Varlesi v. Wayne State Univ.*, 909 F. Supp. 2d 827, 850 (E.D. Mich. 2012).

Steves attempts to paper over this pleading deficiency by noting that its conclusory assertions are made on "information and belief." Opp'n at 28-29. But conclusory assertions— even when based on "information and belief"—cannot survive a motion to dismiss unless they are "accompanied by specific factual allegations" that support liability. *Frazier v. Experian Info. Sols., Inc.*, 2018 WL 3785131, at \*4 (D. Md. Aug. 9, 2018). The FAC does not allege facts plausibly supporting an inference that JELD-WEN knew of Steves' purported business hopes, and its tortious interference claim based on these expectancies should be dismissed.

## CONCLUSION

For the foregoing reasons, JELD-WEN respectfully requests that the Court dismiss Counts One and Two of the FAC in their entirety and with prejudice.

Dated: April 24, 2020

Respectfully submitted,

JELD-WEN, Inc.

By counsel

/s/ *Brian C. Riopelle*
Brian C. Riopelle (VSB #36454)
Gregory J. DuBoff
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
(804) 775-1084 – Tel.
(804) 698-2150 – Fax
briopelle@mcguirewoods.com

Brian D. Sieve
Kirkland & Ellis LLP
300 North LaSalle
Chicago, IL 60654
(312) 862-2000 – Tel.
(312) 862-2200 – Fax
brian.sieve@kirkland.com

Michael A. Glick
Kirkland & Ellis LLP
1301 Pennsylvania Avenue, N.W.
Washington, DC 20004
(202) 389-5000 – Tel.
(202) 389-5200 – Fax
michael.glick@kirkland.com

Alexia R. Brancato
Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
(212) 909-4800 – Tel.
(212) 446-4900 – Fax
alexia.brancato@kirkland.com

*Attorneys for Defendant*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on April 24, 2020, the following counsel of record have been served using the CM/ECF system, which will then send a notification of such filing (NEF) to the registered participants as identified on the NEF to receive electronic service, including:

Lewis F. Powell III
John S. Martin
Alexandra L. Klein
Maya M. Eckstein
Douglas M. Garron
R. Dennis Fairbanks, Jr.
Michael Shebelskie
William H. Wright, Jr.
Hunton Andrews Kurth LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219
(804) 788-8200 – Tel.
(804) 788-8218 – Fax
lpowell@huntonAK.com
martinj@huntonAK.com
aklein@huntonAK.com
meckstein@huntonAK.com
dgarrou@huntonAK.com
dfairbanks@huntonAK.com
mshebelskie@huntonAK.com
cwright@huntonAK.com

Ted Dane
Glenn Pomerantz
Gregory Sergi
Munger, Tolles & Olson LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
(213) 683-9288 – Tel.
(213) 683-4088 – Fax
ted.dane@mto.com
glenn.pomerantz@mto.com
gregory.sergi@mto.com

Kyle Mach
Emily C. Curran-Huberty
Munger, Tolles & Olson LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
(415) 512-4000 – Tel.
(415) 512-4077 – Fax
kyle.mach@mto.com
emily.curran-huberty@mto.com

*Attorneys for Plaintiff*

Marvin G. Pipkin
Kortney Kloppe-Orton
Pipkin Law
10001 Reunion Place, Suite 6400
San Antonio, TX 78216
(210) 731-6495 – Tel.
(210) 293-2139 – Fax

*Of Counsel*

/s/ *Brian C. Riopelle*
Brian C. Riopelle (VSB #36454)
McGuireWoods LLP
Gateway Plaza
800 East Canal Street
Richmond, VA 23219
(804) 775-1084 – Tel.
(804) 698-2150 – Fax
briopelle@mcguirewoods.com

*Attorney for Defendant*