IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

STEVES AND SONS, INC.,

     Plaintiff,

v.                         Civil Action No. 3:20-cv-98
                                    **PUBLIC VERSION**

JELD-WEN, INC.,

     Defendant.

## MEMORANDUM OPINION

This matter is before the Court on JELD-WEN, INC.'S MOTION FOR RULE 65(c) BOND REGARDING APRIL 10, 2020 PRELIMINARY INJUNCTION (ECF No. 132) (the "Bond Motion"). Having reviewed the Bond Motion, the parties' statements of position, response and supplemental memoranda, and accompanying exhibits (ECF Nos. 130, 133, 156, 157, 171, 172), the DECLARATION OF DANIEL CASTILLO (the "Castillo Declaration") and accompanying exhibits (ECF No. 134), and having considered the arguments of counsel for Steves and Sons, Inc. ("Steves") and JELD-WEN, Inc. ("JELD-WEN"), the Court issued an ORDER (ECF No. 174) on April 20, 2020, which required Steves to post bond of $1 million (USD). This MEMORANDUM OPINION explains that decision.

**BACKGROUND**

The history of this action is set out in the MEMORANDUM OPINION issued on April 10, 2020 (ECF No. 121; ECF No. 122).  On February 14, 2020, Steves filed its COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF, DAMAGES, AND SPECIFIC PERFORMANCE (ECF No. 1; ECF No. 6) (the "Complaint") against JELD-WEN.[1]  The Complaint in each of its counts implicates, in whole or in part, or arises out of, a long-term requirements contract in which JELD-WEN, a manufacturer of molded interior doorskins and molded interior doors, agreed to supply Steves, a manufacturer of molded interior doors, with eighty percent (80%) of Steves' requirements for doorskins (the "Supply Agreement").  There are four counts in the Complaint.

Count One alleges a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.  More specifically, Steves alleges in Count One that JELD-WEN is using the illegal market power it gained from its illegal acquisition of CraftMaster Inc. ("CMI") by refusing to supply Steves with doorskins "except on anticompetitive terms and conditions." (ECF No. 6 ¶ 85.)  In Count Two, Steves alleges that JELD-WEN has intentionally and improperly interfered with Steves' existing contracts and business relationships by using an artificially-created need for allocation of sales to its doorskin customers (which

---

[1]     This action involves the contract and some of the conduct that was at issue in Steves and Sons, Inc. v. JELD-WEN, Inc., 3:16-cv-545 (hereinafter "Steves I").  The lengthy and complex history of that litigation is set out in full in previous opinions in Steves I. (ECF No. 976; ECF No. 1424; ECF No. 1581; ECF No. 1784; ECF No. 1813.)

limits the number of doors Steves and JELD-WEN's other doorskin customers can make) to take business that Steves had with existing door customers and that it reasonably expected to have with potential door customers. (Id. ¶¶ 88-97.)   In Count Three, Steves alleges that JELD-WEN has breached, and is continuing to breach, the Supply Agreement by: (1) failing and refusing to deliver doorskins Steves ordered before JELD-WEN issued the notice of allocation; (2) issuing an "unjustified notice of allocation"; and (3) failing to "properly implement and administer the allocation period even if JELD-WEN had been authorized to initiate the allocation period." (Id. ¶ 100.) Count Four seeks a declaratory judgment regarding the propriety of JELD-WEN's notice of allocation and the method of allocation, the so-called "mix methodology." (Id. ¶ 107.)

Steves filed simultaneously with the Complaint a MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION (ECF No. 2) (the "Preliminary Injunction Motion").   The Preliminary Injunction Motion was the subject of the MEMORANDUM OPINION (ECF No. 121; ECF No. 122) (the "Preliminary Injunction Memorandum Opinion") issued April 10, 2020.   The Preliminary Injunction Memorandum Opinion and the ORDER OF PRELIMINARY INJUNCTION (ECF No. 123) (the "Preliminary Injunction Order") are incorporated by reference.   In the Preliminary Injunction Order, the Court found that Steves had clearly and convincingly established that:

> (1)   There is a substantial likelihood, amounting to a near certainty, that Steves will succeed on the merits of

COUNT THREE of the [Complaint], the breach of contract claim against JELD-WEN on the grounds that:

    (a)   JELD-WEN breached the Doorskin Product Agreement (the "Supply Agreement") by refusing to deliver fully the doorskins Steves ordered during the fourth quarter of 2019; and

    (b)   JELD-WEN breached the Supply Agreement by giving notice of allocation in violation of Section 20 of the Supply Agreement; and

    (c)   Even if allocation had been in conformance with Section 20 of the Supply Agreement (which it was not), by adopting an allocation method that is neither fair nor reasonable, JELD-WEN breached the Supply Agreement; and

(2)   Absent a temporary injunction, Steves will suffer irreparable injury as a result of the breaches described in paragraphs 1(a)-(c); and

(3)   As a result of a temporary injunction, JELD-WEN will suffer some, but not adequately-proven, economic hardship, which is, however, significantly of its own creation and which is a consequence of the terms to which it bound itself in the Supply Agreement; and

(4)   The balance of hardships tips decidedly in favor of Steves; and

(5)   The public interest will be served by a preliminary injunction.

(ECF No. 123 at 1-3.) Thereupon, the Court ordered that JELD-WEN shall:

    (A)   Terminate allocation, as to Steves, effective retroactively to January 1, 2020;

4

> (B) Terminate, as to Steves, the ordering, confirmation, and delivery process (the so-called mix methodology) unilaterally instituted as part of allocation;
>
> (C) Revert to the parties' previous ordering, confirmation, and delivery process pending the results of trial on the merits and any order that is entered thereafter; and
>
> (D) Deliver to Steves all doorskins Steves ordered from November 25, 2019 until the date of this Order of Preliminary Injunction ("Undelivered Prior-Placed Orders"), in accord with the requirements of the Supply Agreement, provided, however, that Steves' estimates and orders shall satisfy 6 Del. C. § 2-306, and in the following manner:
>
>> (i) Beginning the first week after the Preliminary Injunction takes effect, in addition to Steves' regularly-placed weekly orders, deliver to Steves 262,400 doorskins per week from the Undelivered Prior-Placed Orders in the order in which Steves placed them, until all Undelivered Prior-Placed Orders have been filled.

(Id. at 3-4.)   In the Preliminary Injunction Order, the Court also ordered the parties to submit briefing addressed to the security requirements of Fed. R. Civ. P. 65(c), which is the subject of this MEMORANDUM OPINION.

### JELD-WEN'S BOND MOTION

On April 13, 2020, three days after the Court issued the preliminary injunction, JELD-WEN filed its Bond Motion.   (ECF No. 132.)   Therein, JELD-WEN requested that the Court order Steves to post a bond of ███████████ as security for the preliminary

injunction.  (ECF No. 133 at 1.)  JELD-WEN contends that there is a "real risk" that the preliminary injunction was issued improperly "given that a preliminary injunction is granted on an incomplete and quickly compiled record."[2]  (Id.)  JELD-WEN argues that the amount of the bond depends on the potential harm to the enjoined party and that "district courts should err on the high side" when setting the amount of the bond. (Id. at 2 (quoting Mead Johnson & Co. v. Abbott Labs., 201 F.3d 883, 888 (7th Cir. 2000)) (internal quotation marks omitted).)

The trial of this case is currently set for June 1, 2020. However, the trial likely will be deferred until the middle or the end of June 2020.[3]  The Bond Motion assumes that the preliminary injunction will be in effect for sixteen weeks.

JELD-WEN contends that "demand from trade customers (including Steves' orders and backorders) will consume all of current inventory and a substantial portion of JELD-WEN's production capacity, such that JELD-WEN will be unable to meet all of its needs for ███████ ██████████████████████████████████████████████ doorskins for its own business."  (Id. at 5 (emphasis added).)

---

[2]    Although the proceedings on the preliminary injunction were expedited, the issues focused on the breach of contract claim, which was precipitated by recent events.  The parties had discovery, and there was a two-day hearing.  Consequently, the record actually is relatively extensive compared to the records of most preliminary injunction proceedings.

[3]    Recently, JELD-WEN has suggested that it will seek to move the trial date until the end of July 2020.  (See, e.g., ECF No. 157 at 5, 5 n.3; ECF No. 195 at 10-11.)

Because of this shortage of doorskins, JELD-WEN argues that, "during the 16-week injunction period, JELD-WEN will be <u>unable to meet its own forecasted door needs</u> for doors requiring those doorskins" and "will be <u>unable to supply itself</u> with approximately ██████ doorskins that are needed for door production and sales, which would result in lost sales of approximately ██████ doors." (<u>Id.</u> at 5-6 (emphasis added).)  JELD-WEN also asserts that it will "lose ████ ████████████████████████████████████████████," such as ████████████████████████. (<u>Id.</u> at 6.)  JELD-WEN estimates that "complying with the injunction the Court has ordered will cause JELD-WEN to lose nearly . . . ████████████████████████████████ ████████████████████████████████████████." (<u>Id.</u>)

As the support for its request for a ██████████ bond, JELD-WEN submitted the declaration of Daniel Castillo ("Castillo"), the President for North America Doors at JELD-WEN.  (ECF No. 134 ¶ 2.) The purpose of the Castillo Declaration is to set out JELD-WEN's anticipated monetary harm from the Preliminary Injunction Order.[4] (<u>Id.</u> ¶¶ 3, 5, 21-27).  Castillo's declaration is the sole basis for JELD-WEN's request that Steves be required to post a ██████████ bond pending appeal.

The record shows that JELD-WEN can operate its doorskin facility in a regular or "standard" mode and a "stretch" mode.  The estimated

---

[4] Castillo's estimated losses do not include loss of future business, but he estimates that loss to be "████████████." (ECF No. 134 ¶ 28).

loss of ███████ is based on Castillo's assertion that JELD-WEN is currently "running at maximum capacity for its production of doorskins" and that "JELD-WEN cannot produce any more doorskins than it is currently producing." (Id. ¶ 6.)   In other words, according to Castillo, although "JELD-WEN's fiber plants are operating in 'standard' mode," transitioning to "stretch" mode would not increase JELD-WEN's production capacity because "JELD-WEN does not have any scheduled downtime in the second quarter, so it is unable to defer any such downtime" as it would do in stretch mode. (Id. ¶ 7.)

Castillo thus estimated that JELD-WEN could produce approximately ███████ doorskins during the next sixteen weeks. (Id. ¶ 8.)   This estimate included the use of new Rockport (a style of doorskin) dies JELD-WEN implemented in its Dodson plant. (Id.) According to Castillo, "even when adding in current inventory to JELD-WEN's production capacity, JELD-WEN still does not have the capacity to meet total demand from Steves, JELD-WEN's other trade customers, and JELD-WEN's own internal doorskin needs to support its door business." (Id. ¶ 10.)

Now, Castillo states that, over the entire sixteen-week injunction period, "Steves' demand over this period will entirely consume (in fact, exceed) JELD-WEN's production capacity for ███████ [(a style)] doorskins for this period." (Id. ¶ 19.)   At the preliminary injunction hearing, it was established that the production shortage involved two styles of doorskins: Rockport and Carrara doorskins. (ECF No. 60 at 9-10 (Castillo testimony).)   And,

now, in addition to the alleged ███████ shortage, Castillo predicts that there will be shortages in other design families, including ████████████████████████████████████████ ████████████ doorskins.[5]  (ECF No. 134 ¶ 20.)

Steves argues that, in setting the amount of the bond, the Court should not, under the unique facts of this case, consider evidence outside of the evidence presented at the preliminary injunction hearing.  (ECF No. 156 at 4-5.)  Thus, Steves argues that the Castillo Declaration cannot be considered in assessing the appropriate bond.  Alternatively, Steves argues that the Castillo Declaration, even if considered, "offers a wide variety of unsupported assumptions" and that it is unreliable.  (Id. at 6.)

According to Steves, the Court should impose only a nominal bond because: (1) "when a plaintiff is plainly going to prevail on the merits, the risk of harm is remote and there is no need for a substantial bond," (ECF No. 130 at 3); (2) "JELD-WEN adduced no credible evidence supporting the harm it claims it will suffer as a result of the injunction," (id. at 4); and (3) "JELD-WEN stands to suffer little damage from the preliminary injunction because its

---

[5]   According to Castillo, JELD-WEN will not be able to "make up the shortfalls" in doorskins by using doorskins from its Latvian facility because: (1) JELD-WEN only imports ████████████ and ████████ doorskins from Latvia; (2) JELD-WEN does not anticipate a shortage of ████████████ doorskins; and (3) Latvia's fiber presses will shut down for three weeks in late April because of the Covid-19 pandemic.  (ECF No. 134 ¶ 24.)

liability will be determined [at trial] in a couple months," (id. at 5).

## LEGAL STANDARD

### A.   Federal Rule of Civil Procedure 65(c)

Rule 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A "party seeking a preliminary injunction prior to the final adjudication of liability must post a bond in order to ensure a source of recovery in the event that the injunction is erroneous." S & D Land Clearing v. D'Elegance Mgmt. Ltd., 34 Fed. App'x 885, 895 (4th Cir. 2002). The "district court retains the discretion to set the bond amount as it sees fit or waive the security requirement. However, the district court must expressly address the issue of security before allowing any waiver and cannot disregard the bond requirement altogether." Pashby v. Delia, 709 F.3d 307, 332 (4th Cir. 2013) (quoting Hoechst Diafoil Co. v. Nan Ya Plastics Corp., 174 F.3d 411, 421 (4th Cir. 1999)) (internal citation and quotation marks omitted). "The burden of establishing the bond amount rests with the party to be restrained, who is in the best position to determine the harm and will suffer from a wrongful restraint." Fleet Feet, Inc. v. Nike Inc., 419 F. Supp. 3d 919, 949 (M.D.N.C. 2019) (quoting Lab. Corp. of Am. Holdings

v. Kearns, 84 F. Supp. 3d 447, 465 (M.D.N.C. 2015)) (internal quotation marks omitted).

When determining the appropriate bond amount, the Court may consider additional evidence.  See, e.g., id. at 949 ("Should Nike wish to seek a higher amount [for bond], it may file a motion to increase the security, accompanied by additional evidentiary support."); Jenkinson v. Highmark W. Va., Inc., No. 3:19-cv-83, 2019 WL 2341668, at *8 (N.D. W. Va. June 3, 2019) ("Due to lack of argument, the parties are GRANTED leave to file additional evidence with the Court regarding the proper bond amount.").

### B.    Whether Castillo's Declaration Can Be Considered

This argument is two-fold: (1) the declaration is an impermissible motion for reconsideration of an already decided issue: the balance of the hardships; and (2) the declaration is unreliable on the facts of this case.

### 1.    The Motion for Reconsideration Contentions

Steves argues that, because Castillo's declaration is the only evidentiary support for the requested bond amount, the Bond Motion is a thinly-veiled motion for reconsideration that does not meet the requirements for such motions.  (ECF No. 187 at 6-8.)  It is, of course, true that "[d]istrict courts retain the power to revise, reconsider, and modify their interlocutory judgments at any time prior to final judgment when such is warranted."  JTH Tax, Inc. v. AIME, No. 2:16-cv-279, 2016 WL 9185404, at *2 (E.D. Va. Sept. 26, 2016) (quoting Am. Canoe Ass'n v. Murphy Farms, Inc., 326 F.3d 505,

515 (4th Cir. 2003)) (internal quotation marks omitted). "The district court's reconsideration of an interlocutory order is not subject to the heightened standards that apply to reconsideration of declaratory judgments. Instead, the Court may exercise its discretion to afford relief from his interlocutory orders as justice requires." Touchcom, Inc. v. Bereskin & Parr, 790 F. Supp. 2d 435, 463 (E.D. Va. 2011) (quoting Fayetteville Inv'rs v. Commercial Builders, Inc., 936 F.2d 1462, 1473 (4th Cir. 1991)) (internal quotation marks and citation omitted). "The discovery of substantially different evidence, a subsequent change in the controlling applicable law, or the clearly erroneous nature of an earlier ruling would all justify reconsideration." Id. (citing Am. Canoe Ass'n, 326 F.3d at 515).

The Castillo Declaration is not "substantially different" and is indeed remarkably similar to the Impact Statement the Court considered and found to be unreliable in the Preliminary Injunction Opinion. (ECF No. 121 at 71-73.) Neither party has contended that controlling applicable law has changed in the two weeks since the Court issued the injunction or that the injunction was clearly erroneous. Moreover, JELD-WEN itself stated that "JELD-WEN is not aware of any reason why considering the . . . Castillo Declaration . . . would require this Court to reopen the preliminary injunction record and reconsider whether the injunction is appropriate in the first place in light of that additional evidence." (ECF No. 171 at 3-4.) Consequently, the Bond Motion is not a motion

12

for reconsideration but, even if the Court were to consider the arguments as a request that the Court reconsider the injunction, the requirements for a motion to reconsider are not met.

## 2.  Unreliability

Steves does not challenge the general principle that, in determining the amount of security to be posted, the Court may take evidence in addition to that which is in the record of the preliminary injunction hearing.   However, Steves contends that the Castillo Declaration cannot be considered in setting the bond because Castillo provided the only evidence of JELD-WEN's injury (the Impact Statement) in the preliminary injunction hearing and the Court has rejected that evidence as insufficient and unreliable.   And, according to Steves, Castillo's declaration is merely a more detailed presentation of what is in the Impact Statement that the Court already has rejected.   A comparison of the Castillo Declaration and the Impact Statement proves that to be generally accurate.[6]

The next impediment to consideration of the Castillo Declaration, says Steves, is that the information in it has not been tested in discovery or by cross-examination.   Of course, Steves is correct.   And, says Steves, because the Court has found the Impact Statement to be unreliable and insufficient to establish harm to

---

[6]   According to JELD-WEN's counsel, Castillo's declaration presents the same information as in the Impact Statement except that: (1) the declaration is in a different form; and (2) the declaration excludes loss attributable to market capitalization decline that would occur following an injunction of the kind sought by Steves. (ECF No. 187 at 28-29.)

JELD-WEN and because the Castillo Declaration is a recasting of what is in the Impact Statement, the absence of discovery and cross-examination adds to the unreliability of the more detailed information in the Castillo Declaration.

There is considerable force to Steves' position that the declaration likely is unreliable.  But that is a matter of the weight to be given the information rather than a ground for excluding it entirely.

In response to Steves' position that the Court should not consider the Castillo Declaration, JELD-WEN argues that it "could not have presented that evidence [the detailed statements in the Castillo Declaration] at the time of the injunction hearing [because] it did not know what order the Court would enter, the status of its customers' orders at the time of the injunction, or how the Court's order would impact JELD-WEN's ability to fill doorskin orders and impact its own door business." (ECF No. 171 at 4.)  This argument is unconvincing because the injunction that the Court issued was substantively identical to the injunction that Steves proposed on March 3, 2020 (before the March 5-6 hearing).  (See ECF No. 47.) And that was the form of injunction to which the Impact Statement (offered by Castillo) was addressed.  Hence, it is not correct to say that the injunction the Court issued could not have been expected at the time of the preliminary injunction hearing.

In sum, Steves make a persuasive argument that the Castillo Declaration should not be considered in assessing the Bond Motion.

However, at Steves' urging, the Court has used its equitable power to issue a preliminary injunction and Rule 65(c) requires that the exercise of that power be accompanied by an assessment of the appropriate security.   It thus is appropriate to consider the Castillo Declaration in making the assessment of the amount of the security, notwithstanding that the Castillo Declaration played no role in the balance of hardships previously assessed in deciding to exercise the equitable power of injunction.   In so doing, the Court may consider that Castillo's related Impact Statement was found to be unreliable and that Steves has not been afforded the opportunity to test the Castillo Declaration in discovery or on cross-examination.

### C.   The Assessment of JELD-WEN's Evidence on Security

We turn now to assessing the evidence JELD-WEN offered—*i.e.*, the Castillo Declaration—in support of its assertion that the security ought to be a ███████████ bond.   That assessment is to be made in accord with several basic principles.

#### 1.   The Basic Principles

"In fixing the amount of an injunction bond, the district court should be guided by the purpose underlying Rule 65(c), which is to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction or restraining order.   The amount of the bond, then, ordinarily depends on the gravity of the potential harm to the enjoined party."   <u>Hoechst Diafoil Co. v. Nan Ya Plastics Corp.</u>, 174 F.3d 411, 421 n.3 (4th

Cir. 1999).   The Fourth Circuit in <u>Hoechst Diafoil Co. v. Nan Ya</u>
<u>Plastics Corp.</u>, 174 F.3d 411 (4th Cir. 1999), explained that:

> The judge usually will fix security in an
> amount that covers the potential incidental
> and consequential costs as well as either the
> losses the unjustly enjoined or restrained
> party will suffer during the period he is
> prohibited from engaging in certain activities
> or the complainant's unjust enrichment caused
> by his adversary being improperly enjoined or
> restrained.

<u>Id.</u> at 421 n.3 (quoting 11A Charles Alan Wright et al., <u>Fed. Prac.</u>
<u>& Proc.</u> § 2954 at 292 (2d ed. 1995)) (internal alteration omitted).
However, in the same case, the Fourth Circuit also has explained
that "**[w]here the district court determines that the risk of harm is**
**remote,** or that the circumstances otherwise warrant it, the court
may fix the amount of the bond accordingly.   In some circumstances,
a nominal bond may suffice."   <u>Id.</u> (emphasis added).   That teaches
rather clearly that the Court is to consider the likelihood that the
injunction was improperly issued—*i.e.,* the likelihood of success.
Indeed, the Fourth Circuit itself and courts within the Fourth
Circuit have taken that approach.   <u>See, e.g.,</u> <u>Candle Factory, Inc.</u>
<u>v. Trade Assocs. Grp.</u>, 23 Fed. App'x 134, 139 (4th Cir. 2001)
(concluding that nominal bond was appropriate because record "amply
supports the court's finding" and that court's "finding that [party]
would suffer little harm if enjoined . . . is not clearly
erroneous"); <u>George Sink PA Injury Lawyers v. George Sink II Law</u>
<u>Firm LLC</u>, No. 2:19-cv-1206, 2019 WL 6318778, at *6 (D.S.C. Nov. 26,
2019) ("The court finds that a nominal bond is appropriate here for

16

two reasons.   First, plaintiff has shown strong likelihood of success on the merits.   Second, defendants are not at risk of suffering severe harm from the mandates of the injunction." (internal citations omitted)); Sanderson Farms, Inc. v. Tyson Foods, Inc., No. 08-210, 2008 WL 11363726, at *1 (D.Md. Apr. 25, 2008) ("There is ample authority supporting the issuance of a nominal bond where the district court determines that a plaintiff is highly likely to succeed on the merits at trial."); Ark. Best Corp. v. Carolina Freight Corp., 60 F. Supp. 2d 517, 521 (W.D.N.C. 1999) ("Circumstances in the instant case warrant the posting of only a nominal bond in that Plaintiffs have shown a strong likelihood of success on the merits.   Further, given that prima facie proof of trademark infringement raises a presumption of injury and harm, the Court's issuance of the injunction is likely to be upheld.").

## 2.   The Effect of the Bond Amount

JELD-WEN argues that the Court should set the bond on the high side because the bond amount caps JELD-WEN's recovery if the preliminary injunction is vacated.[7] A number of courts have made statements to that effect.   See, e.g., Nat'l Collegiate Athletic Assoc. v. Governor of New Jersey, 939 F.3d 597, 606-08 (3d Cir. 2019); Nokia Corp. v. InterDigital, Inc., 645 F.3d 553, 557-59 (2d Cir. 2011); Glob. Naps, Inc. v. Verizon New England, Inc., 489 F.3d 13, 23 (1st Cir. 2007); Continuum Co. v. Incepts, Inc., 873 F.2d

---

[7]   (ECF No. 171 at 2-3 (citing Mead Johnson & Co. v. Abbott Labs., 201 F.3d 883, 888 (7th Cir. 2000).)

801, 803 (5th Cir. 1989).  Several of these cases seem to rely on a statement the Supreme Court of the United States made in a footnote in W.R. Grace & Co. v. Local Union 759, 461 U.S. 757 (1983), which stated that a "party injured by the issuance of an injunction later determined to be erroneous has no action for damages in the absence of a bond."  Id. at 770 n.14.  The statement in W.R. Grace & Co. was based on a decision in Russell v. Farley, 105 U.S. 433, 437–442 (1882), which was grounded, not in Rule 65, but in the common law. And W.R. Grace & Co. did not address Rule 65.  Wright & Miller says otherwise, specifically that the "surety's liability for damages cannot exceed the amount stated in the bonding agreement" but that the "parties who posted the bond are not so protected and they may be liable for damages or costs beyond the limits the court required in the surety agreement."  11A Wright & Miller, Fed. Prac. & Proc. Civ. § 2973 (3d ed.) (Apr. 2020 update); see also Don Post Studios, Inc. v. Cinema Secrets, Inc., 148 F. Supp. 2d 572, 575 (E.D. Pa. 2001) (noting exceptions to cap rule, including where party seeking injunctive relief acted in bad faith, and citing cases).

The Court notes that, in the Fourth Circuit, whether an enjoined party may recover more than the bond amount if the party was improperly enjoined is unclear.  See Int'l Bhd. of Teamsters v. Airgas, Inc., 885 F.3d 230, 237 (4th Cir. 2018) (concluding that party was not entitled to damages but citing as comparison First-Citizens Bank & Tr. Co. v. Camp, 432 F.2d 481, 485 (4th Cir. 1970),

which stated that party could recover damages only within limits of bond amount).

More to the point, Rule 65 does not tell the Court to examine whether the bond is a cap on the enjoined party's ability to recover if the preliminary injunction is improvidently granted. Instead, Rule 65 instructs that the bond must be set as supported by the evidence of potential harm and how remote that putative harm is.

On the record made in this case, the risk of harm to JELD-WEN is remote. As the Court found in the Preliminary Injunction Order, Steves has clearly and convincingly established that "[t]here is a substantial likelihood, amounting to a near certainty, that Steves will succeed on the merits of COUNT THREE . . . ." (ECF No. 123 at 1.) Although it is possible that the Court's injunction will be vacated, it is unlikely given the strength of Steves' showing on all four preliminary injunction requirements—(1) that Steves is likely to succeed on the merits, (2) that Steves would suffer irreparable harm absent an injunction, (3) that the balance of hardships weighs in Steves' favor, and (4) that an injunction is in the public interest. (Id. at 1-3; see generally ECF No. 121.)

The Court previously concluded that the Impact Statement JELD-WEN offered as evidence during the March 5-6, 2020 hearing was unreliable because it contained conclusory statements and made "patently untrue or unsupported assumptions." (ECF No. 121 at 72.) For the same reasons, the Court cannot now rely on that evidence in assessing the amount of the security. Thus, consideration only of

the preliminary injunction record would necessitate a finding that JELD-WEN has not met its burden to prove that a bond of ███████████ is called for.  That leaves JELD-WEN's position on the amount of the bond dependent upon the weight accorded the Castillo Declaration.

### 3.   The Castillo Declaration

To begin, the Castillo Declaration, like the Impact Statement, relies on unsupported assumptions and conclusory statements.  The Castillo Declaration is based on two exhibits: Exhibit A, which consists of ███████████████████████████████ and Exhibit B, which explains the ████████████████████████████ ███████████████████.  (ECF No. 134-1 ("Ex. A"); ECF No. 134-2 ("Ex. B").)  As explained below, the evidence presented in the Castillo Declaration, Exhibit A, and Exhibit B is not reliable.[8]

#### a.   Exhibit A and the Castillo Declaration

The fundamental assumption on which the Castillo Declaration stands is that JELD-WEN's annual production capacity is ███████████ doorskins (███████████).  That can be seen by examining Exhibit A to the Castillo Declaration.

The third chart (the "Sixteen-Week Chart") of Exhibit A examines fiber (doorskin) demand from April 2020 to July 2020 for specific designs.  (Ex. A at 3.)  It lists, *inter alia*, JELD-WEN's sixteen-week capacity; doorskin inventory at JELD-WEN's fiber plants as of

---

[8]    These documents attempt to augment the Impact Statement, which the Court previously found deficient and unreliable in the Preliminary Injunction Opinion, by using the same deficient and unreliable conclusions and assumptions.

April 10, 2020; Steves' April 2020 through July 2020 demand, including the Undelivered Prior-Placed Orders; JELD-WEN's remaining capacity after accounting for Steves' demand; JELD-WEN's remaining capacity after accounting for demand from all customers, including JW Door; and the anticipated shortages and surpluses by doorskin style. (Id.)  All of the metrics included in this chart are also broken down by doorskin style. (Id.)  The Sixteen-Week Chart then lists JELD-WEN's total sixteen-week production capacity as ███████ doorskins. Projecting that figure to fifty-two weeks shows that the chart assumes JELD-WEN's annual production capacity is approximately ████████ doorskins. [9]  That fundamental assumption is wrong based on the record made in the preliminary injunction hearing.

As explained in the Preliminary Injunction Opinion, the Court, relying on JELD-WEN's documents, concluded that "Steves clearly has shown a substantial likelihood of success in proving that JELD-WEN's annual production capacity is ██████ doorskins at a minimum and ███████ doorskins if operating in stretch mode." (ECF No. 121 at 39.)

At trial, the decision whether production capacity is ███████ will be made by the jury. However, for the purposes of assessing

---

[9]  The annual capacity can be calculated from this chart by dividing the sixteen-week capacity by sixteen to arrive at a weekly capacity of ██████ doorskins. Multiplying this figure by fifty-two shows an annual production capacity of ██████ doorskins.

the Bond Motion, the Court concludes that Castillo's assumption of a ▓▓▓▓▓▓ annual production capacity is so at odds with JELD-WEN's business documents[10] and the testimony of JELD-WEN's witness, Stephen Fancher, that the assumption lacks merit.  And, because that assumption is the linchpin on which Castillo's ▓▓▓▓▓▓ damage figure is based, the figure is without foundation.

Another critical component of the ▓▓▓▓▓▓ figure is Castillo's assertion that, "JELD-WEN is running at maximum capacity for its production of doorskins," that JELD-WEN's doorskin plants are operating 24/7 and using all of JELD-WEN's doorskin dies, and that JELD-WEN consequently "cannot produce any more doorskins than it is currently producing."  (ECF No. 134 ¶ 6.)  According to Bruce Fedio (JELD-WEN's Vice President of Fiber Operations in North America), that mode of operation is called "stretch mode."  (See ECF No. 59 at 177-78, 185-86 (Fedio testimony).)  Castillo asserts that "[i]t is not possible for JELD-WEN to enter 'stretch' mode during the next sixteen weeks because JELD-WEN does not have any scheduled downtime in the second quarter, so it is unable to defer any such downtime."  (ECF No. 134 ¶ 7.)  When deposed, Castillo eschewed knowledge of "stretch mode," and JELD-WEN has generally relied on Fedio to provide information on that topic.  (ECF No. 156-1 at 48:10-14 (Castillo Dep.) (▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

[10] The documents (ECF No. 46-16; ECF No. 46-17) were used by JELD-WEN to make important business decisions, including whether to give notice of the allocation at issue here.

████████████████████████████████████████

███████████████████████ ); <u>see also</u> ECF No. 59 at 177-187 (Fedio testimony).)

However, Fedio's testimony at the March 5-6, 2020 hearing made clear that JELD-WEN is not operating in stretch mode.  (ECF No. 59 at 178 (Fedio testimony) ("Q. Have you done that, gone into stretch mode?  A. Not with Jeld-Wen, no.").)  If JELD-WEN were actually operating in stretch mode, as the Castillo Declaration contends,[11] its production capacity should be approximately ███████ doorskins per year, which is ████████████████████ than the capacity upon which Castillo relies to come to the ████████ harm figure, the predicate for the amount of the requested bond. (ECF No. 121 at 40; <u>see also</u> Ex. A at 3.)  Indeed, even if JELD-WEN were not operating in stretch mode, its production capacity would still be █████████████████ than the capacity contained in the Sixteen-Week Chart.  (ECF No. 121 at 40; <u>see also</u> Ex. A at 3.)

Castillo's inaccurate portrayal of the production capacity in turn makes unreliable both (1) the Sixteen-Week Chart's projections of surpluses and shortages and (2) the end product of Castillo's analysis (the ██████████ ).  Because the Castillo Declaration does

---

[11]  Castillo's statements that a "'stretch' mode is only possible . . . if there is a scheduled downtime that can be postponed" and that "JELD-WEN does not have any scheduled downtime in the second quarter" suggest that JELD-WEN is currently operating in stretch mode.  (ECF No. 134 ¶ 7.)

not sufficiently support its production capacity claims and because the production capacity is the foundation of Exhibit A's calculations, the Court rejects as unreliable the portions of Exhibit A and the Castillo Declaration that discuss the production capacity.[12]

Castillo's analysis is also unreliable because it only accounts for JELD-WEN's doorskin inventory at its fiber plants, not at its door plants. (See Ex. A at 3.) The chart lists the "Current Fiber Inventory as of 4/10/2020" as ███████ doorskins.[13] (Id.) However, evidence that Steves attached to its RESPONSE TO JELD-WEN'S MOTION FOR BOND UNDER FEDERAL RULE OF CIVIL PROCEDURE 65(C) (ECF No. 156) shows that JELD-WEN has over █████████████████ doorskins in inventory at its door plants. (ECF No. 156-2 at 2.) JELD-WEN's counsel represented at the April 20, 2020 telephonic hearing that the doorskins in the door plants' inventory were "already committed to be made and delivered" by JW Door and thus could not be used to supply Steves or other doorskin customers. (ECF No. 187 at 30-31.) That is at odds with the proof that Steves has offered. And, in any event, the Court cannot rely on assertions of counsel as a substitute

---

[12]    The foregoing analysis applies equally to the second chart in Exhibit A, which examines fiber demand from the week of April 13, 2020 to the week of May 11, 2020. (Ex. A at 2.) This chart listed the five-week production capacity as ████████ doorskins. The weekly production capacity is consequently ████ doorskins and the yearly production capacity approximately ██████ doorskins.

[13]    The same inventory figure is used in the second chart of Exhibit A, which is similarly unreliable for the same reason. (See Ex. A at 2.)

for evidence. Even if the representation of counsel could be considered, it is still inaccurate to calculate shortages and surpluses without accounting for all doorskins in inventory, including doorskins that JELD-WEN intends JW Door to use. This omission consequently renders the Sixteen-Week Chart and the portions of the Castillo Declaration that concern inventory further unreliable because the record shows that the number of doorskins is at least ██████████████████ than the amount on which the chart is based.

### b. Exhibit B and the Castillo Declaration

As with Exhibit A, the Court finds Exhibit B unreliable because, like the Impact Statement that Castillo presented at the March 5-6, 2020 hearing, Exhibit B relies on unsupported assumptions. For instance, Exhibit B ██████████████████████████████████ ████████████████████████████████████████████ ████████████████████ (Ex. B at 2.) Exhibit B does not explain why that assumption is made. That is a critical omission because the purported loss of that revenue (████████████) in sixteen weeks is more than the purported loss ████████████████████████. Nor does the text of the Castillo Declaration support that information. Instead, the Castillo Declaration merely states in a conclusory manner that █████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████ (ECF No. 134 ¶ 26.)  Because neither

Exhibit B nor the Castillo Declaration provide evidence to support

their contention that ████████████████████████████████,

the Court cannot rely on Exhibit B and the Castillo Declaration's

claim that ████████████████████████████████████████

████████████████████████████████████████████.

(See Ex. B at 2; ECF No. 134 ¶ 27.)  And, a failing of that magnitude

calls into question, as well, the reliability of the entire analysis.

Additionally, Exhibit B assumes that:

████████████████████████

████████████████████

███████████████

██████████████████████

███████████████████████████

███

██████████████████

███████████████

(Ex. B at 2.)  There is no explanation in either Exhibit B or the

Castillo Declaration as to what ██████████████████████████

████████████████████████████████████████████

████ entail, only that a ██████████████████████████.

The Court cannot credit evidence that relies on unsupported and

unexplained assumptions.  Consequently, for the foregoing reasons,

the Court rejects as unreliable Exhibit B and the portions of the

Castillo Declaration that discuss the financial impact of the injunction on JELD-WEN.

## CONCLUSION

In sum, the record shows that Steves has a strong likelihood of success. Of course, the jury will decide at trial what the production capacity is and thus whether allocation was properly noticed under the Supply Agreement. However, it is difficult to accept that a jury would ignore the JELD-WEN documents that were used in making important business decisions, including the decision to notice allocation.

However, if that issue is resolved in JELD-WEN's favor, the jury then will decide at trial whether the mix methodology is fair and reasonable. Here too, JELD-WEN's business documents prove that JELD-WEN actually considered, but rejected, a method of allocation that was fair and reasonable to all concerned. Instead, the record shows that JELD-WEN opted for the mix methodology because it enabled JELD-WEN to meet its own needs. It is difficult to believe that a jury would ignore that evidence.

At trial, the jury will decide whether, under Section 20 of the Supply Agreement, JELD-WEN's own needs can be factored into an allocation as to Steves. The jury is not likely to ignore the testimony and provisions from other contracts that support Steves' position on that point.

But, in assessing the likelihood of success that an injunction has been improvidently issued and whether the harm to JELD-WEN is

remote, the Court is obligated to conclude that, on this record, Steves will prevail.

Also, the evidence offered by JELD-WEN (the Castillo Declaration) to support the need for a ███████████ bond has been rejected.  Thus, JELD-WEN has not carried its burden on that score.

The end result is that JELD-WEN has not carried its burden to demonstrate that the amount of security that it seeks is necessary or appropriate under Rule 65(c).  Considering that failure of proof and the high likelihood of success on the merits on COUNT THREE, the risk of harm to JELD-WEN must be considered remote.  Thus, a nominal bond would be appropriate.  But, a bond of $1 million was required.

For the foregoing reasons, the Court required Steves to post bond of $1 million (USD) and, except to that extent, the Bond Motion (ECF No. 132) was denied.

It is so ORDERED.

_____ /s/ _____
Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: May 8 , 2020